# EXHIBIT D

# CARR ENGINEERING, INC.

12500 CASTLEBRIDGE DRIVE        HOUSTON, TEXAS 77065-4532
TELEPHONE        281-894-8955

May 21, 2021

Mr. Bob Rudock
Bowman and Brooke LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134

Re: Monserratt-Riley v. Tesla

Dear Mr. Rudock,

Carr Engineering, Inc. (CEI) and I have been retained by attorneys representing Tesla, Inc. in the matter referenced above to determine the causes, conditions, and circumstances of a single-vehicle crash that took place in Fort Lauderdale, Florida on May 8, 2018, involving a 2014 Tesla Model S P85D Performance passenger vehicle. In addition, I have analyzed issues relating to the design, manufacture, and performance of the subject 2014 Tesla Model S as they may relate to the various issues raised in the suit.

## Summary of Opinions

In the course of my investigation, I received and reviewed the materials listed in Attachment A and reviewed or generated the materials listed in Attachment B. Based upon the materials listed and my investigation to date, the details of which are found in this report, I have generated the following opinions to a reasonable degree of engineering certainty:

- Mr. Barrett Riley was driving at a speed of approximately 116 miles per hour (MPH) when he failed to properly slow his 2014 Tesla Model S for an upcoming left turn on southbound Seabreeze Boulevard. The posted speed limit on southbound Seabreeze Boulevard was 30 MPH. Mr. Riley's extreme speed was a significant cause of his loss of control and led to the cumulative severity of the multiple impacts that followed.

- The Tesla left approximately 210 feet of tire marks on the roadway surface as it traveled across both southbound travel lanes before impacting a concrete curb on the western side of the road at a speed of approximately 90 MPH. This impact resulted in a total Delta-V of approximately 3.5 MPH with a principal direction of force, or PDOF, of approximately 45 degrees. This impact most likely fractured both right-side wheels, deflated both right-side tires, damaged the right-side suspension components, and resulted in the deployment of all inflatable restraints, the deployment of all safety belt pretensioners, and the precautionary disconnection of the high-voltage battery.

- After travelling approximately 33 feet, the Tesla next struck a concrete wall on the north side of the driveway for the residence at 1313 Seabreeze Boulevard with its entire right side at a speed of approximately 85 MPH. This impact resulted in a total Delta-V of

approximately 14 MPH with a PDOF of approximately 69 degrees. This impact caused additional damage to the right-side wheels, the right-side tires, the right-side suspension components, and the right-side body structures.

- After travelling approximately 31 feet, the Tesla next struck a concrete wall on the south side of the driveway with its right-front corner at a speed of approximately 79 MPH. This impact resulted in a total Delta-V of approximately 38 MPH with a PDOF of approximately 49 degrees. During this impact, the already-damaged right-front wheel, right-front tire, and right-front suspension components were driven rearward and into the protective case surrounding the vehicle's high-voltage battery assembly.

- Following the collision with the concrete wall on the south side of the driveway, the Tesla became at least partially airborne as it rotated clockwise, landing in the right-hand southbound travel lane of Seabreeze Boulevard. It slid and rotated for approximately 162 feet, unsupported by its right-side wheels and tires, before striking the eastern concrete curb with a PDOF of approximately 74 degrees. This impact caused additional damage to the lower right-side structures of the Tesla and likely contributed toward the already-damaged high-voltage battery assembly partially separating from the vehicle.

- After travelling approximately 18 feet, the Tesla next struck a metal light pole with its right-front door at a speed of approximately 32 MPH. This impact resulted in a total Delta-V of approximately 15 MPH with a PDOF of approximately 74 degrees. This impact caused additional damage to the lower right-side structures of the Tesla and likely contributed toward the already-damaged high-voltage battery assembly partially separating from the vehicle.

- The severe cumulative damage sustained by the right side of the Tesla, and specifically the multiple direct impacts that partially compromised the high-voltage battery assembly's protective outer housing, resulted in a post-crash fire.

Supporting bases for each of these opinions are provided in the pages that follow.

**Table of Contents**

Summary of Opinions

1.    Experience and Qualifications to Render Opinions

2.    Crash Overview – Police Report

3.    National Transportation Safety Board Investigation

4.    Work Performed and Engineering Analyses
      A.    CEI's scene inspections
      B.    CEI's scaled 3D scene model
      C.    CEI's vehicle inspection – September 11, 2020
      D.    Event data recorder overview and pre-crash data analysis
      E.    EDR longitudinal Delta-V analysis
      F.    EDR lateral Delta-V analysis
      G.    Pre-crash path analysis
      H.    Video analyses
      I.    POI-1 analysis
      J.    POI-2 analysis
      K.    POI-3 analysis
      L.    POI-4 analysis
      M.    POI-5 analysis
      N.    POR analysis
      O.    Historical speed analysis

5.    Conclusions

Attachment A – Materials Received and Reviewed for Monserratt-Riley v. Tesla

Attachment B – Materials Reviewed or Generated for Monserratt-Riley v. Tesla

Attachment C – Curriculum Vitae for James Walker, Jr.

Attachment D – Four-Year Testimony Record for James Walker, Jr.

## 1.    Experience and Qualifications to Render Opinions

I am a resident of the State of Texas and an employee of Carr Engineering, Inc., a Texas corporation at 12500 Castlebridge Drive, Houston, Texas 77065.  I received my bachelor's degree in Automotive Mechanical Engineering from General Motors Institute in Flint, Michigan, in 1994, and I am currently a Licensed and Registered Professional Engineer in the State of Texas.  Over the course of my professional career, I have compiled more than 30 years of automotive engineering experience in motor vehicle-related areas including component design, vehicle dynamics, electro-mechanical control system development, failure analysis, and crash reconstruction.

From 1989 until 1995, I was employed as a Powertrain System Test Engineer at AC Rochester, a division of General Motors.  In this role, I was responsible for the specification, design, and testing of multiple vehicle systems and components including fuel injection systems, air intake systems, valvetrain systems, and overall vehicle dynamic response.

From 1995 until 2006, I was employed as a Brake Controls Engineer and Manager at a variety of automotive manufacturers and industry-leading suppliers of hydraulic brake systems and electronic brake and chassis control systems including Kelsey-Hayes, Saturn Corporation (a division of General Motors), the Robert Bosch Corporation, Ford Motor Company, and Delphi. In these roles, I was responsible for the specification, design, calibration, testing, integration, and validation of hydraulic brake systems and electronic brake and chassis control systems.  In addition, I was responsible for the training of development test drivers, the generation of standardized testing protocols, and was jointly responsible for the management of cold weather testing facilities in northern Michigan and northern Minnesota.

From 2006 until the present, I have been employed as a Principal Engineer at CEI.  In this role, I perform investigations to determine the causes, conditions, and circumstances of motor vehicle crashes.  In addition, I analyze vehicle motions and vehicle responses to driver commands in order to evaluate braking capacities, acceleration capacities, handling capacities, stability capacities, and the possible interactions with active chassis and brake control systems such as anti-lock braking systems (ABS), traction control systems (TCS), and electronic stability control (ESC).

I also have special expertise in the fields of automobile racing, racecar mission, design, and performance, and the specialized equipment used in the racing environment.  This expertise has been accumulated over a period of 20 years in the course of my personal racecar design, fabrication, and competition activities.  I have been a licensed competitor (driver) in sanctioned road racing events since 1997 with organizations such as the Sports Car Club of America, the Historic Motor Sports Association, the International Motor Sports Association, and the SRO Motorsports Group.

To this day, I continue as an advanced driving instructor for a variety of organizations such as the Porsche Club of America and the BMW Car Club of America, specializing in driver education and limit handling training.  These experiences have allowed me to develop advanced driving techniques and vehicle dynamic evaluation skills while simultaneously providing me with the opportunity to observe both novice and advanced drivers first-hand in a limit-handling and braking environment.

As a direct result of my professional work and motorsports experience, I have been commissioned by SAE International to create and instruct five separate Professional Development Seminars in the areas of hydraulic brake systems, electronic brake control systems, and vehicle dynamics. Hundreds of automotive industry engineers have attended these courses since their inception, and in recognition of the quality of the seminars, I was awarded the SAE Forest R. McFarland Award in 2005 and was designated as an SAE Master Instructor in 2010 (in fact, the very first recipient of this recognition).

Also, as a direct result of my professional work and motorsports experience, I was commissioned by CarTech Books to author a book focusing on brake system design and analysis. Published in 2007, High-Performance Brake Systems has sold nearly ten thousand copies worldwide and has been reprinted three times.

A copy of my current CV can be found as Attachment C and a copy of my current four-year testimony record can be found as Attachment D. CEI currently charges $595 per hour for my services.

## 2.     **Crash Overview – Police Report**

According to the Florida Traffic Crash Report, the crash occurred on Saturday, May 8, 2018 at approximately 6:46 p.m. on SR A1A (Seabreeze Boulevard) 100 feet north of Harbor Beach Parkway in the city of Fort Lauderdale.  A gray 2014 Tesla Model S (Unit 1) bearing VIN 5YJSA1H24EFP62693 was being driven southbound by Mr. Barrett Riley at an "…unknown high rate of speed."  Mr. Riley "…failed to maintain proper control…" of the vehicle and subsequently crashed "…into the wall on the north side of the entrance to 1313 SR A1A."

As the vehicle continued southbound, it "…collided into the wall on the south side of 1313 SR A1A (Seabreeze Blvd) and caught on fire."  The Tesla then "…re-entered the roadway, spinning in a SE direction across SR A1A…" before it "…collided into a light pole on east side of SR A1A." following this final collision, the Tesla "…spun again and came to final rest on the sidewalk in front of 1344 SR A1A..." at which time "…it became fully engulfed in flames."



Not-to-scale diagram of the crash scene as found in the Florida Traffic Crash Report.

A witness to the crash, Mr. Adam Cohen, stated that Mr. Riley had "…passed him at a high rate of speed…" and "…lost control of the vehicle."  He stated that the "…front seat passenger was Edgar Monserrat [sic]…"  and that the "…backseat passenger was Alex Berry."

A second witness to the crash, Mr. Beckton Peddy, stated that "…he was traveling southbound in a separate vehicle on Seabreeze Blvd following Mr. Cohen…" when Mr. Riley "…passed him and then passed Mr. Cohen's vehicle."  He stated that he "…did not witness the actual crash…" but that the Tesla was "…engulfed in flames…" as be pulled up and observed "…Alex Berry outside of the vehicle on the ground."

A third witness to the crash, Mr. James Harris, stated that he was "…driving northbound in the 1300 Block of Seabreeze Blvd…" when he observed the Tesla "…driving southbound at a very high rate of speed…" and "…going so fast that it was 'on two wheels.'" He stated that he observed the Tesla "…strike the wall on the west side of the road and then spin out." In the process, the Tesla "…clipped the rear driver side wheel well…" of Mr. Harris' vehicle.

A fourth witness to the crash, Mr. Larry Groshart, was "…standing outside of his residence when he heard screeching tires." He stated that he saw the Tesla "…driving southbound at a high rate of speed…" before it "…hit the wall on the west side of the road…" and crashed "…on the east side of the road, becoming engulfed in flames."

Both Mr. Riley and Mr. Monserratt died as a result of the crash. Mr. Berry was listed as having "…possible…" injuries.

In the location of the crash, the investigating office described Seabreeze Boulevard as level and curved to the left with a speed limit of 30 miles per hour (MPH) in both directions. The environmental conditions were reported as daylight, clear, and dry, and no "Contributing Circumstances" were attributed to either the roadway or the environment.

3.    **National Transportation Safety Board Investigation**

The National Transportation Safety Board, or NTSB, performed a separate investigation of the crash.  I received a large number of documents generated during the course of this investigation, key summaries of which follow in the paragraphs below.

*Highway Accident Brief*

On page 1 of the report, under the heading of *Crash Description*, it states, "On Tuesday, May 8, 2018, at 6:46 p.m., a 2014 Tesla Model S electric-powered car occupied by an 18-year-old driver and two 18-year-old passengers was traveling south in the 1300 block of Seabreeze Boulevard, in Fort Lauderdale, Florida (figure 1), at a recorded speed of 116 mph.  The driver and his passengers were on their way to the driver's residence from a nearby shopping mall, a trip of about 4 miles."

In describing the roadway in the location of the crash, the report states, "The posted speed limit is 30 mph.  At the crash location, the roadway curves to the left for southbound traffic.  The approach to the curve has a turn-warning sign indicating that the roadway turns left, augmented by a flashing beacon and a posted advisory speed of 25 mph (figure 2)."

Witness accounts of the crash stated that "…the driver had maneuvered the car into the left lane and was passing another vehicle.  The driver lost control while moving back into the right lane as he attempted to negotiate the curve.  As the car exited the curve, it struck and mounted the curb on the west side of the road, crossed the sidewalk, and continued south, striking a wall on the north side of a residential driveway.  The car continued forward and struck the wall on the south side of the driveway.  Witnesses reported that flames came from the car after the second collision."

On page 2 of the report, it states that following the crash with the wall on the south side of the driveway, the Tesla "…reentered the road, mounted the curb on the east side of Seabreeze Boulevard, struck a metal light pole, rotated, and came to rest in the driveway of an adjacent residence.  The car was engulfed in fire."

On page 5 of the report, under the heading of Signage, it states, "A speed limit sign facing southbound traffic was posted 474 feet north of the curve where the crash occurred.  A turn-warning (W1-1) sign and a 25-mph advisory speed plaque (W13-1P) were posted facing southbound traffic 171 feet before the start of the curve.  An amber flashing warning beacon was posted above the turn-warning sign.  The beacon was functioning at the time of the National Transportation Safety Board (NTSB) on-scene investigation."

On page 9 of the report, under the heading of *Precrash RCM Data*, it states, "The data are consistent with manual vehicle operation.  Although the car's advanced driver assistance systems were not recorded on the RCM, no indication was found that any (for example, lane-keeping assist or adaptive cruise control in Tesla's Autopilot suite) were active at the time of the crash.  Data from the RCM are also consistent with the surviving passenger's account of the vehicle's speed."

Finally, on page 10 of the report, under the heading of *Video Analysis*, it states, "Investigators obtained video recordings from three traffic cameras and one security camera along Seabreeze Boulevard that showed the car before the crash. The combined video was analyzed to observe the vehicle's movements and to estimate its speed in three segments."

As a result of the NTSB's video analysis, it was found that, "The first segment shows the vehicle in the left lane, traveling behind a white car. The vehicle's estimated speed is 48 mph. The second segment shows the vehicle moving from the left lane to the right lane and passing the white car. The vehicle's estimated speed is 75 mph. The third segment shows the vehicle moving from the right lane to the left lane as it approaches the curve in the 1300 block of Seabreeze Boulevard. The vehicle's estimated speed is 112 mph. The third segment ends 4 seconds before impact."

*Highway Factors Group Factual Report*

This report was written by the NTSB's "Highway Factors Group" to determine if "…certain highway data could provide additional investigative resources." The materials were collected from both the Florida Department of Transportation and the Fort Lauderdale Police Department.

On page 7 of the report, a "Spot Speed Study" performed in August of 2015 is presented. According to the report, the study contained three separate speed studies performed in the general location of the crash over a 24-hour period to determine the average speed and the range of speeds used by motorists. In the southbound direction in the specific location of the crash, the average speed observed was listed as 36 MPH with the 85th percentile speed listed as 40 MPH.

On page 9 of the report, the roadway geometry is discussed. According to the report, the curve where the crash occurred "…begins about 549 feet south of the Holiday Drive intersection." The radius of the curve was listed as "…488.10 feet…" with a length of "…340.17 feet." The curve central angle was listed as "…39.8 degrees." Finally, the "…maximum cross slope (superelevation) of the curve…" was approximately 3.4 percent near the curve midpoint, with the superelevation decreasing "…to about 2.0 percent at the south end of the curve."

## 4.    Work Performed and Engineering Analyses

## A.    CEI's scene inspections

Under my direction, representatives of CEI inspected the scene of the crash on May 24, 2018 and March 25, 2021.  I personally inspected the scene of the crash on September 10, 2020.  Using police scene photographs, I was able to locate, document, and survey the general location of the crash.

The crash occurred on a left-hand curve of southbound Seabreeze Boulevard approximately 600 feet north of Harbor Beach Parkway.  Seabreeze Boulevard consisted of two paved travel lanes in each direction separated by a center turning lane.  When heading in the Tesla's original southerly direction of travel, a paved shoulder separated the travel lane from the vertical face of a five-inch-tall concrete curb (the western curb).  A concrete sidewalk was located adjacent to the concrete curb, and was separated from a 12-inch-thick concrete wall by a narrow area of grass.



CEI's scene inspection photograph taken on May 24, 2018.  This photograph was taken looking north, with the initial concrete wall impact shown to the right (blue arrow) relative to the Tesla's path of travel.

A similar paved shoulder also separated the northbound travel lanes from the vertical face of a five-inch-tall concrete curb (the eastern curb).  The posted speed limit on Seabreeze Boulevard was 30 MPH in both directions.  A yellow curve advisory sign with a recommended 25 MPH speed limit was located approximately 200 feet north of the curve.  The curve advisory sign was equipped with a flashing yellow light.  Visibility was found to be completely unobstructed leading up to and through the scene of the crash.

While the roadway surface was observed to be in good repair, I was able to locate gouges and markings on the paved roadway surface and the vertical faces of the concrete curbs consistent with the Tesla's travel toward its multiple points of impact. These gouges and markings had been outlined with orange paint during prior investigations. The first point of impact, or POI, hereafter referred to as POI-1, was identified along the vertical face of the western concrete curb.

A driveway for the residence at 1313 Seabreeze Boulevard was bounded by concrete walls to the north and to the south. A distinct impact mark, POI-2, was located on the concrete wall on the north side of the driveway consistent with a primarily lateral impact. A second distinct impact mark, POI-3, was located on the concrete wall on the south side of the driveway consistent with a primarily longitudinal impact.



Google Earth image of Seabreeze Boulevard in the location of the crash. The Tesla's original direction of travel was from the upper left side of the frame to the lower right side of the frame.

Continuing across to the northbound lanes of Seabreeze Boulevard, I identified a series of scrapes, grouped together as POI-4, on the vertical face of the eastern concrete curb. The final impact, POI-5, occurred as the Tesla traveled from POI-4 into a fixed metal light pole located approximately four feet east of the vertical face of the eastern concrete curb. The vehicle's point of rest, or POR, was also identified and documented.

Still photographs, laser survey data, video recordings, 3D FARO scan data, and aerial photographs were taken over the course of these inspections. Throughout the duration of these inspections, I did not find any evidence of a pre-existing roadway design, maintenance, or environmental condition that would have caused or contributed to the causation of the crash.

### B.   CEI's scaled 3D scene model

Under my direct supervision, a scaled crash scene model was created of Seabreeze Boulevard in the location of the crash.   The model was generated using the digital photographs, aerial photographs, FARO scan data, and total station survey data collected during CEI's scene inspections.  I then relied on scrapes, tire marks, and photographic evidence to positively locate the various marking on the road, various points of impact, and the POR documented in police scene photographs.  Much of this evidence was still present during CEI's scene inspection on May 24, 2018.



CEI's scaled 3D model of Seabreeze Boulevard in the location of the crash.

The scaled 3D scene model revealed that the first tire marks were located on the roadway surface approximately 210 feet north of the first gouges observed on the western concrete curb (POI-1). After striking the western concrete curb, the Tesla continued traveling generally south approximately 33 feet before striking the concrete wall on the north side of the driveway (POI-2). Approximately 31 feet farther to the south, the Tesla struck the concrete wall on the south side of the driveway (POI-3).  This third impact caused the Tesla to rotate clockwise as it became at least partially airborne, landing in the right-hand southbound travel lane of Seabreeze Boulevard.

The Tesla continued to rotate clockwise as it moved generally southeast across all of the paved travel lanes.  After traveling approximately 163 feet, it struck the eastern concrete curb (POI-4). Approximately 17 feet farther down the road, the vehicle struck a fixed metal light pole (POI-5) and interacted with several trees.  This collective series of impacts on the east side of Seabreeze Boulevard caused the Tesla to reverse its rotation as it traveled approximately 32 feet to its POR.

## C.   CEI's vehicle inspection – September 11, 2020

I personally inspected the crash-involved 2014 Tesla P85D Model S Performance on September 11, 2020 in Miami, Florida.  The VIN (5YJSA1H24EFP62693) matched the VIN recorded on the Florida Traffic Crash Report.   According to labels affixed to the subject vehicle, it was manufactured in December 2014 and conformed to all applicable U.S. Federal Motor Vehicle Safety, Bumper, and Theft Prevention Standards in effect at that time.  The powertrain consisted of dual electric motors, single-speed transmissions, and all-wheel drive.  The electronic odometer was inoperable.



Crash-involved 2014 Tesla P85D Model S Performance during CEI's vehicle inspection on September 11, 2020.

The vehicle displayed direct contact damage and deformation consistent with multiple right-side impacts.  Significant damage to the Tesla extended across all of its right-side structures, but was concentrated on the right-front frame elements, the right-front corner, both right-side doors, and the right-rear corner.  The front drive motor and transmission were separated from the vehicle, as were the right-front and right-rear suspension assemblies and the right-front and right-rear tire and wheel assemblies.

In contrast to these findings, the Tesla's front bumper bar was found to be intact and attached to the right-side frame rail.  While the right-side frame rail was substantially deformed and torn free of the vehicle during the crash, the bumper bar was comparatively undamaged.  The only visible deformation to the bumper bar was a small amount of crush observed outboard of the frame rail attachment on the right-hand side.

The right-front door was separated from the Tesla.  A vertical imprint of a narrow-object impact was observed near the right-front door's centerline.  This pattern extended to the right-front rocker

panel.  The right-rear door skin and interior panel had been pulled away from the vehicle in a rear-to-front orientation.  Scrape marks found on the trailing edge of the right-rear door skin aligned with scrape marks on the right-rear fender, indicating that the folding deformation observed occurred after the interaction with the concrete wall on the north side of the driveway.

Prior to my inspection, the Tesla's high-voltage battery assembly had been removed from the vehicle.  The battery assembly's protective outer housing was essentially rectangular in shape and was originally secured to the underside of the Tesla's unibody with vertical fasteners.  By design, the high-voltage battery assembly extended from just behind the front axle to a location just in front of the rear tires.



The Tesla's high-voltage battery assembly with top cover removed during CEI's vehicle inspection on September 11, 2020.  The right-front corner of the battery assembly is shown in the foreground.

Because it had been previously disassembled and inspected, the high-voltage battery assembly's top cover was able to be removed without tools.  Upon removal, I found that the battery assembly was compartmentalized into sixteen separate sections, each containing approximately 440 separate battery cells.

I observed direct contact damage and deformation to the right-front corner of the high-voltage battery assembly's protective outer housing in the location of the right-front wheel, tire, and suspension.  The direct contact damage and deformation was distributed across at least three of the sixteen compartmentalized sections and extended into the area normally occupied by individual battery cells.

A 3D FARO laser scan of the vehicle was performed during my inspection. This data was collected in order to quantify the magnitude and orientation of the physical damage sustained by the Tesla during the crash. The image that follows was created from the 3D FARO laser scan performed during my inspection of the Tesla.



Processed data from CEI's scaled 3D FARO laser scan of the Tesla.

The four wheel positions were fitted with Michelin Pilot Super Sport tires. While the left-front and the left-rear wheels were intact, the right-front and right-rear wheels were fractured in multiple locations. All four tires displayed tread depths consistent with tires that had approximately 50 percent of their useful life remaining. Those tires with visible date codes were manufactured in 2017, indicating that they were not original equipment to the Tesla. A table summarizing my inspection of the four tires follows below.

| Position | Brand | Model | Type | Size | Tread |
|----------|-------|-------|------|------|-------|
| Left front | Michelin | PSS | High-Perf | 245/35R21 | ~ 7/32" |
| Right front | Michelin | PSS | High-Perf | 245/35R21 | ~ 7/32" |
| Left rear | Michelin | PSS | High-Perf | 265/35R21 | ~ 7/32" |
| Right rear | Michelin | PSS | High-Perf | 265/35R21 | ~ 7/32" |

In summary, I found no mechanical or electrical problems with the Tesla that would have caused or contributed to the crash. I found no evidence of a condition that would have negatively impacted the vehicle's crash avoidance capacity, steering capacity, or braking performance prior to the crash. In my opinion, each system, subsystem, and component was intact, functional, and available for use by the driver prior to and at the time of the crash.

**D.**    **Event data recorder overview and pre-crash data analysis**

Following the crash, the NTSB was able to retrieve crash data stored in the Tesla's restraint control module. The information imaged from the event data recorder, or EDR, was translated by Tesla on May 11, 2018 at 17:30:04 (UTC), three days after the crash. I subsequently received and analyzed the translated EDR file.

*EDR overview*

One crash event, or the initial crash, was stored in the EDR. At the time of the imaging, the ignition cycle counter was 5631. The initial crash event occurred during ignition cycle 5630, indicating that the data stored in the EDR was generated as a result of the initial crash. Data pertaining to the pre-crash motion of the Tesla and data pertaining to the initial impact severity were both contained in the file that I received.

The stored event consisted of a longitudinal crash severity, or Delta-V, of approximately -2.5 MPH (recorded as 4.0 kilometers per hour, or KPH) and a lateral Delta-V of approximately -2.5 MPH (recorded as 4.0 KPH). The maximum resultant Delta-V of approximately 3.5 MPH occurred approximately 64 milliseconds (ms) after the initial crash was first detected. Both front occupants' safety belts were buckled, and all frontal, knee, side, and seat inflatable restraints were deployed along with all safety belt retractor and lap pretensioners. Approximately 55 ms after the initial crash was detected, the high-voltage battery was disconnected by the Tesla's control system.

*Pre-crash data analysis*

The pre-crash data for the initial event stored in the Tesla EDR contained five seconds of data in half-second increments related to the indicated vehicle speed (KPH), the driver's application of the accelerator pedal (percent of full), the rear electrical motor rotational speed (revolutions per minute, or RPM), the driver's application of the brakes (on or off), the driver's steering input (degrees), the state of the stability control system (ESC), and the state of the anti-lock braking system (ABS). These data points were recorded in tabular format on page 7 of the EDR report.

| Time (sec) | Vehicle Speed (kph) | Accelerator Pedal % | Rear Motor Speed (rpm) | Service Brake | Steering Wheel Angle (deg) | Stability Control | ABS Activity |
|---|---|---|---|---|---|---|---|
| -5.0 | 176 | 78 | 13000 | Off | 8.4 | On | Off |
| -4.5 | 179 | 75 | 13200 | Off | 12.6 | On | Off |
| -4.0 | 182 | 74 | 13400 | Off | 16.8 | On | Off |
| -3.5 | 185 | 74 | 13600 | Off | 16.8 | On | Off |
| -3.0 | 187 | 0 | 13700 | Off | -8.4 | On | Off |
| -2.5 | 184 | 0 | 13600 | On | -16.8 | On | Off |
| -2.0 | 175 | 0 | 13000 | On | -33.6 | Engaged | Off |
| -1.5 | 166 | 0 | 12300 | On | -42.0 | Engaged | Off |
| -1.0 | 155 | 0 | 11400 | On | -46.2 | Engaged | Off |
| -0.5 | 144 | 0 | 10800 | On | -54.6 | Engaged | Off |
| 0.0 | 139 | 0 | 10300 | On | -54.6 | Engaged | Off |

Pre-crash data table from page 7 of the Tesla's EDR report.

The pre-crash data indicates that the Tesla was being steered to the right by Mr. Riley at a speed of approximately 109 MPH (recorded as 176 KPH) five seconds prior to the initial crash. The accelerator pedal was depressed 78 percent and the brakes were not applied.

Approximately 3.0 seconds prior to the initial crash, the Tesla was traveling at a speed of approximately 116 MPH (recorded as 187 KPH). At this point, Mr. Riley simultaneously released his foot from the accelerator pedal and began to steer the vehicle to the left.

Approximately 2.5 seconds prior to the initial crash, Mr. Riley applied the brakes, but with insufficient force to engage the ABS. The Tesla began to decelerate in response to Mr. Riley's braking command as he increased his steering input to the left.

Approximately 2.0 seconds prior to the initial crash, the ESC engaged and remained engaged until impact. Mr. Riley continued to brake and steer until the initial crash occurred at a speed of approximately 86 MPH (recorded as 139 KPH).

In total, the Tesla decelerated from approximately 114 MPH (recorded as 184 KPH) to approximately 86 MPH (recorded as 139 KPH) in the final 2.5 seconds prior to the initial crash. The average longitudinal deceleration of the Tesla over this period was approximately 0.5 g.

Based on the Tesla's recorded speed, I was able to calculate the individual segment distances traveled during each 0.5-second recording interval. A table illustrating these calculations as well as the segment-specific longitudinal deceleration and total distance traveled follows below.

| Time | Vehicle Speed | | | Longitudinal Deceleration | Segment Distance | Total Distance |
|------|------|------|------|------|------|------|
| (sec) | (KPH) | (MPH) | (FPS) | (g) | (ft) | (ft) |
| -5.0 | 176 | 109.4 | 160.4 | | 81 | 781 |
| -4.5 | 179 | 111.2 | 163.1 | 0.17 | 82 | 700 |
| -4.0 | 182 | 113.1 | 165.9 | 0.17 | 84 | 618 |
| -3.5 | 185 | 115.0 | 168.6 | 0.17 | 85 | 535 |
| -3.0 | 187 | 116.2 | 170.4 | 0.11 | 85 | 450 |
| -2.5 | 184 | 114.3 | 167.7 | -0.17 | 82 | 365 |
| -2.0 | 175 | 108.7 | 159.5 | -0.51 | 78 | 283 |
| -1.5 | 166 | 103.1 | 151.3 | -0.51 | 73 | 206 |
| -1.0 | 155 | 96.3 | 141.3 | -0.62 | 68 | 133 |
| -0.5 | 144 | 89.5 | 131.2 | -0.62 | 64 | 64 |
| 0.0 | 139 | 86.4 | 126.7 | -0.28 | 0 | 0 |

It should be noted that the vehicle speeds in the table above have not been adjusted for tire slip due to braking. For this reason, the vehicle speeds reported during the 2.5 seconds prior to the initial crash likely underreport the actual vehicle speed by approximately four percent. Adjusting for this condition would result in an actual vehicle speed of approximately 89.9 MPH at impact.

## E.   EDR longitudinal Delta-V analysis

The Tesla's EDR file also contained information about the initial curb impact as experienced by the Tesla.  Specifically, the EDR contained a recording of the longitudinal Delta-V experienced by the Tesla during the initial crash impulse.  The longitudinal Delta-V data points were recorded in units of KPH.  As per its design, the Tesla's EDR recorded the first 300 ms of this event.

As stated above, the Tesla's maximum longitudinal Delta-V was approximately -2.5 MPH (the negative sign indicates that the vehicle was slowing down longitudinally during the initial crash pulse).  The graph below illustrates the Tesla's recorded longitudinal acceleration for the entirety of the recording.



Longitudinal acceleration graph generated from page 10 of the Tesla's EDR file.

As can be seen in the graph above, the longitudinal acceleration data generally indicates that the initial crash pulse was approximately 100 ms in duration.  At this point, the longitudinal acceleration data generally stabilized.  The total area under the longitudinal acceleration curve resulted in a cumulative longitudinal Delta-V of approximately -2.5 MPH for the initial crash.

However, approximately 260 ms after the start of the initial crash, the longitudinal acceleration values began to increase again.  At an average speed of approximately 85 MPH (the details of which are discussed in the pages that follow), the Tesla would have traveled a distance of approximately 32 feet between the start of the initial crash and the start of what appears to be the onset of a second, but not fully memorialized, longitudinal crash event.

## F.     EDR lateral Delta-V analysis

The Tesla's EDR file also contained a recording of the lateral Delta-V experienced by the Tesla during the initial curb impact.  The lateral Delta-V data points were recorded in units of KPH.  As per its design, the Tesla's EDR recorded the first 300 ms of this event.

As stated above, the Tesla's maximum lateral Delta-V was approximately -2.5 MPH (the negative sign indicates that the vehicle was accelerating from right-to-left during the initial crash pulse). The graph below illustrates the Tesla's recorded lateral acceleration for the entirety of the initial crash recording.



Lateral acceleration graph generated from page 12 of the Tesla's EDR file.

As can be seen in the graph above, the lateral acceleration data generally indicates that the initial crash pulse was approximately 100 ms in duration.  At this point, the lateral acceleration data generally stabilized and was no longer reporting significant values.  The total area under the lateral acceleration curve resulted in a cumulative lateral Delta-V of approximately -2.5 MPH for the initial crash.

However, approximately 260 ms after the start of the initial crash, the lateral acceleration values began to increase again.  At an average speed of approximately 85 MPH (the details of which are discussed in the pages that follow), the Tesla would have traveled a distance of approximately 32 feet between the start of the initial crash and the start of what appears to be the onset of a second, but not fully memorialized, lateral crash event.

## G.    Pre-crash path analysis

My survey and analysis of the crash scene included the calculation of the radius of curvature of southbound Seabreeze Boulevard in the location of the crash.  In the location measured, I found the left southbound travel lane to have a radius of approximately 617 feet and the right southbound travel lane to have a radius of approximately 627 feet (an average of approximately 622 feet).  I have also considered documents produced to me during this litigation that have cited radii varying between 488 feet (the roadway centerline as per highway plan sheets) and 633 feet (the average of southbound travel lanes 1 and 2 as per Robert Caldwell).

In the table that follows, I have calculated the lateral acceleration capacity required of a vehicle to travel along southbound Seabreeze Boulevard in the location of the crash for all radii that have been discussed.  The first calculation represents the lateral acceleration capacity required at the posted advisory speed of 25 MPH.  The second calculation represents the lateral acceleration capacity required at the posted speed limit of 30 MPH.  All values are well *below* the 0.89 g lateral acceleration capacity of a 2014 Tesla Model S P85D as measured by Road & Track magazine.

|  | Plan Sheets | CEI | Caldwell |
|---|---|---|---|
| Curve Radius | 488 feet | 622 feet | 633 feet |
| Lateral acceleration at 25 MPH | 0.09 g | 0.07 g | 0.07 g |
| Lateral acceleration at 30 MPH | 0.12 g | 0.10 g | 0.09 g |

The first tire mark evidence left by the Tesla was measured to be approximately 210 feet from the initial impact with the western concrete curb.  At this location, the vehicle was traveling at a speed greater than 100 MPH.  As can be seen in the table that follows, independent of which radius is considered this resulted in a lateral acceleration demand well *above* the 0.89 g lateral acceleration capacity of a 2014 Tesla Model S P85D as measured by Road & Track magazine.

|  | Plan Sheets | CEI | Caldwell |
|---|---|---|---|
| Curve Radius | 488 feet | 622 feet | 633 feet |
| Lateral acceleration at 100 MPH | 1.37 g | 1.07 g | 1.06 g |

Additionally, because Mr. Riley was applying the brakes continuously in this location, the Tesla's lateral acceleration capacity would have been reduced significantly.  Using the concept of the Friction Circle, longitudinal braking at 0.5 g would have decreased the vehicle's theoretical maximum lateral acceleration capacity to a level no greater than 0.8 g.  It is for this reason that the vehicle path followed a radius of approximately 770 feet, moving to its right across both southbound travel lanes before striking the western concrete curb.

In his report dated January 18, 2021, Mr. Robert Caldwell opines that if "…the Tesla's speed was limited to 85 mph the vehicle could have made the curve."  However, Mr. Caldwell's analysis assumes a best-case scenario with idea surface conditions, no restrictions on the path of travel, and a driver trained to control a vehicle at its handling limit at extremely high speed.  While Mr. Caldwell uses calculations to suggest that the Tesla may have been designed with sufficient lateral force capacity to theoretically negotiate this maneuver at reduced speed, practically speaking, it is highly unlikely that entering the center turn lane and avoiding surrounding traffic would have allowed Mr. Riley to safely drive through the curve at 85 MPH.

## H.   Video analyses

I have analyzed various video recordings of the Tesla as it traveled south on Seabreeze Boulevard prior to the crash.  Three of these recordings were made by city cameras placed at various locations along Seabreeze Boulevard.  These three cameras were grouped approximately 1,700 to 2,000 feet north of the crash.  A fourth camera was located at the Best Western Hotel approximately 1,000 feet north of the crash, and a fifth camera was located at a residence located at 1209 Seabreeze Boulevard approximately 850 feet north of the crash.

While none of these video recordings captured the crash event itself, I have considered these video recordings in combination with my scaled 3D model to analyze the pre-crash motion of the Tesla. I have also reviewed and summarized the work of the NTSB documented in a February 6, 2019 "Video Study" report to create the table that follows.

| Camera Location | Distance from Crash | NTSB Speed |
|---|---|---|
| City Camera 1 | ~2,000 feet | ~48 MPH |
| City Camera 2 | ~1,850 feet | ~75 MPH |
| City Camera 3 | ~1,700 feet | not calculated |
| Best Western Hotel | ~1,000 feet | not calculated |
| 1209 Seabreeze Boulevard | ~850 feet | ~112 MPH |

The NTSB estimated that Mr. Riley was driving at a speed of approximately 112 MPH approximately four seconds prior to the crash.  This estimate is consistent with the pre-crash speeds recorded by the Tesla's EDR in the five seconds prior to the crash.

I have additionally considered Mr. Riley's positioning of the Tesla as it entered the left-hand turn just prior to the crash.  Consistent with the tire mark evidence on the roadway surface, the video shows the vehicle moving out of the left travel lane and at least partially into the center turning lane just prior to the crash.  This maneuvering by Mr. Riley as he approached the left-hand turn would have effectively decreased the available radius of curvature, requiring higher levels of lateral acceleration toward the exit of the corner.  This further supports my opinion that it is highly unlikely that entering the center turn lane and avoiding surrounding traffic would have allowed Mr. Riley to safely drive through the curve at a reduced speed of 85 MPH.

## I.   POI-1 analysis

As the Tesla approached the western concrete curb, it was turning to the left, rotating counterclockwise.  The right-front and right-rear wheels and tires contacted the western concrete curb nearly simultaneously.  These impacts caused the vertical face of the western concrete curb to fracture in two locations that aligned with the wheelbase of the vehicle (the distance from the right-front wheel and tire to the right-rear wheel and tire).  Given the vertical height of the western concrete curb (approximately five inches) and the sidewall height of the Tesla's tires (less than four inches), the Tesla's aluminum wheels were in direct contact with the vertical face of the western concrete curb, most likely causing them to be fractured.



CEI's scaled 3D model of the physical alignment of the Tesla and its right-side wheels and tires
as they struck the raised western concrete curb (POI-1).

The orientation and shape of the tire marks after the impact with the western concrete curb indicate that 1) the right-side tires were most likely deflated after striking the western concrete curb and 2) the trajectory of the Tesla remained largely unchanged after striking the western concrete curb. The magnitude (only the energy required to fracture the right-side wheels without redirection) and orientation (approximately equal longitudinal and lateral forces) of the impact with the western concrete curb indicate the impact at POI-1 was most likely the crash pulse recorded by the EDR.

It follows from the EDR recorded data that at POI-1, the Tesla was traveling at a speed of approximately 90 MPH (adjusted for tire slip during braking) and the total Delta-V was approximately 3.5 MPH (-2.5 MPH longitudinal and -2.5 MPH lateral).  The principal direction of force, or PDOF, was approximately 45 degrees.  This was the impact that resulted in the deployment of all inflatable restraints, the deployment of all safety belt pretensioners, and the precautionary disconnection of the high-voltage battery.

## J.     POI-2 analysis

After impacting the western concrete curb, the Tesla continued to travel generally to the south at a speed of approximately 87 MPH.  It crossed the concrete sidewalk, leaving tire marks consistent with the deflation of the right-side tires.  Approximately 33 feet south of POI-1, the already-damaged right-front wheel and tire (and likely the right-front suspension components) first struck the concrete wall on the north side of the driveway (POI-2), leaving a distinct mark on the vertical face of the wall.  The Tesla traveled the distance between POI-1 and POI-2 in approximately 260 ms.  This combination of speed and distance makes POI-2 consistent with the second, but not fully memorialized, crash event observed at the end of the EDR crash pulse recordings.



CEI's scaled 3D model of the physical alignment of the Tesla (semitransparent) and its high-voltage battery
assembly as it struck the concrete wall on the north side of the driveway (POI-2).

At the point of initial contact with the concrete wall on the north side of the driveway, the Tesla was traveling at a speed of approximately 85 MPH.  This impact redirected the Tesla to the east, changing its direction of travel but not substantially changing its travel speed.  The redirection caused the already-damaged right-rear wheel and tire (and likely the right-rear suspension components) to also strike the concrete wall on the north side of the driveway, leaving another distinct mark on the vertical face of the wall.

A momentum vector analysis indicates that while the Tesla's travel speed was reduced to approximately 81 MPH as a result of the wall impact, the lateral Delta-V (which was responsible for the redirection of the vehicle) was approximately -14 MPH (right-to-left) with a PDOF of approximately 69 degrees.  The magnitude of the Delta-V and the orientation of the PDOF are both *inconsistent* with POI-2 being the crash pulse recorded by the EDR (a lateral Delta-V of -2.5 MPH and a PDOF of approximately 45 degrees).

## K.   <u>POI-3 analysis</u>

After impacting the concrete wall on the north side of the driveway, the Tesla continued to travel generally to the south at a speed of approximately 81 MPH.  It crossed the driveway, leaving tire marks consistent with the deflation of the right-side tires.  Approximately 31 feet south of POI-2, the right-front corner of the Tesla, including the already-damaged right-front wheel, tire and suspension, struck the concrete wall on the south side of the driveway (POI-3), leaving a distinct mark on the vertical face of the wall.



CEI's scaled 3D model of the physical alignment of the Tesla (semitransparent) and its high-voltage battery assembly as it struck the concrete wall on the south side of the driveway (POI-3).

At the point of initial contact with the concrete wall on the south side of the driveway, the Tesla was traveling at a speed of approximately 79 MPH.  In the location of the impact, the vertical face of the concrete wall was curved, which caused only the right side of the Tesla to interact with the wall.  This offset impact significantly redirected the Tesla to the east, and caused it to become at least partially airborne as it rotated clockwise.

During this impact, the already-damaged right-front wheel, tire, and suspension components were driven rearward, damaging the protective case and cover surrounding the vehicle's high-voltage battery assembly.  Because these components had been severely compromised during the first two impacts, their structural integrity was greatly diminished at this point in the crash sequence.

A momentum vector analysis indicates that the Tesla experienced a total Delta-V of approximately 38 MPH as a result of the wall impact.  The PDOF associated with this impact was approximately 49 degrees.  This was the

## L.    POI-4 analysis

After impacting the concrete wall on the south side of the driveway, the Tesla became at least partially airborne as it rotated clockwise, landing in the right-hand southbound travel lane of Seabreeze Boulevard.  The vehicle continued to rotate clockwise as it moved generally southeast across all of the paved travel lanes.  Tire mark evidence along the path suggests that both the right-front and the right-rear wheel, tire, and suspension components were separated from the vehicle as it continued traveling toward the eastern concrete curb.



CEI's scaled 3D model of the physical alignment of the Tesla (semitransparent) as it struck the eastern concrete curb (POI-4).  The high-voltage battery assembly is shown making contact with the raised concrete curb.

After traveling approximately 162 feet, the Tesla struck the eastern concrete curb (POI-4).  The various tire marks and other scrapes and gouges on the roadway surface indicate that the underbody components on the right side of the vehicle, no longer supported by wheels and tires, were in direct contact with the ground prior to impact.  The orientation and shape of the tire marks after the impact with the eastern concrete curb indicate that the trajectory of the Tesla remained largely unchanged after striking the eastern concrete curb.

While the impact at POI-4 has certain similarities to the impact analyzed at POI-1 (the western concrete curb), enough differences exist (travel speed, vehicle orientation, missing right-side wheels and tires) that it is not possible to perform a detailed analysis of the Delta-V due to this discrete impact.  For this reason, a cumulative Delta-V for POI-4 and POI-5 will be considered and discussed in the pages that follow.  That said, the impact at POI-4 certainly caused additional damage to the Tesla's lower right-side structures as it crashed up and over the eastern concrete curb and likely caused the already-damaged high-voltage battery assembly to become partially separated from the vehicle.

## M.   POI-5 analysis

After impacting the eastern concrete curb, the Tesla continued to travel generally to the southeast for approximately 18 feet before striking a metal light pole with its right-front door (POI-5).  The impact was severe enough to leave an imprint on both the right-front door and the right-side rocker panel, causing further damage to the lower right-side structures of the Tesla.  The magnitude and orientation of this impact caused the vehicle to rapidly reverse its yaw rate from clockwise to counterclockwise.  The metal light pole was broken free of its mounts during this phase of the crash.



CEI's scaled 3D model of the physical alignment of the Tesla as it struck the metal light pole (POI-5).
The pole (yellow) broke away during the impact, allowing the vehicle to enter the stand of trees.

The rapid change in yaw rate contributed to the right-rear door of the Tesla engaging a stand of trees.  This complex series of events resulted in at least one tree forcibly prying the right-rear door partially open as the vehicle traveled approximately 32 feet to its POR.  The combination of the yaw rate reversal, the multiple impacts in this location, and the partial opening of the right-rear door resulted in Mr. Berry, the unbelted right-rear passenger, being ejected from the Tesla during this phase of the crash.

I have estimated the cumulative Delta-V for POI-4 and POI-5 to be approximately 10 to 20 MPH, with the majority of this energy being dissipated during the interaction with the metal light pole.  While energy was certainly dissipated during the interaction with the eastern concrete curb and the trees, there is no scientific basis to assign a specific amount of energy to each of those discrete events.  All of these impacts, however, caused additional damage to the lower right-side structures of the Tesla.

N.    **POR analysis**

After impacting the metal light pole, the Tesla traveled approximately 32 feet to its POR.  As it rotated counterclockwise, Mr. Berry, the unbelted right-rear passenger, was ejected from the vehicle, depositing him in a stand of trees.



CEI's scaled 3D model of the physical alignment of the Tesla at its POR.

The Tesla ultimately came to rest in a driveway opening approximately 486 feet south of the initial tire mark.  The severe cumulative damage sustained by the right side of the vehicle, and specifically the multiple direct impacts that partially compromised the high-voltage battery assembly's protective outer housing, resulted in a post-crash fire.

## O.   Historical speed analysis

I have reviewed materials produced that document the daily use of the Tesla during the four months prior to the crash.  Specifically, I was provided a spreadsheet that listed by date the maximum speed attained by the Tesla each day it was driven from January 1, 2018 through and including May 4, 2018, the last day that such data was collected from the vehicle.  The chart that follows below presents the daily maximum speed attained by the Tesla in this timeframe in graphical format.



The daily maximum speed attained by the Tesla from January 1, 2018 through and including May 4, 2018.

Two different colors were used in the bar chart above to represent the operating condition of the Tesla.  The bars colored dark blue represent days that the Tesla was driven as delivered from the manufacturer with an electronic 133-MPH vehicle speed limiting function.  Over the 81 days of driving that took place in this timeframe, the average top speed of the Tesla was approximately 93 MPH.  The governed top speed of approximately 133 MPH was reached five times.

It is my understanding that from March 6, 2018 until April 4, 2018, the Tesla's top speed limiting function was reset to 85 MPH.  The bars colored light blue represent days that the Tesla was driven as modified by a dealer technician with the electronic 85-MPH vehicle speed limiting function.  Over the seven days of driving that took place in this timeframe, the average top speed of the Tesla was approximately 69 MPH.  The governed top speed of approximately 85 MPH was reached three times.

5.    <u>**Conclusions**</u>

Mr. Riley was driving at a speed of approximately 116 MPH when he failed to properly slow his 2014 Tesla Model S for an upcoming left turn on southbound Seabreeze Boulevard.  Mr. Riley's extreme speed was a significant cause of his loss of control and led to the cumulative severity of the multiple impacts that followed.

The Tesla left approximately 210 feet of tire marks on the roadway surface as it traveled across both southbound travel lanes before impacting a concrete curb on the western side of the road at a speed of approximately 90 MPH.  This impact fractured both right-side wheels, deflated both right-side tires, damaged the right-side suspension components, and resulted in the deployment of all inflatable restraints, the deployment of all safety belt pretensioners, and the precautionary disconnection of the high-voltage battery.

After travelling approximately 33 feet, the Tesla next struck a concrete wall on the north side of the driveway for the residence at 1313 Seabreeze Boulevard with its entire right side at a speed of approximately 85 MPH.  This impact resulted in a total Delta-V of approximately 14 MPH.  This was followed 31 feet later by an impact with a concrete wall on the south side of the driveway at a speed of approximately 79 MPH.  This impact resulted in a total Delta-V of approximately 38 MPH.  Both of these concrete wall impacts caused the right-front wheel, right-front tire, and right-front suspension components to be driven rearward and into the protective case surrounding the vehicle's high-voltage battery assembly.

The Tesla slid and rotated for approximately 180 feet, unsupported by its right-side wheels and tires, before striking the eastern concrete curb and a metal light pole with its right-front door at a speed of approximately 32 MPH.  These impacts resulted in a total Delta-V of approximately 15 MPH, causing additional damage to the lower right-side structures of the Tesla and likely contributing toward the already-damaged high-voltage battery assembly partially separating from the vehicle.  The severe cumulative damage sustained by the right side of the Tesla, and specifically the multiple direct impacts that partially compromised the high-voltage battery assembly's protective outer housing, resulted in a post-crash fire.

Underpinning my opinions in this report are the fundamental physical relationships learned in the pursuit of my degree in mechanical engineering and my direct industry design, development, and evaluation experience in the field of vehicle dynamics.  These opinions are expressed with a reasonable degree of engineering certainty, and I reserve the right to both revise these opinions and offer new opinions if additional information becomes available.  It is expected that additional exhibits and demonstratives may be created at the time of trial to assist me in illustrating these opinions.

Sincerely,

James Walker, Jr., P.E.

**Attachment A**

Materials Received and Reviewed for Monserratt-Riley v. Tesla

1. Depositions by:
   a. Juliana Ables (12/09/20 + exhibits A-J)
   b. Alexander William Berry (08/26/20 + exhibits 1-19, 21)
   c. Christian Anthony Catanese (11/10/20 + exhibits A-C)
   d. Adam Cohen (08/07/20 + exhibits 1-3)
   e. Matthew Ryan Cohen (12/21/20 + exhibits A-J)
   f. Joseph A. Constantino (08/21/20 + exhibits 1-4)
   g. Larry Robert Groshart (11/19/19 + exhibits 1-5)
   h. Cosmin Ilonta (02/11/19 + exhibits 1-2)
   i. Kari Koulouris (11/19/19)
   j. Halston Loyd (07/14/20)
   k. Leopoldo E. Matheus (08/11/20)
   l. Kyler Muruve (01/21/21 + exhibits A-F)
   m. Johnathan Ordonez (08/21/20 + exhibits 1, 3, 5,6)
   n. Marlon Osbourne, M.D. (03/04/20 + exhibits 1-10)
   o. Beckton C. Peddy (01/2/21 + exhibits A-K)
   p. James B. Riley (04/12/21 + exhibits 1-3)
   q. Jenny Riley (04/13/21 + exhibits 1-3)
   r. Regan Riley (04/21/21 + exhibits 1-4)
   s. Jake Hunter Shapiro (11/16/20 + exhibits 1-10)
   t. Sabrina Silva (12/22/20 + exhibits A-B)
   u. Aaron T. Smith (08/11/20)
   v. Shari Stenglein (01/07/21 + exhibits A-N)
   w. Joshua Turner (07/14/20 + exhibits 1-4)
2. Event 1 data record
3. Fort Lauderdale Police Department press release
4. Accident scene photographs
5. Riley Complaint
6. Riley Order Civil Trial Date, Pretrial Deadlines, and Referral to Magistrate Judge
7. Tesla EDR
8. Florida Traffic Crash Report
9. Incident Details
10. Police accident scene photographs
11. Scene videos
12. Fort Lauderdale Fire Rescue Ambulance records
13. Fort Lauderdale Fire Dept. records
14. Broward Co. Medical Examiner Autopsy Reports and photographs
15. NTSB Documents Produced: Delegated Highway Accident Brief, Preliminary Report, Crash Summary Report, Human Performance Group Chairman's Factual Report, State of Florida DAVID Report, Driver Cellular Telephone Records, Post-Mortem Toxicology Results, Traffic Citation and Adjudication, Weather Data, Astronomical Data, Highway Factors Group Factual Report, Highway Plan Sheets, AADT Counts Data, Highway Crash Data, SR A1A Safety Review Study 2013, SR A1A Speed Study 2015, Technical Reconstruction Group Factual Report, Tesla EDR, Video Study, Survival Factors Group

Chairman's Factual Report, Westway Towing List of Tesla Towing Operations, Witness Interviews, Battery and Vehicle Factual Report of Investigation, Vehicle Recorders-Specialist's Factual Report, Technical Review Correspondence

16. Def.'s (James Riley) Amended Response to Plaintiff's First Request for Production, No. 2 Per Court Order

17. Def.'s (James Riley) Supplemental Amended Response to Plaintiff's First Request for Production, No. 2 Per Court Order

18. NTSB Sheryl Harley voicemail file

19. Def.'s (James Riley) Response to Request for Production

20. Attachments to Response to Request for Production of Documents

21. Plaintiff's Notice of Filing Privilege Log

22. Plaintiff's Response to Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Request for Production and associated documents

23. Plaintiff's Answers to Interrogatories Propounded by Def.

24. Def., Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's Interrogatories

25. Def., Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's Requests for Production

26. Def., Tesla, Inc. d/b/a Tesla Florida, Inc.'s Supplemental Response to Plaintiff's Interrogatories

27. Def., Tesla, Inc. d/b/a Tesla Florida, Inc.'s Supplemental Response to Plaintiff's Requests for Production

28. Tesla Document Production: TESLA-00003872 - TESLA-00004385, TESLA-00000227 - TESLA-00003871, TESLA-00000196 - TESLA-00003103, TESLA-00000001 - TESLA-00000193

29. Tesla, Inc. Privilege Log

30. Media coverage videos and articles

31. Surveillance videos of accident

32. Cell phone video of accident scene

33. Accident scene photographs

34. Accident scene video

35. Def. Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's First Request for Production

36. Def. Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's First Request for Admission

37. Westway Towing records

38. 1st Class European Authorized Coachworks records

39. Plaintiff's Disclosure of Expert Witnesses

40. Report by Robert J. Caldwell, P.E.

41. Report by Kelly B. Kennett, MS

42. Corrected Discovery Schedule and Pretrial Order

43. Order Setting Civil Trial Date, Pretrial Deadlines, and Referral to Magistrate Judge, Order Granting Joint to Extend Certain Pretrial Deadlines

44. News video

45. Riley Amended Scheduling Order

46. Monserratt Amended Discovery Schedule and Pretrial Order

47. Accident scene video

48. Second Amended Discovery Schedule and Pretrial Order

49. City cameras surveillance videos

50. Plaintiff's Expert Witness Disclosure with attachments

51.    Plaintiff's Additional Disclosure of Expert Witnesses
52.    Report by Dr. Ralph E. White
53.    Def. Tesla, Inc. d/b/a Tesla Florida, Inc.'s Notice of Service of Responses to Plaintiff's Second Set of Interrogatories
54.    Def. Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's Second Requests for Production
55.    Def. Tesla, Inc. d/b/a Tesla Florida, Inc.'s Notice of Service of Responses to Plaintiff's Third Set of Interrogatories
56.    Def. Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's Third Requests for Production
57.    Tesla Document Production TESLA-00004387 - TESLA00006132
58.    Notice of Taking Remote Videotaped Deposition Duces Tecum of Plaintiff's Expert Stanislav I. Stoliarov, Ph.D.
59.    Notice of Taking Videotaped Deposition Duces Tecum Of Plaintiff's Expert John V. Marraccini, M.D.
60.    Notice of Taking Remote Videotaped Deposition of Plaintiff's Expert Peter B. Sunderland, Ph.D.
61.    Notice of Taking Videotaped Deposition Duces Tecum of Plaintiff's Expert Barry L. Bookman
62.    Notice of Taking Videotaped Deposition Duces Tecum of Plaintiff's Expert Miles E. Moss, P.E.
63.    Def. James B. Riley, Individually, James B. Riley as the Personal Representative of the Estate of Barrett Riley, Deceased, and JR Corporate Services Group LLC's Expert Witness Disclosure
64.    Report by Robert J. Caldwell, P.E.
65.    Report by Dr. Ralph E. White
66.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s First Request for Production to Plaintiff
67.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Response to Def. James Riley's First Request to Produce Notice of Serving Second Set of Interrogatories to Plaintiff
68.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s First Request for Production to Def., Notice of Serving First Interrogatories to Def.
69.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Second Request for Production to Plaintiff
70.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s First Request for Production to Plaintiff, James B. Riley, as Personal Representative of the Estate of Barrett Riley
71.    Answers to First Interrogatories by Tesla, Inc.
72.    Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Response to First Request for Production of Tesla Inc. a/k/a/ Tesla Florida, Inc.
73.    Plaintiff's Response to Def. Tesla, Inc.'s First Request for Production, Plaintiff's Response to Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Second Request for Production
74.    Plaintiff's Answers to Second Interrogatories Propounded by Def., Plaintiff's Supplemental Response to Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Request for Production
75.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Notice of Service of Responses to Plaintiff's Second Set of Interrogatories
76.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Response to Plaintiff's Second Requests for Production
77.    Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Request for Production to Plaintiff

78.   Plaintiff's Response to Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Request for Production

79.   Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Response to Second Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc.

80.   Plaintiff's Second Supplemental Response to Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Request for Production

81.   Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Request for Production to Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley

82.   Notice of Serving Third Interrogatories to Plaintiff, Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley

83.   Amended Response to First Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc., Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley

84.   Amended Response to Second Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc., Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley

85.   Second Amended Response to First Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc., NOS 6, 26, 27, 28 and 35, Def. James B. Riley, as the Personal Representative of the Estate of Barrett Riley's

86.   Response to Third Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc., Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Notice of Service of Responses to Plaintiff's Third Set of Interrogatories

87.   Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Response to Plaintiff's Third Requests for Production

88.   Def. Tesla, Inc. a/k/a Tesla Florida, Inc.'s Notice of Service of Supplemental Responses to Plaintiff's Third Set of Interrogatories

89.   Tesla Document Production: TESLA-00006133 - TESLA-00007263

90.   Riley Plaintiff's Fact Witness List

91.   (Riley) Tesla, Inc., d/b/a Tesla Motors, Inc.'s Fact Witness List

92.   Def. Tesla, Inc. a/k/a Tesla Florida, Inc. And Halston Loyd's Expert Witness Disclosures with attachment

93.   Police CAD Drawings

94.   (Monserratt) Cross Notices of Taking Deposition Duces Tecum Via Web/Remote

95.   Plaintiffs' Notice of Taking Deposition Duces Tecum Via Web/Remote

96.   (Riley) Notice of Taking Videotaped Deposition Duces Tecum of Def.'s Expert James Walker

97.   IIHS crash test reports, photographs, and videos

**Attachment B**

Materials Reviewed or Generated for Monserratt-Riley v. Tesla

1. Deposition summaries
2. Photographs, notes, and scan data – Carr Engineering, Inc., crash-involved 2014 Tesla Model S inspection, September 11, 2020
3. Photographs, notes, and scan data – Carr Engineering, Inc., exemplar 2014 Tesla Model S inspection, April 8-9, 2021
4. Photographs, notes, video, scan data, and total station data – Carr Engineering, Inc., crash scene inspection, May 24-25, 2018
5. Photographs and video – Carr Engineering, Inc., crash scene inspection, September 10, 2020
6. Photographs, notes, and scan data – Carr Engineering, Inc., crash scene inspection, March 25, 2021
7. 2014 Tesla Model S materials
8. EDR report and analysis materials
9. Google Earth images
10. CEI 2D reconstruction materials
11. CEI 3D reconstruction materials
12. Presentation – SAE C0315 – Introduction to Brake Control Systems, James Walker, Jr., Carr Engineering, Inc.
13. Presentation – SAE C0414 – Applied Vehicle Dynamics, James Walker, Jr., Carr Engineering, Inc.
14. Presentation – SAE C0718 – High-Performance Brake Systems, James Walker, Jr., Carr Engineering, Inc.
15. Publication – High-Performance Brake Systems, Design, Selection and Installation, James Walker, Jr., 2007

**Attachment C**

Curriculum Vitae for James Walker, Jr.

Education and Licensing
- Bachelor of Science in Mechanical Engineering, GMI, 1994
- Registered Professional Engineer in the state of Texas, 2008 to present

Specialized Professional Competencies
- Motor vehicle crash investigation, reconstruction, and failure analysis to determine causes, conditions, and circumstances
- Specification, design, test, and evaluation of electronic control systems for motor vehicle steering, handling, acceleration, and braking systems
- Specification, design, test, and evaluation of conventional motor vehicle steering, handling, acceleration, and braking systems, including dynamic stability assessment
- Application/certification of Federal Motor Vehicle Safety Standards as well as associated vehicle manufacturer internal performance requirements and specifications

Professional Experience and Qualifications
- Powertrain System Test Engineer, AC Rochester, July 1989 to January 1995
- Brake Control Systems Engineer, Kelsey-Hayes, January 1995 to May 1996
- Brake Control Senior Design/Release Engineer, Saturn/GM, May 1996 to October 1999
- Brake Control Senior Application Engineer, Bosch, October 1999 to May 2002
- Brake Control Senior Design/Release Engineer, Ford, May 2002 to May 2003
- Engineering Manager of Vehicle Development, Delphi, May 2003 to October 2006
- Principal Engineer, Carr Engineering, Inc., October 2006 to present

Publications and Instructing Achievements
- Creator/instructor of five SAE Professional Development Seminars focusing on brake control systems, vehicle dynamics, and high-performance brake systems, 2004 to present
- Author of High-Performance Brake Systems: Design, Selection, and Installation, 2007
- Author of multiple magazine articles and technical white papers focusing on steering, handling, braking, and overall vehicle dynamics, 1997 to 2005
- Recipient of SAE's Forrest R. McFarland Award for contributions toward Professional Development, 2005
- Recipient of SAE's Master Instructor designation, 2010

Motorsports Experience
- Competition license holder for sanctioned road racing events with organizations including the Sports Car Club of America, the Historic Motor Sports Association, the International Motor Sports Association, and SRO Motorsports Group, 1997 to present
- Participant/instructor for high-performance driving schools with organizations including the Porsche Club of America and the BMW Car Club of America, 1992 to present

**Attachment D**

Four-Year Testimony Record for James Walker, Jr.

| Case Name | Case # | Venue | Type | Date |
|---|---|---|---|---|
| Bernardino v Nissan | BC 493949 | Superior Court of CA, County of Los Angeles – Central | Deposition | 06/01/2017 |
| Wolf v MBUSA | SCV-251845 | Superior Court of CA, County of Sonoma | Deposition | 07/06/2017 |
| Bernardino v Nissan | BC 493949 | Superior Court of CA, County of Los Angeles – Central | Trial | 07/17/2017 |
| Huerta v Toyota | BC 568370 | Superior Court of CA, County of Los Angeles – Central | Deposition | 07/21/2017 |
| Brandon v Yamaha | 79306-CV | Brazoria County, TX | Deposition | 08/22/2017 |
| Aguirre v Nissan | P014-1385 | Superior Court of CA, County of Yolo | Trial | 05/24/2018 |
| Makhlouf v Nissan | CL16002729-00 | Circuit Court of Virginia Beach, VA | Deposition | 07/13/2018 |
| Phillip v Toyota | ST-14-CV-0000543 | Superior Circuit Court of the Virgin Islands, St. Thomas | Deposition | 08/02/2018 |
| Reavis v Toyota | DC-16-15296 | Dallas County, TX | Trial | 08/07/2018 |
| Pahan v Kia | 2014 L 004163 | Cook County, IL | Deposition | 09/05/2018 |
| Pahan v Kia | 2014 L 004163 | Cook County, IL | Trial | 10/02/2018 |
| Marshall v Hyundai | 12-CV-3072 | USDC, Southern District, NY | Deposition | 04/03/2019 |
| King v Brown | 16A-60189-1 | DeKalb County, GA | Deposition | 04/16/2019 |
| Hill v Kia | 4:16-cv-117 | USDC, Eastern District, TN | Deposition | 04/23/2019 |
| Lyles v Jaguar Land Rover | 15-C-1023 | Kanawha County, WV | Deposition | 05/10/2019 |

| Case Name | Case # | Venue | Type | Date |
|---|---|---|---|---|
| Fenner v Toyota | A-17-757335-C | Clark County, NV | Deposition | 06/28/2019 |
| Richardson v Toyota | 17-C-02398-5 | Gwinnett County, GA | Deposition | 10/29/2019 |
| Banner v Tesla | 50-2019-CA-009962 | Palm Beach County, FL | Deposition | 02/04/2021 |
| Ward v Lamborghini | A-17-757614-C | Clark County, NV | Deposition | 03/23/2021 |