# EXHIBIT F

```
 1              IN THE UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2

    JAMES B. RILEY, as            §
 3  personal Representative of    §
    the ESTATE OF BARRETT         §
 4  RILEY, deceased,              §
                                  § CASE NO. 20-cv-60517-RS
 5              Plaintiff,        §
                                  §
 6  VS.                           §
                                  §
 7  TESLA, INC., d/b/a TESLA      §
    MOTORS, INC.,                 §
 8                                §
                Defendant.        §
 9


10


11


12      VIDEOTAPED DEPOSITION OF ROBERT J. CALDWELL

13                  Denver, Colorado

14              Tuesday, June 1, 2021

15                (REPORTED REMOTELY)

16


17


18


19


20


21


22


23     REPORTED BY:

24     Linda Russell, CSR

25     JOB NO:  194913
```

1                    CALDWELL

2

3

4          June 1, 2021

5          8:03 a.m. MDT

6

7

8     DEPOSITION OF ROBERT J. CALDWELL, taken on

9  behalf of Defendant, held remotely in Denver,

10 Colorado, before Linda Russell, Certified Court

11 Reporter No. 2965.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CALDWELL

 2   A P P E A R A N C E S

 3

 4   REPRESENTING THE PLAINTIFF:
         PATRICK MONTOYA, ESQ.
 5       Colson Hicks Eidson
         255 Alhambra Circle
 6       Coral Gables, Florida 33134

 7

 8   REPRESENTING THE DEFENDANT:
         ROBERT RUDOCK, ESQ.
 9       Bowman and Brooke
         Two Alhambra Plaza
10       Coral Gables, Florida 33134

11

12
     THE VIDEOGRAPHER:
13       Manny Garcia

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                                              Page
     ROBERT J. CALDWELL
 3       BY MR. RUDOCK                              6
     CERTIFICATE                                  168
 4   ERRATA SHEET                                 169

 5

 6                 EXHIBITS MARKED

 7      No.         Description              Page

 8   Exhibit 1     Expert Report of Robert J.    16
                   Caldwell, P.E.
 9
     Exhibit 2     Medical Examiner photograph   75
10                 DSC_0039.JPG

11   Exhibit 3     Photograph P8300527.jpg       75

12   Exhibit 4     Medical Examiner photograph   76
                   DSC_0031.JPG
13
     Exhibit 5     Photograph P8300487.jpg,      85
14                 Photograph P8300531.jpg,
                   Photograph P8300536.jpg
15
     Exhibit 6     Attachment 14                 94
16
     Exhibit 7     Notes and analysis           101
17
     Exhibit 8     Vehicle Inspection notes     158
18
     Exhibit 9     Scene Inspection notes       158
19

20

21

22

23

24

25
```

```
 1                      CALDWELL

 2              P-R-O-C-E-E-D-I-N-G-S

 3              THE VIDEOGRAPHER:  My name is Manny

 4   Garcia, certified legal videographer in

 5   association to TSG Reporting, Inc.

 6              Due to the severity of the COVID-19,

 7   and following the practice of social distancing,

 8   I will not be in the same room with the witness,

 9   but will record this videotaped deposition

10   remotely.  The reporter, Linda Russell, also will

11   not be in the same room and will swear the

12   witness remotely.

13              Do all parties stipulate to the

14   validity of this video recording and remote

15   swearing and that it will be admissible in the

16   courtroom as if it had been taken following

17   Rule 30 and other rules of the Federal Rules of

18   Civil Procedures?

19              MR. RUDOCK:  Bob Rudock for Tesla.

20   Yes.

21              MR. MONTOYA:  Patrick Montoya on

22   behalf of the Plaintiff.  Agreed.

23              THE VIDEOGRAPHER:  This is the start

24   of media labeled Number 1 of the video-recorded

25   deposition of Robert J. Caldwell in the matter of
```

```
 1                      CALDWELL

 2  James B. Riley versus Tesla, Inc., on June the

 3  1st, 2021, at approximately 8:03 a.m.

 4            My name is Manuel Garcia, I'm a

 5  certified videographer in association with TSG

 6  Reporting, Inc.  The court reporter is Linda

 7  Russell, in association with TSG Reporting.

 8            Counsel, please introduce yourselves.

 9            MR. RUDOCK:  Bob Rudock, counsel for

10  Tesla.

11            MR. MONTOYA:  Patrick Montoya, on

12  behalf of the Rileys.

13            THE VIDEOGRAPHER:  Court reporter,

14  please swear in the witness.

15                  ROBERT J. CALDWELL,

16        having sworn or affirmed to tell the

17        truth, the whole truth and nothing but the

18        truth was examined and testified as

19        follows:

20                  EXAMINATION

21  BY MR. RUDOCK:

22        Q.  Good morning, sir.  Please state your

23  name.

24        A.  Robert J. Caldwell.

25        Q.  I tend to call people first names all
```

1                    CALDWELL

2  the time, so no disrespect, that's just what I

3  do.  So, hope that's okay with you.

4          A.  It's just fine.

5          Q.  All right.  When -- when were you

6  retained?

7          A.  Stand by a second here.  I'll have to

8  grab my file.

9              Sorry about that.

10         Q.  Okay.

11         A.  I have a series of notes here that

12  are dated May 14th of 2018.

13         Q.  And who were you retained by?

14         A.  I was contacted by Mike Eidson.

15         Q.  And what were you asked to do?

16         A.  To investigate and reconstruct a

17  motor vehicle crash.

18         Q.  And I assume that -- that is your

19  sole role and the only areas you're going to

20  offer opinions in this case, that is accident

21  reconstruction?

22         A.  That is correct.

23         Q.  All right.  No -- no kinematics, no

24  biomechanics, no opinions as far as any defect

25  allegations involving this particular vehicle?

1                    CALDWELL

2         A.  With regard to kinematics, I haven't

3    done any detailed kinematics study of occupant

4    motion; however, that's something I do and I -- I

5    have some knowledge and thoughts about it, but I

6    haven't done the study.  So I don't expect I will

7    opine on it.

8         Q.  Okay.

9         A.  I certainly won't opine on

10   biomechanics.  And I won't give any defect

11   opinions.

12        Q.  All right.  Thank you.

13             And have you worked for the Colson

14   Hicks firm before?

15        A.  I have.

16        Q.  Who in particular, Mr. Eidson,

17   Mr. Montoya, Mr. Miner?

18        A.  Yeah, predominantly in the past prior

19   to this case it was Mr. Eidson and Joe Kalbac.

20   I've also worked with Julie, you know, Kane, who

21   was just in the room --

22        Q.  Right.

23        A.  -- in the past.  There probably have

24   been some others, but those are the folks that

25   come to mind.

```
 1                      CALDWELL

 2          Q.  And how many times would you say

 3   you've worked with those folks in the past?

 4          A.  Probably in the order of ten -- ten

 5   occasions.

 6          Q.  Could have been the last time I saw

 7   you might have been one of those cases, I don't

 8   know, but we've seen each other in the past.

 9              You have -- you brought your whole

10   file with you, I assume?

11          A.  Yes.

12          Q.  And I believe it was, I'm not sure if

13   it was Friday or Saturday, Curt produced your

14   file to us.  And I assume when that was produced

15   to us, when you sent it to Curt nothing was

16   removed, you produced the entire file?

17          A.  Yes, it -- yes.  With the exception

18   there should have been a document that was in

19   there called Common Documents.  In other words,

20   we produced our entire work product file --

21          Q.  Right.

22          A.  -- we didn't produce, you know,

23   deposition transcripts and the like.

24          Q.  Yeah, we -- there's -- there's no

25   need to re-send the same things back and forth to
```

```
                         CALDWELL
 1
 2   each other.  I understand.
 3             Okay.  Have you ever had any -- did
 4   you ever talk to Mr. Riley about this case?
 5        A.  I have not.
 6        Q.  Any conversations with any police,
 7   any eyewitnesss, anybody on the scene?
 8        A.  No.
 9        Q.  Conversations with other experts?
10        A.  I did have a conversation with Kelly,
11   is it Kennett, who I think is doing the
12   biomechanics.
13        Q.  All right.  And when was that?
14        A.  I don't know the exact date, but it's
15   been prior to the submission of my report, if I
16   remember correctly.
17        Q.  Okay.  So -- yeah, the reports were
18   done back in January, so is it fair to say you
19   would have had that conversation with him before
20   that, and most likely in January or December of
21   last year?
22        A.  Yes, I think -- I think that's a fair
23   timetable.
24        Q.  And the -- what was the conversation,
25   what did it entail?
```

1                      CALDWELL

2          A.  Well, it was primarily me explaining

3     the reconstruction to him as opposed to anything

4     flowing the other direction.

5          Q.  And how long was that conversation?

6          A.  I don't have a specific recall, but

7     my best estimate would be roughly half an hour.

8          Q.  Did you do any work with an exemplar

9     vehicle?

10         A.  No.

11         Q.  All right.  I assume your opinions

12    are your final -- final trial opinions, correct?

13         A.  I believe that's the case.  However,

14    I do need to leave the door open for my review

15    of, for instance, Mr. Walker's file.  I've read

16    his report, but I haven't seen his actual file.

17    And so if I can take a look at his actual work

18    product, you know, I don't anticipate things will

19    change, but it's possible.

20         Q.  And your opinions that you plan to

21    offer in this case are all set forth in your

22    report, and that report is dated January 18,

23    2021, correct?

24         A.  That's correct.

25              And, again, that's a summary of my

1                         CALDWELL

2    opinions.  For instance, one item that didn't get

3    reported in the document was the principal

4    direction of force on the Tesla at the -- at the

5    light pole impact.  I -- I don't know why it was

6    omitted, but I had calculated that but had not

7    put it in the report.

8              So, again, if we come upon anything

9    else that's an opinion that wasn't stated, I'll

10   try and let you know.

11        Q.   No problem.

12             What was that PDOF at the pole?

13        A.   Four o'clock.

14        Q.   So in terms of degrees, it would be,

15   what, seventy --

16        A.   No, like a hundred -- I think the

17   calculated number was 126 degrees measured

18   clockwise from the front of the car.  So

19   four o'clock would be just to the rear of

20   directly broadside from the right.

21        Q.   By right rear tire?

22        A.   Yes, right rear tire and the right

23   side of the car.  In other words, there's a

24   continuing impact by the pole to the side of the

25   car.

1                          CALDWELL

2          Q.  So if we're lining that -- as the

3    vehicle is coming around about to strike the

4    pole, if we are lining those up the pole would be

5    coming into contact with that right rear wheel

6    and right rear tire initially?

7          A.  Yes, initially, and then moving along

8    the right side of the car until it --

9          Q.  Right.

10         A.  -- pockets at the right front door.

11         Q.  I understand.  Okay.  We'll talk

12   about that a little bit more, but thank you for

13   bringing it up now.

14              Okay.  Any additional work you're

15   contemplating other than, as you said, looking at

16   Walker's file when you get that?

17         A.  I'm sorry, I didn't catch that

18   question.

19         Q.  My bad.

20              Is there any additional work you are

21   contemplating doing other than reviewing Walker's

22   file, which you told me earlier?

23         A.  Again, I would expect I would

24   probably prepare trial exhibits.  That hasn't

25   been discussed yet, but I would expect that I

```
 1                    CALDWELL
 2   would do that.
 3        Q.  Okay.  So trial exhibits, Walker's
 4   report, that's the additional -- Walker's file,
 5   rather -- that's the additional work that you
 6   would contemplate completing at this point?
 7        A.  That's correct, yes.
 8        Q.  Have you done any additional work on
 9   the case since you prepared your report, other
10   than I assume getting ready for this deposition?
11        A.  No.
12        Q.  Have you reviewed any additional
13   materials that came in, such as additional
14   depositions, since you prepared your report?
15        A.  Yes.  I -- I was furnished with the
16   reports that were generated by your experts that
17   at least were relevant to my area.  And then I
18   also was provided with a number of depositions of
19   friends of the folks that were involved in the
20   crash where there was deposition testimony about
21   mainly I think addressing Mr. Barrett Riley's
22   driving.
23        Q.  Meaning his -- meaning his -- the
24   folks that were out there were his friends which
25   were essentially describing what happened?
```

```
                           CALDWELL
 1
 2          A.  Well, that, I think I had some of
 3    that already at the time I prepared my report.
 4    But these were mostly people that weren't
 5    witnesses to the event or shortly thereafter but
 6    rather were friends that were addressing things
 7    that were -- was on social media and so forth.
 8          Q.  Okay.
 9              Okay.  And I believe those are set
10    forth in some document that I think Curt sent us
11    of additional materials that you -- that you were
12    provided.  We'll find that.  You don't have that
13    handy, do you?
14          A.  I don't.  But you also received in my
15    file a packet of deposition summaries, and so
16    those -- those names should be on the individual
17    summaries in that file.
18          Q.  So the folks in the summaries,
19    those -- that would have been the additional
20    depositions that you read since the report?
21          A.  Correct.
22          Q.  All right.  Awesome.  Okay.  Thanks.
23              How much time have you spent on the
24    case, approximately?
25          A.  I really don't know.  I would have to
```

1                    CALDWELL

2    go back and review our invoices.

3         Q.  We're not going to waste time doing

4    that.  We can -- we can do that later.

5              Okay.  On your report --

6              MR. RUDOCK:  Linda, we will make

7    Bob's report Exhibit 1.  And we'll get these all

8    to you.

9              (Exhibit 1 marked for identification.)

10   BY MR. RUDOCK:

11        Q.  So on page 2 of your report, first

12   full paragraph you state, "The crash site was

13   inspected, measured using a 3D scanner, and

14   photographed with a standard digital camera on

15   August 30.  The Tesla was inspected, measured

16   using a 3D scanner, and photographed with a

17   standard digital camera on August 30, 2018."

18              I have received -- seen photographs,

19   and I have received photographs of your

20   inspection, okay, but I have not received any

21   vehicle scan data.  Do you -- where is your

22   vehicle scan data -- data?

23        A.  Well, the results of the scan data

24   were produced with the file, in other words, the

25   scan of the vehicle and the scan of the accident

CALDWELL

1
2  site.  The actual point cloud, I did not produce
3  that, but I can.
4       Q.  Yeah, I'm interested in getting the
5  scan data for the scene and the scan data for the
6  vehicle.  You can get those to us?
7       A.  Yeah.  Just in the raw point cloud
8  fashion?
9       Q.  Absolutely.  Okay.  Thank you.
10      A.  Yeah, let me make a quick note here.
11          Okay.
12      Q.  Now, you also indicate that the scans
13 were processed into a 3D point cloud,
14 Attachment 2 and 3.  So are you saying that
15 Attachment -- Attachment 3 is what you are
16 calling your point cloud?
17      A.  Yes, that's the processed scan data.
18      Q.  And so what -- what are you trying to
19 show on this?  It doesn't really -- doesn't
20 really tell me anything.  What are you trying
21 to -- what's the purpose of this particular
22 attachment?
23      A.  Well, the basic --
24      Q.  What is -- I'm sorry, go ahead.
25      A.  The purpose was just to show the

1                    CALDWELL

2    process that we went through to create the -- the

3    scene drawings that we're eventually going to be

4    using in our reconstruction.  And so, yeah, it

5    doesn't look like much on Attachment 3, but

6    that's a step in the process.  And so that was

7    the purpose of showing that.

8          Q.  So what are you going to show to --

9    what are you going to show to a jury?  You said

10   the scene drawing.  Is that what you're

11   contemplating showing what you have attached as

12   Attachments 13 through 14?

13          MR. MONTOYA:  Bob, to the extent

14   we're doing demonstratives, we're talking about

15   the data that he will be set up during trial.  So

16   I'm not sure I understand your question.  The

17   document doesn't preventing him from reporting.

18          MR. RUDOCK:  No, what he -- what he

19   was saying is that he used his iCloud to prepare

20   a drawing and I'm asking him is the drawing he's

21   using are those the things that are in 13 and 14

22   on his report.  If you go to 13 and 14 you see

23   drawings.  That's what I'm asking.

24          THE WITNESS:  Yeah --

25          MR. MONTOYA:  Okay.  I thought you

```
 1                      CALDWELL
 2   were talking three.  I'm sorry.  Go ahead.
 3        A.  The -- the -- the final product will
 4   probably be shown in different images, not just
 5   one.
 6             But, for instance, you know, the
 7   process we go through in creating this, you'll
 8   see that there's a layout of the police
 9   measurements, and laying that out on our scan,
10   and then laying it out on a Google image, and
11   then placing the vehicle dynamics onto the final
12   product to basically walk through the event.
13   BY MR. RUDOCK:
14        Q.  Okay.  So, but where is the final
15   product?  I need to see that, obviously.
16        A.  Well, the final product is, for
17   instance, 13 -- Attachment 13.
18        Q.  Okay.
19        A.  And Attachment 14 is just a zoomed-in
20   version, as is --
21        Q.  Okay.
22        A.  Well, I don't know why I have
23   multiple Attachment 14's.  Okay.
24        Q.  On -- on the copy of the report I
25   have multiple copies of 14, it's just different
```

1                         CALDWELL

2    views of it.

3              A.  Right.  Yes, that's why it is.

4              Q.  Okay.  So what you plan to show the

5    jury as far as your drawings are concerned is

6    what you have in Attachments 13 and 14?

7              A.  I presume so.  But obviously --

8              Q.  Okay.

9              A.  -- Mr. Montoya or Mr. Miner, whoever

10   is going to be handling this matter, as far as

11   I'm concerned they're -- they're going to

12   ultimately make the call as to what we're going

13   to show the jury.

14             Q.  Yeah.

15             A.  This is just to kind of explain with

16   the report.  You know, a picture is worth a

17   thousand words, so to speak, and so that's what

18   our attempt was to do.

19             Q.  Yeah, well, here's what I'm getting

20   at.  You said you ran scan data of the vehicle,

21   scan data of the scene.  I see Attachments 13

22   through 14, and I want to make sure what you plan

23   on showing the jury is that, you're not planning

24   on coming in with any 3D modeling, because I

25   don't see anything like that.

```
 1                    CALDWELL
 2        A.   What are you referring to as 3D
 3   modeling?
 4        Q.   An animation in 3D showing how the
 5   vehicle comes through the scene, how it interacts
 6   with the curve, the walls, the pole.  You're not
 7   planning on doing anything like that?  Because,
 8   generally speaking, when I see scan data,
 9   reconstruction experts do things with scan data
10   other than preparing the drawing that are
11   Attachment 13 and 14.
12        A.   Well, those drawings are
13   three-dimensional.  In other words, it's produced
14   in -- it's done in a CAD system that is
15   three-dimensional.  And so they're all showing a
16   plan view, but I can show those views in any
17   fashion that I would want.
18        Q.   So I guess that's where I'm getting a
19   little concerned.  When you say "shown in any
20   form you want," if this is the form, Exhibits 13
21   through -- or Attachments 13 through 14, that's
22   fine, I just want to make sure I have what you
23   plan on showing the jury.
24        A.   Well, I certainly plan on showing the
25   jury something like that.
```

```
 1                    CALDWELL
 2        Q.  Okay.
 3        A.  Again, the exhibits that I would
 4   produce for trial haven't been determined yet,
 5   and that will be a process that I'll discuss with
 6   counsel.
 7        Q.  Okay.  As far as you're sitting here,
 8   you don't plan on coming in and having any -- I
 9   understand you believe 13 and 14 is 3D.  It
10   doesn't look like 3D to me.
11        A.  Well --
12        Q.  It looks just like -- go ahead.
13        A.  It's a plan view of a 3D image.
14        Q.  Okay.  Let me just finish, we can
15   move on to something else.  The plan -- so these
16   are the plan views you plan on showing the jury,
17   correct?  With the -- with the caveat when you
18   talk to Patrick and Curt.
19        A.  Correct.
20        Q.  All right.  That's all.  Okay, fine.
21            When you say in your sentence there,
22   "The scene cans have been processed into a 3D
23   cloud point," a cloud point, again, that's what
24   you showed me on Attachment 3, correct?
25        A.  Yes.
```

1                         CALDWELL

2          Q.   And then you say, "A wireframe of an

3    undamaged vehicle has been obtained."  Where is

4    that?  What is -- what do you mean by a wireframe

5    of an undamaged vehicle?

6          A.   Well, it is the -- basically the 3D

7    model, the computer model of the vehicle.  And I

8    can use that to superimpose upon the damaged

9    vehicle and I can look at, for instance, how much

10   deformation occurred at various points.

11         Q.   Okay.  Where is that?  Where's this

12   wireframe of an undamaged vehicle?  That's my

13   only question.

14         A.   Well, let me see here if that's been

15   printed.

16              (Document Review)

17         A.   Sorry, I kind of had my file torn up

18   as I was going through it.  Do you have the --

19         Q.   You're old -- you're old school.

20   You're not like these other guys who just start

21   panging -- banging away on the computer.  You're

22   more like me.

23         A.   Well, I -- well, I also -- my

24   computer is in use, so I kind of have trouble

25   with it.

1                        CALDWELL

2          Q.  That's my point.  You have these guys

3    who it doesn't matter, they can just go zip, zip

4    and -- I don't know how they do it, but I'm with

5    you.

6          A.  Well, in a subfolder called

7    "Drawings" --

8          Q.  Oh, okay.

9          A.  -- there's an image of the car and

10   its dimensions.  And that is the computer model

11   of the car that I referred to as a wireframe.

12         Q.  Okay.  I see -- I've seen that here.

13   We can move on.  That was in I believe a section

14   we got Friday or Saturday in your notes file,

15   what was called notes file.  We'll talk about

16   that.  Okay.  I did not realize that's what you

17   were calling the wireframe.

18         A.  Okay.

19         Q.  All right.  Fine.

20              Okay.  Page 3 of your report in the

21   "Site" section you talk about the roadway -- the

22   roadway geometry curve through C1003 was reviewed

23   and it was identified that southbound lane 1,

24   closest to the center, had an approximate radius

25   of 321 feet and southbound lane two had an

1                     CALDWELL

2    approximate radius of 345 feet.  All you're doing

3    there is just telling me about the curvature of

4    the roadway?

5         A.  That's correct.

6              MR. MONTOYA:  Bob, I'm reading -- I'm

7    reading this to say 621 and 645.  Right?  You

8    said 321 and 345.

9              MR. RUDOCK:  Did I say three?  My

10   bad.  Yes, 621 and 645, yeah.  Thank you.

11   BY MR. RUDOCK:

12        Q.  And then on that same page under Adam

13   Cohen on the bottom, you say Mr. Cohen was

14   traveling on Seabreeze when Mr. Riley passed him

15   on the left while traveling in the center turn

16   lane.

17              And all you're -- what you're telling

18   me there is there are videos showing Barrett in

19   the center turn lane, not in lane 1 or 2.  That's

20   the point of that statement from Mr. Cohen,

21   correct?

22        A.  No.  I believe that was a

23   summarization of his testimony.

24        Q.  Okay.  It's your understanding that

25   Mr. -- that Barrett was passing someone in the

```
 1                    CALDWELL
 2   turn lane, right?
 3         A.   That's my understanding, yes.
 4         Q.   Right.  And it's your belief based on
 5   testimony that was Mr. Cohen?
 6         A.   That's my recollection, yes.
 7         Q.   Okay.  Now I want to -- let's go to
 8   page 4 of your report under "Analysis" section,
 9   and the third paragraph, and that first sentence
10   where it says, "The RCM reported one event with a
11   maximum longitudinal delta-v of 2.5 miles per
12   hour at 64 milliseconds and a maximum lateral
13   delta-v of 2.5 miles per hour at 22 milliseconds.
14   The resultant delta-v was 3.5 miles per hour at
15   64 milliseconds.  And then you refer to
16   Attachment 7.  And Attachment 7 is the EDR data,
17   the readout, correct?
18         A.   Yes, at least part of it.
19         Q.   Right.
20              So the -- when it says "RCM," that's
21   just a control module which is used in this
22   vehicle to record the first event data?
23         A.   Correct.
24         Q.   And it shows one event on the CDR?
25         A.   There was one -- there was one event
```

1                    CALDWELL

2  recorded, yes.

3       Q.  And you believe that single reported

4  event was the vehicle crashing into the first

5  wall -- the first driveway wall?

6       A.  Yes, I do.

7            And, again, that was one of those

8  things that I wrestled with a little bit as to

9  whether I thought it was going to be the curb

10  strike, which obviously Mr. Walker has concluded,

11  or the wall strike.  And I concluded that the

12  wall strike was more likely.

13       Q.  And why is that?  What's the basis

14  for your determining that the wall strike was the

15  EDR recording of the 3.5 delta-v?  You say you

16  wrestled with it -- what's the basis, then you

17  can tell me what the wrestling was.

18       A.  Well, we know that the wake-up or

19  what technically is the algorithm enable, or AE

20  point, is going to be occurring at or about the

21  curve or the wall, because the event that's

22  recorded is clearly not the more major impact

23  that is taking place at the south wall -- the

24  curved wall.  And so we know that algorithm

25  enable is occurring at either the curb strike or

1                      CALDWELL

2    the wall strike.  And my view of the curb strike

3    is -- is that typically I don't see the curb

4    strike producing this degree of stability and I

5    typically don't see the system waking up at curb

6    strikes.  And so I went with the wall.

7          Q.  Okay.  So -- so if I understand that,

8    just based on your background and experience you

9    do not see the algorithms waking up to record

10   events when it hits a curb?

11         A.  Typically, yes.  I felt like that was

12   a possibility here, and certainly something I

13   considered.

14         Q.  Got it.  Okay.

15             Now, here -- so we're talking about

16   the same series of events.  So Barrett is driving

17   down the -- down the road, he's in that turn

18   lane, he tries to pass I guess it's Mr. Cohen,

19   then the vehicle strikes the curb, strikes wall

20   one, goes across the driveway strikes wall two,

21   goes across the road contacts the curb on the

22   other side, and then hits a pole, and then goes

23   to rest?

24         A.  Correct.

25         Q.  Okay.  All right.  So -- all right.

1                   CALDWELL

2    That was pretty good, we got through that all in

3    one sentence.

4           A.   It might have been a run-on sentence,

5    but we got through it.

6           Q.   Oh, it was definitely a run-on.

7                Any other -- any other reason for

8    you -- you believe that initial event was wall

9    one as opposed to the curb other than your

10   experience on how these event data recorders and

11   the algorithms wake up?

12          A.   No, I think that's it.

13          Q.   Okay.

14          A.   Just as an aside, the reconstruction

15   person for the NTSB concluded it was the wall as

16   well.  But that wasn't the reason for my

17   decision, but that is another supporting point

18   there, I guess.

19          Q.   Right.  Okay.

20               When you were out at the scene -- in

21   your cloud documents when you're out there, looks

22   like you were out there in August, I believe, of

23   2018, approximately four months after the

24   accident, something like that.  Does that sound

25   right?

1                      CALDWELL

2          A.  Yes.

3          Q.  Okay.  Do you recall seeing any

4    damage to the curb, any tire marks on the curb,

5    did you record those, anything like that?  And

6    when I say the curb, I mean the curb --

7          A.  Yes.

8          Q.  -- curb one.

9          A.  That's -- that's what I assumed in

10   answering the question, yes.

11         Q.  Okay.  And did you -- did you

12   document that -- the damage and tire marks that

13   you saw to curb one?

14         A.  Yes.  I took pictures of it.

15         Q.  How long would it take you to find

16   those right now?

17         A.  Well, let me see if I have them

18   printed in my file or just electronically.

19   Stand by.

20              The only prints that I have in my

21   file are these.  I don't know if you can see

22   those.

23         Q.  Yeah.

24         A.  If you have those, I'll try and...

25              You know, I can't see these well

```
 1                        CALDWELL
 2   enough, so let me see if I can load a CD here and
 3   be able to do that.  I have a second computer
 4   that I'll try and fire up here.  Just -- it
 5   shouldn't take too long.
 6        Q.  It looks like to me that you have 42
 7   photos of the scene.
 8             (Document Review)
 9        A.  Do you have my photos available so I
10   can just give you a JPEG number?
11        Q.  I do.
12        A.  Okay.  JPEG number ending in 704.
13        Q.  Yeah.
14        A.  And then JPEG 705 both show that
15   area.  708 as well.
16        Q.  Yeah.  I see those and I see some
17   marks and I see some it looks like damage to the
18   curb.  Did you do any type of analysis of which
19   of those tire marks we see on there and damage to
20   the curb were caused by what portion of the
21   vehicle?
22        A.  Yes.  They were caused by the right
23   side tires.  The more northerly one is the right
24   rear and the more southerly one is the right
25   front.
```

```
 1                      CALDWELL
 2          Q.  Yeah, I'm looking at -- are you
 3  looking at 708?
 4          A.  Yes.
 5          Q.  Yes.  Okay.  And do you see
 6  deformation, it looks like some damage to the
 7  curb itself?  Looks like some portion of the
 8  concrete looks like it was disturbed or maybe
 9  even taken out a little bit?
10          A.  Yes, the concrete was chipped there,
11  yes.
12          Q.  Right.  Okay.
13              And since we're on Zoom and this
14  creates an issue, I see it looks like to be at
15  least two places where the concrete was chipped
16  out.  Would you agree with that?
17          A.  Yes.
18          Q.  And do you see the leaf -- the tree
19  leaf that is hanging down over the wall?
20          A.  I do.
21          Q.  And so that -- it appears that a chip
22  would be one to the upper part of the screen and
23  one to the lower part of the screen on the -- on
24  the curb.  Agreed?  So we're looking at the same
25  thing.
```

1                    CALDWELL

2         A.  Yes.  So left and right of the part

3    of the tree branch.

4         Q.  A better way to say it.  Okay.  Okay.

5    Thank you.

6              Did you make any determination as to

7    the specific damage that was caused to the right

8    tires and wheels as a result of those impacts to

9    the curb we just saw, that you just showed me?

10        A.  Well, since we have significant

11   additional events that affected those areas of

12   the vehicle, we don't get a good accurate

13   assessment in looking at the final condition of

14   those areas as to exactly what occurred when.

15   However, I determined that this likely damaged

16   both right side wheels and likely caused

17   deflation of the tires.

18        Q.  Okay.  Now, when the vehicle hit wall

19   one and then wall two, the walls didn't move,

20   right?

21        A.  Not very much.

22        Q.  And when you say -- okay.  When you

23   say "not very much," I guess theoretically it

24   moved, but, I mean, it still remained the same --

25   the average person would say, okay, the wall was

```
 1                     CALDWELL
 2  an immovable wall.
 3          A.  I think that's fair to say.  And so I
 4  didn't mean to be, you know, I guess making light
 5  of the fact, but I think that the wall probably
 6  vibrated and it looked like it probably cracked
 7  on the south wall, so I concluded that the wall
 8  didn't move very much.
 9          Q.  The south wall meaning wall -- what
10  I'm calling wall two?
11          A.  Correct.
12          Q.  All right.  Did -- did both of those
13  walls appear to be the same construction-wise?
14          A.  Yes.
15          Q.  All right.  My big question here is
16  on wall number two -- I'm sorry, at wall number
17  one, per your report in your reconstruction, you
18  have wall number one being hit at 85 miles per
19  hour with a PDOF of 45 and a delta-v of 3.5, but
20  then hitting wall two approximately, you know,
21  half a second later, I guess, at 80 miles per
22  hour with a PDOF of 35, you have a 38 mile per
23  hour delta-v.
24          A.  Correct.
25          Q.  Okay.  And why is that?  What is the
```

1                     CALDWELL

2   basis of wall one being hit at 85 with a 45 PDOF,

3   wall two being hit at 80 with a 35 PDOF almost at

4   the same time but the velocity chain is much

5   higher on wall two than wall one?

6          A.  Well, wall two -- excuse me, wall one

7   was basically a sideswipe, you know, it was a

8   side contact between the vehicle and the wall so

9   that the vehicle was moving not completely

10  parallel to the -- to the line of the wall, but

11  not that far off from being parallel with the

12  wall, the line of the wall.  And so it's more of

13  what I would consider a side -- sideswipe or a

14  side slap to the wall, whereas after crossing the

15  driveway and hitting wall two, or what I call the

16  south wall, that wall is basically a barrier, for

17  lack of a better term, set up in front of the

18  vehicle.  So we have direct frontal engagement

19  with that wall and that's a much more severe

20  impact.

21         Q.  Okay.  So it -- all right.  So it's

22  basically sideswipe versus essentially an offset

23  barrier -- barrier impact?

24         A.  Correct.

25         Q.  When you say sideswipe, when the

1                    CALDWELL

2    vehicle came into wall one at 85 miles per hour

3    at a PDOF of 45, I'm assuming the vehicle did get

4    redirected counterclockwise.  Is that fair?

5         A.  Yes.

6         Q.  All right.  And the basis for your

7    38 mile per hour delta-v of hitting wall two I

8    believe comes from your momentum diagram that you

9    did on -- which is in your notes?

10        A.  That -- that, among others, including

11   the -- the deformation analysis of the right

12   front corner of the Tesla.

13        Q.  Did you do any deformation analysis

14   of the Tesla from impacting wall one?

15        A.  No.

16        Q.  But you did do a deformation analysis

17   for impacting wall two?

18        A.  Correct.

19        Q.  Okay.  Why no deformation analysis

20   for wall one?

21        A.  Well, because the vehicle really

22   didn't deform significantly at wall one.

23        Q.  And is that -- and is that simply

24   based on your opinion that the wall one impact

25   was the 3.5 delta-v sideswipe as recorded in

```
 1                    CALDWELL
 2   event one?
 3          A.  Well, partly.  But also just in
 4   looking at the vehicle.  The vehicle didn't
 5   sustain significant damage.  Certainly it got
 6   scraped up and so on, but it didn't get deformed
 7   in the manner in which I can apply a basic speed
 8   from damage kind of analysis.
 9          Q.  Okay.  I don't understand that.
10   How -- the vehicle is badly damaged; fair?
11          A.  Yes.
12          Q.  And how do you know -- you said from
13   looking at the vehicle you could determine it
14   came from wall one versus wall two.  How do you
15   know that from simply looking at the damage to
16   the vehicle?  That, I don't understand.
17              I understand if you're saying it was
18   a 3.5 delta-v versus a 38 delta-v, that I get.
19   But from just looking at the damage, itself, how
20   can you tell wall one, wall two?
21          A.  Well, because while the right front
22   corner would have been involved -- right front
23   corner of the car would have been involved to an
24   extent in the wall one contact --
25          Q.  Right.
```

```
 1                    CALDWELL
 2          A.  -- the wall two contact is going to
 3  be much more severe and is going to cover or I
 4  guess overlay the damage -- any damage that would
 5  have existed in the wall one contact.
 6          Q.  Right.
 7          A.  The right side of the vehicle had
 8  very little what I would consider crush damage
 9  that I could attribute to that wall one contact.
10          Q.  Right.  No -- no, that's -- that's
11  part of my point.  Wall two was a much bigger
12  impact than wall one, in your opinion, so when
13  wall two is hit, it would -- you wouldn't be able
14  to see what damage was caused by wall one.  I
15  think that's what you're saying.
16          A.  At least to the right front corner,
17  yes.
18          Q.  Right.  Right.  Correct.  Okay.
19              Do you understand where I got
20  confused in your answer?  Because my question was
21  the basis for the damage that you see -- well,
22  strike that.
23              The original question was your
24  delta-v of 38 for wall two is based on your
25  momentum diagram, which is on page 3 of your
```

```
 1                      CALDWELL
 2   notes, correct?
 3           A.  Correct.
 4           Q.  Right.  And then you said it's also
 5   based on the damage profile I thought you said to
 6   wall one.  That's where I got confused.
 7           A.  If I said wall one, I misspoke.  It's
 8   wall two.
 9           Q.  Okay.  So -- all right.
10               The amount of damage caused to
11   wall -- by -- to the vehicle from impacting
12   wall one we cannot determine, because after it
13   hit wall one is when it hit wall two, which
14   caused the greater damage, so any damage that was
15   caused in wall one you wouldn't be able to tell?
16           A.  That's true, at least with respect to
17   the right front corner.
18           Q.  Correct.
19           A.  But you also -- you also know
20   other -- other topics about that in that the
21   angle of incidence to the -- to wall one is very
22   shallow.  In other words, the vehicle is coming
23   in at a pathway that's nearly parallel, not --
24           Q.  Right.
25           A.  -- not completely parallel,
```

1                         CALDWELL

2    obviously, or it wouldn't have hit the wall, but

3    it's -- it's coming in at a very shallow angle of

4    incidence.  And so the engagement of the right

5    front corner would have been relatively minor

6    because we're hitting more of the side of the car

7    than the front of the car.

8           Q.  All right.  Let's -- I'll have some

9    follow-ups on that in a second.  Let's look at

10   your momentum diagram, which is page 3 of your

11   notes.

12          A.  I'm sorry, but I have -- I got stuff

13   out of order now.

14              Okay.

15          Q.  Okay?

16          A.  Go ahead.

17          Q.  So this is momentum diagram from

18   wall -- impact to wall two, right?

19          A.  Correct.

20          Q.  And what you have here, you have it

21   looks like -- one, two, four -- looks like eight

22   vehicles drawn, right?

23          A.  Okay.

24          Q.  I'll tell you what, let me try to

25   share my screen and maybe that will make this

```
 1                       CALDWELL
 2   easier.  How about that?
 3          A.  Okay.
 4          Q.  Do you see that?
 5          A.  No.
 6          Q.  Great.  Hang on.
 7              How about now?
 8          A.  Okay.  I see that now.
 9          Q.  Okay.  Awesome.
10              Okay.  We have what I am counting
11   four vehicles going left to right.  That would be
12   one, vehicle two, vehicle three, vehicle four.
13   Would you agree with that?
14          A.  Okay.
15          Q.  And then when it starts -- and then
16   it makes contact -- or then it -- it's -- strike.
17   Let me back up.
18              It looks like vehicle -- we have
19   vehicle one, vehicle two.  And in between vehicle
20   one and two, this line here is the wall -- what
21   we are calling wall one, right?  When I move my
22   cursor.  Correct?
23          A.  (Sound distortion).
24          Q.  Hey, you're -- we're not hearing you.
25              MR. RUDOCK:  Did you hear him,
```

```
 1                      CALDWELL
 2   Patrick?
 3               MR. MONTOYA:  No, I'm having the same
 4   problem.
 5               Bob, you want to start over again?
 6   We have a hard --
 7               MR. RUDOCK:  Yes.  Do you hear me
 8   now, Bob?  There he is.  Bob, do you hear me?
 9               THE WITNESS:  I don't know what
10   happened there, but you -- you froze.
11               MR. RUDOCK:  Oh, okay.  Okay.  You're
12   back.  Everybody -- okay.
13   BY MR. RUDOCK:
14        Q.  Okay.  We see the vehicles coming in
15   from the left and we counted one, two, three,
16   four vehicles.  Then we have the vehicle starting
17   to yaw clockwise, which -- and going off across
18   the road, correct?
19        A.  Correct.
20        Q.  All right.  This line right here,
21   which is around vehicle what I'm calling three,
22   this line denotes the -- denotes wall one, right?
23        A.  Yes, at least the curved part of it.
24        Q.  Right.
25        A.  I think that's where we froze.  That
```

```
 1                    CALDWELL
 2   wall is -- is back parallel with the roadway.
 3        Q.  Right.  My only point is, this is --
 4   this is documenting where wall one would be, and
 5   then the line over here at vehicle four and five,
 6   this line is documenting where wall two would be.
 7        A.  Correct.
 8        Q.  Right.  Got it.  Okay.
 9             And do you see where my cursor is
10   now?
11        A.  Yes.
12             MR. RUDOCK:  And, mister video guy, I
13   assume you're getting this recorded as opposed to
14   just looking at Mr. Caldwell?
15             THE VIDEOGRAPHER:  I can get it
16   recorded also.
17             MR. RUDOCK:  Awesome.
18   BY MR. RUDOCK:
19        Q.  So this line what I'm showing here,
20   which would be at the rear tire when the vehicle
21   is yawing clockwise across the road, that would
22   be -- that would be the outgoing velocity vector.
23   Agree?
24        A.  Some of that you broke up on.  Can
25   you say that again?
```

1                         CALDWELL

2          Q.  Yeah.  The line that I am showing

3    here with my cursor moving it along, which is a

4    line from the rear wheel -- appears to be at the

5    rear wheel, this would be the outgoing velocity

6    vector.  Agree?

7          A.  No.  That is the tire mark that was

8    generated by the left rear wheel.

9          Q.  Okay.  All right.  It would -- is

10   it -- is the velocity -- outgoing velocity vector

11   from the impact with wall two also in that same

12   general direction?

13         A.  Yes.

14         Q.  Okay.  And then when I'm looking down

15   here where it says "Vf," that is the outgoing

16   velocity vector?

17         A.  Correct.

18         Q.  And "Vi," Vi is a -- down here is the

19   incoming velocity vector, which you have as

20   80 miles per hour, correct?

21         A.  Yes.

22         Q.  And in between here "24 degrees,"

23   24 degrees is the angle between the incoming and

24   outgoing velocity vectors?

25         A.  Correct.

1                    CALDWELL

2        Q.  And these two lines -- and what

3    you're doing here is determining delta-v

4    geometrically; that's what you're doing, right?

5        A.  Correct.

6        Q.  And all the red over here, this is

7    the delta-v.  And this 37.7, that is how you come

8    up with your velocity change with impact wall two

9    being 37.8, or 8?

10       A.  Well, I reported it as 38, but you

11   can --

12       Q.  Yeah.

13       A.  -- see that there's a range of

14   numbers there.

15       Q.  Right.  I'm sorry.  37.7 to 39.2,

16   which we're calling 38.

17       A.  Correct.

18       Q.  The point being, when I asked you

19   what's the basis for your velocity change wall

20   two, this whole diagram, this momentum diagram,

21   this shows us how you do it?

22       A.  Yes.  And that was also borne -- that

23   was also borne out in the crush analysis.

24       Q.  Right.  And we'll talk about that.

25   And I just wanted to make sure I go through that,

1                        CALDWELL

2    because when we saw the report we didn't have any

3    of this, so I'm looking at the report, "All

4    right.  Where the heck is he coming up with

5    this 38?"

6              This is how you did it, right?

7         A.  Correct.

8         Q.  Okay.  That -- that -- that's all,

9    all I was going with that.

10             And the 24 degrees down here in the

11   triangle, that's what you're showing up here in

12   the vehicles?

13        A.  Correct.

14        Q.  All right.  Okay.

15             I -- I did not see --

16             MR. RUDOCK:  Let me stop sharing

17   here.  All right.  There you go.  Okay.  You're

18   back.

19   BY MR. RUDOCK:

20        Q.  Where is your momentum diagram for

21   wall one just like you did for wall two?

22        A.  Well, since I used the reported data

23   from the event recorder, the Event Data Recorder,

24   I didn't do one.

25        Q.  Now, when I -- you showed me the

1                    CALDWELL

2   incoming velocity vector speed of 80 on wall one,

3   what was the incoming velocity vector speed when

4   the vehicle hit wall one?  You showed me what it

5   was for wall two.  What is the incoming velocity

6   vector speed for wall one?

7           A.  Well, again, what I used there, since

8   we have a recording of the vehicle speed at

9   algorithm enable, I used that.  And I also

10  applied a range to that that would account for

11  any error in the -- in the recording device,

12  meaning the speedometer, essentially, which is

13  where the EDR gets the speed data and --

14          Q.  Okay.  So --

15          A.  Can I finish --

16          Q.  Yeah.  I'm sorry.

17          A.  -- for a moment?

18              It accomplishes -- it accomplishes

19  any potential error in the -- in the speed

20  recording device, and it also accommodates any

21  possible error in the reported speed due to

22  vehicle slip angle.

23          Q.  Okay.  All I want -- all I want to

24  know is what was the incoming velocity vector

25  speed for wall one?  What's the number?

1                          CALDWELL

2              A.  Well, again, the reported speed was

3      86.  What I reported in my calculations here is

4      that the speed at the time of algorithm enable,

5      based on my analysis, was between 82 and 88 miles

6      an hour.  And the reported number was that

7      86 miles an hour.

8              Q.  Okay.

9              A.  I felt the most likely speed at the

10     wall was probably about 85.

11             Q.  Okay.  So the incoming velocity

12     vector speed wall one, 85?

13             A.  Correct.

14             Q.  Okay.  And then what's the

15     outgoing -- what's the outgoing velocity vector

16     speed on wall one?

17             A.  Well, you're going to reduce the

18     speed by the -- by the numbers recorded in the

19     EDR --

20             Q.  Okay.

21             A.  -- given the determination that it

22     most likely impact -- woke up the system with the

23     wall versus the curb.

24             Q.  So if you're relying on the EDR, are

25     you saying that that outgoing velocity vector

1                    CALDWELL

2    speed would be 82?

3         A.  Well, something in that -- in that

4    order.  Again, you're adding -- you're taking the

5    resultant delta-v.  We only slowed the

6    longitudinal delta-v by -- or longitudinal speed

7    based on the EDR by two and a half miles an hour.

8         Q.  And all I'm trying to do here is

9    figure out what your momentum diagram would look

10   like on wall one just as you did for wall two.

11   So that outgoing velocity vector as you sit here

12   today, your best estimate is 80, 82?

13        A.  Yes, in that neighborhood anyway.

14   And then we also retard speed by the continued

15   travel of the vehicle.

16        Q.  Now, for your momentum diagram on

17   wall two, you had the angle between the incoming

18   and outcoming -- I'm sorry, incoming/outgoing

19   vector speeds, that angle was 24.  What is that

20   angle for wall one?

21        A.  I didn't determine that.  I obviously

22   can, but I don't --

23        Q.  Yeah, what's your --

24        A.  -- have that number for you.

25        Q.  What's your best estimate of what

1                       CALDWELL

2     that would be?

3          A.  I don't want to make an estimate.  I

4     would have to measure it.

5          Q.  Well, can you do that now?

6          A.  Not easily, no.

7          Q.  How long would that take?

8          A.  I don't know, fifteen, twenty

9     minutes.

10         Q.  Okay.  Then let's -- let's stake a

11    break and if you could come up with that, that

12    would be great.

13         A.  Take a break right now?

14         Q.  Yes, please.

15              THE VIDEOGRAPHER:  The time is 9:08.

16    We're going off the record.

17         (A break was taken from 9:08 a.m. to

18         9:15 a.m.)

19              THE VIDEOGRAPHER:  The time is 9:15.

20    We're back on the record.

21    BY MR. RUDOCK:

22         Q.  All right.  So the pending question

23    was the angle between incoming and outgoing

24    velocity vectors.

25         A.  Yes.  And my computer froze.  I'm

1                        CALDWELL

2    trying to do this remotely and my computer froze,

3    and so my best estimate is going to be about a

4    five degree deflection angle.

5              Q.  Five degree okay.

6              All right.  And the PDOF you gave,

7    that was 45, I think you said?  Or was that wall

8    two?

9              A.  No, that was --

10             Q.  One was forty- --

11             A.  -- wall one.

12             Q.  Yeah, one was 45 and one was 35.

13   What was -- which was which?  Sorry.

14             A.  The 45 was wall one, based on the

15   Event Data Recorder.

16             Q.  Got it.

17             A.  The -- the impact at wall two, the

18   angle is about, oh, 33 to 37 was the calculated

19   number.

20             Q.  Okay.  All right.  I understand, you

21   know, 3.5, it's for wall one is based on the EDR.

22   And you didn't get an opportunity to do the

23   momentum diagram for wall one like you did for

24   wall two.  Did you do any -- any type of

25   mathematical calculations to verify that 3.5 for

1                    CALDWELL

2   wall one?

3           A.  I did not.

4           Q.  Okay.  And recall when you were --

5   you were looking at those scene photographs where

6   you showed me the damage to the curb.  Did you

7   document any damage to the wall when you were out

8   there like three or four months later, whatever

9   that was?  And I'm assuming the answer is no,

10  because I'm imagining the wall -- the wall was

11  probably repaired by that time.

12          A.  Well, the wall had been re-painted by

13  that time.  I don't know if it had been

14  re-stuccoed, but I assume that it had been

15  patched.

16          Q.  Okay.  So when you were out there you

17  didn't see any evidence to any damage to the

18  wall?

19          A.  Well, no, that's not correct.  I felt

20  like --

21          Q.  Okay.

22          A.  -- there was a crack in the -- yeah,

23  a vertical crack in the -- that is south of wall

24  two, or the south wall.  And I can't tell you for

25  sure that was due to this crash, but it must have

1                    CALDWELL

2    been.

3         Q.  Okay.  Yeah, that's all I'm getting

4    at.  You showed me some physical evidence on the

5    curb that was still there, but -- that you could

6    equate to the accident, but you couldn't show me

7    any physical evidence on the wall that you would

8    actually equate to the accident on either wall.

9    Fair?

10        A.  I think that's fair, yes.

11        Q.  All right.

12             All right.  Okay.  So then -- let's

13   see.  After the vehicle impacts curb one,

14   sideswipes wall one, impacts wall two, it then

15   comes off wall two, rotate -- yaws clockwise

16   across the road, comes into contact with the curb

17   on that side, and then impacts the pole?

18        A.  Correct.

19        Q.  All right.  So let's -- let's get

20   some -- let's talk some detail about this pole

21   impact.

22             On page 5 of your report, the first

23   full paragraph, second sentence which starts,

24   "The vehicle."  Do you see that?

25        A.  No.  On page 5?

1                      CALDWELL

2          Q.  I'm sorry, page 5, first full

3   paragraph.  The first full paragraph starts, "The

4   Tesla then reentered."

5          A.  Right.  Okay.  I see that.

6          Q.  Okay.  I'm sorry.  I'm sorry.  The

7   third full sentence starts, "The vehicle engaged

8   the landscaping."

9          A.  Yes.

10         Q.  Okay.  Let me -- let me just read

11  that so we have that in the record so we can talk

12  about this.

13              You state that, "The vehicle engaged

14  the landscaping bordering the sidewalk and the

15  right rear wheel impacted the base of a light

16  pole on the east side of the roadway just north

17  of the driveway of 1344 Seabreeze Boulevard.  The

18  light pole slid along the right rear passenger

19  door and into the right front passenger door.

20  The light pole broke away from its base.  The

21  vehicle rotated counterclockwise coming to rest

22  facing south on the sidewalk in the drive

23  entrance of 1313 Seabreeze Boulevard.  The impact

24  with the light pole likely caused both right side

25  doors to open," period, end of quote.

```
 1                     CALDWELL
 2          So let me -- let's -- let's talk
 3   about that sentence, is where I want to go here.
 4          So you indicated the vehicle hitting
 5   the pole along the right rear wheel and then into
 6   the rear passenger door and then to the front
 7   door, right?
 8          A.  Correct.
 9          Q.  How -- how far did the pole slide
10   along the rear passenger door into the right
11   front passenger door, are we talking five feet,
12   six feet?
13          A.  Well, stand by just one second.  I
14   just noticed there's a typo in my report.  The
15   vehicle --
16          Q.  Okay.
17          A.  The vehicle didn't come to rest at
18   1313 Seabreeze Boulevard.  That should be 1344 --
19          Q.  Oh, okay.
20          A.  -- in my paragraph.
21          Q.  No big deal.
22          A.  So, I apologize for that.  I don't
23   know how that slipped by.
24          Q.  That's not -- not a big deal.  It
25   came to rest where it came to rest.  Okay.
```

1                          CALDWELL

2          A.   Anyway, I -- I don't have a precise

3    dimension for you there.  I could measure that on

4    the -- on the damaged car, but I don't have that

5    dimension for you off the top of my head.

6          Q.   Well, that's kind of where I'm going.

7    What's the physical evidence that you would point

8    to that that actually happened, that we had this

9    sliding from hitting the right rear wheel onto

10   the passenger -- right rear passenger door and

11   sliding into the right front door?

12         A.   Well, this is an area where the

13   primary thought about the right rear wheel is we

14   have a broken piece of the right rear rim that is

15   at the pole base in the photography at the

16   accident scene.  So that located the initial

17   point of contact for me.

18         Q.   Oh.  So can you show me that?  So

19   what you're -- there's a picture of the -- of a

20   rim at the base of the pole, that's what you're

21   saying?

22         A.   A piece of the broken wheel from the

23   right rear, yes.

24         Q.   Okay.  What photo is that?

25         A.   Well, I wrote down a photo number

1                    CALDWELL

2  that we can probably then pull up.

3          Q.  I see.

4          A.  It's shown in more than one image,

5  but the one that I thought was pretty good was in

6  the Medical Examiner's photos.

7          Q.  Okay.

8          A.  JPEG 0039.

9          Q.  In the ME -- okay.

10             Whew, I'm not sure I can pull those

11 up quickly.  Do you have a corresponding one in

12 your -- in -- no, I guess -- and the other one,

13 0039.  So this would be a photo that they took at

14 the scene, obviously?

15         A.  Correct.  The Medical Examiner --

16 it's in the Medical Examiner set that I felt was

17 a good example of that.

18         Q.  Okay.  So that told you -- and you

19 believe that was from the right rear?

20         A.  I do.

21         Q.  So that told you that the right rear

22 wheel initially came in contact with the pole?

23         A.  Correct.

24         Q.  Okay.

25         A.  And fractured a piece of the --

1                          CALDWELL

2      fractured a piece of the wheel off.

3            Q.  Got it.

4                What are those wheels made of, do you

5      know?

6            A.  They're an alloy material.  It's

7      pretty brittle and it breaks relatively easily.

8            Q.  Right.  Do you know -- do you know

9      what kind -- what kind of alloy?

10           A.  Well, there's different kinds, but

11     typically I'd found that they were aluminum alloy

12     of some type.  But obviously they've made

13     them magnesium alloys and other types of

14     materials as well.

15           Q.  No, no, I understand that.  Do you

16     know if it's magnesium, aluminum, do you know?

17     That's all.

18           A.  I don't know for sure, no --

19           Q.  Okay.

20           A.  -- other than I -- it's a -- it's

21     typically a cast alloy material.

22           Q.  Do you have any other photographs

23     showing that the right rear wheel impacted the

24     bottom of the light pole?

25           A.  I'm sure that there are other

```
 1                        CALDWELL
 2   photographs that show that piece of evidence, but
 3   I didn't write down any other photo numbers.  Do
 4   you want me to search a little bit?
 5        Q.  I'll tell you what, if you want to
 6   take a minute or two, that would be great.
 7        A.  And do you have a set of photographs
 8   that you would prefer to look at?
 9        Q.  Yeah, I -- not really.
10             MR. MONTOYA:  Bob, do you want to see
11   if I can input it?  I can pull those up pretty
12   quickly.
13             MR. RUDOCK:  If you can do that,
14   sure.
15             MR. MONTOYA:  Yeah, let me try and
16   share and put -- 039, you said, Mr. Caldwell?
17             THE WITNESS:  Yes.
18             MR. MONTOYA:  Let me see if I can do
19   that.
20             Can you see that now, the picture,
21   0039?
22             THE WITNESS:  Yes.
23             MR. MONTOYA:  Okay.
24             MR. RUDOCK:  00 -- okay.
25             THE WITNESS:  And, Patrick, if you
```

```
 1                    CALDWELL
 2   would, if you could zoom in on the lower left
 3   corner.
 4             MR. MONTOYA:  Lower left.  Oh, man.
 5             MR. RUDOCK:  There you go.  Attaboy.
 6             MR. MONTOYA:  I'll see what I can do.
 7   A little more up?
 8             MR. RUDOCK:  No, just -- where is
 9   that --
10             THE WITNESS:  A little bit more,
11   maybe.
12             MR. MONTOYA:  Okay.
13             THE WITNESS:  I don't have any way to
14   point at Patrick's screen.
15             MR. MONTOYA:  There you go.  Right
16   here, right?
17             THE WITNESS:  Now if you could shift
18   the photo to the right.  There.  Good job.
19        A.  If you look carefully here what you
20   see is the anchor bolts for the post base.
21   BY MR. RUDOCK:
22        Q.  Yeah, I'm not sure I can tell.
23        A.  Do you -- do you see those?
24        Q.  No.
25             MR. RUDOCK:  Patrick, can you zoom
```

```
 1                    CALDWELL
 2  out maybe a little?
 3         A.  Do you see the --
 4  BY MR. RUDOCK:
 5         Q.  Go ahead, Bob.  Sorry.
 6         A.  Well, if you -- if you look at --
 7  there's a shaft there.  That appeared to be the
 8  half shaft -- do you see the shaft I'm talk
 9  about --
10         Q.  Yeah.
11         A.  At that lower left rear?
12            MR. MONTOYA:  I'm trying to see if I
13  can that any better.
14            MR. RUDOCK:  Okay.  Can you -- that
15  was pretty good, Patrick.  Not bad.
16            MR. MONTOYA:  I'm trying here.  I
17  tried earlier.  Got it now?
18            THE WITNESS:  No.  You need to share
19  your screen.
20            MR. MONTOYA:  All right.  Let me try
21  one more time.
22            (Sotto voce)
23            THE WITNESS:  Why don't you stop --
24  just stop a second.
25            MR. MONTOYA:  Okay.
```

```
 1                    CALDWELL

 2          THE WITNESS:  Okay.

 3      A.  Now, first of all, you see the pole

 4  that -- to the upper right of the frame?

 5  BY MR. RUDOCK:

 6      Q.  Yes.

 7      A.  Okay.  That is a pre -- prestressed

 8  concrete pole.  It's not metal, it's concrete.

 9  And all these table-looking things running from

10  the post base --

11      Q.  Yes.

12      A.  -- running from the post back to the

13  base --

14      Q.  Yes.

15      A.  -- those are the tendons that stress

16  the concrete in the pole, because concrete is

17  terrible in tension so you need these tendons to

18  take the tensile loads.

19          Those tendons run to the post base at

20  the lower left of the frame.  And if you look at

21  where the tendons run to, you can see anchor

22  bolts.  You can see three of them.  There's one.

23  There's two.  And see if Patrick can find three.

24  Whoop.  Whoop.  Too far.  Too far.  Getting

25  close.  Right there.
```

1                    CALDWELL

2                    So those are three of the -- those

3    are three of the anchor bolts.

4                    Now, the black-looking piece of

5    material there is the broken piece of the wheel.

6         Q.   Oh, okay.  And -- which is --

7         A.   Now, that's -- that's the half shaft.

8    That's the broken piece of the wheel right there.

9         Q.   Okay.  That -- the black part below

10   one of the -- between the bolts, which has a --

11   some vegetation on top of it?

12        A.   Correct.

13        Q.   Okay.  Okay.  And this is photo 39.

14   Okay.  Got it.

15                   Any other -- any other physical

16   evidence supporting that the right rear wheel

17   impacted the base of the pole?

18        A.   Well, we also have some corresponding

19   damage to the right rear fender area.  There are

20   abrasion patterns there that are certainly going

21   to be partially due to the side slap to the first

22   wall.  And then we also create a second set of

23   abrasion patterns there that I think are likely

24   due to the pole.  And we also have to have a

25   physical force that's going to open the right

1                    CALDWELL

2  rear door, because that's going to be the portal

3  of ejection for Mr. Berry.

4              And so the pole basically hooks the

5  door edge of the right rear door and forces that

6  door open and dog-ears it forward.

7              The vehicle is continuing to rotate

8  during this phase and then comes in and also

9  engages the right front door and basically leaves

10  the characteristic pole impact shape -- the

11  indentation of the pole in the midsection of the

12  right front door and basically rips the latch

13  right out of the door edge, the rear door edge.

14  And that opened the right front door at the same

15  point in time.  And it's -- the right front door

16  is clearly open as the vehicle is at rest, as is

17  shown in the cell phone video.

18        Q.   Okay.  So can you pull up a picture

19  of the vehicle where you said demonstrates the

20  pole hitting the right rear?  You said that there

21  was damage to the right rear door from the wall

22  one, but then there would be more caused by the

23  pole when it hits the right -- right rear wheel

24  and then goes forward into the right front door.

25  You said there was a picture of that.

```
 1                    CALDWELL
 2        A.  You lost my -- you lost me there.
 3        Q.  Okay.  You've said -- you told me
 4   that -- okay.  The big question was what's the --
 5   what's the physical evidence that the right rear
 6   wheel impacted the base of the light pole.  And
 7   you said, number one, we have this ME photo 0032,
 8   which Patrick pulled up, and we just looked at
 9   that and you pointed out the damage to the rim.
10   Right?
11        A.  Yes.
12        Q.  Okay.  And then you also said there's
13   also additional physical evidence showing that
14   the right rear wheel impacted the pole -- the
15   base of the pole, that there was -- there was
16   damage on the right side of the -- of the
17   vehicle.  And then you followed that up with some
18   of that was also caused by the initial wall
19   impact.  You remember saying that?
20        A.  What I said was there was -- there
21   were two abrasion patterns that are slightly
22   different angles to the right rear fender.
23        Q.  Okay.  Can you show me -- can you
24   show me those different abrasion patterns?  And
25   then what I assume you'll be able to do is say
```

```
 1                    CALDWELL
 2   this is from the impact of wall one and this is
 3   from the impact of the pole.
 4        A.  Well, I'm not sure I can distinguish
 5   which is which.  I can just tell you that there
 6   are two.
 7        Q.  Okay.  If you could just show me
 8   those, that would be great.
 9        A.  Okay.  Let me see if I can find them
10   on my photos here.
11             (Document Review)
12        A.  If you can open my photo, it's JPEG
13   number 527.
14        Q.  I'm trying to get there.
15             Okay.  I've got it.  527.  Okay.
16        A.  What we're looking at --
17        Q.  Do you want me to share that?
18        A.  If you want to display it, yeah,
19   sure.
20        Q.  Let me see.  That one?
21        A.  That is correct.
22             MR. RUDOCK:  Do you see that,
23   Patrick?
24             THE WITNESS:  Yes.
25             MR. RUDOCK:  Okay.  All right.
```

```
 1                    CALDWELL
 2          MR. MONTOYA:  Yes.  Thank you.
 3   BY MR. RUDOCK:
 4          Q.  Okay.  So what are we looking at?
 5          A.  Well, we're looking at the right rear
 6   wheel well of the Tesla.
 7          Q.  Right rear.  Okay.  And the front of
 8   the vehicle is to the right or to the left?
 9          A.  To the right.
10          Q.  All right.  And --
11          A.  The door opening -- the door opening
12   for the right rear door is to the upper left in
13   the frame -- correction.  I'm sorry.  Upper
14   right.
15          Q.  Upper right.  Yes.  Yes.
16          Okay.  So what damage are you showing
17   here?  What -- what are you -- what are you
18   trying to show me here as far as these marks are
19   concerned?
20          A.  Well, first of all, what you can see
21   is there's a general appearance of movement of
22   the fender in a forward direction.
23          Q.  Okay.
24          A.  And the reason that's important is
25   because at the first wall hit any movement that
```

                         CALDWELL

1

2    should have taken place to these structures

3    should have been to the rear.  And what you

4    looked at at the top and forward edge of the

5    wheel well opening, you see a bunch of hard

6    surface abrasions.  These -- this abrasion

7    pattern has two different directions to it.  And

8    so I'm saying one of them is most likely from the

9    pole, because, again, hard surface abrasions are

10   either going to be the stucco to the wall --

11        Q.  Okay.  Let me --

12        A.  -- or the --

13        Q.  Okay.  Do you see my cursor?

14        A.  Yes.

15        Q.  Okay.  So these marks here, there's

16   going -- those seem to be -- and this would be on

17   the forward -- forward portion of the wheel well,

18   these seem to be going fore and aft.  That would

19   be pattern number one?

20        A.  Well, pattern number one and pattern

21   number two are fore and aft.

22        Q.  Okay.

23        A.  But there -- there is -- there's two

24   different patterns there.

25        Q.  Okay.  What is -- what is -- describe

                        CALDWELL
1    what pattern number one is.

2            A.  Well, it's fore and aft.  And then

3    there's a -- there's a second pattern with a

4    slightly different angle to it.

5            Q.  Which is also fore and aft?

6            A.  Yes.

7            Q.  So you're -- okay.  So you're

8    seeing -- you're seeing two separate fore and aft

9    abrasions or impacts or contacts in this area

10   forward the wheel well?

11           A.  Yes.

12           Q.  Okay.  And so is that what you meant

13   that there -- so some of these would have been

14   from wall one and some of these would have been

15   from pole?

16           A.  Correct.

17           Q.  And as you sit here you don't know

18   which is which, I assume?

19           A.  That's correct.

20           Q.  Okay.  Any other physical evidence of

21   contact with that right rear -- right rear on the

22   vehicle with the pole?

23           A.  Well, it was mentioned briefly, but

24   that -- not only part of that rim was there at

1                    CALDWELL

2    the post base -- pole base, I should call it, and

3    it also appeared that the right rear half shaft

4    for the drive portion of what would be an axle is

5    also laying there with the broken rim.

6         Q.   In photo 0039?

7         A.   Yes.

8         Q.   The ME photo that Patrick showed us?

9         A.   Correct.

10        Q.   Okay.  So the right rear wheel and

11   tire, I'm assuming what you're saying, was on the

12   vehicle as it went across the road and then once

13   it impacted the pole, the wheel would have

14   fractured and come off, right rear?

15        A.   Right.  And, again, just to be clear,

16   I'm not saying the right rear wheel and tire were

17   in good shape or probably even in normal

18   configuration after the curb strike -- the first

19   curb strike.

20        Q.   Right.

21        A.   But I believe that they were there in

22   some fashion.  I could not trace a tire mark from

23   the right rear.  I could see a partial tire mark

24   from the right front.  And with -- the period in

25   time we're talking about is as the vehicle was

```
 1                        CALDWELL
 2   rotating clockwise coming off of wall two headed
 3   toward the pole strike.  I could see scraping and
 4   that type of damage to the roadway that I
 5   attributed probably to the -- to the right rear
 6   area, but I couldn't see a tire mark there.  But
 7   I believe that the tire and wheel had to be still
 8   in some fashion connected to the vehicle.
 9        Q.  On the right rear -- on the right
10   rear coming across the -- coming across the road?
11        A.  Correct.
12        Q.  Okay.  But the right front tire, what
13   you're telling me is, it was in place because you
14   see a tire mark from the right front as it
15   approaches the -- as it approaches the far curb
16   and pole?
17        A.  Actually, that's not quite correct.
18        Q.  Okay.
19        A.  I see a tire mark that I -- that I
20   attributed to the right front in the early phases
21   of the travel coming off of wall two headed
22   toward the curb and pole on the east side.
23        Q.  Did you -- is that documented in your
24   report, that mark?
25        A.  No, I don't think so.
```

1                    CALDWELL

2          Q.   Were there any photographs of that

3     that were taken by the ME people out at the night

4     of the accident?

5          A.   I think so.  Let me look here just

6     really quickly.

7          Q.   What about Attachment 10 to your

8     report?

9          A.   Let me find that.

10         Q.   Yeah.  Yeah, you've got some photos

11    here in that.

12              MR. RUDOCK:  Okay.  Let me stop

13    sharing this, guys.  Okay.

14         A.   Attachment 10 is not the best image

15    of it, but it is there.  But it's not a very good

16    image of it.  I can probably go back and find

17    that and then maybe Patrick can light it up for

18    us.

19              MR. RUDOCK:  Okay.

20              MR. MONTOYA:  Fair enough.

21              THE WITNESS:  Stand by just a second.

22              If you look at image from the Medical

23    Examiner's number 31.

24              MR. MONTOYA:  Is that it?

25              THE WITNESS:  That's good, yes.

```
 1                      CALDWELL

 2   BY MR. RUDOCK:

 3        Q.  Okay.  Let me ask the question.  So

 4   what is -- okay.  The tire mark which is to the

 5   left of the screen, which on the bottom of it you

 6   see the word "Property," it starts going --

 7   starts there.  What is that from?

 8        A.  That is from the right -- excuse me.

 9   The left front.

10        Q.  Left front.

11        A.  I'm sorry.  I'm sorry.  No, I'm

12   turned around.  We're looking downstream in this

13   image.  That is from the left rear tire.  The

14   tire mark.  We see scrape marks that are left

15   there that are from some componentry that is at

16   the right rear corner of the vehicle, those

17   scrape marks.

18        Q.  The scrape marks which start at the

19   "B" -- "BCME" on the bottom are from what?

20        A.  Some componentry at the right rear

21   corner of the car.

22        Q.  And the tire mark to the left of that

23   is what?

24        A.  The predominant black tire mark is --

25        Q.  Right.
```

1                    CALDWELL

2         A.  -- from the left rear.

3         Q.  Okay.  And then the tire mark which

4    starts at the end under the word "Forbidden,"

5    what is that one from?

6         A.  That is from the right front --

7    excuse me, left front corner of the car.

8         Q.  Left front wheel -- left front tire?

9         A.  Left front tire, correct.

10        Q.  Yeah.  Yeah, you meant "tire" not

11   "corner."  Okay.

12        A.  Yeah, sorry.

13        Q.  Okay.

14        A.  Then if you look to the right of what

15   I'm saying is the left front tire mark, you see

16   an additional -- additional tire mark as well

17   that crosses over into the lane divider line.

18             THE WITNESS:  No, to the right.

19   Patrick, with your cursor.  To the right.  To the

20   right.

21             MR. MONTOYA:  Keep telling me if I'm

22   getting warmer or cooler.

23             THE WITNESS:  To the lower right

24   corner.  Now go right.  Right there.

25        A.  So what we can see is all four

```
 1                      CALDWELL
 2  vehicle wheel positions are identified there.
 3  BY MR. RUDOCK:
 4        Q.  So what is -- what is -- what is this
 5  mark which is above the tire mark which starts at
 6  the word -- at the end of the word "Forbidden"
 7  that is just north of that, what is that tire
 8  mark?  It's a more clear mark.  What is that --
 9        A.  That -- that's from the right front
10  tire.
11        Q.  All right.  Okay.
12        A.  And sometime during this travel the
13  right front tire separates from the vehicle, and
14  probably the wheel and hub as well, because you
15  can see the tire is -- is laying in the road.
16        Q.  Upstream -- okay.  All right.
17            MR. RUDOCK:  Hey, housekeeping.
18  Linda, we're going to make -- the report is
19  Exhibit 1.  We will make the ME Photo Number 39,
20  Exhibit 2.  The photograph that Bob just showed
21  us earlier as photo 527 showing the damage to the
22  right rear wheel area, we'll make that 3.  And
23  then we will make this photo 31 Exhibit 4.
24            (Exhibit 2 marked for identification.)
25            (Exhibit 3 marked for identification.)
```

1                    CALDWELL

2          (Exhibit 4 marked for identification.)

3    BY MR. RUDOCK:

4          Q.  Okay.  So when the vehicle is coming

5    back across the road, as we see in photo 39, at

6    that point it does have all four wheels and tires

7    in place, or it does not?

8          A.  It does.  But I would correct the

9    term "in place."  As we've already talked about,

10   the -- the right side tires and wheels were

11   damaged at the curb strike --

12         Q.  Right.

13         A.  -- and probably flattened.

14         Q.  Okay.

15         A.  And, again, the right rear tire, I

16   can't see evidence of it leaving a tire mark in

17   this photo.  I can see scrapes that I determine

18   came from the right rear corner -- the right rear

19   wheel position of the vehicle.  I can see a tire

20   mark, however, from the right front.

21         Q.  Okay.  So the tires and wheels are in

22   place with the exception of the caveat you just

23   said.  Understand.

24         A.  Right.  I guess I just have a problem

25   with "in place," because --

                        CALDWELL

1
2        Q.  Oh, no --

3        A.  -- they're not in normal -- they're

4   not in a normal position or attitude.

5        Q.  No, no, I understand.  And you've

6   clarified it.  I got it.

7        A.  Okay.

8        Q.  The four wheels and tires weren't

9   just normal as they came across, that's --

10  correct?  That's what you meant.

11       A.  Well --

12       Q.  I think that's understood.

13       A.  I think the left side or the driver's

14  side probably were in reasonable shape.

15       Q.  Okay.  All right.

16            When you said the pole hooked the

17  door, are you saying the pole hooked the right

18  rear door?

19       A.  Correct.

20       Q.  Okay.  Hooked the right rear door.

21  After it hooked the right rear door, what did it

22  do?

23       A.  Well, it forced that door to open and

24  folded the door over upon itself in a

25  rear-to-front fashion.

1                    CALDWELL

2         Q.  Right.  And then at some point the

3    pole impacts the right front door?

4         A.  Correct.

5         Q.  Was that a direct hit on blow?  Was

6    it sliding along and then hit it?  How did --

7    what was -- dynamically how did that happen,

8    impact to the right front door?

9         A.  Well, it's a continuation.  As the

10   vehicle is still rotating in a clockwise

11   direction as it's coming into this impact, the --

12   the right front door is forced open and is also

13   impacted by the pole.  And I believe that the

14   door was actually open to an extent at the time

15   of the pole impact where we see the prominent

16   indentation.  And I say that because we don't see

17   corresponding pole impact damage, or at least not

18   to even close to the extent of the pole impact

19   damage that you see in the door at the rocker

20   seal.  So the rocker seal is -- it shows a minor

21   area of damage from the pole, but not to nearly

22   the extent that the door skin does.

23        Q.  Okay.  Let's...

24            So let's find a photo, if you could,

25   for me, showing this impact to the right front

```
 1                    CALDWELL
 2   door.
 3          A.  Okay.
 4             MR. MONTOYA:  If -- Patrick, since --
 5          A.  Or can you open my photos, Bob?
 6   BY MR. RUDOCK:
 7          Q.  Yes, I can.
 8          A.  Okay.  Well, if we look at photo 531.
 9          Q.  Getting there.
10             Okay.  That one?
11          A.  Yes.  And then you can also scroll
12   forward.  I shot like, I don't know, five or six
13   photos at least from different angles on that
14   door showing the way this indentation takes
15   place.  And specifically if you move forward to
16   536.
17          Q.  I'm trying to get it.
18             Okay.  Do you see that?
19          A.  I see 531.
20          Q.  Oh, okay.  Hang on.
21          A.  You should be able to just advance
22   that by putting your cursor to the right side of
23   the -- right side of that screen, it should give
24   you an advance arrow there and then you can click
25   through.
```

```
 1                     CALDWELL
 2         Q.  Yes.  Are you seeing -- are you
 3  seeing now?
 4         A.  No, nothing is changing.
 5         Q.  Do you see 531?
 6         A.  I do see 531.
 7         Q.  Okay.  Let me try to...
 8             Well, let me try again.
 9             There you go.
10         A.  Okay.
11         Q.  Okay.
12         A.  Again, on this -- on this photo we're
13  looking at the top edge of the door looking
14  downward, generally.
15         Q.  Yes.
16         A.  You can also see directionality in
17  this photo in the way the dent was created from
18  the indentation of the pole.  You can see that
19  there is forward-directed movement of the
20  material of the door, whereas any movement that
21  would have been caused from the frontal impacts
22  would be directed rearward.  And so --
23         Q.  So you think the pole --
24         A.  Go ahead.
25         Q.  So you think the pole did not -- or
```

1                    CALDWELL

2    it had to have made contact with the rear door

3    before it made contact in this photo 531 and 536?

4         A.  Correct.

5         Q.  Okay.  Again you see photo 31?

6         A.  Yes.

7         Q.  Okay.  The front -- okay.  The door

8    handle, is that toward the A-pillar or is that

9    toward the B-pillar?

10        A.  The B-pillar.

11        Q.  All right.  I do not see any fore and

12   aft longitudinal markings on this door skin right

13   here before this big impact.  Wouldn't we expect

14   to see some sort of markings on here if the pole

15   was coming from the rear door impacting the front

16   door causing this indentation in 31?

17        A.  Well, again, the vehicle is

18   continuing to rotate such that it's going to slap

19   that door into the pole.

20        Q.  Slaps the door -- what do you mean

21   slaps the door into the pole?

22        A.  Well, I don't know that I can say it

23   any better than that, because I'm saying that --

24   that the door -- and one point we haven't

25   discussed yet that I mentioned is that the door,

1                       CALDWELL

2    I felt, is a good likelihood that the door is

3    already open when that impact takes place, or at

4    least cracked open.  And I say that because of

5    the marked difference in the degree of

6    penetration into the door panel itself compared

7    to what impact the rocker seal lever of the car.

8         Q.  Okay.  Show -- what photo do you

9    have?

10        A.  If you want to open 487 of my photos.

11        Q.  487.

12            Okay.  There is 487.  Do you see

13   that?  Okay.

14        A.  I do.

15        Q.  So what are you -- what are you

16   trying to show me on 487?

17        A.  Well, the door opening that we're

18   seeing centered in the screen is the right front

19   door opening.  Obviously --

20        Q.  Correct.

21        A.  -- the door is gone.

22        Q.  Correct.

23        A.  And the structure along the bottom of

24   the door opening I'm referring to as the rocker

25   seal.

1                    CALDWELL

2         Q.  Right.  What I'm moving my cursor on?

3         A.  Right.

4              And if you look -- if you stop your

5    cursor and move it left a little bit.  A little

6    bit more.  A little bit more.  Right there.

7    Right there.  Right below your cursor is a minor

8    dent in the rocker seal.

9         Q.  Okay.

10        A.  And I'm saying that that is not in

11   the same degree of deformation as we see in the

12   door itself.

13        Q.  In the U part to the door itself?

14        A.  Correct.

15        Q.  Well, the locker is a lot stronger

16   than that door skin, correct?

17        A.  Correct.

18        Q.  So just for the record -- for the

19   record, this red box in the vehicle which I'm

20   circling now -- which I'm using with my cursor,

21   the indentation that we're talking about in the

22   rocker is essentially just below that, right?

23        A.  Correct.

24        Q.  Okay.  And -- all right.  So what

25   you're saying is this indentation in the rocker

1              CALDWELL

2    is small compared to the major indentation you

3    see to the right front door skin, so that tells

4    you that there was not a direct impact from the

5    pole right into the door because you would have

6    expected to see this rocker area damaged similar

7    to what we see the door?

8           A.  Well, or at least damage to a greater

9    extent.

10          Q.  Right.

11          A.  And that's why I'm saying that the

12   door was probably cracked open at the time that

13   that impact takes place.

14          Q.  All right.  What is it -- what is it

15   that hooks the door?  What part -- how does the

16   pole hook the edge of the front -- right front

17   door to start to pull it open?  Mechanically

18   allow does that happen?  I don't -- I don't

19   understand that.

20          A.  I'm not sure it did hook it in that

21   fashion.  You obviously have forward-directed

22   force, as well as lateral, of course, from the

23   pole contact to that right front door.  And so

24   that forward-directed force pulled the latch out

25   of the -- out of the rear of the door.

```
 1                    CALDWELL

 2        Q.  Yeah, I used the word "hook" because

 3   that's the word you used.

 4        A.  I used that word to describe what

 5   happened at the right rear door, I hope -- I

 6   think.  That was my intent.

 7        Q.  Oh, the right rear door.  Okay.

 8            So tell me again what you think

 9   happened to cause the right front door to open.

10   I wasn't following that.

11        A.  Well, I think it was the pole impact

12   directed forward on the door.  And then as that

13   impact takes place, the door actually comes open.

14   And that's why we see different degrees of

15   penetration in the door relative to the rocker

16   seal.

17            MR. RUDOCK:  We'll make photos 531,

18   536, and 587 Exhibit 5.

19        (Exhibit 5 marked for identification.)

20   BY MR. RUDOCK:

21        Q.  Okay.  Your exhibit -- I'm sorry,

22   your Attachments 14, of which there are six of

23   them, is your vehicle diagram showing the vehicle

24   how it goes through the accident scene, impacts

25   the curb, wall one, wall two, goes across, hits
```

```
 1                      CALDWELL
 2   the curb on the other side, then hits the tree.
 3   Right?
 4           A.  You mean the pole?
 5           Q.  Yes, the pole.  Sorry.
 6           A.  Yes.
 7           Q.  Okay.  I do not see in any of these
 8   attachments, which is Attachment 14, the pole.
 9   Where is the pole?  And maybe the best way to do
10   is to look at Attachment 14, the second one.
11           A.  I'm not sure I'm on the -- I'm not
12   sure my -- the order is the same here.
13           Q.  Yeah, go to your report.
14           A.  Yes, I'm there.
15               Did you have a question?
16           Q.  Yeah, I'm trying to...
17               Okay.  I'm showing my screen again.
18   Do you see this?
19           A.  Yes.
20           Q.  All right.  This is Attachment 14.
21   And this would be the attachment which has
22   labeled on it 73.9, 102.2.  That's the one we
23   have in front of us, correct?
24           A.  Yes.
25           Q.  All right.  So going from left to
```

```
 1                        CALDWELL
 2   right we have -- one, two, three, four, five,
 3   six, seven, eight, nine -- we have nine vehicles
 4   going across as you're showing how the vehicle is
 5   rotating clockwise.  And then we have a series of
 6   vehicles above the 23.2 number that you have
 7   where in here somewhere I'm assuming it's hitting
 8   the pole and coming to final rest, right?  Do you
 9   see this?
10        A.  Yes.
11        Q.  Is the last car on the upper
12   right-hand corner, is that final rest?
13        A.  Yes.
14        Q.  All right.  Where in this series of
15   vehicles at the end here, and it appears to be it
16   looks like five or six vehicles below the 23.2
17   number, where is the pole?
18        A.  Well, it's not showing well.
19        Q.  Well, where is it shown at all?
20   That's my question.  This is supposed to be
21   telling us and showing the jury how the vehicle
22   interacted with the pole, hit the rear wheel,
23   then comes forward, starts to peel the door off,
24   impacts the front door.  I need to know
25   where's -- where's the pole?  I need to know
```

```
 1                      CALDWELL
 2  where that is in here.  Where is it?
 3          A.  Well, let's see here.  If we can
 4  count back from the resting point of the vehicle,
 5  the pole is interacting with the car at vehicle
 6  position six back from the -- from the resting
 7  point.
 8          Q.  One, two, three, four, five, six.
 9              Is six the vehicle which is -- I tell
10  you, let's do it this way.  This might make it
11  easier.  Going from left to right where it's --
12  where it's hitting wall number two.
13          A.  You lost me there.  Start again.
14          Q.  Okay.  Looking at -- looking at the
15  exhibit which is on screen, which we're going to
16  call this Exhibit 6 now, Attachment 14.
17              MR. MONTOYA:  And, Bob, I don't want
18  to interfere, but do you have a highlighter thing
19  up there, that little highlighter?  If you just
20  want to bring that -- drag that down and just
21  highlight the car you're talking about.
22              MR. RUDOCK:  That thing?
23              MR. MONTOYA:  Yes.
24              MR. RUDOCK:  Oh.  Thanks, Patrick.
25  BY MR. RUDOCK:
```

1                      CALDWELL

2          Q.  Okay.  You see -- see what I've just

3    highlighted?

4          A.  Yes.

5          Q.  Okay.  Let's call that car one,

6    because you can clearly see that.  All right?

7    Then we're going to go one, two, three --

8          A.  Okay.

9          Q.  -- four, five, six, seven, eight.  So

10   number eight would be the vehicle which shows the

11   left rear pointing toward the bushes -- I'm

12   sorry, that vehicle is pointing toward the

13   bushes, it's still rotating clockwise, so that

14   would be number eight, do you -- which is this

15   one right here.

16         A.  So you're counting from number one.

17   You're calling number one the mark you put?

18         Q.  Yeah, this is number one down here

19   where it impacts wall one -- I'm sorry, wall two.

20   The next one would be two.  Next one three.

21   Four.  Five.  Six.  Seven.  Eight.  Okay?  That

22   is number eight.

23         A.  Yes.

24         Q.  You are saying what I have here as

25   number nine is where it's impacting the pole?

```
 1                      CALDWELL
 2          A.  Correct, at about that position.
 3          Q.  Okay.  And at that position in number
 4   nine, that is where it is hitting the right rear
 5   wheel, the first impact with the right rear
 6   wheel, and then it goes along the right side
 7   until it contacts the right front door as you
 8   described?
 9          A.  Correct.
10          Q.  Okay.  If that is number nine, the
11   one I just marked would be ten.  Okay?
12          A.  Okay.
13          Q.  And will we agree that this one here
14   is eleven?  Right here is eleven.  Still there?
15          A.  Yeah, I'm with you.
16          Q.  Okay.  That's eleven.
17              Then the next one would be twelve,
18   thirteen, fourteen.  And point of rest would be
19   vehicle fourteen, right here.  Agree?  Yes?  No?
20          A.  Yes, I do.  I was just counting
21   again.
22          Q.  Oh, my bad.  Okay.  That's -- so we
23   have fourteen vehicles up through here.
24              Okay.  So number nine -- number nine,
25   which is this one here, is impact pole.  That's
```

```
 1                    CALDWELL
 2   nine.  What is happening at ten?
 3        A.  Well, first of all, I -- admittedly
 4   as I look at this, I didn't graphically show this
 5   as clearly as I could have and should have.
 6        Q.  That's why I'm asking these
 7   questions.  I'm trying to figure out all this
 8   interaction with the pole.
 9        A.  And so I should -- I should draw that
10   better, and I will do so.  So that's one other
11   future job I will do.
12             I'm not sure based on this particular
13   view of that drawing I can do much better.  But
14   as the vehicle hits at the right rear, the
15   direction of rotation of the vehicle changes --
16        Q.  Right, no --
17        A.  -- from clockwise to
18   counterclockwise.
19        Q.  Yeah, I got that.  Let me -- let me
20   just -- so we -- we stay on track here.  So this
21   one right here which we are calling nine, that is
22   where that initial impact would have been with
23   the right rear wheel?
24        A.  At or about that position, yes.
25        Q.  Understand.
```

```
 1                        CALDWELL
 2                And then what -- what -- number ten,
 3    what is happening on ten?  Is that where we now
 4    are starting to go from a clockwise yaw into a
 5    counterclockwise yaw?
 6         A.  Yes, it is.
 7         Q.  And -- and it's --
 8         A.  It's beginning -- it's beginning at
 9    the right rear contact, but it's developing as we
10    move to ten -- position ten.
11         Q.  Okay.  And then at position eleven,
12    is that the position where the right front door
13    is being impacted by the pole causing that --
14         A.  No, that --
15         Q.  -- big indentation?
16         A.  That would have already happened by
17    the time we get to that position.
18         Q.  Okay.  So that would be -- that --
19    the impact to the pole -- I'm sorry, the impact
20    of the vehicle striking the pole would have been
21    between positions ten and eleven?  Between here.
22         A.  Well --
23         Q.  Well, if you -- if you don't know any
24    of this now, that's fine, just let me know.  I'm
25    just trying to figure out what's going on.
```

```
 1                     CALDWELL
 2          A.  Well, position nine is about at the
 3   position of the initial pole contact.
 4          Q.  Right.
 5          A.  Shortly after that we're engaging the
 6   right rear and right front doors.  And so I
 7   didn't show graphically that interaction as well
 8   as I should have.  I didn't anticipate these
 9   questions.
10          Q.  So somewhere between -- is this a
11   fair statement:  Somewhere between nine, ten, and
12   the eleventh position is where this vehicle is
13   impacting the right rear area going forward,
14   contacting the right rear door, starting to pull
15   open the left front door, and then the impact of
16   the pole into the left front -- I'm sorry, right
17   front door where we see that U-shaped damage,
18   that's all going on between nine, ten, and
19   eleven?
20          A.  Probably nine and ten, yes.
21              MR. RUDOCK:  Okay.  All right.
22              All right.  And this -- this will be
23   Exhibit 6, I think I said -- right -- guys?
24   Linda?
25              MR. MONTOYA:  I've got six.  Five is
```

1                    CALDWELL

2   the composite photos.  This should be six.

3        (Exhibit 6 marked for identification.)

4             MR. RUDOCK:  Okay.  Okay.  And I'll

5   tell you what, Patrick, if it's okay with you,

6   when I send these to the court reporter I'll try

7   to print this and I'll label them one, two

8   through fourteen, so we can understand this when

9   we read it.  Is that okay?

10             MR. MONTOYA:  That works.

11             MR. RUDOCK:  Unless you know how to

12   do it now.  I don't.

13             MR. MONTOYA:  Taking too much time.

14   That will be fine.

15             MR. RUDOCK:  Agreed.  All right.  All

16   right.

17   BY MR. RUDOCK:

18        Q.  Okay.  Now, recall -- you were

19   just -- you told me that this right rear wheel is

20   broken off at the pole and that's where you

21   showed me that Medical Examiner's Photo 39.

22        A.  Well, I believe that's where the

23   ultimate separation occurred, yes, based upon the

24   fact that we see a fractured piece of the wheel

25   at the pole base.

1                    CALDWELL

2        Q.  Okay.  So let's -- the ultimate

3   separation, meaning it could have been broken and

4   separated before?

5        A.  Well, as I think I indicated, I felt

6   that that wheel and tire were damaged at the

7   initial curb strike and probably weren't in

8   normal configuration under the vehicle such that

9   it was supporting the vehicle, because we see

10  scrapes in the roadway that we talked about

11  already that come from this right rear position.

12       Q.  Okay.

13       A.  But I feel that that wheel and hub

14  assembly had to have been there at the pole

15  because we broke off a piece of the wheel.

16       Q.  So right -- okay.  So right side

17  wheels and tires are damaged at the curb, were

18  damaged throughout the sequence, but then the

19  right rear wheel is completely off when it hits

20  the pole?

21       A.  Well, subsequent the pole, yes.

22       Q.  Okay.  And I apologize for this, but

23  I'm having trouble understanding dynamically how

24  does the pole pull a -- the both -- both doors?

25  How does that -- how does that happen?  What --

1                      CALDWELL

2    what grabs it, because I'm un- -- let me just.

3    I'm envisioning this pole.  It's round.  It's

4    smooth.  How is that pole grabbing onto the doors

5    and pulling them away?  I don't -- I don't get

6    that.

7         A.  Well, you can see in the damage of

8    the right rear door exactly how that had to have

9    happened, because you can see that as the pole is

10   along the right rear -- is along the right rear

11   fender of the vehicle and the vehicle is moving

12   rearward, that door edge is exposed and therefore

13   the -- it is pulled forward and you can see how

14   the door is bent from that action.

15        Q.  Out from the pole as opposed -- out

16   from the pole as opposed to getting entangled in

17   the shrubs, the trees, it's being pulled from the

18   pole?

19        A.  Well, I can't --

20        Q.  That's what -- I'm having problems it

21   grabbing on.

22        A.  Well, I'll tell you what, the one

23   thing I'll do is I'll draw this better and

24   produce a better looking drawing that's going to

25   describe that in more detail.

1                     CALDWELL

2              But first of all, those trees and the

3      foliage there are of, shall we say, lightweight

4      structures compared to the pole.  I think we'll

5      all agree with that.  And so the forces to open

6      that right rear door have to be significant.  And

7      the only item that I can see that is going to be

8      capable of doing that is the pole.

9              So as the pole moves forward relative

10     to the car, the deflection of the right rear

11     fender allows there to be a -- an action where

12     you can hook the pole on the door skin and you

13     then rip the door forward and cause -- and force

14     it to open as well as fold forward upon itself.

15          Q.  The -- okay.  And then you said point

16     of rest 23 feet from the -- from the pole?

17          A.  Yes.

18          Q.  And when was Mr. Berry ejected, did

19     you look at that or not?

20          A.  Well, I didn't look at it in any

21     great degree of detail, but obviously after the

22     door comes open he can be ejected out the -- out

23     the path of the vehicle.  And the vehicle's

24     trajectory is going to be, you know, I guess

25     southeast, generally, which as he -- as that door

```
1                     CALDWELL
2    opens, he is then going to continue traveling
3    along the velocity vector of the vehicle at that
4    time.  And he was reportedly at rest in -- kind
5    of in the foliage near the north edge of that
6    driveway at 1344.
7         Q.  Okay.  On your section called "Speed
8    Analysis," which is page 5 --
9         A.  Yes.
10        Q.  -- you say:  Based on Conservation of
11   Energy and Conservation of Momentum, the crash
12   was analyzed to a reasonable degree of
13   engineering certainty.
14             Do you have any Conservation of
15   Energy equations that you did to show us?
16        A.  Well, I didn't print the equations,
17   but it's basically kinetic energy -- when we're
18   talking about the vehicle in motion now --
19        Q.  Wait, wait.  Okay, okay.  Time out,
20   time out.  All I'm asking is, is there -- do you
21   have an equation that you can show me?
22        A.  Not that I wrote down, but I can
23   recite it to you.
24        Q.  Okay.  Site -- site -- site it from
25   that.  Tell me the numbers.  Don't tell me the
```

1                        CALDWELL

2    theory.  Don't tell me how you do it.  Give me

3    the numbers.  I want to see the numbers.

4           A.  Well, I can't really do that because

5    there's --

6           Q.  Okay.

7           A.  Let me -- let me take a step back and

8    if you don't -- if this doesn't answer your

9    question you can go ahead and ask me further.

10              But the way this accident gets

11   reconstructed is you start at rest and you work

12   backwards.  And so what you're doing here is

13   you're looking at the energy dissipated in the

14   travel from the pole to rest.  So what you have

15   to look at is the vehicle decelerating over that

16   23 feet due to tires dragging, metal components

17   dragging, et cetera.

18              So you -- you are going to basically

19   calculate the energy that is lost or that is

20   expended, is a better way to say that, in that

21   travel segment.  You then have to look at the

22   energy that is lost in the pole contact and the

23   pole impact.  And so you add that to what the --

24   the summation of the energy loss of the vehicle.

25              Then you're going to look at the

```
 1                    CALDWELL
 2   vehicle's energy loss as it travels southeast
 3   across the Seabreeze Avenue.  And you're then
 4   going to look at the energy lost at the south
 5   wall impact, or the number two wall impact, then
 6   the segment from wall one to wall two, then the
 7   pre-impact travel of the vehicle would be
 8   considered prior to that.  And so there's no one
 9   number I can point to that answers your question.
10   But if you look at the notes and analysis file --
11   and you had pointed out that -- that -- on page 3
12   where there was a vector diagram.
13           Q.  Yeah.
14           A.  Okay.  On this -- on page 2 of that
15   is where these segments are broken down into
16   points -- into positions.
17           Q.  Okay.  You can talk about that now.
18   Okay.
19           A.  And -- and so each individual energy
20   calculation and/or momentum calculation is
21   delineated here.  The equations aren't written
22   down, but the -- the energy --
23           Q.  Okay.
24           A.  -- the energy loss is calculated and
25   the speed loss over the segment is calculated.
```

```
 1                     CALDWELL

 2          Q.  Okay.  Let me -- let's go through

 3     that, then.

 4               MR. RUDOCK:  We'll make the notes,

 5     which I believe are approximately 30 or 31 pages,

 6     that will be Exhibit 7.

 7               (Exhibit 7 marked for identification.)

 8     BY MR. RUDOCK:

 9          Q.  And page 2 of your notes is what you

10     were just telling me about, this -- this is

11     essentially your full reconstruction beginning to

12     end?

13          A.  Yes.

14          Q.  All right.  So let me ask you some

15     questions about this.

16               So on the top portion of it, this is

17     impact to wall one, which is what you said is the

18     3.5 delta-v based on your experience, and that's

19     also what the NTSB essentially concluded.  That's

20     what the first top half of this is?

21          A.  It's what's reported on the -- in the

22     Event Data Recorder.

23          Q.  Right.  Yes, yes.  That's wall one.

24     That's -- that's the top portion of this,

25     correct?
```

1                          CALDWELL

2          A.   Correct.

3          Q.   Okay.  And then under -- then it

4     says, "Impact with wall, 80.3."  That's wall two.

5          A.   Right.

6          Q.   Right.  And you did an EDCRASH

7     analysis to verify that?

8          A.   Correct.

9          Q.   And that -- that's -- okay.

10              All right.  And then the next thing

11    you did was, "Speed departing wall impact."  And

12    then the bottom part of this deals with the

13    impact to the pole.

14         A.   Not entirely, no.  Because I had

15    to -- I had to consider the losses of -- the

16    losses of energy or expended -- expended energy

17    as the vehicle travels across Seabreeze.

18         Q.   Okay.

19         A.   And then we get to the pole.

20         Q.   Okay.  I see that.

21              And then when you're down at the pole

22    it looks like you did a momentum diagram for the

23    pole like you did for wall two.

24         A.   Yes.  And I -- I need to make this

25    clear that that vector diagram is not to scale.

1                          CALDWELL

2   The -- it's just an example of how the numbers

3   are put into place, but I -- it is not plotted to

4   scale.

5          Q.  I don't understand what that means.

6   You say the delta-v pole impact was 21.3.  That's

7   accurate, I assume?

8          A.  Yes.

9          Q.  Okay.

10         A.  But -- but, for instance, the

11  18 degrees -- when it says PDOF 18, that's based

12  on an earth-based coordinate system and that's

13  the angle between the delta-v vector and the

14  incoming vector.

15         Q.  Okay.

16         A.  And the way it's drawn here is just a

17  representation.  And it's drawn and it's going to

18  look like it's probably about 45 degrees, but in

19  reality it's 18, is the number.  So that's what I

20  mean when it's not drawn to sale.

21         Q.  Well, let me ask -- let me ask you

22  this, then.  That momentum diagram for the pole

23  shows an outgoing velocity vector of 15.5, that's

24  accurate?

25         A.  Yes.

1                        CALDWELL

2          Q.   And the incoming velocity vector to

3    the pole is -- looks like it is 34.3, that's

4    accurate?

5          A.   You -- you broke up there.   If you

6    said 34, that's accurate.

7          Q.   Yes.   Yes, that's what I said.

8    Sorry.

9               And the angle, incoming versus out

10   coming, is 25.   That's accurate?

11         A.   Yes.

12         Q.   Right.   And then the -- and then you

13   come up with a delta-v of 21.3 for the impact to

14   the pole?

15         A.   That's correct.

16         Q.   Right.   So all of -- all of that is

17   accurate.   So I'm still not -- so when you say

18   not to scale, the only issue there is the PDOF?

19         A.   No.   The length of the vectors is not

20   intended to be mathematically correct.

21         Q.   Oh, okay.

22         A.   The labels -- the labels are correct,

23   the diagram is just not to scale.

24         Q.   Oh, okay.   You're talking the length

25   of the vectors.   But as far as the speeds and the

```
 1                    CALDWELL
 2   numbers and everything, that's all accurate?
 3          A.  Yes, right.
 4          Q.  Right.  Otherwise, why would you put
 5   it in here; fair?
 6          A.  That's fair.
 7              (Phone interruption.)
 8              MR. RUDOCK:  Sorry.  That was the
 9   like fifth Spam Risk call of the morning so far.
10              THE WITNESS:  Says your vehicle's
11   warranty expiring?
12              MR. RUDOCK:  My vehicle's?
13              THE WITNESS:  That's the spam calls I
14   always get is your vehicle's --
15              MR. RUDOCK:  Oh, yeah.  Oh, yeah.
16              THE WITNESS:  -- warranty is
17   expiring.
18              MR. RUDOCK:  And the answer is --
19   yeah.  And the answer is, "Yes, and I don't
20   care."  That's the biggest scam.  These cars, I
21   mean, it's not like thirty years ago.  Geez.
22   Scam.
23              I also do not get the warranty for
24   the extension on the vacuum.
25   BY MR. RUDOCK:
```

1                        CALDWELL

2          Q.  All right.  Okay.  Let me ask a

3  couple more questions here and then we'll take a

4  little break.

5              Page 6, top -- very top page, it

6  says, at time zero, has slowed to 86.4.  And this

7  is -- this is all dealing -- this whole -- this

8  section is dealing with the pre-crash data table,

9  right?

10         A.  Yes.

11         Q.  Yeah?

12         A.  Yes.

13         Q.  And so the last reported event here

14  is 86.4 miles per hour, you converted that from

15  139 kilometers?

16         A.  Correct.

17         Q.  And this is the curb -- or this is

18  the wall, rather, as we talked about.  And this

19  whole Event Data Recorder, this records the

20  information five seconds before that impact,

21  which you believe is wall number one, as we

22  talked about?

23         A.  Yes, that's what I concluded, yes.

24         Q.  Right.  Did you make any adjustment

25  for braking at that wall impact?

```
 1                    CALDWELL

 2          A.  No.  Why would I?

 3          Q.  Well, because you said that he was --

 4   it shows in here that he was steering and

 5   braking.

 6          A.  Yes, of course.  But, again --

 7          Q.  That's why.

 8          A.  -- we already know what the speed is

 9   at the wall based on --

10          Q.  Okay.

11          A.  -- the data recorder.

12          Q.  Okay.

13          A.  And so I didn't need to make any

14   adjustment.

15          Q.  Okay.

16          A.  I'm certainly considering the fact

17   that he's braking and steering.

18              MR. RUDOCK:  Okay.  You guys want to

19   take about a ten-minute break or so?  Pat?

20              MR. MONTOYA:  How are you holding up?

21   Just tell me what you want to do.  Tell me how

22   you're holding up.

23              MR. RUDOCK:  I mean, it's up --

24              MR. MONTOYA:  I'm talking to

25   Mr. Caldwell, not you.
```

```
 1                    CALDWELL

 2            MR. RUDOCK:  Oh, I know, I know.

 3            THE WITNESS:  I'm holding up fine.

 4            Just as a quick question for Bob.

 5   How long do you expect to go here?

 6            MR. RUDOCK:  I suspect like we could

 7   finish this up --

 8            MR. MONTOYA:  That was the next

 9   question.  So what's the lunch hour?

10            MR. RUDOCK:  The -- no, no, no.  Hour

11   and a half max.

12            THE WITNESS:  Okay.  Yeah.

13            MR. RUDOCK:  Linda, if it's okay with

14   you, I think, and Manny, take ten minutes and

15   then keep plugging through so we can get her

16   done.

17            THE COURT REPORTER:  That works for

18   me.

19            THE WITNESS:  Fine with me.

20            THE VIDEOGRAPHER:  The time is 10:41.

21   We're going off the record.

22        (A break was taken from 10:41 a.m. to

23        10:56 a.m.)

24            THE VIDEOGRAPHER:  Time is 10:56.

25   We're back on the record.
```

```
 1                      CALDWELL

 2   BY MR. RUDOCK:

 3          Q.  Bob, page 6 of your report,

 4   "Alternative Speed Analysis."  Let's talk about

 5   this.

 6          A.  Okay.

 7          Q.  Second paragraph where you say,

 8   "Assuming the speed limiter was active and the

 9   Tesla entered the curve at the top speed of

10   85 miles per hour, it could have made the curve.

11   The radius of lane two is approximately 645 feet

12   and is superelevated at approximately 2%.  To

13   follow a curve of that radius at 85 miles per

14   hour the vehicle would had to have generated

15   centripetal or lateral (sideways) acceleration of

16   approximately 0.77 g.  This acceleration would

17   have come from the tires as well as the

18   superelevation (bank angle) of the roadway."

19                Okay.  So this is a significant

20   opinion of yours that if the vehicle was going

21   through there at 85, the vehicle could make it,

22   correct?

23          A.  Correct.

24          Q.  Would it?  Not could it, would it?

25          A.  Well, that's a question that all I
```

1                          CALDWELL

2    can say is that we know certain information from

3    the Event Data Recorder and from the plotting of

4    the tire marks as to what kind of lateral

5    acceleration the vehicle was generating.  And so

6    since it was generating lateral acceleration in

7    excess of what was required to make it at 85, I

8    can say that it probably -- that it probably

9    would have done it.

10               Your question I think is valid in

11   that, you know, it's a question of physics as

12   well as driver inputs.  And we know what the

13   vehicle was doing that day in terms of lateral

14   acceleration.  And so since the driver was

15   capable of generating -- causing his vehicle to

16   generate lateral acceleration in excess of what

17   would have been needed at 85, I believe he

18   probably could have made it.

19               Now --

20        Q.  So you --

21        A.  I need to put a couple more points on

22   here that you didn't read there, is I felt that

23   it was likely that even entering at 85, the

24   driver would have probably used more than just

25   the outside lane and he probably would have

```
 1                    CALDWELL
 2   slowed and so that would have reduced the net
 3   required lateral acceleration.
 4          Q.  So we know he did not slow, because
 5   he wrecked; fair?
 6          A.  No.  No, we know he did slow.
 7          Q.  I mean, he did wreck.
 8          A.  That's true.
 9          Q.  Okay.  So you are telling me that the
10   vehicle itself is capable of going through that
11   turn lane two at 85?  The vehicle is capable of
12   going through there at lane two at 85?
13          A.  Yes.
14          Q.  What about the driver Barrett, is he
15   capable of going through that curve at 85?  And I
16   believe the answer is not -- is no, because he
17   didn't make it.  Fair?
18          A.  Well, he wasn't going 85.
19          Q.  You're right.  He was going 116.
20          A.  Well, not --
21          Q.  True?
22          A.  -- not at the curve -- not at the
23   curve entry.  He was going 116 prior to the
24   curve, yes.
25          Q.  At the curve when he -- okay.  How
```

1                      CALDWELL

2     fast was he going when he -- well, first of

3     all -- strike that.

4              You're talking about the radius of

5     lane two, correct?

6          A.  Yes.

7          Q.  And we know from Cohen, we know from

8     videos, he was not in lane two when he started to

9     negotiate the curve, correct?

10         A.  Correct.

11         Q.  He was in the -- in the -- in the

12    non-passing turning lane, correct?

13         A.  That's my understanding, yes.

14         Q.  And the radius --

15         A.  That's back at the pass, which

16    probably occurred prior to entering the corner.

17         Q.  The radius of lane two would be the

18    longest radius of 645 feet, right?

19         A.  The long --

20         Q.  That's what you said in your --

21         A.  The long --

22         Q.  That's what you said in your report?

23         A.  The longest radius if the vehicle

24    stays in a lane.

25         Q.  Correct.  The radius for the lane

1                    CALDWELL

2    two -- I'm sorry, the turn lane, which he was in

3    when he was passing his friend, is how many feet?

4         A.  I don't know that off the top of my

5    head.

6         Q.  Okay.  But we know when he was

7    passing Mr. Cohen he was not in lane two, he was

8    not in lane one, he was in the turning lane,

9    which is not a passing lane.  We know that,

10   right?

11        A.  Yes, I would not consider that -- the

12   painted media area to be a passing lane.

13        Q.  And there was traffic out there,

14   there were other cars out there, right?

15        A.  Well, somewhere, yes, but --

16        Q.  Well, you've seen the -- you've seen

17   the videos of -- of cars going up and down,

18   right?  I noticed in your notes you had a

19   notation, and we can talk about it, how you

20   looked at various videos.

21        A.  Yes.  I mean, there's certainly other

22   traffic, but nobody was impinging upon

23   Mr. Riley's movements that we're directly

24   consider -- considering here once the --

25        Q.  What's the basis for that?  What's

```
 1                     CALDWELL
 2   the basis for that statement?
 3                 MR. MONTOYA:  I'm sorry, you're not
 4   letting him finish.  I know you're excited, but
 5   you need to let him finish.
 6                 MR. RUDOCK:  I apologize.  Yeah, I am
 7   getting a little angry with this one, Patrick, I
 8   confess.
 9                 THE WITNESS:  Well, and I don't mean
10   to make you angry.
11         A.  He didn't hit anybody.
12   BY MR. RUDOCK:
13         Q.  Oh, okay.
14         A.  And so, you know, along his path of
15   travel there was nobody immediately interfering
16   with his travel path.  That's all I'm saying.
17         Q.  Oh, okay.
18                 Do you know if he was distracted at
19   all?  Barrett.  His name is Barrett.
20         A.  Right, I'm aware of that.
21                 You know, I -- I can't speak to that,
22   I'm not in the car.  I -- I can't speak to that.
23   I would certainly not expect him to be distracted
24   because at this kind of speed and in this
25   setting, I would expect that he'd be paying
```

```
 1                    CALDWELL
 2   attention.
 3          Q.  Do you have any basis for that or is
 4   that just your assumption?
 5          A.  Well, again, I -- I'm not going to
 6   render an opinion one way or the other.  I'm just
 7   saying that putting myself in that position, I'd
 8   be paying very close attention to my --
 9          Q.  Could you -- the tighter the radius,
10   the slower you have to go --
11          A.  Correct.
12          Q.  -- to make it through that, right?
13          A.  Correct.
14          Q.  And the tightest radius in this area
15   would be the turn lane, right?
16          A.  Well, the turn lane or even the
17   northbound lanes would be shorter radii.
18          Q.  Okay.  Absolutely.  But in the
19   direction he's going, the turn lane would have
20   the shortest radius and he would have to go the
21   slowest to get around?
22          A.  If that was his goal to maintain that
23   lane, yes.
24          Q.  Well, I -- okay.  And then the
25   next -- then lane one you can go a little -- a
```

```
1                      CALDWELL
2    little faster, right?
3         A.  Yes.
4         Q.  And lane two go a little faster,
5    right?
6         A.  Right.
7         Q.  In lane two is where you have your --
8    where you have him coming when you're making this
9    analysis that he can get through there going 85,
10   right?
11        A.  Say that again?
12        Q.  Your analysis that the vehicle could
13   go through here going 85 miles per hour is based
14   on going through it at lane two?
15        A.  That was the lane that I gave the
16   example for, yes.  I can calculate it for any
17   other radius.
18        Q.  On page 6 you say -- well, on this --
19   you said about expected him not to be distracted.
20   What -- what studies do you know of, if any, are
21   out there about 16-, 17-, 18-year-old boys being
22   distracted when they're driving with other people
23   in the car?
24        A.  Well, I'm not aware of any studies
25   that I can cite to you.  I know that, for
```

1                          CALDWELL

2     instance, younger drivers are prohibited from

3     having other people in the car other than a, like

4     for instance a check driver, for reasons of

5     distraction.  But I don't know what studies those

6     might have been based upon.

7          Q.  All right.  Is it your belief or have

8     you heard of studies where teenagers who are

9     driving are more likely --

10         A.  You broke up.

11         Q.  -- to be distracted with -- I'm

12    sorry, did you hear me?

13         A.  You broke up initially there, but I

14    hear you now.

15         Q.  Okay.  Okay.

16              You are aware that there are studies,

17    and I guess just common sense tells you, that

18    teenage drivers are more likely to be distracted

19    when they are driving when they have friends in

20    the car; would you agree with that basic concept?

21         A.  Well, I think, as I said, I don't

22    know of any studies specifically, but I'm aware

23    of procedurally younger drivers are prohibited

24    from having, you know, passengers in their car up

25    to a certain age, and the probable reason there

```
 1                    CALDWELL
 2   would be distraction.
 3        Q.  Right.  Bob Caldwell as an accident
 4   reconstruction expert safety expert, you are
 5   aware that teenage drivers tend to be more
 6   distracted when they are in vehicle -- when they
 7   have passengers in their vehicle?
 8        A.  Well, all I'm saying here is that I'm
 9   aware that other people have taken steps or other
10   agencies have taken steps to reduce the
11   likelihood of that occurring.
12        Q.  Do you, Bob Caldwell, believe that
13   that is an issue?
14        A.  I think it can be an issue, yes, of
15   younger drivers, or any driver, for that matter,
16   becoming distracted in their driving task.
17        Q.  And I certainly -- I certainly
18   believe you believed it was improper for Barrett
19   to be going 116 and 90, then trying to go through
20   the curve at 85, you don't think that was a good
21   idea, right?
22        A.  I do not think that was a good idea,
23   no.
24        Q.  Now, on page 6 of 7, you also say
25   that -- let's see -- at the very last sentence,
```

1                        CALDWELL

2    Bob, on page 6, that says, "The required lateral

3    acceleration value could be reduced if the driver

4    had used more of the available roadway width

5    and/or slowed down by releasing the accelerator

6    pedal or applying the brake pedal."

7              Basically what you're saying there is

8    he could have made this if he was being more

9    careful?

10             A.   Well, I'm saying that had that

11   speed -- had the speed limiter been on and his

12   speed was reduced coming into the corner to

13   85 miles an hour, that he probably could have

14   made the curve simply by staying in lane two, but

15   that had he slowed further from that 85 miles an

16   hour and/or shortened the curve so to speak by,

17   you know, cutting the corner, that he could have

18   traveled a lighter radius and both of those items

19   would have reduced the required lateral

20   acceleration.

21             Q.   Take the foot off the accelerator

22   pedal, it would slow him down; that's what you're

23   saying?  Yes?

24             A.   You broke up there, I'm sorry.

25             Q.   Take -- if he takes his foot off the

1                        CALDWELL

2      accelerator pedal that slows him down in his

3      vehicle, right?

4           A.  Yes.

5           Q.  If he puts his foot on the brakes,

6      that slows him down, right?

7           A.  Yes.

8           Q.  Do you know if there was anything

9      preventing him from not passing his friend in the

10     turn lane?

11          A.  I'm not aware of anything, no.

12          Q.  And as the accident reconstruction

13     safety guy, you are not sitting here telling me

14     it was okay for him to go 85 around that curve?

15          A.  No.  Obviously it's well in excess of

16     the posted speed limit and I think it's out of

17     character for the locale.

18          Q.  Right.  When you -- you say here when

19     you're talking about this 0.77 G's -- so when

20     you're saying 0.77, that means the car is

21     essentially using 77 percent of its cornering

22     ability?

23          A.  Well, kind of.  In other words, are

24     you familiar with the concept of a friction

25     circle?

1                          CALDWELL

2          Q.  I think, but go ahead.

3          A.  Well, what we see in the section of

4    time that I analyzed here, as I had indicated, is

5    between minus 1.5 seconds and minus 0.5 seconds,

6    so a one-second interval just prior to getting

7    into the curve.  And as we look at that, we can

8    tell how much slowing takes place because of the

9    Event Data Recorder and so we can therefore

10   calculate the amount of deceleration that's

11   taking place over that segment of travel.

12               We also can measure the radius of

13   curvature of the tire marks and actually the

14   vehicle's center of mass as it's traveling

15   through the -- through that section of the curve

16   and we know its speed, its average speed between

17   those two points.  And so from that we can

18   calculate how much lateral acceleration the

19   vehicle is experiencing.

20               So in other words, as long as you

21   don't lock these tires, and you can't lock the

22   tires on this vehicle because it's got an

23   antilock brake system, but given the fact that

24   we're doing two things at once, we're requiring

25   lateral force and longitudinal force from our

1                       CALDWELL

2    tires -- from that vehicle's tires.

3            And in order to know what the total

4    tire grip was, you would square both of those

5    acceleration rates, add them together and take

6    the square root.  So basically the Pythagorean

7    Theorem.  And so when you do that you come up

8    with a total tire force available there of about

9    1 G.

10           Q.  Okay.  So -- so -- yeah.  Okay.  All

11   right.

12           A.  And so the 0.77 just happens to be

13   77 percent of 1 G, but that's just

14   circumstantial.  It doesn't mean it's -- it

15   wouldn't mean that in a vacuum, in other words.

16           Q.  So this car could corner at 1 G, is

17   that what you're saying?

18           A.  Well, theoretically that kind of tire

19   force is available.  Whether or not the vehicle,

20   given its suspension, the way the vehicle is

21   going to react to those higher -- higher forces,

22   whether or not that could maintain that --

23           Q.  Are you a NASCAR -- sorry.

24           A.  Am I a NASCAR guy?

25           Q.  Yeah.

```
 1                      CALDWELL
 2          A.  No.
 3          Q.  Okay.  Do you have a favorite racer
 4   or anything?
 5          A.  I'm not really a car race fan.
 6          Q.  Okay.  What -- yeah, what -- okay.
 7   All -- kind of what's going through my mind is so
 8   this vehicle, the way it's designed, and assuming
 9   the road is really good, the tires are really
10   good, a skilled NASCAR guy could probably go
11   through this curve even higher than 85, with --
12   you know, obviously -- obviously with no one on
13   the road and everything is careful and all that?
14          A.  That's possible, yes.
15          Q.  And that's all I took out of your
16   0.77 G statement.
17          A.  Well, and it's, I think, all you --
18   all you needed to take out of it because that
19   is --
20          Q.  Right.
21          A.  The 0.77 is less than the maximum
22   cornering capability of the vehicle.
23          Q.  Okay.  But -- right.
24              And with that said, if you're going
25   too fast around any curve, it still could lead
```

1                         CALDWELL

2    it -- lead to -- lead to an accident.  There's

3    always a curve that you can take too fast.

4         A.  Of course, yes.

5         Q.  And I would cite someone known as

6    Tiger Woods for that proposition.

7         A.  I haven't studied his wreck, but what

8    I --

9         Q.  Yeah.

10        A.  -- read about it in the paper, it

11   appears that he -- he didn't make the curve.

12        Q.  Yeah.  No, I mean, I know that curve

13   and I know where that is, and, geez, you know, he

14   just came around there too quick.

15             Okay.  What -- tell me what you know

16   about Barrett and his training, experience

17   driving-wise.  What can you tell me about him?

18        A.  Well, I don't know specifically what

19   training he had.

20        Q.  Okay.

21        A.  I just know he's 18 years old and he

22   probably started driving at 16 or maybe even a

23   little younger than that.  But I believe 16 would

24   be the age at which you could get a driver's

25   license in Florida, but correct me if I'm wrong.

1                         CALDWELL

2   So, you know, we had two years plus of driving

3   experience.  And he was obviously experienced in

4   driving high-performance vehicles.

5         Q.  Okay.  What are -- explain that.

6   What's the basis for your saying he was

7   experienced in driving high-performance vehicles?

8   Name all of them.

9         A.  Well, I -- I read in some of the

10   testimony that he apparently had a BMW at one

11   point or something like that, and then was -- had

12   been driving Teslas.

13         Q.  Do you know the make and model or --

14   or the model year of the BMW?

15         A.  I do not.

16         Q.  Any other vehicles that you can list

17   which you call high-performance that he -- that

18   he has driven?

19         A.  Well, the only thing that I really

20   was citing there was the operations of the Tesla.

21         Q.  Okay.  So as far as specific

22   training, specific instruction he had in driving,

23   you do not know; is that a fair statement?

24         A.  That's a fair statement.

25         Q.  And you -- you have no idea whether

1                    CALDWELL

2    he had any racing-type training, right?

3         A.  I'm not aware of that, no.

4         Q.  Do you know whether or not his

5    parents were aware that he would drive fast and

6    that he would --

7         A.  Well, I knew that --

8         Q.  -- that he would exceed the speed

9    limit, not just once but on multiple, multiple

10   occasions?  Are you aware of that?

11        A.  Well, first of all, I think that's

12   two different questions.  I was aware that he had

13   gotten a speeding ticket.  And I presume his

14   parents were aware of that.

15        Q.  Yes.

16        A.  With respect to -- their aware -- any

17   awareness that they might have had of him driving

18   fast on other occasions, I'm not aware of that.

19        Q.  Forgetting what they are aware of or

20   were aware of or when, are you now aware that

21   Barrett had a propensity to drive very fast?

22        A.  I don't know that I would call it a

23   propensity necessarily, but he definitely, based

24   on the testimony of some of his friends and the

25   vehicle history that was printed out in

1                     CALDWELL

2    Mr. Walker's report, he had definitely driven

3    fast, yes.

4          Q.  Are you aware that his parents told

5    him that if he wanted to go fast they would take

6    him down to the Homestead Speedway and allow him

7    to drive fast on the Homestead Speedway; have you

8    heard of that?

9          A.  No.

10         Q.  Okay.  Do you know what the Homestead

11   Speedway is?

12         A.  No.

13         Q.  Okay.  And all I was going with that,

14   you have no information one way or the other

15   whether he actually went down and trained and --

16   or drove fast around the Homestead Speedway?

17   It's a race -- a racetrack south of Miami.

18         A.  Yeah, I know where Homestead is.  I

19   just wasn't aware of the Speedway.

20         Q.  Right.  Do you have any information

21   that he actually went down there and drove on the

22   Speedway?

23         A.  I don't have any information one way

24   or another.

25         Q.  And whether or not he was distracted,

```
 1                      CALDWELL
 2   you don't -- you don't know?
 3        A.  Well, again, I take it much -- it
 4   probably depends on the point in time that we're
 5   talking about, if we're talking about any
 6   distraction.
 7             I wasn't in the car, so I don't know
 8   personally.  I'm just saying that as we come into
 9   this corner or curve at this high of a speed, I
10   would have expected him to be focused on his
11   driving.  That's all I was saying there.
12        Q.  Is it fair to say he was not focused
13   on his driving because he crashed?
14        A.  No.
15        Q.  No?
16        A.  It's fair to say -- it's fair to say
17   that he just from a physics point of view as he
18   came into the corner, the curve, he was going too
19   fast to physically track the curve.
20        Q.  So it was the curve's fault or it was
21   the driver's fault?
22             MR. MONTOYA:  Objection.
23   Argumentative.  Not here to determine fault.
24        A.  I didn't --
25             MR. MONTOYA:  Object to the question.
```

```
 1                    CALDWELL
 2   BY MR. RUDOCK:
 3        Q.  Are you blaming the curve for the
 4   accident?
 5        A.  No, the curve is there.  I think I
 6   made it very clear the driver came into the curve
 7   too fast to be able to track the curve.
 8        Q.  What -- do you know anything about
 9   Barrett's eye tracking problems?
10        A.  I know nothing about any of his
11   health issues or eye issues.
12        Q.  What do you know about the number of
13   crashes that have occurred in that vicinity?
14        A.  The only thing I ever read about
15   that -- I didn't do any kind of crash study at
16   that location.  The only thing I was aware of is
17   I believe the NTSB commented on it, I don't
18   remember specifically.  And then the neighbor who
19   was a witness -- it's Larry something.
20        Q.  Right.
21        A.  Larry --
22        Q.  Gotshal, or something like that?
23        A.  Groshart.  Groshart.  Groshart.
24        Q.  G-r-o-s-h-a-r-t.
25             Yeah, what did Mr. Groshart say?
```

1                    CALDWELL

2          A.  Well, he said there had been numerous

3    crashes at that location.

4          Q.  And it's known as Dead Man's Curve,

5    right?

6          A.  That's what he said, yes.  I have

7    never heard it called that by anyone else.

8          Q.  And this is right by -- this is right

9    by Barrett's house, isn't it?

10         A.  Again, I don't know specifically

11   where Mr. Riley lived relative to this, other

12   than the testimony of one of his friends said

13   they were -- it was nearby.

14         Q.  Do you know how many times in the

15   past Barrett had gone through that curve?

16         A.  No.

17         Q.  Well, assuming it was right by his

18   house, is it a fair assumption that he's gone

19   through there many times in these

20   high-performance vehicles that you talk about?

21         A.  Well, presumably.  I know that's a

22   main thoroughfare.  Seabreeze is a main

23   thoroughfare, so presumably he had driven through

24   there before, I just don't know how many times.

25         Q.  Do you have any type of data or

```
 1                    CALDWELL
 2   testing to support the basis for your opinion
 3   that Barrett, himself, could have made that turn
 4   going 85?
 5        A.  The only thing that I can tell you
 6   about that, it's not based on testing, unless we
 7   consider this -- the crash event as being a test,
 8   whereby we know the lateral acceleration the
 9   vehicles generate.  And so --
10        Q.  And you're talking -- the 0.77 you're
11   talking about?  I'm sorry.
12             MR. MONTOYA:  Hold on, man.  You've
13   got to let him finish.
14   BY MR. RUDOCK:
15        Q.  Go ahead.  I was trying to
16   short-circuit.  Go ahead.
17        A.  No, what I was saying is we know the
18   vehicle was generating about eight-tenths of a G
19   lateral.  And so we know that the -- that
20   Mr. Riley and his vehicle were already generating
21   enough tire force in the crash event itself that
22   he could have taken the corner and taken the
23   curve at that -- at 85 miles an hour, that
24   because the -- the fact that he's actually
25   generating that much lateral acceleration and the
```

1                     CALDWELL

2  fact that that's greater than what's required to

3  track, again, lane two at 85 miles an hour, that

4  allows me to get to that point.

5         Q.  That's where I was going.  The 0.77,

6  that's what you're talking about?

7         A.  The 0.77 is what's required.  The 0.8

8  is what he was generating, you know, a second

9  before the crash, literally the wake up of the

10 vehicle.

11        Q.  So to answer my question, the only --

12 you have no -- no testing that you can point me

13 to to support your opinion that he could have

14 made it through there going 85?

15        A.  I don't need any testing.  I'm not

16 going to point you to any testing, because the

17 fact of the event itself tells us that.

18        Q.  Got it.

19             Did you ever consider maybe going out

20 there having a vehicle and drive around either

21 lane one, lane two, or through the turn lane at

22 75, 80, 85?  Did you ever consider doing that?

23        A.  No.

24        Q.  Have you ever done anything in any of

25 your cases where you got the help of the local

```
 1                    CALDWELL
 2   police, the highway patrol, where they allowed
 3   you to shut down the road for a little bit of
 4   time to do testing, have you ever done anything
 5   like that?
 6        A.  I don't recall ever -- ever doing
 7   that, no.
 8        Q.  Could Bob Caldwell have made it
 9   through there going 85?
10        A.  Well, I guess from a technical point
11   of view, from a physics point of view, yes, I
12   could have.  Would I attempt that?  No, I
13   wouldn't.
14        Q.  Okay.
15             All right.  And then in your report,
16   the Conclusion section essentially goes through
17   and just summarizes everything that's in your
18   report, essentially everything we've just talked
19   about?
20        A.  I believe so, yes.
21             (Phone interruption.)
22             MR. RUDOCK:  Somebody need to get
23   that?
24             THE WITNESS:  No.  I'm sure it's my
25   car warranty is expiring or something.
```

```
 1                      CALDWELL

 2              MR. RUDOCK:  Well, we're on the same

 3   page.

 4              THE WITNESS:  I'm sorry, I can't

 5   reach the phone from where I'm sitting or I would

 6   cut it off.

 7              MR. RUDOCK:  Okay.  In your report,

 8   Bob, let me just go through these attachments.

 9              Hey, did we mark the notes as

10   Exhibit 7, by the way?  Is somebody writing that

11   down?

12              THE COURT REPORTER:  I can look

13   backwards.  Give me one second.

14              MR. MONTOYA:  Yeah, the notes are

15   Exhibit 7.

16              MR. RUDOCK:  Okay.  All right.  Cool.

17   Okay.

18   BY MR. RUDOCK:

19        Q.  All right.  On your report,

20   Attachment 1, this lists all the documents

21   provided, meaning all the documents that you got

22   from Curt and Patrick's office, right?

23        A.  Yes, at least at the time of the

24   report.

25        Q.  Okay.  And then on page 2 of
```

```
 1                    CALDWELL
 2  Attachment 1 it lists a number of depositions,
 3  and you had summarized looks like four of them.
 4        A.  There should be more than that.
 5        Q.  You know what, you're right, you're
 6  right.  Forget -- forget that.
 7             It says, "Exhibits:  Defense
 8  Exhibit 21."  What was Defense Exhibit 21?  Do
 9  you see that?
10        A.  Off the top of my head, I don't
11  recall.
12        Q.  And then it says, "Plaintiff
13  Exhibits 1 through 19 and Plaintiff" -- and then
14  just says "Plaintiff Exhibit."  I'm just trying
15  to make sure I've got everything you got.
16        A.  I'm presuming they were exhibits to
17  some deposition.  I don't --
18        Q.  Okay.
19        A.  I just don't recall off the top of my
20  head what those were.
21        Q.  We don't -- I don't want you to look
22  for that now.  If you can, when we're gone, just
23  email Patrick or Denise or Curt or somebody and
24  just -- just tell them what those are.  Okay?
25  And then they'll get it to me.
```

1                    CALDWELL

2         A.  Okay.  Let me just make a quick note

3    here.

4         Q.  Okay.  It's not a big deal, I just

5    want to -- want to know what they are.

6         A.  Okay.

7         Q.  Okay.  And then Exhibits 4 and 5 and

8    6, just -- just you documenting the damage to the

9    vehicle -- right -- that's all we're doing there?

10        A.  What were -- what were you talking --

11   which page?

12        Q.  I'm sorry.  We're back on your

13   report.

14        A.  Yes.

15        Q.  We're going -- we're just going

16   through the attachments.

17        A.  Okay.

18        Q.  So I'm now at Attachments 4, 5 and --

19   Attachments 4 and 5.

20        A.  Right.

21        Q.  And all you're doing here is

22   documenting the damage?

23        A.  Yes.

24        Q.  And I assume you don't have any --

25   you didn't document the force that caused it to

1                        CALDWELL

2   do any damage to any of these component or any of

3   the components in the vehicle for that matter?

4          A.   Not individually, no.   The --

5   basically the speed from damage does calculate

6   the peak force applied during wall to impact.

7          Q.   Yeah, your -- the diagram, the

8   momentum diagram?

9          A.   No.

10          Q.   No?

11          A.   The speed from damage crash analysis.

12          Q.   Oh, is that in your notes?

13          A.   Yes.

14          Q.   Okay.   Put that aside, we'll get to

15   that.   Let's get through these attachments and

16   then we'll go through your notes.   You don't need

17   to pull that out right now.

18          A.   Okay.

19          Q.   Okay.   And Attachment 6 is the police

20   survey.   It's just -- did you use this at all?

21   What did you -- what did you use this for?

22          A.   Well, I plotted that information on

23   our scene diagram and --

24          Q.   Okay.

25          A.   -- was able to therefore, you know,

```
 1                    CALDWELL
 2    track --
 3           Q.  Got it.
 4           A.  -- path of the vehicle.
 5           Q.  Did you do a vehicle -- a scene
 6    survey?
 7           A.  With the -- with the scanner, yes.  I
 8    did not use a -- like a total station like the
 9    police did.  I used the scanner.
10           Q.  Right.  And remember you're going
11    to get -- you're going to get us that data.
12           A.  Yeah, I have a note.
13           Q.  Okay.  And 12 is your cloud that we
14    talked about, right?
15           A.  Yes, it's -- it's the Google image,
16    is 12.  The Google image is 12 with the
17    Fort Lauderdale Police Department evidence --
18           Q.  Oh, got it.
19           A.  -- superimposed upon it.
20           Q.  I see the lines.  Okay.  Got it.
21    Didn't see that before.
22           A.  And also each individual survey
23    coordinate point is marked as a -- as just an
24    individual point.
25           Q.  On your Attachment Number 4, which we
```

1                    CALDWELL

2   had talked about, remember we had numbered one of

3   those with the different cars.  Can you look at

4   the next -- the last one or the next to last one

5   and you have different miles per hour.  You're

6   basically taking the EDR data and backing it up

7   and putting -- putting the measurements on here,

8   right?

9          A.  Correct.

10         Q.  What -- what is the blue line that is

11  going through, what is that?  You see there's

12  like a light blue line?

13         A.  I do.  I don't know why -- why that's

14  there.

15              What I did to get to the start of the

16  curve prior to the tire marks is I just simply

17  projected the path of travel rearward or upstream

18  in the event.  The blue line, I don't know if

19  that was something that came from the police or

20  where that came from.

21         Q.  All right.  Well, I'm glad it's not

22  me, because I couldn't figure that one out.

23         A.  I -- in other words, if you look at

24  the vehicle at minus two second position --

25         Q.  Yes.

1                        CALDWELL

2         A.  -- that is going to show the position

3  of the vehicle as I back it up to the start of

4  where tire marks are going to be occurring.  And

5  so the blue line is a path of travel that gets

6  the vehicle to that position.  I can't tell you

7  that's the exact path of the vehicle, but it

8  is --

9         Q.  Okay.

10        A.  -- a path that leads to the correct

11 position.

12        Q.  And if -- if the EDR is not from

13 hitting wall one but it's from hitting the curb,

14 all of these numbers, these -- these -- the time

15 and the speed that you have on these Exhibit --

16 Attachment 4, they would all be back further up,

17 back further up from where Barrett came from?

18        A.  Correct.  And that's something I'll

19 consider as I look at Mr. Walker's file, is --

20        Q.  All right.

21        A.  -- if I do believe he had a valid

22 reason for picking the curb instead of the wall,

23 I'll reconsider.  But the way it stands now, as I

24 pointed out in my analysis, I felt, and so did

25 the NTSB investigator, that the wall was more

1                    CALDWELL

2  likely.

3       Q.  Right.

4            I take it you did not do any type of

5  analyses as far as when the airbags deployed in

6  these -- in this -- in these various impacts?

7       A.  Well, kind of.  I mean, the EDR

8  basically has the airbags deploying as a response

9  to the algorithm enable.  And -- and when I say

10  the airbags, I'm talking about with the exception

11  of the side curtain bags, that the bags are all

12  deploying in response to the event that's

13  recorded in the data recorder.

14       Q.  Okay.  So if I understand what you're

15  saying again, based on that, the -- the

16  frontal bags -- well, let me strike -- back up.

17            Do you know how many bags are in

18  here?  Have you -- have you actually even looked

19  at that?

20       A.  I -- I haven't.  It's recorded in the

21  data --

22       Q.  Right.  Okay.

23       A.  -- but I haven't -- I can't tell you

24  off the top of my head.  I know there's frontal

25  bags, side curtain bags, side bags, knee bolster

CALDWELL

1
2   bags.  But I haven't counted them up.

3          Q.  So -- so what I -- okay, that's fair.

4   So what I'm hearing you saying is that you

5   believe the frontal bags, knee bolster bags would

6   have -- would have deployed at time zero, which

7   was -- which is EDR records and what you believe

8   is hitting wall one?

9          A.  That's correct, with the exception of

10  your statement of time zero.

11         Q.  Okay.

12         A.  They -- they deployed as a result of

13  the event that is recorded at time zero -- that

14  begins at time zero.

15         Q.  Right.  They would have deployed when

16  it hit the wall, wall one?

17         A.  Using that as being the -- being the

18  trigger for algorithm enable, that is correct.

19         Q.  And as far as the side bags, side

20  curtain bags, side torso bags, whatever other

21  bags were in there, you haven't done an analysis

22  when you believe they would have deployed?

23         A.  Well, I don't need to do an analysis,

24  it's recorded in the data recorder.

25         Q.  Well, here -- the reason -- the only

```
 1                       CALDWELL
 2   reason I'm asking you that is because when I
 3   asked Kenneth when did the bags deploy, he said,
 4   "Ask Caldwell."
 5        A.  Well, again, I've got the bags
 6   deploying as a result of the event that triggered
 7   algorithm enable.  And my opinion, as stated in
 8   my report and here in the deposition, is that was
 9   at the wall.  Now, if it was at the curb, then it
10   was at the curb.
11        Q.  Right.  Okay.
12             Do you have any information as far as
13   how long the bags would have remained inflated to
14   their optimal ability to protect someone in a
15   crash?
16        A.  Again, that would be the specific bag
17   design and --
18        Q.  Right.
19        A.  -- I haven't studied that.
20        Q.  Okay.  I'm only asking those because
21   those were kind of punted to you, which you
22   apparently didn't realize you were suppose to
23   catch that punt.
24        A.  Well, if I'm supposed to be telling
25   you how long the bags stand, I don't know that
```

```
 1                    CALDWELL
 2    answer.  I can probably do some research on that,
 3    though.
 4         Q.  I'm sorry, I'm a football/baseball
 5    guy, so sorry for the analogy.
 6              All right.  Your -- let's go through
 7    your notes which we marked previously as seven.
 8    Do you want to pull those up?
 9         A.  Give me just a moment here to do a
10    little housekeeping.
11         Q.  Sure.
12              MR. RUDOCK:  Patrick, how am I doing
13    on that hour and a half promise?
14              MR. MONTOYA:  Good question.
15              MR. RUDOCK:  I think we're still
16    good.
17              MR. MONTOYA:  I'm not sure.
18              MR. RUDOCK:  I think we've got about
19    a half hour.
20              The reason I say that, I told Denise
21    that the other day.  No, never believed me.  We
22    did it.
23              MR. MONTOYA:  I never -- I mean, I'm
24    always asked that question.  You know, never get
25    through with this.  You know, no way we can do
```

1                     CALDWELL

2  that.  So I say ballpark it.

3           MR. RUDOCK:  Yeah.

4  BY MR. RUDOCK:

5           Q.  You ready, Robert?

6           A.  Okay.  Yes, I am.

7           Q.  Okay.  Page 1 of your notes, this is

8  the -- the EDR, the history, right?

9           A.  It's the -- it's the document that we

10  created where you're actually able to see vehicle

11  speeds in miles per hour and stuff as opposed to

12  the actual one from the vehicle.

13           Q.  Right.  The -- okay.  You are

14  correct.

15           And on -- on this you have -- well,

16  this is documenting information from the EDR,

17  too, correct?

18           A.  Yes, although it's mostly just

19  breaking down what the EDR says, converting it to

20  feet per second and --

21           Q.  Right.

22           A.  -- things like that that we typically

23  work with in calculating distance traveled and so

24  on.

25           Q.  Right.  You added to it, which is

1                        CALDWELL

2    where you have miles per hour max, miles per hour

3    minimum, what is that -- what's -- what's the

4    purpose of that?  How -- how did -- how did you

5    come up with that?

6         A.  Well, basically what you find with

7    these event data recorders is they're recording,

8    depending on the vehicle, it could be the average

9    of the wheel speeds of all four wheels or it

10   could be just taken off of some central point in

11   the drive system.

12              This particular vehicle I believe is

13   recording the average of all four wheels.  But

14   what you can see there is that there's going to

15   be potential differences that can come out there

16   and so the actual reported speed in the EDR can

17   have some variability to it.  And so based on

18   what my experience and that of our firm is that

19   this represents a max and minimum that I can put

20   brackets on.

21        Q.  What do you plan to do with it?  I

22   guess I'm not quite sure.

23        A.  Nothing in particular.

24        Q.  Okay.  I thought there was something

25   there.

1                      CALDWELL

2              Okay.  Page 2 we already talked

3     about.  Page 3 we talked about.  Let's see.

4     Page 8.

5              A.  Now you've kind of lost me there.

6     What does page 8 look like?  Because mine are out

7     of order now compared to yours.  Show me that

8     again.

9              Q.  The diagram.

10             I can pull it -- you know what, let

11    me pull it up.

12             MR. MONTOYA:  I have it right here,

13    if you want.

14             MR. RUDOCK:  You have it?

15             MR. MONTOYA:  Yeah.

16             MR. RUDOCK:  Go ahead.  You're

17    quicker than me.

18             MR. MONTOYA:  That should be it,

19    right?

20             MR. RUDOCK:  That's it, yes.  You see

21    at the top there, that's what I'm calling page 8.

22             THE WITNESS:  All right.  I've got

23    it.

24    BY MR. RUDOCK:

25             Q.  Okay.  This is -- this is your scene

```
 1                       CALDWELL
 2    diagram with some of the vehicles in there.  It's
 3    just another -- another view of the attachments
 4    you had in your report, or are you trying to show
 5    something different here?
 6            A.  No, this is a page excerpt that --
 7    excerpt directly from the NTSB report.
 8            Q.  Oh, my bad.  Okay.  Thank you.
 9                All right.  Page 9.
10                MR. RUDOCK:  There you go.
11            A.  Which -- what does it look like
12    again?
13    BY MR. RUDOCK:
14            Q.  It's on the screen.
15            A.  Okay.  I've got it.
16            Q.  There you go.
17                Okay.  You see the part there where
18    it talks about EDR?  This is -- these are notes
19    apparently that you had when we had discussed
20    earlier that you were wondering if in fact the
21    curb was the first point as opposed to the wall.
22            A.  Yes.
23            Q.  You're just kind of -- you're just
24    kind of documenting that here for us?
25            A.  Well, again, this was done early on
```

```
 1                    CALDWELL

 2   in my analysis here and --

 3          Q.  Right.

 4          A.  -- so I'm just making some notes here

 5   about, you know, what do I think was algorithm

 6   enable.

 7          Q.  Right.  I understand.

 8              Page 12.

 9              MR. RUDOCK:  Thanks for doing this,

10   Patrick.  Makes it quicker.

11   BY MR. RUDOCK:

12          Q.  These -- these are the NTSB videos

13   that you looked at which showed the vehicle

14   driving down the road before the crash.

15   That's -- that's what you're documenting here?

16          A.  Yes.

17          Q.  Okay.  Then it looks like 13, 14, 15

18   are simply your notes from your looking at the

19   depositions.  See, there's Adam Cohen, if you

20   want to go to the next one.

21          A.  Yeah, that's what it.

22          Q.  Right.  You have Constantino,

23   Groshart.

24              Okay.  Next one.

25              Okay.  Next one.
```

```
 1                         CALDWELL

 2              That was height of pole.

 3              Next one.

 4              Okay.  This right here.  Okay.  This

 5   is your -- this is page 17.  This is your -- you

 6   had talked earlier about EDCRASH and you used

 7   EDCRASH to help verify your speeds for wall --

 8   for wall two.

 9         A.   Correct.  In other words, just to

10   make it clear how this plays into the analysis,

11   you know, we already went through the velocity

12   vector analysis and in that we know, based on the

13   impact speed to the -- to the wall two, that

14   we're able to calculate and we're going to know

15   the exit speed from that wall because of the

16   distance the vehicle travels and how it travels

17   and the amount of speed loss that it experiences

18   at the pole strike.  And so you can draw that

19   vector diagram, but then as a check against that

20   you look at the vehicle speed from damage.

21         Q.   Okay.  So essentially what you did is

22   you look at the damage to the vehicle and you do

23   a crush profile, number one.  And then you would

24   take stiffness coefficients telling --

25   essentially telling the program how strong the
```

1                    CALDWELL

2   vehicle is.  You plug that into EDCRASH and then

3   EDCRASH comes out and gives you the speeds.  And

4   that's essentially what you did?

5          A.  Well, at least the speed change, the

6   delta-v.

7          Q.  Right.  But I'm right at part one and

8   two, you do a crush profile, then you put in

9   stiffness coefficients and --

10         A.  You're correct.

11         Q.  -- that tells you the speeds?

12         A.  You are correct.

13         Q.  All right.  And the lower the

14  stiffness values, the lower the delta-v.  The

15  higher the stiffness values, the higher the

16  delta-v?

17         A.  For a given crush profile, yes.

18         Q.  Right.

19             Now, here's my -- I don't understand

20  on this where -- how you did your crush profile.

21  And if we can go to --

22             MR. RUDOCK:  Patrick, if you can go

23  up to number 22.

24             Okay.  If you can -- yeah, okay.

25  Yeah, there you go.  Perfect, that works.  That's

1                    CALDWELL

2   good.  There you are.  Hold on that one.

3   BY MR. RUDOCK:

4        Q.  All right.  Is the red line that is

5   here, is that -- is that supposed to be the crush

6   profile?

7        A.  It is, of the -- and let me be

8   specific on that.  For the crush profile from

9   direct contact damage.

10            Obviously the entire front of the car

11  probably gets some deformation to it, or will get

12  some deformation to it, but that's how the

13  vehicle fit into the surface of the wall.  And

14  the way I attributed the most rearward collapse

15  is I knew where the wheel had imprinted the rear

16  of the wheel well and right front door.

17       Q.  So basically -- okay.  I understand

18  that.  What I -- what I hear you're telling me is

19  you essentially put the wall in there which you

20  made your profile.  And the reason you did that,

21  I assume, is unlike other cases where you have

22  where we can go in and take a point, measure the

23  bumper, measure the fender, you really couldn't

24  do that here because of all the damage, so

25  instead of doing it that way, which is a more of

1                      CALDWELL

2    a traditional way, I guess, you used this as the

3    crush profile.  Is that a fair statement?

4         A.   That's a fair statement.

5         Q.   Because you didn't have a whole lot

6    of stuff to measure, right?

7         A.   Well, the stuff that's there was

8    measured, but you're correct in that the damage

9    and --

10        Q.   Yeah, yeah.

11        A.   -- the thermal -- the thermal damage

12   had basically changed the way the vehicle would

13   have typically looked had there been no fire.

14        Q.   Yeah.  And when I was looking at

15   this, boy that really matches up to the wall.  So

16   that's what you did?

17        A.   That's is correct.

18        Q.   The red -- the red line.  Yeah.

19             And then the different numbers that

20   you have along there, 29.9, 34.1, from what point

21   to what point are those?  How did you come up

22   with that?  Is that from using -- well, how did

23   you come up with that?

24        A.   Well, the dimension lines are

25   actually shown.  It's the distance from where the

```
 1                    CALDWELL
 2   front bumper cover would have begun to where it
 3   would have had to have -- it would have had to
 4   been deformed to fit that wall profile.  And so
 5   the dimension arrows are shown there as to where
 6   it's measured.
 7           Q.  All right.  So you used -- you used
 8   an exemplar vehicle, I assume, right?
 9           A.  Well, the computer model of the
10   vehicle.
11           Q.  Okay.  Yeah.
12               MR. RUDOCK:  Pat, if you can go to
13   number 27.
14               MR. MONTOYA:  I think this is it.
15               MR. RUDOCK:  Yeah, if you could --
16   BY MR. RUDOCK:
17           Q.  So this is the model -- this is the
18   exemplar model?
19           A.  Well, it is.  Obviously there is the
20   damage of the -- that the vehicle sustained is
21   also shown on top of it, and so --
22           Q.  Right.
23           A.  -- it's kind of a confusing drawing.
24               MR. RUDOCK:  I tell you what.  Pat,
25   if you could go back one or two more, I'm sorry,
```

1                    CALDWELL

2    like to 25 maybe.  There you go.  If you could

3    shrink that.  You're good at -- you're good at

4    this.

5              Okay.  There you go.

6    BY MR. RUDOCK:

7         Q.  All right.  So that -- that's --

8    that's the exemplar model you used?

9         A.  That's correct.

10        Q.  And -- okay.  What is this -- where

11   did you buy this?  Is it -- is there a name for

12   this?  You went online somewhere and found this,

13   I assume?

14        A.  Yes.  We have a typical supplier that

15   we use to get that.  And so we get the image of

16   the vehicle and -- and/or the -- it's actually

17   more than an image, it's a 3D computer model of

18   the vehicle.  And then we look to make sure it

19   matches the vehicle specifications.

20        Q.  What -- what is this 3D model, what's

21   it called?  Can -- can I go out and buy it?

22        A.  I would have to check with supplier

23   we use, but, yes, you can.

24        Q.  Okay.  Can you -- can you get us that

25   supplier or send us -- or give us this model?

```
 1                    CALDWELL
 2  Well, if it cost you money, you're not going to
 3  want to do that, but can you get us the name of
 4  the 3D model where you got it?
 5       A.  Well, I don't mind just giving you
 6  the model.
 7       Q.  That's -- okay.  Sorry I'm giving you
 8  a list of to-do's there.
 9            MR. RUDOCK:  And then number 23 and
10  24, Patrick.
11  BY MR. RUDOCK:
12       Q.  So these are -- this is from Neptune
13  Engineering and these are the stiffness values
14  you -- you put in to tell how strong the vehicle
15  is?
16       A.  Correct.
17       Q.  And was this from one crash test, two
18  crash tests?  Where do these come from, do you
19  know?
20       A.  Well, they're -- they're two
21  different crash tests.
22       Q.  Okay.  All right.
23       A.  You know, let me just make sure it's
24  clear here.  One of these is a lateral impact,
25  because if you look across the top it will give
```

```
 1                    CALDWELL
 2  you what they call the -- I'm sorry, the PDOF --
 3  I'm sorry, it's both the same.  You're right.
 4          Q.  Yeah.
 5          A.  I thought one was going to be a side
 6  impact, but, no, they're not.
 7          Q.  Yeah, no, that's okay.
 8          MR. RUDOCK:  Hey, go to 19, Patrick,
 9  please.  Thank you.
10  BY MR. RUDOCK:
11          Q.  What is this?
12          A.  That's just the printout of the crush
13  profile that EDCRASH interpreted from the
14  measurements we gave it.
15          Q.  Oh, got it.
16          MR. RUDOCK:  And then 21.
17  BY MR. RUDOCK:
18          Q.  Okay.  21, this -- this shows the
19  numbers that you put in from the stiffness
20  numbers from Neptune?
21          A.  Correct.
22          MR. RUDOCK:  All right.  Getting
23  close.  I'll just make sure.
24          You can I think take that down now,
25  Patrick.  Thank you.
```

1                    CALDWELL

2              MR. MONTOYA:  Okay.

3              MR. RUDOCK:  We're going to make that

4    hour and a half.

5              Just so for the record we have your

6    inspection vehicle notes, they're going to be

7    Exhibit 8.

8         (Exhibit 8 marked for identification.)

9              MR. RUDOCK:  Inspection scene notes

10   are nine.

11        (Exhibit 9 marked for identification.)

12             MR. RUDOCK:  Just want to get them

13   attached so we have that.

14   BY MR. RUDOCK:

15        Q.  The summaries that you did are of

16   Natarange, Rafael, Walker.  That's the only three

17   summaries I was provided.

18             Who did the summaries, do you do

19   them, do you have somebody else do them?

20        A.  It was probably done by Julie

21   Garrett, who's one of my assistants.

22             Are you sure you don't have Jack

23   Rittenour, too?

24        Q.  No, I don't have that one.

25        A.  You don't have that one?

```
 1                       CALDWELL

 2          Q.  Do you know Jack?

 3          A.  I don't know Jack, I mean,

 4   personally.

 5          Q.  Yeah, he's a -- he used to work for

 6   Ford for a long time.

 7          A.  Yeah, I'm aware of who he is and all.

 8   But I have a summary of his report as well.

 9          Q.  Okay.  Just give that to Patrick,

10   he'll give me that one.

11          A.  Okay.  I'm surprised.  They should

12   have all been done at the same time.

13              MR. RUDOCK:  All right.  Let me just

14   go look through my -- the file that Curt provided

15   to make sure we have stuff here.  Hang on.

16   BY MR. RUDOCK:

17          Q.  In your file there's something that

18   says, "Common Documents Provided and Not

19   Produced."  Okay.  I understand that.  That's

20   just all the standard stuff everybody has, right?

21          A.  Well, I assumed you already had it

22   all, and I just wanted to --

23          Q.  Yeah.

24          A.  -- reveal to you what I had.

25          Q.  Yeah.
```

```
 1                      CALDWELL

 2              MR. RUDOCK:  And like you, I start

 3      throwing stuff all over the place.

 4      BY MR. RUDOCK:

 5           Q.  Just a couple more questions, some

 6      background stuff.

 7              On your CV -- well, how is -- how is

 8      it that you got your training and experience in

 9      accident reconstruction and motor vehicle -- for

10      motor vehicles.  Your BS is an architectural

11      engineer, and then you did graduate studies as

12      civil engineer.  How is it that you got into

13      accident reconstruction being an architectural

14      guy?

15           A.  Well, it's architectural engineering.

16      And my -- the field of study there was structural

17      mechanics.  And then I was in engineering

18      mechanics in the civil department.

19              But basically my last semester of

20      school I took a class from a professor named

21      Richard Crawford, who had been one of the

22      pioneers in the field of accident reconstruction.

23      And the class name was Failure Analysis.  And so

24      what we were doing is we were looking at actual

25      case histories that Professor Crawford had looked
```

```
 1                        CALDWELL
 2   at.  And that was where I was initially exposed
 3   to accident reconstruction.
 4                And after I graduated, Professor
 5   Crawford hired me and together we formed the
 6   company Ponderosa Associates.  And, you know, I
 7   was just out of college at the time.
 8                But basically I learned accident
 9   reconstruction then from my exposure in -- in
10   that class and then continuing on in terms of
11   working as Professor Crawford's assistant.
12                Of course all engineers are given the
13   same background in basically physics, engineering
14   mechanics, mathematics, things of that nature,
15   and so all the tools, whether you're in
16   architectural engineering or aerospace
17   engineering, you learn -- you get all the tools
18   that are necessary to do this work.  I just
19   learned the application through first of all
20   course exposure that I mentioned and then working
21   in the field.
22        Q.  Yeah, on your CV it says areas of
23   expertise: motor vehicle accident reconstruction
24   including bicycles, motorcycles, highway safety
25   design, ski bindings, ski slope reconstruction,
```

1                      CALDWELL

2    heavy truck accident reconstruction, railroad

3    accidents, crossing evaluation, vehicle

4    crashworthiness and kinematics.

5             Have you given, or do you give,

6    defect opinions as far as vehicles or products

7    are concerned or is it simply limited to accident

8    reconstruction?

9         A.  Well, I think I have given defect

10   opinions before, but only as they relate to

11   accident reconstruction.  Example --

12        Q.  Yeah, give me an example, yes.

13        A.  Say we broke a tie rod in the

14   steering system of a vehicle and that causes a

15   wreck.  I would report on, you know, the failure

16   analysis of the tie rod, for instance.  And if I

17   considered it a defect, I would call it a defect.

18        Q.  What would be an example on the ski

19   slopes, ski bindings?

20        A.  Well, I haven't worked in that area

21   in a number of years, but one that primarily is

22   an issue that I addressed where I gave a defect

23   opinion is a binding that was built probably in

24   the 1980s had an easy-release function whereby

25   rather than having -- I don't know if everybody

```
 1                    CALDWELL
 2    is a skier here, but typically to get out of a
 3    ski binding you usually have to use your pole or
 4    your other ski and kind of step on the release
 5    mechanism of the heel piece of the binding.  And
 6    that requires significant force.  And this
 7    particular binding had a touch release whereby
 8    just barely touching the release button would
 9    open the rear binding.  And that led to
10    pre-release problems whereby prior to the need
11    for a release to the -- at the heel piece, you
12    were getting a pre-release, which would
13    frequently cause a skier to be out of control and
14    crash.
15         Q.  So you're going down the slope and
16    you've got a binding problem.  That's a problem.
17         A.  That's true.
18         Q.  What about heavy truck accident, what
19    defect opinions in that?  I assume like a tie rod
20    or -- how did that -- how did that work?
21         A.  Well, I'm trying to recall if I gave
22    defect opinions in any of those matters.  But for
23    instance one of the areas in heavy truck
24    accidents where there has been a product
25    liability claim that I've worked on involved the
```

1                       CALDWELL

2    fuel tank placement, whereby in any kind of side

3    impact or sideswiping event or something like

4    that, even when there's a frontal accident and

5    the front suspension is driven back into the

6    exposed saddle tank on the side of the tractor,

7    the tank gets breached.  And so obviously the

8    placement of, you know, a substantial amount of

9    potential energy in a fuel tank like that in an

10   exposed position I consider a dangerous defect.

11   And I don't recall that I testified to that, but

12   I -- my accident reconstruction certainly showed

13   the cause of the breach of the fuel tank.

14            Q.  Your reconstruction of going through

15   the crush diagram, all the kind of stuff we're

16   talking about here, and you would -- you would

17   say, "Okay.  Based on this reconstruction, here's

18   the component that punctured the tank"?

19            A.  Correct.

20            Q.  Okay.  Is there everything on your

21   CV I guess current?  You're still a member of

22   these organizations and societies?

23            A.  I am.  The only thing I would point

24   out is -- I don't know why this didn't get

25   changed -- but it shows that I am the President

1                    CALDWELL

2    of the company and I am no longer the President

3    of the company.  I no longer have any ownership

4    interest.

5         Q.  You -- did you get impeached?  I'm

6    just kidding.

7         A.  No, I actually was trying to escape.

8         Q.  Trying to slow down?

9         A.  Yeah, I'm in the process of retiring.

10   I still have --

11        Q.  Good for you.

12        A.  -- a current amount of work going,

13   but I just turned 70 years old and I'd like to --

14   I'd like to be done at some point in time.

15        Q.  Good for you.

16             When was the last time you were in a

17   trial?  I'm looking at your trial list here.  Did

18   you have any trials last year?  Bad year, I

19   understand.

20        A.  Yeah, I testified in January, kind of

21   before, you know, the COVID thing happened.

22        Q.  Yeah.  What was that case?

23        A.  That was a case where a pedestrian

24   was impacted by a vehicle.

25        Q.  On Appendix E of your report it says,

```
 1                    CALDWELL

 2   "Proposed Trial Exhibit List."  This is

 3   essentially just general descriptions of

 4   potential exhibits?

 5        A.  That is correct.  It was my

 6   understanding that this is a document -- or an

 7   area that I needed to address as part of like a

 8   Federal Rule 26 report.

 9        Q.  Yeah.  Okay.

10            Were you ever disqualified by a Court

11   from testifying?

12        A.  No.

13            MR. RUDOCK:  All right.  Thank you,

14   sir.  You have some homework from me.  I

15   apologize for that.  But if you can get that

16   stuff to Patrick, Curt, Denise, whoever, we'd

17   appreciate it.

18            And I'll get you these exhibits,

19   Linda.  Cannot promise it today, but hopefully by

20   tomorrow.

21            THE COURT REPORTER:  No problem.

22            MR. RUDOCK:  All right.

23            THE VIDEOGRAPHER:  Questions for

24   Patrick?

25            MR. MONTOYA:  No, none from me at
```

```
1                     CALDWELL

2   all.   Thank you.

3               MR. RUDOCK:   All right.   Thank you,

4   everybody.   Be safe.

5               THE VIDEOGRAPHER:   The time is 12:15.

6   This concludes today's deposition on June 1st,

7   2021.

8               (Time Noted:   12:15 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATE

2

 STATE OF TEXAS    )
3                   )
 COUNTY OF HARRIS  )

4

5          I, LINDA RUSSELL, a Certified Court

6   Reporter within and for the State of Texas, do

7   hereby certify:

8          That ROBERT J. CALDWELL, the witness whose

9   deposition is hereinbefore set forth, was duly

10  sworn by me and that such deposition is a true

11  record of the testimony given by such witness.

12         I certify that review of the transcript by

13  the deponent was requested.

14         I further certify that I am not related to

15  any of the parties to this action by blood or

16  marriage; and that I am in no way interested in

17  the outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set my

19  hand this 4th day of June, 2021.

20

21         _____
            LINDA RUSSELL, Texas CSR #2965
22          Expiration Date:  4/30/2023

23          TSG Reporting, Inc.
            Firm Registration No. 615
24          228 E. 45th Street, Suite 810
            New York, New York 10017

25

1      ERRATA SHEET FOR THE TRANSCRIPT OF:

2   CASE NAME: JAMES B. RILEY v TESLA, INC.

3   DEP. DATE: June 1, 2021

4   DEPONENT:  ROBERT J. CALDWELL

5                    CORRECTIONS:

6   Pg.   Ln.    Now Reads         Should Read      Reason

7   ____  ____   _____   _____   _____

8   ____  ____   _____   _____   _____

9   ____  ____   _____   _____   _____

10  ____  ____   _____   _____   _____

11  ____  ____   _____   _____   _____

12  ____  ____   _____   _____   _____

13  ____  ____   _____   _____   _____

14  ____  ____   _____   _____   _____

15  ____  ____   _____   _____   _____

16  ____  ____   _____   _____   _____

17  ____  ____   _____   _____   _____

18

19                              _____

20                              ROBERT J. CALDWELL

21  SUBSCRIBED AND SWORN BEFORE ME

22  THIS_____DAY OF_____, 2021.

23

24  _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____