# EXHIBIT G

# Delta V Biomechanics

930 Commercial Street
Palo Alto, CA  94303

Telephone: (650) 320.8800
FAX: (877) 819.1969

May 21, 2021

Robert Rudock
Bowman & Brooke
Two Alhambra Plaza, Suite 800
Miami, FL 33134

**RE:   Riley v Tesla**

Dear Mr. Rudock:

This letter summarizes results of the investigation carried out to date in the above-referenced litigation. The following sections provide descriptions of the accident, review the injuries to the plaintiff, and present the analysis of the accident. My opinions are stated to a reasonable degree of engineering and medical certainty. My education, experience and training relative to the opinions set forth in this report are outlined in my curriculum vitae, which is attached to this report. Testimony history and rate schedules are also attached as appendices.

## Materials Received and Reviewed

The list contained in Appendix A describes materials that were received from your office and subsequently reviewed. The bibliography includes technical literature reviewed in conjunction with this matter.

## Accident Description

The accident description in this section is a synopsis based on the Florida Traffic Crash Report.

The report described a single vehicle collision that occurred at 6:46 pm on May 8, 2018 on Seabreeze Boulevard in Fort Lauderdale, Florida. The vehicle involved in the collision was a 2014 Tesla Model S ("The Tesla") bearing Florida license plate JBR3 and a Vehicle Identification Number (VIN) of 5YJSA1H24EFP62693.

According to the police report, the Tesla was traveling southbound on Seabreeze Boulevard at a high rate of speed when the driver failed to maintain control of the vehicle causing the Tesla to collide into a north side wall. It then continued and collided with the south side wall. It then caught on fire, re-entered the roadway spinning, collided with a light pole, spun again and came to rest. At this point, the Tesla became fully engulfed in flames.

Police documents indicated that there were three occupants in the Tesla at the time of the collision:

- **Barrett Riley**, an 18-year-old male (DOB: 6-4-1999) was the driver. He was wearing his shoulder and lap belt, his airbag status was coded as "Deployed – Combination," and he was not ejected. His injury severity was coded as "Fatal (Within 30 Days)."
- **Edgar Monserratt**, an 18-year-old male (DOB: 10-8-1999) was the front passenger. He was wearing his shoulder and lap belt, his airbag status was coded as "Deployed – Combination," and he was not ejected. His injury severity was coded as "Fatal (Within 30 Days)."
- **Alexander Berry**, an 18-year-old male (DOB: 8-17-1999) was the right rear passenger. The report indicates he was wearing his shoulder and lap belt, his airbag status was coded as "Not Applicable," and he was totally ejected from the vehicle. His injury severity was coded as "Possible."

At the time of the accident, the conditions were clear and daylight. The accident occurred on a level and curved section of dry road. The posted speed limit on Seabreeze Boulevard was 30 mph.

## Summary of Fact Witness Testimony

### Juliana Ables, deposition dated December 9, 2020
Barrett Riley and Edgar Monserratt's friend, Julianna Ables, testified to the following:
- Barrett liked to drive fast. He would drive 15 or 20 over the speed limit. Ms. Ables saw Barrett drive 120 mph. (16)

### Alexander Berry, deposition dated August 26, 2020
Rear seat occupant Alexander Berry testified to the following:
- Barrett was the driver, Edgar was the passenger, and Alexander was in the right rear seat. (18)
- Alexander did not put his seatbelt on because he had pain in his knee from a meniscus tear. (21)
- He thought Barrett was going over a hundred miles an hour. (26)
- He remembered being on his phone, looking up from his phone facing right, feeling the car go up on the sidewalk and seeing a wall. (29)
- Barrett went into the median turn lane to pass the car of Adam Cohen, another friend of theirs. (30)
- He did not remember how he left the car, but he thought the right rear door crumpled up and he slid through there. (34-35)
- There was nothing wrong with the car that he felt or heard from Barrett. (50)
- He had been in Barrett's car when he had exceeded the speed limit or pulled an occasional risky move. "But I've never felt in danger." (80)
- Barrett liked to drive fast. (124)
- More times than not Barrett was probably driving fast or in excess of the speed limit. (126)
- He grabbed for the seatbelt when Barrett started braking before the collision. He could not pull it out because it was locked. (146)

### Christian Catanese, deposition dated November 10, 2020
Barrett Riley's friend, Christian Catanese, testified to the following:
- Barrett sped often. (23)
- The fastest he had seen Barrett drive was 155 mph. (24-25)

- Mrs. Riley told Christian to not let Barrett go fast and that she was worried about them. (49-50)
- He learned that Adam and Barrett were racing and that Barrett lost control of his car. (54-55)
- Racing was "an ongoing thing, but it was not commonplace." (55)

### Adam Cohen, deposition dated August 7, 2020
Barrett Riley and Edgar Monserratt's friend, Adam Cohen, testified to the following:
- Adam Cohen met up with Barrett, Edgar and Alex at the mall on the day of the accident. (11)
- Barrett, Edgar and Alex got into Barrett's car. Adam got into his own car. They were going to Barrett's house. (16-17)
- When they left the mall, he was in front of everyone. (17)
- At some point on Seabreeze, he was passed by Barrett's car. (18)
- Barrett passed him right before the bend. Barrett went through the middle lane. (25)
- Barrett passed Adam on his left. (26)
- Adam was going 30 mph when Barrett passed him. (27)
- Barrett was going at least three times faster than Adam was going. (28)
- Barrett was in the middle lane until he passed him, then the car started going off back to the right. "He was not in a ton of control at that point." (30)
- He was understeering and skidding. He ended up going up the curb, hitting the wall and then spun to the other side, going to the curb on the east side of the road. (31)
- "It jumped the curb. And then it kind of sideswiped the wall on the west side of the road. And then it spun out. And then it ended up -- it spun out, like across the road and ended up on the curb at the east side of the road on fire." (32)
- The car caught on fire somewhere between the time when it jumped the curb and hit the final curb on the east side of the road. The car ended up facing north. (36)
- He tried to go near the car, but it was too hot. (37)
- There was a vertical indent in the passenger's side door, like it hit a pole. (72)
- The vehicle was fully engulfed in flames. It appeared to be coming from the big battery at the bottom. It didn't appear that the front specifically was on fire. (75)
- They weren't able to get close enough to touch the car. Alex was maybe 10 ft from the vehicle, towards the back. (76)
- Barrett drove fast. It wasn't unusual for him to drive 90, 100, 110, 120 mph. (109)
- When he ran over to the Tesla, he could see Barrett's and Edgar's silhouettes. (134)
- He got five, six feet away from the driver's side of the Tesla, but it was really hot. Barrett and Edgar did not appear to be moving. (136)

### Matthew Cohen, deposition dated December 21, 2020
Barrett Riley and Edgar Monserratt's friend, Matthew Cohen, testified to the following:
- Barrett liked to drive fast, above the speed limit. (19-20)
- Barrett got a speeding ticket. They were racing and Barrett got pulled over shortly after they were racing. (24)
- Barrett would race every so often. (29)

### Joseph Constantino, deposition dated August 21, 2020
Tesla Service Concierge Joseph Constantino testified to the following:

- Mrs. Riley texted Mr. Constantino, telling him that Barrett went 112 in a 50 mph zone. She wanted the car put in limiter mode. (48)
- He was able to give Barrett a loaner car with speed limited at 85 mph. (59-60)
- He did not know before the accident that the speed limiter had been taken off. (79)

### Larry Groshart, deposition dated November 19, 2019
Larry Groshart witnessed the accident and testified to the following:
- "I saw a passenger car coming south on Seabreeze Boulevard. It jumped the curb about where this white car is. It struck this wall with the right side of the vehicle. Then the vehicle proceeded and struck this curbed wall head-on. When that vehicle struck that wall, a huge fireball erupted from the front of the automobile. Then the automobile bounced off that and pirouetted south and across Seabreeze Boulevard to my side of the road." There was very little traffic. (12)
- It sounded like the brakes were locked so the tires were skidding. (13)
- He did not know how fast it was going. The speed limit is 30 mph. "All I could really tell was it was much too fast for that curve and the conditions." (14)


*Ex. 2, x: first impact, o: second impact*

- The flames started at the "o" impact. (18)
- After the "o" impact, the car spun south and east across the road to a point not shown in Ex. 2 where it hit a light pole. (19)
- The latter impact took out and destroyed the light pole. He did not see anyone get out of the vehicle. People trying to render assistance could not get close enough to the vehicle due to the fire. (21-22)
- There were loud popping noises coming from the vehicle after it stopped. (23)
- He did not see anyone ejected from the vehicle. (30)
- He did not think anyone got closer than 10 feet from the car. (63)

### Cosmin Ilonta, deposition dated February 11, 2020
Firefighter Paramedic Cosmin Ilonta responded to the scene and testified to the following:
- Mr. Ilonta was dispatched at 6:47 pm and arrived on scene at 6:50 pm. (9)
- The vehicle was on fire when they arrived. (13)
- There was a patient north of the car. The vehicle was "fully engulfed." He couldn't tell if there was anyone inside. (14)
- He and his crew determined the occupants were dead on arrival. (16)
- He wasn't able to see the occupants until the fire was out. (17)

### Kari Koulouris, deposition dated November 19, 2019
Kari Koulouris witnessed the accident and testified to the following:

- Ms. Koulouris was traveling southbound on Seabreeze Boulevard. "Um, I did notice a car going quickly by me, he passed up. And as I continued to drive, and I just can't remember if I came to that little stoplight by the fire station, but I… heard something. Didn't know what it was. Kept on driving. And I came across what kind of looked like a war zone to me, actually. It was debris in the road. A tire. A whole wheel. And then off to the left I saw a vehicle on fire." (7)
- The vehicle passed her on her right and was going twice as fast as her. She was going 25-30 mph. (8-9)
- The entire hood of the car was on fire. (10)
- She saw the front passenger. "… the bags were inflated. But… there wasn't any on the passenger door side, so I could see that person fairly clearly… I saw long dark hair. I thought it was a woman… the passenger was slumped into the air bags. No apparent consciousness. Blood coming from the side of their head. And pale. There was a minute fascicular kind of action in... the muscles… it was just like a … very, very, very slight tremor all over his body that I could see." (13)
- She couldn't see a driver. The airbags were deployed all the way around. (14)
- The front passenger eventually started moving differently. "Instead of this minute little muscle action, I saw a very radical seizure-like activity, where he was violently hitting the front and slamming to the back of the seat, just back and forth very violently. It wasn't purposeful… it didn't appear to be trying to get out. It was just… the only way I can describe it as a nurse is a very like grand mal type of seizure action." (16)
- Blood was coming from the passenger's temple area. It wasn't gushing blood. She did not see any other visible injuries. (22)
- The passenger was still wearing his seatbelt. (36)

### Halston Loyd, deposition dated July 14, 2020
Tesla Service Technician Halston Loyd testified to the following:
- The mother of Barrett Riley wanted the speed limiter put on the Tesla. (29)
- Barrett returned to the service center on April 4. The speed limiter was disabled during this visit. (36)
- Mr. Loyd removed the speed limiter. (37)
- He thought the speed limiter had accidentally been turned on while it was in for service and that it was not supposed to be on. (45)

### Leopoldo Matheus, deposition dated August 11, 2020
Tesla Shop Supervisor Leopoldo Matheus testified to the following:
- Mr. Matheus was not involved in the discussions to put on or take off the speed limiter. (23)

### Kyler Muruve, deposition dated January 21, 2021
Barrett Riley and Edgar Monserratt's friend, Kyler Muruve, testified to the following:
- Barrett would usually drive fast, 10 mph over the speed limit. (13)
- Kyler learned of the accident when Juliana Ables called him. He wasn't surprised Barrett was speeding at the time of the crash. (41)

### Jonathan Ordonez, deposition dated August 21, 2020
Tesla Service Technician Jonathan Ordonez testified to the following:

- He received an email on March 5th about Mrs. Riley wanting to put a speed limiter on one of her family's Teslas. (32)
- He put the speed limiter on. (41)

### Marlon Osbourne, MD, deposition dated March 4, 2020

Medical Examiner Marlon Osbourne testified to the following:

- Mr. Osbourne performed the autopsy on Edgar Monserratt Martinez. (10)
- He determined cause of death as multiple blunt impacts and thermal injuries. He had blunt trauma to the head and brain. (13)
- A document listing cause of death as thermal injuries would be an error. It's missing the blunt impact. (18)
- He believed thermal injuries contributed to his death. (19)
- "The thermal injuries describe charring of the skin on the head, the face, the neck, the chest, the upper abdomen, upper back and extremities. It denotes those pugilistic posturing or contracture of the extremities. And this describes the areas of sparing on the lower abdomen, inguinal area, mid back and lower back." (23)
- "There was a fracture of the middle cranial fossa anterior to the petrous portion of the temporal bone. Linear fractures in the right middle cranial fossa. There's a thin subarachnoid hemorrhage overlying the basal aspect of the frontal bones. There are contusions of the basal frontal, left temporal, left parietal, left occipital lobes of the brain. And contusions of the right temporal lobe." (23-24)
- The right second through sixth ribs were fractured anteriorly, and the right lobe of the liver had several lacerations. There was also a right femur fracture. (25)
- His carboxyhemoglobin saturation was 1 percent. (36)
- His body was approximately 80% charred. (43)
- If witnesses had described Edgar moving and rocking back and forth after the crash, it wouldn't change opinions or make him believe the thermal injuries were more likely the cause of death. (47)
- The brain injuries were enough to be fatal. (104)
- There was also an open left ankle fracture. (110)
- He did not find any soot in Edgar's trachea. (121)
- The blunt trauma to the brain may have been acutely lethal and may have resulted in immediate loss of consciousness. (123)
- He may have died before the extent of charring occurred. (126)
- The toxicology and internal findings support his traumatic injuries were lethal. (127)
- He also performed the autopsy of Barrett Riley. (128)
- Barrett's cause of death was solely thermal injuries. (129)
- He did not note any blunt force trauma sustained by Barrett. (130)

### Beckton Peddy, deposition dated January 28, 2021

Barrett Riley and Edgar Monserratt's friend, Beckton Peddy, testified to the following:

- Barrett would typically drive over the speed limit. (19)
- Barrett's car was put in a "limited" mode after getting a ticket. Barrett told him he went to the Tesla shop to get the speed limiter removed. "… I think this is basically his words – that he snuck that request in there to remove that." (22-24)

- Beckton had been in the Tesla when Barrett drove over 100 mph. (30)
- While driving home from the mall, Barrett passed Beckton on Beckton's right, near where A1A curves to the left. Beckton was going much slower than the speed limit since there was significant traffic. (73-75)
- "So I saw him, so he moved to the right of me and passed me at a normal rate of speed, didn't think anything of it. And I never saw it until I came upon it in the accident site. … So I believe I come upon the scene and… I see his car over on the wall, and I just remember thinking that, oh boy, Barrett got into an accident. It's probably nothing too bad. At least that's my memory. And I know I pulled onto the right shoulder and got out and ran over. And it was at that point I noticed the car was on fire." (76)
- He only got within a few feet of the back of the Tesla. It was very hot. He was concerned it was going to explode. He went to check on Alexander Berry who was sitting on the driveway close to the car. He moved Alex further away from the car. (77)
- He assumed Barrett and Edgar were still in the Tesla. (79)
- The driver door was closed. He couldn't tell if anyone was inside due to the smoke. (82)

*James Riley, deposition dated April 12, 2021*
Barrett Riley's father, James Riley, testified to the following:
- Mr. Riley put a speed limiter on Barrett's Tesla because he caught Barrett speeding multiple times after getting his license. (45)
- The accident could be attributed to Barrett, but it could also be attributed to "the vehicle itself." (98)
- Barrett received a ticket for going 112 mph. (103)
- Barrett had asthma, so he did not smoke. (205)
- Mr. Riley was surprised the state did not take away Barrett's license after the speeding ticket. (238)
- He was told by Beckton Peddy that the vehicle burst into intense flames as soon as it hit the second wall. (244)
- Barrett had "life-threatening "allergies. (254)
- Mr. Riley spoke with Elon Musk after the accident: "I just don't understand why the guys couldn't get out of the car. My son had… no injuries from the... collision, and I didn't understand why he didn't just open the door and step out, or why the bystanders couldn't open the door. … the bystanders said the door handles weren't out. And then he said that the doors are mechanical from the inside – they're both electric and mechanical from the inside, and that the driver could have pulled the door handle far enough aft to open the door. And then I said, 'Well, why would they not have done that?' And he said, 'I don't know. Maybe they were just stunned after the airbag deployment.'" (257-258)

*Jenny Riley, deposition dated April 13, 2021*
Barrett Riley's mother, Jenny Riley, testified to the following:
- About two months before the accident, Barrett received a speeding ticket for going 112 mph. (49)
- She recalled telling Christian [Catanese]: "You can't let Barrett go fast. You have to tell him to slow down. I'm worried about you guys." (78-79)
- "And so I just went through the barricade and just went straight to where the accident was. And Jim was already there. And there were people everywhere. And the car was a disaster. …

And all the blame can be put on them. Tesla is wrong with not having the door handles open. Those boys could be here if they could have just gotten out of the car. Those stupid batteries." (92)

- She did not know if Barrett smoked. He had asthma. She found a vape pen in his drawer after the accident, but she had never seen him vape. (97)

### Reagan Riley, deposition dated April 21, 2021
Barrett Riley's sister, Reagan Riley, testified to the following:
- Barrett had some sort of learning disability with an eye tracking issue. (49)
- She did not think Barrett would use JUUL e-cigarettes. (69-70)

### Jake Shapiro, deposition dated November 16, 2020
Barrett Riley's friend, Jake Shapiro, testified to the following:
- Jake was driving a Camaro when Barrett received a speeding ticket. They were not racing per se, but Barrett accelerated to pass him. (34-36)
- He wasn't surprised to learn that Barrett was speeding at the time of the incident. (57)

### Sabrina Silva, deposition dated December 22, 2020
Barrett Riley and Edgar Monserratt's friend, Sabrina Silva, testified to the following:
- Barrett drove fast a couple of times, a little over the speed limit. (16)

### Aaron Smith, deposition dated August 11, 2020
Tesla Field Technician Specialist Aaron Smith testified to the following:
- The Tesla was in for a service for a replacement HV pack. The son picked up the car. He returned to the service center rode with a technician for 18 minutes and the limiter was disabled. (58)
- If the electrical system of the car shuts down, the door handles would not present from the outside, but the doors could still be opened from the inside via a mechanical release. (71)

### Shari Stenglein, deposition dated January 7, 2021
Barrett Riley and Edgar Monserratt's friend, Shari Stenglein, testified to the following:
- It was normal for Barrett to drive over the speed limit. (14)
- She'd been in the car once when Barrett drove 151 mph. She asked him to slow down because she felt unsafe. (17-18)

### Joshua Turner, deposition dated July 14, 2020
Tesla Service Manager Joshua Turner testified to the following:
- Speed limiters were not to be placed on customer-owned vehicles. He did not know why a speed limiter was placed on the subject vehicle. (40)

## Summary of Medical Records

### Barrett Riley
Fort Lauderdale Fire Rescue first responders arrived on scene to find Barrett Riley as the driver of a vehicle that was engulfed in flames. He had injuries that were incompatible with life and was pronounced deceased.

Broward County Office of the Medical Examiner and Trauma Services Investigator Kaylin Nelson arrived on scene and observed Barrett in the driver's seat, leaned over toward the passenger side of the vehicle. Removal Transport Services of Broward untangled Barrett from wires which were going in different directions throughout the front seats of the vehicle.

Broward County Associate Medical Examiner Dr. Marlon Osbourne examined Barrett's body on May 9, 2018. He noted that the body measured 69" in length and weighed 184 pounds. Evidence of thermal injuries consisted of charred skin of the head, face, neck, chest, upper abdomen, upper back and extremities and pugilistic contractures of the extremities. Dr. Osbourne's autopsy findings were of thermal injuries. He reported the cause of death as thermal injuries and the manner of death as accident. A toxicological analysis demonstrated a blood carboxyhemoglobin saturation of 11% and detected no alcohol or drugs.

### Edgar Monserratt, Jr.
Responding emergency personnel from Fort Lauderdale Fire Rescue arrived on scene to find Edgar Monserratt, Jr. as the front passenger of a vehicle that was engulfed in flames. He had injuries that were incompatible with life and was pronounced deceased.

Ms. Nelson arrived on scene to find Edgar in the passenger seat, leaned over toward the center console. Edgar's right foot was hanging out of the door, and there was a charred black sneaker on the ground nearby. Removal Transport Services of Broward untangled Edgar from wires going in different directions throughout the front seats of the vehicle. Using tools, fire rescue extricated Edgar's left foot from where it was stuck to the floor of the vehicle.

Dr. Osbourne performed an autopsy on Edgar's body on May 9, 2018. Dr. Osbourne noted that the body measured 69" in length and weighed 172 pounds. Evidence of thermal injuries consisted of charred skin of the head, face, neck, chest, upper abdomen, upper back and extremities and pugilistic contractures of the extremities. Evidence of blunt trauma to the head included a linear fracture in the left middle cranial fossa anterior to the petrous portion of the temporal lobe; two linear fractures in the right middle cranial fossa; thin subarachnoid hemorrhage overlying the basal aspect of the frontal lobes, the left temporal and parietal lobes; and contusions of the left basal frontal, left temporal, left parietal, left occipital and right temporal lobes. Evidence of blunt trauma to the torso consisted of right anterolateral 2nd through 6th rib fractures and right liver lacerations.

In summary, Dr. Osbourne's autopsy findings were of blunt trauma consisting of skull base fractures, cortical contusions, cerebral edema, rib fractures, and liver lacerations, as well as thermal injuries. A toxicological analysis demonstrated a blood carboxy-hemoglobin saturation of 1%. No alcohol or drugs were detected. Dr. Osbourne reported the cause of death as multiple blunt impact and thermal injuries and the manner of death as accident.

## Discussion

### Review of Accident Reconstruction
According to the accident reconstruction of Mr. James Walker of Carr Engineering Inc., the Tesla was traveling approximately 116 mph as it approached the left turn and began to lose control. It left approximately 210 feet of tire marks before impacting the curb on the west side of the road at approximately 90 mph. The impact resulted in a delta v of approximately 3.5 mph with a PDOF

of approximately 45 degrees. This impact resulted in the deployment of all airbags and pretensioners. The Tesla continued approximately 33 feet before striking the north side of the driveway wall on its right side at approximately 85 mph, resulting in a delta v of approximately 14 mph with a PDOF of approximately 69 degrees. The Tesla continued another 31 feet across the driveway before striking the south side of the driveway wall on its right-front corner at a speed of approximately 79 mph, resulting in a delta v of approximately 38 mph with a PDOF of approximately 49 degrees. The Tesla became partially airborne as it entered a clockwise yaw, sliding and rotating across Seabreeze Boulevard before striking the curb on the east side of the road with a PDOF of approximately 74 degrees. The Tesla continued approximately 18 feet before striking a light pole on the front passenger door at a speed of approximately 32 mph, resulting in a delta v of approximately 15 mph with a PDOF of approximately 74 degrees before coming to rest.

In total, the Tesla experienced at least five distinct impacts with three involving injurious impact speeds and delta vs with significant lateral components as summarized in Table 1.

| Impact | Impact Speed (mph) | Delta V (mph) | PDOF (degrees) |
|---|---|---|---|
| West curb | 90 | 3.5 | 45 |
| North driveway wall | 85 | 14 | 69 |
| South driveway wall | 79 | 38 | 49 |
| East curb | - | - | - |
| Pole | 32 | 15 | 74 |

Table 1: Accident reconstruction summary

### Subject Vehicle Inspection

Delta V Biomechanics inspected the subject 2014 Tesla Model S on October 1, 2020 in Miami Florida. Digital photographs, notes and measurements were taken. Findings included, but were not limited to:

- Extensive fire damage throughout
- Pole-type impact damage to the front passenger door
- The driver latch plate was burnt into its buckle
- The front passenger latch plate was not found in the vehicle at inspection

### Occupant Kinematics and Injury Mechanism

Medical Examiner Marlon Osborne identified no traumatic injuries to Barrett Riley at autopsy. However, photographs of Barrett's body do show hemorrhages consistent with traumatic injury. At the anterior pelvis are hemorrhages consistent with seat belt loading (Figure 1, top, green arrows). Photographs of the left thigh (Figure 1, top, yellow) and right skull (Figure 1, bottom right) demonstrate significant bleeding, and there are hemorrhages in the soft tissues of the right posterior neck (Figure 1, bottom left, blue). A small amount, 11%, of carboxyhemoglobin was found.

Riley v Tesla                                                                    May 21, 2021



**Figure 1: Autopsy photos of Barrett Riley**

Dr. Osborne found significant traumatic injury to Edgar Monserratt including fatal basilar skull fractures and brain injury. Edgar's carboxyhemoglobin level was 1% and there was no soot in his airway.

As the vehicle hopped the initial curb, locking the seatbelts at the retractors and deploying the airbags, each occupant would move slightly down into their seats and forward and to the right as their bodies interacted with their locked shoulder and lap belts and potentially with their deploying frontal airbags, and potentially for Edgar, his side curtain airbag. As the vehicle continued forward and interacted with the north driveway wall, their bodies would move to the right and partially forward along the 69 degree PDOF, significantly loading their shoulder and lap belts and interacting with other vehicle structure to their right and in front of them, likely through their now deflating or fully deflated airbags. Barrett likely interacted with the center console, front passenger seat, or even Edgar himself. Edgar likely interacted with the front passenger door. As the vehicle continued and struck the south driveway wall, now significantly out of position, their bodies would have moved similarly as the preceding impact but more forward along the 49 degree PDOF and with greater excursion due to the higher severity of the impact. Barrett would have again likely interacted with the vehicle structures and Edgar to his right, but also possibly the steering wheel and middle instrument panel and possibly Alexander Berry who would also be brought significantly forward at this impact. Edgar likely again loaded his front passenger door as well as the instrument panel structures in front of him. After the vehicle rebounded across the road and struck the pole and trees/shrubbery, each occupant would have moved again predominantly to the right along the 74 degree PDOF, interacting with their seatbelts, the aforementioned structures to their right, and now for Edgar, the pole itself.

After the initial curb impact, each successive impact brought each occupant more and more out of an optimal seating position due to impact induced kinematics and subsequent rebound, diminishing the vehicle's restraint systems' and airbags' effectiveness. Barrett and Edgar essentially did not have the benefit on an optimal airbag in any of the three significant impacts in the collision sequence.

Edgar's fatal brain injury likely occurred when his head moved to the right at the time of the pole impact. His side airbag had already deployed earlier in the sequence and would not have optimally restrained him during this impact. Mr. Alexander Berry, unrestrained in the back row seat, likely also loaded Edgar's seat and interacted with him causing or contributing to his head injuries during the south driveway wall impact.

### Carboxyhemoglobin

Carbon monoxide (CO) is a colorless, odorless, and tasteless gas that is released during the incomplete combustion of carbon-containing fuels. CO can be absorbed though the lungs and the amount of gas absorbed depends on the ventilation rate, duration of exposure, and relative concentrations of carbon monoxide and oxygen in the environment. Once CO diffuses into the bloodstream, it readily binds with hemoglobin (Hb) to form carboxyhemoglobin (COHb), which decreases the red blood cell's ability to bind and transport oxygen to the body. Since about 95% of all absorbed CO binds to Hb, the percentage of total Hb in the blood that is in the form of COHb is a biomarker of CO exposure (Ernst 1998, NAS 2010, Penney 2008).

Blood COHb levels depend on a number of factors, including the ambient levels of carbon monoxide. For example, smokers are exposed to increased environmental CO concentrations, which can lead to COHb levels ranging from 3 to 15% (Ernst 1998, NAS 2010). Furthermore, blood COHb levels can be useful in differentiating fire and trauma as possible causes of death in fatal motor vehicle collision fires. Numerous studies indicate that a COHb concentration of greater

than 40-50% is associated with carbon monoxide poisoning, whereas traumatic injuries are likely to have caused death below this threshold. For instance, research has demonstrated that a COHb level of around 34-56% is not lethal to healthy individuals, and subjects who were exposed to 20-33% COHb concentrations subsequently reported headache as their only complaint (NAS 2010, Wirthwein 1996).

Evidence that one is alive at the time of the fire includes soot lining the airways, bright cherry-red coloration of the skeletal muscle, viscera, and blood due to carbon monoxide inhalation, an elevated blood carboxyhemoglobin saturation, and if the person lived long enough, microscopic documentation of an inflammatory reaction to the burn. With the exception of smokers, who can have baseline carboxyhemoglobin saturations of 10-15%, most individuals who die in sudden unexpected deaths will have little to no carboxyhemoglobin in their blood. Deaths due solely to the toxicity of CO have blood carboxyhemoglobin levels in the range of 50 to 80%.  (Dolinak 2005).

Edgar Monserratt's carboxyhemoglobin saturation, 1% at autopsy, is negligible for someone breathing during a fire. Furthermore, the coroner noted no soot in his respiratory system. Together, these findings and the totality of the evidence indicate that Edgar was unconscious without respiratory drive, if not already dead, when the fire started.

Barrett Riley's carboxyhemoglobin saturation, 11% at autopsy, is lower than what would be expected in a purely thermal death due to the post-collision fire of the subject crash, i.e., not a flash fire. Based on the severity of the collision and the physical evidence including that his latch plate was burnt into the buckle, it is likely Barrett was unconscious once the vehicle came to rest. Barrett's lack of traumatic injuries found at autopsy is not consistent with his failure to extricate himself. More likely he was unconscious as a result of the impacts.

Certain upper cervical spine injuries can render a patient immediately unconscious. Although there is no indication in the autopsy report that Barrett's posterior neck was dissected to look for trauma in the cervical spine, the photographs show otherwise, as discussed above.

According to one pathology text (Spitz 2006):

> An autopsy of a traffic death…is incomplete without a thorough examination of the cervical spine. …Meticulous examination of the cervical spine is also recommended in automobile occupants in cases of post-collision fire….

Another (DiMaio 2001) notes:

> In any automobile death in which no cause of death is found at autopsy, the back of the neck should be explored.

Additionally, (Dolinak 2005):

> It is useful to perform posterior neck dissections in victims of motor vehicle accidents, particularly if the body is charred and there are no devastating injuries. This may reveal neck fractures, atlanto-occipital injury, or other evidence of severe neck flexion/extension or torsion that was not previously recognized.

## Consciousness

An impact to the head will cause it to rotate about some point of the cervical spine between the occipital condyles to C7/T1. During such a rotation, forces are transmitted to the skull prior to the brain, and the skull and brain will move at different rates because they are not rigidly coupled to one another (Gennarelli 2003, Goldsmith 2004). Traumatic head and brain injuries can be classified into linear or translational injuries (e.g., skull fractures, epidural hematomas, and contusions secondary to skull fracture) and angular or rotational injuries (e.g., subdural [SDH] and intra-cerebral hematomas, concussion and diffuse axonal injury (DAI), and coup and contrecoup contusions that occur in the absence of skull fracture) (Adams 1982, Blumbergs 1989, Kleiven 2003; see Table 1).

| Type of Injury | Skull Deformation (Contact) | Head Motion | |
|---|---|---|---|
| | | Translational | Angular |
| Skull fracture | + | – | – |
| Epidural hematoma | + | – | – |
| Coup contusion | + | – | – |
| Contrecoup contusion | + | + | + |
| Subdural hematoma | – | + | + |
| Concussion | – | – | + |
| Diffuse axonal injury | – | – | + |

**Table 2: Mechanisms of common head injuries (Gennarelli 1989)**

Diffuse brain injuries are characterized by generalized rather than focal impairment of brain function. They form a continuum of severity ranging from minor concussion not associated with loss of consciousness (LOC), the "classic" cerebral concussion with transient disturbance of consciousness, and DAI with prolonged LOC of varying duration (see Table 2).

| Description | AIS | Concussion Grade | Duration of LOC |
|---|---|---|---|
| Mild concussion | 1 | 1 to 3 | None |
| Classical concussion | 2 | 4 | <1 hour |
| Severe concussion | 3 | 4 | 1 – 6 hours |
| Mild diffuse axonal injury | 4 | 5 | 6 – 24 hours |
| Moderate diffuse axonal injury | 5 | 5 | >24 hours, no brainstem abnormality |
| Severe diffuse axonal injury | 5 | 5 | >24 hours, decerebration/decortication |

**Table 3: Definitions of diffuse brain injury (Gennarelli 2003)**

According to the 2015 edition of the AIS published by the Association for the Advancement of Automotive Medicine, DAI is a "clinicopathological complex defined as immediate and prolonged coma due to widespread damage to axons and other neuronal processes in the brain" (AAAM 2015).

DAI is associated with mechanical disruption of many axons in the cerebral hemispheres and subcortical white matter with these axonal disturbances extending below the midbrain and into the brainstem to a variable degree. The severity of injury is related to the magnitude of brain acceleration, the duration over which this acceleration occurs, and the direction of head movement (Bain 2000, DiMaio 2015, Gennarelli 1982, Gennarelli 1987). For example, faster and shorter acceleration along the antero-posterior or sagittal plane is more likely to produce subdural hematoma, whereas slower and longer accelerations along the coronal or lateral plane tends to cause DAI (Goldsmith 2004; see Figure 2 and Figure 3).



**Figure 2: Effect of sagittal versus coronal plane brain acceleration on resulting injury type**



**Figure 3: Tolerance curves for diffuse brain injuries (adapted from Gennarelli 1981)**

DAI, the most severe type of diffuse brain injury, occurs when strain levels in the axons are high (i.e., when the axons are forcibly stretched and extended), and rotational acceleration has been shown to contribute more than 80% to brain strain in motor vehicle accidents (Bain 2000, Margulies 1992, Zhang 2006). Furthermore, the severity of DAI varies as a function of the strain level; researchers determined that reversible brain injury akin to concussion could be produced at strains of 0.05, whereas the tissue disruption characteristic of severe DAI occurred at a higher strain of 0.20 (Gennarelli 1989; see Figure 4).



**Figure 4: Effect of varying strain levels on tissue disruption in isolated axonal preparations in comparison to an equivalent HIC value of 1000 (adapted from Gennarelli 1989)**

There was no indication that either Barrett or Edgar were conscious once the vehicle came to rest. Both likely sustained a brain insult along the continuum from classical concussion to diffuse axonal injury which would have rendered both immediately unconscious. These brain injuries can occur in the absence of any hemorrhage, meaning they may not be apparent at autopsy (Spitz 2006).

The laterality to the three potentially injury-producing impacts (north driveway wall, south driveway wall, and pole) created the types of forces that typically produce rotational brain injuries. The lateral component of these impacts is consistent with the coronal accelerations of the head about the neck that is the common mechanism for DAI. Because the airbag systems of the vehicle had deployed earlier in the collision sequence, they would not provide optimal restraint for either of the front seat occupants during these three impacts. For Barrett, these impacts would have brought his head into injurious contact with structures to his right. Given the severity of these three impacts, the suboptimal restraint status at the time of those impacts, the occupant kinematics with excursion to the right, the trauma evident on the right side of Barrett's head, and the lack of evidence of consciousness, it is likely that Barrett sustained a DAI in the subject collision.

Factors pointing toward unconsciousness include that neither occupant extricated himself from the vehicle, Barrett's latch plate being found in the buckle, and the overall severity of the accident.

Bystander video shows the Tesla at rest after the accident. Edgar can be seen slumped forward with his right upper extremity moving in jerking motions. This is consistent with seizure type activity after brain insult. This movement does not appear intentional and is not an indicator of consciousness. I agree with Ms. Koulouris's description of Edgar's movements. Barrett is unable to be seen in this video, but there does not appear to be any movement from his seating position. The video supports the conclusion that both occupants were unconscious.

*Accident Severity*

The most important factor in predicting the risk of injury or death in a frontal crash is crash severity, which is expressed as the vehicle's change in velocity (delta v) during the impact (Funk 2008).

Frontal impacts with delta vs of 38 mph are exceptionally severe, near the 100th percentile in terms of National Automotive Sampling System (NASS) data (Figure 5, Goertz 2010).



**Figure 5: Crash severity (Goertz 2010)**

A high delta v frontal impact, such as the subject collision, is extremely injurious with a non-insignificant chance of death. In a study of belted drivers involved in frontal impacts, a delta v of 38 mph was associated with a fatality risk of approximately 15% (Figure 6, Richards 2010).



**Figure 6: Risk of belted driver fatality by crash severity (Richards 2010)**

In addition to crash severity, crash mode has a noteworthy effect on injury. In a study of NASS and Crash Injury Research and Engineering Network (CIREN) data, the authors calculated the risk of serious-to-fatal (AIS 3+) injury by crash mode (Augenstein 2003). At a collision severity of 30

mph delta v, the likelihood of serious-to-fatal injury was 83.8%, 47.8%, 38.9%, and 19.9% for near-side lateral, far-side lateral, frontal, and rear impacts. Serious-to-fatal injury for occupants in frontal impacts with 38mph delta vs was about 70% (Figure 7).



**Figure 7: Probability of serious to fatal injury by crash mode and severity (Augenstein 2003)**

### Multiple Impact Collisions

Multiple impact crashes (MICs), such as the subject collision, are less common and far more injurious than single impact crashes. NASS CDS data from 1998-2000 showed that MICs represented only 24% of the crashes but 42% of all the MAIS 3+ injuries. Specifically, crashes with two and three-plus impacts accounted for 24% and 18% of the MAIS 3+ injuries, respectively (Digges 2003). Compared to a single impact, there is a higher risk of being seriously injured in a multiple impact event (Fay 2001). For instance, the risk of MAIS 3+ injury is 1.9 and 3.8 times higher in two and three-plus impact crashes than in a single frontal-impact crashes, respectively. (Digges 2003).

| Crash Mode | People % | MAIS 3+ % | Rate |
|---|---|---|---|
| Front Single | 45% | 32% | 1.65 |
| Back Single | 5% | 1.0% | 0.42 |
| Side Single | 21% | 17% | 1.79 |
| Top Single | 5% | 8% | 3.85 |
| Two Impacts | 17% | 24% | 3.21 |
| Three+ Impacts | 6% | 18% | 6.25 |

**Figure 8: Probability of serious to fatal injury for single and multiple impact collisiosn (Digges 2003)**

A more recent study analyzed NASS CDS data from 1997-2015 to compare the risk of severe injury (MAIS 4+) in single and multiple impact crashes for non-ejected, belted drivers and found that 58% of severe injuries occurred in crashes with multiple (two to four) impacts. In general, the increase in injury risk was statistically significant for each subsequent impact. Specifically, occupants in two, three, and four-plus impact collisions are 2.2, 3.4, and 8.3 times as likely to

sustain MAIS 4+ injury compared to those in single impact collisions (Viano 2018).

*Critique of Plaintiff Expert*

In his report dated January 19, 2021, Mr. Kelly Kennett opined, "Absent the vehicle fire, there is no expectation or evidence that Mr. Riley would have been fatally, or even seriously, injured in this crash," citing each individual impact being survivable on its own and claiming that Barrett "was a belt-restrained driver who also enjoyed the benefits of the vehicle's deployable restraints," in addition to Barrett's lack of injuries found at autopsy.

As discussed earlier, Barrett likely sustained an incapacitating injury based on his failure to extricate himself from the vehicle, low carboxyhemoglobin levels, and his latch plate remaining burnt into the buckle.

Mr. Kennett looking at each individual impact separately fails to consider the elevated injury risk in multiple impact collisions. Though not explicitly stated when the airbags deployed in the subject accident, Barrett would not have received the benefit of a deployed airbag for at least one of the impacts. Since airbags are designed to deploy once only, once it is deployed, it is not available to protect an occupant in a subsequent impact. No airbag will prevent interaction between Barrett's head and Edgar's shoulder or seat back.


## Opinions

1.  The subject collision, involving multiple impacts, was an extremely severe one, in the top fraction of 1% of all collisions, with a very high injury potential.

2.  Barrett Riley likely sustained a diffuse axonal injury during the collision.

3.  Edgar Monserratt sustained a fatal head injury that rendered him immediately unconscious, likely from the lateral pole impact.

Please note that this report is based upon information available to me at the time of its preparation. Should substantial additional information that affects the contents of this report become available, an amended or supplementary report may be prepared.

If you have any questions, do not hesitate to contact me.

Sincerely,

Elizabeth H. Raphael, M.D., F.A.C.E.P.

Riley v Tesla                                                                          May 21, 2021

## Appendix A: Materials Received and Reviewed

### *Legal Documents*

- Complaint - James Riley
- Defendant's Amended Response to Plaintiff's First Request for Production, No. 2 Per Court Order
- Defendant's Response to Request for Production
- Defendant's Supplemental Amended Response to Plaintiff's First Request for Production, No. 2 Per Court Order
- Demand Letter re Alexander Berry
- First Amended Complaint - Edgar Monserratt
- Plaintiff's Answers to Interrogatories Propounded by Defendant
- Plaintiff's Notice of Filing Privilege Log
- Plaintiff's Notice of Taking Videotaped Deposition
- Plaintiff's Response to Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Request for Production
- Defendant Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's First for Admission
- Defendant Tesla, Inc. d/b/a Tesla Florida, Inc.'s Response to Plaintiff's First for Production
- Plaintiff's Disclosure of Expert Witnesses
- Corrected Discovery Schedule and Pretrial Order
- Order Granting Joint Motion to Extend Certain Pretrial Deadlines
- Order Setting Trial and Pretrial Deadlines
- Amended Discovery Schedule and Pretrial Order (Monserratt v Tesla)
- Amended Scheduling Order (Riley v Tesla)
- Defendants Riley Expert Witness Disclosures
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s First Interrogatories to Defendant
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s First Request for Production to Defendant
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s First Request for Production to Plaintiff
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Responses to Plaintiff's Second Set of Interrogatories
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Response to Defendant, James Riley's First Request to Produce
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Response to Plaintiff's Second Requests for Production
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Response to Plaintiff's Third Requests for Production
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Responses to Plaintiff's Third Set of Interrogatories
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Second Request for Production to Defendant, James B. Riley, as the Personal Representative of the Estate of Jenny Riley
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Second Request for Production to Plaintiff
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Second Set of Interrogatories to Plaintiff

- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Supplemental Responses to Plaintiff's Third Set of Interrogatories
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Interrogatories to Plaintiff
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Request for Production to Defendant, James B. Riley, as the Personal Representative of the Estate of Barrett Riley
- Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Request for Production to Plaintiff
- Defendant Tesla, Inc. d/b/a Tesla Motors, Inc.'s First Request for Production to Plaintiff James B. Riley, as Personal Representative of the Estate of Barrett Riley
- Defendant's, James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Amended Response to First Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc.
- Defendant's, James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Amended Response to Second Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc.
- Defendant's, James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Response to First Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc.
- Defendant's, James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Response to Second Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc.
- Defendant's, James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Response to Third Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc.
- Defendant's, James B. Riley, as the Personal Representative of the Estate of Barrett Riley, Second Amended Response to First Request for Production of Tesla, Inc. a/k/a Tesla Florida, Inc., Nos. 6, 26-28 and 35
- James B. Riley's Answers to First Interrogatories by Tesla, Inc., dated 2020-10-02
- James B. Riley's Answers to First Interrogatories by Tesla, Inc., dated 2020-10-09
- Plaintiff's Answers to Second Interrogatories Propounded by Defendant
- Plaintiff's Answers to Third Interrogatories Propounded by Defendant
- Plaintiff's Response to Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Second Request for Production
- Plaintiff's Response to Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Third Request for Production
- Plaintiff's Response to Defendant Tesla, Inc.'s First Request for Production
- Plaintiff's Second Supplemental Response to Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Request for Production
- Plaintiff's Supplemental Response to Defendant Tesla, Inc. a/k/a Tesla Florida, Inc.'s Request for Production
- Defendants Tesla, Inc. a/k/a Tesla Florida, Inc. and Halston Loyd's Expert Witness Disclosures
- Plaintiff's Fact Witness List
- Tesla, Inc. d/b/a Tesla Motors, Inc.'s Fact Witness List

*Accident/Incident Reports*
- Florida Traffic Crash Report Long Form Produced by Plaintiff
- Florida Traffic Crash Report Update
- Fort Lauderdale Fire Rescue Records
- Fort Lauderdale Police Department Calls for Service Report
- Fort Lauderdale Police Department Incident Details

- Fort Lauderdale Police Department Traffic Homicide Investigation Report
- Florida Traffic Crash Report Long Form
- NTSB Investigation

### *Photographs, Videos, and Inspections*
- Autopsy Photos of Barrett Riley
- Autopsy Photos of Edgar Monserratt, Jr.
- Pre-Accident Photos of Edgar Monserratt, Jr.
- Scene Photos Produced by Plaintiff
- Scene Photos by Broward County Medical Examiner
- Scene Photos by Fort Lauderdale Police Department
- Video - 1209 Seabreeze Blvd, dated 2018-05-08
- Video - Best Western Oceanside Inn, dated 2018-05-08
- Video - Cell Phone, dated 2018-05-08
- Videos Produced by City of Fort Lauderdale
- Drone Photos Produced by Riley Counsel
- Scene Photos Produced by Riley Counsel
- Scene Video Produced by Riley Counsel
- Scene Inspection Photos and Video by CEI, dated 2020-09-10
- Vehicle Inspection Photos and Notes by CEI, dated 2020-09-11
- Scene Photos and Videos by Beckton Peddy
- Scene Inspection Photos by CEI, dated 2021-03-25

### *Fact Witness Statements and Depositions*
- Cosmin Ilonta, dated 2020-02-11 with exhibits
- Halston Loyd, dated 2020-07-14
- Joshua Turner, dated 2020-07-14 with exhibits
- Karl Koulouri, dated 2019-11-19
- Larry Groshart, dated 2019-11-19 with exhibits
- Marlon Osbourn, dated 2020-03-04 with exhibits
- Aaron Smith, dated 2020-08-11
- Adam Cohen, dated 2020-08-07 with exhibits
- Alexander Berry, dated 2020-08-26 with exhibits
- Jonathan Ordonez, dated 2020-08-21 with exhibits
- Joseph Constantino, dated 2020-08-21 with exhibits
- Leopoldo Matheus, dated 2020-08-11
- Christian Catanese, dated 2020-11-10 with exhibits
- Jake Shapiro, dated 2020-11-16 with exhibits
- Juliana Ables, dated 2020-12-09 with exhibits
- Matthew Cohen, dated 2020-12-21 with exhibits
- Sabrina Silva, dated 2020-12-22 with exhibits
- Beckton Peddy, dated 2021-01-28 with exhibits
- James Riley, dated 2021-04-12 with exhibits
- Jenny Riley, dated 2021-04-13 with exhibits

- Reagan Riley, dated 2021-04-21 with exhibits

### Expert Witness Reports
- Kelly Kennett, dated 2021-01-19
- Robert Caldwell, dated 2021-01-18
- Ralph White, dated 2021-04-15

### Medical Records of Edgar Monserratt
- Broward County Medical Examiner
- Fort Lauderdale Fire Rescue
- Broward County Medical Examiner Radiology

### Medical Records of Barrett Riley
- Broward County Medical Examiner
- Fort Lauderdale Fire Rescue
- Broward County Medical Examiner Radiology

### Medical Records of Alexander Berry
- Fort Lauderdale Fire Rescue

### Miscellaneous
- Document Production by James Riley, dated 2019-08-30
- Document Production by James Riley, dated 2020-03-11
- Document Production by Plaintiff, dated 2019-11-25
- EDR Report - 5YJSA1H24EFP62693
- News Articles and Videos (El Nuevo Herald, Miami Herald, South Florida Sun Sentinel, WFOR CBS 4, WPLG ABC 10, WTVJ NBC 6)
- Records - USAA

# Bibliography

Accident Severity

1.  Goertz A, Yaek J, Compton C. Accident statistical distributions from NASS CDS. *SAE Paper No. 2010-01-0139*. 2010 Apr 12.

2.  Funk JR, Cormier JM, Gabler HC. Effect of delta-V errors in NASS on frontal crash risk calculations. InAnnals of Advances in Automotive Medicine/Annual Scientific Conference 2008 (Vol. 52, p. 155). Association for the Advancement of Automotive Medicine.

3.  Augenstein J, Perdeck E, Stratton J, Digges K, Bahouth G. Characteristics of crashes that increase the risk of serious injuries. In Annual Proceedings/Association for the Advancement of Automotive Medicine 2003 (Vol. 47, p. 561). Association for the Advancement of Automotive Medicine.

4.  Richards DC. Relationship between speed and risk of fatal injury: pedestrians and car occupants. 2010.

5.  Viano DC, Parenteau CS. Severe injury in multiple impacts: Analysis of 1997-2015 NASS-CDS. *Traffic Inj Prev*. 2018;19(5):501-505.

Consciousness

1.  Association for the Advancement of Automotive Medicine (AAAM). The Abbreviated Injury Scale, 2015 Revision. *AAAM*. 2016 Oct.

2.  Adams JH, Graham DI, Murray LS, Scott G. Diffuse axonal injury due to nonmissile head injury in humans: an analysis of 45 cases. *Ann Neurol*. 1982 Dec;12(6):557-63.

3.  Bain AC, Meaney DF. Tissue-level thresholds for axonal damage in an experimental model of central nervous system white matter injury. *J Biomech Eng*. 2000 Dec;122(6):615-22.

4.  Blumbergs PC, Jones NR, North JB. Diffuse axonal injury in head trauma. *J Neurol Neurosurg Psychiatry*. 1989 Jul;52(7):838-41.

5.  DiMaio VJ, DiMaio D. "Asphyxia" in DiMaio VJ, DiMaio D. Forensic Pathology, Second Edition. *CRC Press*: Boca Raton, FL, 2001.

6.  Dolinak D, Matshes E, Lew EO. Forensic Pathology: Principles and Practice. Elsevier, 2005 Apr 8.

7.  Gennarelli TA, Spielman GM, Langfitt TW, Gildenberg PL, Harrington T, Jane JA, Marshall LF, Miller JD, Pitts LH. Influence of the type of intracranial lesion on outcome from severe head injury. *J Neurosurg*. 1982 Jan;56(1):26-32.

8.   Gennarelli TA, Thibault LE, Tomei G, Wiser R, Graham D, Adams J. Directional dependence of axonal brain injury due to centroidal and non-centroidal acceleration. *SAE Paper 872197*, 1987.

9.   Gennarelli TA, Thibault LE. "Clinical rationale for a head injury angular acceleration criterion" in Mackay M, Petrucelli E. Head Injury Mechanisms: The Need for an Angular Acceleration Criterion. *Am Assoc for Automot Med*: Des Plaines, IL, 1989.

10.  Gennarelli TA, Pintar FA, Yoganandan N. Biomechanical tolerances for diffuse brain injury and a hypothesis for genotypic variability in response to trauma. *Annu Proc Assoc Adv Automot Med*. 2003 Sep 22-24;47:624-8.

11.  Goldsmith W, Plunkett J. A biomechanical analysis of the causes of traumatic brain injury in infants and children. *Am J Forensic Med Pathol*. 2004 Jun;25(2):89-100.

12.  Kleiven S. Influence of impact direction on the human head in prediction of subdural hematoma. *J Neurotrauma*. 2003 Apr;20(4):365-79.

13.  Margulies SS, Thibault LE. A proposed tolerance criterion for diffuse axonal injury in man. *J Biomec*h. 1992 Aug;25(8):917-23.

14.  Spitz WU, *in* Fisher Spitz and Fisher's medicolegal investigation of death: guidelines for the application of pathology to crime investigation. Eds. Werner U. Spitz, and Daniel J. Spitz. Charles C Thomas Publisher, 2006.

15.  Zhang J, Yoganandan N, Pintar FA, Gennarelli TA. Brain strains in vehicle impact tests. *Annu Proc Assoc Adv Automot Med*. 2006;50:1-12.

Carboxyhemoglobin

1.   Ernst A, Zibrak JD. Carbon monoxide poisoning. *N Engl J Med*. 1998 Nov 26;339(22):1603-8.

2.   National Academy of Sciences (NAS). Acute Exposure Guideline Levels for Selected Airborne Chemicals, Volume 8. *The National Academics Press*: Washington, DC, 2010.

3.   Penney GB. Carbon Monoxide Poisoning. *CRC Press*: Boca Raton, FL, 2008.

4.   Wirthwein DP, Pless JE. Carboxyhemoglobin levels in a series of automobile fires: death due to crash or fire. *Am J Forensic Med Pathol*. 1996 Jun;17(2):117-23.