## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60517-RS

JAMES B. RILEY, as personal
Representative of the ESTATE OF
BARRETT RILEY, deceased,

        Plaintiff,

v.

TESLA, INC., d/b/a
TESLA MOTORS, INC.

        Defendant.

_____/

### TESLA, INC, d/b/a TESLA MOTORS, INC's
### MOTION TO EXCLUDE THE TESTIMONY OF
### PLAINTIFF'S EXPERT RALPH WHITE UNDER FEDERAL RULES OF EVIDENCE
### 702 AND 403 AND MEMORANDUM OF LAW

        Tesla, Inc., d/b/a Tesla Motors, Inc., moves under Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, and Rule 403, to exclude the opinions of Plaintiff's battery expert, Ralph White. White's opinions are not based on testing, research, or knowledge; instead they are based on the expert's "intuition," "mistaken assumptions," "possibilities," and misinformed facts. White concedes he lacks expertise and knowledge about this complex multi-impact crash. Thus, his testimony adds nothing on the issue of whether a defect in the battery existed or whether it was a cause of Barrett Riley's death.

### INTRODUCTION

        Relevant to this motion, Plaintiff claims the high voltage battery pack (as distinguished from the 12-volt battery) in this electric vehicle was defectively designed such that it caught fire in the crash, and but for the alleged defect there would not have been a fire. Plaintiff claims the fire caused his son's death. Dr. Ralph White is Plaintiff's expert on the battery design. Dr. White

claims the design was "not safe" because it "promoted" thermal runaway propagation. (White Report at 5, attached as Exh. A; White Depo., attached as Exh. B). Thermal runaway occurs when a cell is crushed, penetrated, or heated in a way that causes the cell to overload the built-in safety mechanism. When the thermal runaway in one cell causes other cells to go into thermal runaway, it leads to thermal runaway propagation. (*See* Exh. B at 31, 179). White claims the battery housing was "not strong enough" to protect the cell in a crash and that the cell design created a risk of thermal runaway propagation. Tesla denies its battery was defective and asserts the fire was caused by the tremendous crushing forces in this high-speed multi-impact event.

White admits vehicles "are not his area" (Exh. B at 71), so he did not investigate what happened in this crash. Moreover, despite describing himself as "a battery guy," (*Id.* at 48), he went to the internet for information, but it turned out he researched the wrong battery. Yet, using information relating to the wrong battery, White intends to testify that the battery used in this vehicle is "not safe," and the caused thermal runaway propagation in *this* crash. So how does he reach his opinions?

Lacking expertise in vehicles and knowledge about the crush forces in a crash, White instead relies on his "intuition" that the battery casing is not "strong enough." (*Id.* at 37). But, even while as he claims the housing should be stronger, he admits he would be speculating as to whether that would have made a difference. (*Id.* at 90). In addition, relying on what he called a "reasonable assumption" about which battery was in Riley's Model S, White wrote his expert report based on what he found on the internet—which he now admits was wrong. And he failed to investigate the correct design. He did not know what industry standards apply or about Tesla's pre-market testing produced in this case, and did no testing or inspection of his own.

As a result, White opines:

- Two of the "usual safety features" found in batteries were missing. In reality, the first feature *was* there and the second was replaced by an equivalent design. He did not know that because he researched the wrong battery.

- The battery cell walls are too thin. In reality, the actual Model S cell wall falls within the range he considers appropriate. He admits he did not know the wall thickness when he wrote his Report saying that it was too thin. (*Id.* at 101).

- The individual cells are too close based on a photograph of a damaged cell and his "assumption" that the spacing is the same for an undamaged cell. (*Id.* at 146-47). He did not examine an undamaged battery's spacing, which obviously differs from one that has been damaged. (*Id.* at 147).

- Tesla should have used a fire-retardant material to reduce runaway propagation. (*Id.* at 120). In reality, the battery incorporated several features designed to prevent the spread of fire including a ceramic blanket with a rating of 1200 degrees Celsius. (Arora Report at ¶ 37, attached as Exh. C).

Faced with his mistakes, White steadfastly maintained his opinions held true because Tesla had not "disproved" them. (*See, e.g.*, Exh. B at 80). This, of course, erroneously inverts the burden of proof, but moreover, ignores the evidence establishing the vehicle and battery comply with all applicable standards as well as satisfying Tesla's internal requirements.

Finally, and critically, leaving aside his inability to offer reliable and relevant opinions as to the design of the battery, by his own admission, White has no information about this accident and forces involved, and, thus, did not consider the crash relative to any of his analysis in this case. (*Id.* at 93). And he could not since he is unqualified on the issue of the crashworthiness of the battery. In any event, any opinion that the design of the battery was the cause of thermal runaway

propagation in this crash is irrelevant because nothing more than speculation, and the ipse dixit of an expert who lacks facts necessary to support his conclusion.

White's testimony, boiled down, is that the battery design he found on the internet is defective, but he did not investigate the batteries involved in this crash, and even if he had, he is not qualified to opine about their performance in this or any crash.  In short, his testimony does not reflect the rigor of scientific inquiry that a court demands when considering expert testimony.

## FACTS

### I.     THE ACCIDENT

Tesla adopts the description of the accident facts set forth in its Motion to Exclude the Testimony of Kelly Kennett (ECF 28).

### II.    THE TESLA BATTERY

The 2014 Tesla Model S was equipped with an 85 kWh Li-ion battery located beneath the floor of the car. (Exh. C at ¶ 23). The battery consists of 16 modules on top of mica paper. (*Id.* at ¶ 36). Each module contains 444 individual Li-ion cells separated by air, a cooling system, and a thermal barrier made of woven fiberglass. (*Id.* at ¶¶ 15, 23).  The 16 modules and their individual cells comprise the "battery pack" enclosed in a ¼ inch thick aluminum alloy encasement. (*Id.* at ¶ 36). It sits atop a pair of "skis" with steel bolting on its sides for additional support. (*Id.*). The top of the battery pack is covered with a ceramic blanket with a temperature rating of 1200 degrees Celsius and a zero flame rating per ASTM E 84 (*Id.* at ¶ 37) to protect occupants in the cabin of the vehicle in the event of a fire.

Li-ion cells come in a variety of forms. (*Id.* at ¶ 27). The cells used in the 2014 Model S (NCR18650BB) are different from those available to consumers (NCR18650B) (*Id.* at ¶ 43). Each cell has a current interrupt device (CID), wirebond fuses attached to both terminals of the cell, and

a safety vent at the bottom of the cell. (*Id*. at ¶ 44). This design was intended to disable the cell

and prevent it from being charged when the internal pressure rises above a certain threshold. (*Id*.).

The cells were certified by Underwriter Laboratories (UL) 1642, the most widely-used

standard to evaluate the safety of Li-ion cells in the U.S. (TESLA– 6336, attached as Exh. D; Exh.

C at ¶ 46). They also complied with United Nations (UN) 38.3, which specified requirements for

testing Li-ion batteries under mechanically, thermally, and electrically abusive conditions prior to

transport. (TESLA–6314 to 6319, attached as Exh. E; *see also* Exh. C at ¶ 46).

The battery pack and 2014 Model S satisfied all applicable Federal Motor Vehicle Safety

Standards (FMVSS), including FMVSS 305, and the National Highway Transportation Safety

Administration's (NHTSA) New Car Assessment Program (NCAP), both of which test the strength

(mechanically) of the battery pack within the production vehicle under different crash conditions.

(TESLA–1010 to 2528, attached as Exh. F). Further, the battery pack complied with United

Nations Regulation (UNR) 100, which required that it withstand a crush test of 100kN, which is

over 22,000 pounds of force (TESLA–6267 to 6306, attached as Exh. G). Finally, Tesla

demonstrated the individual Li-ion cells within the battery pack were resistant to thermal runaway

propagation. (TESLA–7031 to 7041, 7205, attached as Exh. H).

This multi-impact crash damaged the front of the battery pack around and between module

13 and modules 15 and 16. (Exh. C at ¶ 38). The battery baseplate was also deformed and bent

upwards in the same area. (*Id*.).  The image below is from one of the inspections.



### III.    WHITE'S TESTIMONY

#### A.    White's Background and Experience

White's experience related to Electric Vehicle (EV) batteries is limited to working with a team that was trying to develop the capability to simulate the performance of batteries in an EV. (Exh. B at 23-25, 173-74).  He has no experience designing a battery housing for use in an EV, or evaluating its performance in an automobile crash. (*Id.* at 10, 36).

#### B.    White's Knowledge Regarding The Tesla Battery

White testified that a manufacturer must anticipate the possibility that one cell in the pack will go into thermal runaway, and that will propagate to the remaining cells. (*Id.* at 10-11, 31). To address this, White opined about the battery housing and the individual cells.  But as his deposition reveals, he failed to conduct a proper investigation for either aspect of the design.

To start, White knew Tesla used a battery manufactured by Panasonic, so he based the opinions in his report on a spec sheet and photograph he found on the Internet. (*Id.* at 132, 147). In fact, the battery cell in the Model S was one specifically designed for use in this vehicle (Exh C. at ¶¶ 15-17), and the information he found on the web was for a different battery.  Thus, White now ***admits that his assumptions were wrong***, and the cell he claimed to be defective was not in this battery. (Exh. B at 125, 133). Accordingly, he also had to acknowledge that his opinions as to the safety features and thickness of the battery cell walls were incorrect. (*Id.* at 125, 130, 133).

Further, White does not recall details of the battery housing or how the components go into the housing, and he was unfamiliar with the fail-safe features of the housing and the battery packs. (*Id.* at 76, 79). He has not inspected a Tesla battery pack other than looking at the damaged battery from this accident. (*Id.* at 78). He attended the inspection conducted by Tesla's battery expert, where he watched what Tesla's expert was doing, and took photographs to include in his own report. But he felt it was unnecessary to do his own investigation, or take his own CT scan, or do

anything with the three cells he retrieved from the Riley vehicle during the inspection. (*Id.* at 78, 133-34, 144).  White did not inspect the cells one by one. (*Id.* at 206). Indeed, he did not do any of his own testing on damaged or undamaged Tesla cells, modules, or battery packs, and he does not plan to do any testing in the future. (Exh. B at 10, 15, 36). And he has not done any calculations for this case. (*Id.* at 12).

Finally, White stated he was not provided any test results showing "[Tesla] complied with the requirement to prevent cell to cell thermal runaway propagation." (*Id.* at 34-36). Tesla did in fact produce the testing to Plaintiff. (Letter to Counsel, attached as Exh. I).

### C.    White's Knowledge Concerning The Accident

White acknowledges he is "the battery guy," the vehicle is "not really [his] area." (Exh. B at 48, 71). He did not inspect the accident vehicle. (*Id.* at 48). He is unfamiliar with the accident reconstruction, does not recall the details of the accident and had no plans to review the accident reconstruction experts' reports. (*Id.* at 14, 48-49). And he does not know the forces in this accident and has no knowledge of the sequence of the crashes the vehicle experienced. (*Id.* at 45, 49). In particular, he did not know the number of impacts experienced by the battery. (*Id.* at 46).

### D.    Testimony Concerning Thermal Runaway

White acknowledges thermal runaway can occur with any lithium-ion battery. (*Id.* at 151). It is not unique to Tesla. (*Id.* at 152). Likewise, he agreed that "any EV battery will have a large number of cells that are close together." (*Id.* at 30). Nonetheless, while agreeing any EV battery will have cells close together, and that runaway can happen in any Li-ion battery, White says *this* pack is defective because the cells were positioned next to one another and because thermal runaway propagation occurred. (*Id.* at 152). But he does not know how many cells were crushed in this crash, and admits that each of the cells that were crushed could have and "probably" did

cause thermal runaway. (*Id.* at 152-53); *see also id.* at 155 (damage to the battery pack was sufficient to do damage to the battery cells that could result in thermal propagation).

From watching the inspection and looking at pictures from that inspection, he concluded cell-to-cell thermal propagation runaway occurred, and that "perhaps" it could have been avoided had the modules been designed to prevent such cell-to-cell thermal runaway propagation. (*Id.* at 134). He agreed there was "massive" damage to the right front of the battery, particularly Module 13 which experienced at least one severe impact and was damaged significantly. (*Id.* at 156). While not "very clear" from the picture, he stated "I think you can surmise even from this picture that the crush cells were limited to in a general way module 13." (*Id.* at 160). Later when asked how he distinguished between a cell that was crushed and one that was damaged by thermal propagation, he responded, "that's my opinion. I'm sure that others may have a different opinion." (*Id.* at 164-65). But he holds this "opinion" without having inspected the individual cells.

White acknowledged he could not opine whether the battery in another manufacturer's vehicle would have performed any better in this crash. (*Id.* at 89). He claimed it would be possible to design a battery to "prevent such a catastrophic event from occurring even at 200 mph," but it would require a determination of the requisite strength, the materials to be used and the characteristics of those materials. (*Id.* at 91-92). He has not done that work. (*Id.* at 92). And he acknowledged it would be speculation to testify that a stronger battery would not have been breached in this accident. (*Id.* at 90). In his opinion, all of the 18560 form factor batteries that he is aware of would have reacted the same way in this crash. (*Id.* at 95). "[I]t's hard to know whether or not [another battery] would have performed the same way." (*Id.* at 96).

**LEGAL STANDARD**

The admission of expert evidence is governed by Federal Rule of Evidence 702, as interpreted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its

progeny. Tesla adopts the legal standard set forth in its Motion to Exclude Testimony of Plaintiff's

Biomechanic Expert, Kelly Kennett and Memorandum Of Law.  (ECF 28).

## ARGUMENT

I.  **WHITE'S OPINIONS AS TO AN ALLEGED DEFECT IN THE BATTERY FAIL TO SATISFY RULES 702 AND 403**

White identifies five different defects that he claims made the battery "not safe." His

opinion as to each is unreliable and inadmissible. But it is not just each individual defect theory

that fails; White's entire testimony is not premised on a reliable methodology, it is not connected

to the facts of the case, and it is nothing more than the speculation of an unprepared expert.

A.  **White Failed To Conduct The Investigation Required Of An Expert; Instead He Bases His Opinions on Intuition, Speculation and Possibilities**

As set forth above, White wrote his expert Report based on the wrong battery and then

failed to conduct any investigation or testing as to the correct battery. Instead, he watched Tesla's

expert do the investigation that science and courts require, and elected to stick with what the

internet and YouTube taught him about a battery that was not in this car.

White might be a scientist, but his work in this case, his approach, conclusions, opinions,

and his testimony are far from what courts demand from expert witnesses. *Cook ex rel. Estate of*

*Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005) ("[A] trial court

may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not

adequately explained."); *See also Knepfle v. J&P Cycles, LLC*, No. 818CV543TKKMCPT, 2021

WL 1845214, at *7 (M.D. Fla. May 7, 2021) (reliability not shown where expert cited no peer

reviewed studies or publications or test theory).[1]

---

[1] *See also Ramkelawan v. Globus Med. Inc*., No. 5:18-CV-100-OC-30PRL, 2019 WL 8267231, at *9 (M.D. Fla. Dec. 10, 2019) (excluding biomechanic's opinion where he failed to employ independent testing to confirm his opinion); *Fed. Trade Comm'n v. Simple Health Plans LLC*, No. 18-CV-62593, 2021 WL 810262, at *8-9 (S.D. Fla. Mar. 3, 2021) (finding expert testimony

Indeed, since White has not engaged in the rigor that is the hallmark of proper expert opinions, it is not surprising his testimony is replete with speculation. For example, he acknowledges that his opinion as to the strength of the battery case is based on "intuition," (Exh. B at 37); *see also id.* at 100 ("it's possible that the BB cells" also have thin walls); *id.* at 80 (the cells were "too close together" in the battery pack which 'probably" subjected the battery to cell-to-cell thermal runaway; his "guess" would be that if one of the cells went into thermal runaway, the other cells would as well).

This speculation is plainly inadmissible. *See e.g. Kilpatrick v. Breg, Inc*., 613 F.3d 1329, 1336 (11th Cir. 2010) (court must determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). [2] It does not assist the jury in performing its function to hear about hunches and guesswork, especially when the testimony is based on the wrong product.

**B.** **White Misstates The Burden Of Proof And In Doing So, Demonstrates That He has No Basis For His Opinions**

Throughout the deposition, when White was asked to provide support for his opinion, he simply resorted to argument, insisting that his opinions are true and correct unless and until Tesla disproves them. He complained that no testing was produced to vindicate the design and concluded his deposition by noting that he would "like to see proof that there's no cell to cell propagation

---

unreliable where he did not consider relevant areas of inquiry and his opinion was disconnected from the facts); *see also Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 ("The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."); *Ramkelawan*, 2019 WL 8267231, at *9 (expert opinion excluded where it was "little more than *ipse dixit*").

[2] *See also Jones v. Otis Elevator Co*., 861 F.2d 655, 662 (11th Cir. 1988) (expert must know "facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation"); *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786 ("The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.")

within a module." (Exh. B at 204; *see also id.* at 80-82).

In any event, White has it backwards. Plaintiff has the burden to demonstrate that White's opinions satisfy Rule 702 and *Daubert*. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion[.]"). And of course, it will be Plaintiff's burden to prove defect at trial—not Tesla's burden to prove the negative, that the battery was non-defective, even though that's true.

## II.     **EACH OF WHITE'S SPECIFIC OPINIONS ARE INADMISSIBLE**

Beyond the foregoing, an examination of each of the opinions he offers as to why the battery is "not safe" cannot withstand the scrutiny required by Rule 702, or considerations of unfair prejudice under Rule 403.

### A.     <u>The Battery Housing Was Not Strong Enough</u>

White claims the battery pack is "not safe" because the battery housing was "not strong enough to prevent collapsing upon impact." (Exh. B at 36).  The battery pack was made of ¼ inch aluminum, but White opined it should have been made of ½ inch steel. (*Id.*). He described this as "more of a qualitative statement" based on "obvious intuition." (*Id.* at 37).

White could not define or quantify what "stronger" means. (*Id.* at 38). He claimed the pack should be "more substantial, thicker and of steel," but he could not draw the line where the battery pack would be defective because it was not "strong enough." (*Id.* at 39, 42). He would want to make it "as safe as possible" and  "strong enough to survive impact." (*Id.* at 43). According to White, there would have to be testing and simulation to determine how strong it should be, but he has not done that. (*Id.* at 10, 36, 41-42, 50). "[I]t's a matter of doing additional work to determine what would be a reasonable housing that would under normal crash conditions survive." (*Id.* at 43). He defines "normal" as the crash conditions that are specified in the federal testing for the vehicle itself. (*Id.* at 44). It appears that in his view, it is not sufficient that the battery withstand

the forces of an impact **when tested in the vehicle**; rather, the **battery pack itself** should be tested to meet the same federal standards as the vehicle. (*Id.* at 40, 44) . But that is not what the standard requires- the battery must be tested within the confines of the vehicle.

He claims that would be the minimum requirement. (*Id.* at 44). Though he has never designed an automotive battery pack, he says he would do so to withstand forces equivalent to the maximum speed of the car:

> **[I]f I were doing this**, I might say, well, a car is designed to go 155 mph. What would happen if the battery pack was impacted at a speed of 155 miles per hour. Now I see Tesla is going up to 200 miles per hour. So I think it depends upon the desire to prevent a catastrophic fire under crash conditions of whatever magnitude is deemed reasonable for safety purposes.

(*Id.* at 44-45) (emphasis added).

Despite offering this opinion, White acknowledges he does not know the forces in this crash, or the impacts experienced by the battery. (*Id.* at 46). And **he did not use the impacts in any of the analysis in this case.** (*Id.* at 93). But that does not matter to him -- the battery pack was not strong enough since "the battery housing collapsed." (*Id.* at 45-46). He "suggest[s]" the battery "may not have been damaged as badly or maybe not damaged at all" if the battery housing was stronger. (*Id.* at 47). Again, this was based on his "intuition" because it was "obvious" ¼ inch aluminum is not "particularly strong relative to one half inch steel." (*Id.* at 47-48). But most importantly, he does not say and cannot say that the ½ inch steel housing would have performed better; he did not assess that, investigate it, test it, or do anything, agreeing it would be "speculation" to say a stronger battery housing would not have been breached. (*Id.* at 90).

White's bottom line was that the battery pack was not strong enough because Tesla had not seen (or done) testing proving it was. (*Id.* at 74). He did not know what strength was required, whether Tesla tested the battery enclosure, or the results of any such testing. (*Id.* at 40, 49, 72-75). He was apparently unaware Tesla had produced documentation of the battery abuse testing

showing that individual Li-ion cells were resistant to thermal runaway propagation. (Exh. H). Further, he acknowledges the vehicle passed FMVSS 305 which tests the strength (mechanically) and the battery pack within the production vehicle under different crash conditions. (*Id.* at 70, 75; *see also* Exh. F). And as discussed above, the battery cells had passed UN38.3 testing (Exh. E). White did not know this. (*Id.* at 56). His only response was that the testing (he was unaware of) was nonetheless inadequate with regard to the battery pack. (*Id.* at 89).

White's "housing strength" opinion is inadmissible: ***First,*** White has not tested his opinion about battery housing strength, despite stating that testing would be required to determine the how strong the battery housing should be. An untested theory that has not been subject to peer review and is not generally accepted in the scientific community opinion is unreliable. *See Wilson v. Taser Intern., Inc.*, No. 08-13810, 303 Fed. App'x. 708, 714 (11th Cir. Dec. 16, 2008).[3]  Not only was White unaware of scientific studies that would support his position, he also failed to account for the fact that the battery housing complied with several government crash safety standards. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 (11th Cir. 1999) (expert's testimony unreliable where his opinion was contradicted by numerous scientific studies and he did not justify his "out of sync" opinion).

***Second,*** White did not evaluate the forces in the accident, did not know how many times the battery was impacted during the crash, and did not analyze the effects of the impacts on the battery. Without evaluating whether 1/2 inch steel versus ¼ inch aluminum would have made a difference, all White could purport to opine was that the battery housing is not strong enough because it failed. He cannot say what would have resisted failure, including whether ½ inch steel would have prevented propagation in this crash.  Simply, this is not science. *Fed. Trade Comm'n*,

---

[3] See also n. 3 and accompanying text.

2021 WL 810262, at *8-9 (finding expert testimony unreliable where he did not consider relevant areas of inquiry and his opinion was disconnected from the facts).[4]

**Third,** White's "intuitions" about the effectiveness of the battery housing is entirely unhelpful to the jury. *Frazier*, 387 F.3d at 1262 ("[E]xpert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person."); *Fed. Trade Comm'n*, 2021 WL 810262, at *9 (expert testimony should be excluded where it offers "nothing beyond what the average lay person can determine for themselves"). His "obvious intuition" sounds like "common sense" but, steel vs aluminum, material thickness and the crash performance characteristics of each material are not within the realm of common sense. Hence, expert testimony is needed to assist the jury. It does nothing to assist the jury to simply refer to his own "intuition."

**Finally**, White's opinion is nothing more than speculation and the *ipse dixit* of the expert. *See Ramkelawan*, 2019 WL 8267231, at *9 (expert opinion excluded where he failed to employ independent testing to confirm his opinion; opinion was "little more than *ipse dixit*").[5]

### B.     The Model S Cells Lacked The "Usual Safety Features"

White next claims the individual battery cells were not protected by two usual safety features: Current Interruption Device (CID) and Positive Temperature Coefficient (PTC).  White conceded that at the time he wrote his report, he did not know what battery was being used in the vehicle. (Exh. B at 124). He now knows it **does** have CID. (*Id.* at 125, 166). This opinion is thus, immaterial to any issue in the case.

White also claimed the battery was unsafe because it did not have PTC which is intended to stop the current from flowing out of or into a cell when the cell becomes hot. (*Id.* at 130). In

---

[4] *See also* n. 3 and accompanying text.
[5] *See also* cases cited in Issue IA.

fact, Tesla substituted wire bonds to provide overcurrent protection, which White acknowledged serves the purpose of the PTC and were an "excellent addition." (*Id.* at 125, 131, 166-67). He still thinks there should have been a PTC component (*id.* at 166- 67) but he did not do any investigation or testing to support this opinion. (*Id.* at 129). He also acknowledged there is debate about whether to remove PTC because of the high voltage (*Id.* at 126-29). ***Ultimately, he cannot say to a reasonable degree of engineering certainty that had the PTC been on the battery, it would have prevented cell-to-cell propagation in this crash***. (*Id.* at 127). In light of his admission, this opinion adds nothing, and it is both irrelevant and speculative.[6]

### C.      The Cell Walls Were Too Thin

White next claimed the can walls for each cell were too thin, making it more likely the cell would go into thermal runaway, and propagate to other cells. (*Id.* at 97). Incredibly, when he wrote his Report, he did not even know the thickness of the cell. (*Id.* at 99). He assumed that because it was a Panasonic cell, and those cells were "known" to have thin can walls, this cell must be thin. (*Id.* at 100). He thought it was a "reasonable assumption." (*Id.* at 101, 106). It was wrong.

Nonetheless, even after learning that his opinion was based on the wrong cell, he claimed that it is "possible" the "BB" cell actually in this battery was still too thin. (*Id.* at 99-100). As with the battery pack, White did not specify what would have been "strong enough" or "thick enough" to prevent the fire and was unaware of any standards, guidelines or peer reviewed documentation concerning the thickness of the cylinder wall. (*Id.* at 102, 104-05). He claimed it was just "common knowledge" the Panasonic battery was too thin. (*Id.* at 102).  His bottom line: "[a]ll I know" is that a side wall rupture occurred at 127 microns with another company's battery. (*Id.* at 109).

---

[6] *See also* cases cited in Issue IA.

When he finally offered a proposed thickness of the cells, he suggested something greater than 200 microns (0.20 mm) is appropriate. (*Id.* at 108). As it happens, Tesla's expert's CT scan of an undamaged cell from Riley's vehicle confirmed the thickness of the can wall to be 0.21 mm (Exh.  C. at ¶ 46; *see also* Product specification sheet; attached as Exh. J). So, the cell wall satisfied the "*White standard,*" as well as the "real standards" like UN38.3 and UL 1642. (*See* Exhs. D, E).

Further, without knowing if there are sufficient tests to determine how thick the wall would have to be to prevent side wall rupturing, he claimed Tesla did not provide any crush test concerning individual cells. (*Id.* at 106-09). As a result, when asked if he could state within a reasonable degree of engineering certainty whether thicker can walls would have made a difference in this crash, he responded that he had "hoped" to see Tesla testing on this to decide. (*Id.* at 109-110).

**First,** this opinion like others, is unreliable and irrelevant because it is based on incorrect facts. *In re Denture Cream Prod. Liab. Litig.*, 795 F. Supp. 2d 1345, 1363 (S.D. Fla. 2011).

**Second,** once he learned about his error, he simply relied on "common knowledge." And he chose not to even examine the battery cell walls in this case. Thus, White's opinion fails to account for basic facts about the battery cell walls, lacks any reliable or relevant foundation, and is connected to the facts of this case with nothing more than *ipse dixit*.[7]

**Third**, to the extent White's opinion truly is "common knowledge," he would be unable to provide that testimony to jury because expert testimony is only permissible "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262; *Fed. Trade Comm'n*, 2021 WL 810262, at *9 (expert testimony should be excluded where it offers "nothing beyond what the average lay person can determine for themselves").

---

[7] *See* Cases Cited in Issue IA.

**Fourth,** if anything, White's opinions just supports the conclusion that the cell was sufficiently thick since the CT scan proves the actual cells are in the range he proscribed. *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1301 (N.D. Fla. 2017) (excluding expert testimony where correcting the error in his analysis essentially negated the expert's conclusion).

**Fifth**, his opinion was not grounded in testing and the actual testing disproved his claim.[8]

### D.    The Cells Were Too Close Together

White also opined that the cells were "too close together" in the battery pack which 'probably' subjected the battery to cell-to-cell thermal runaway, and his "guess" would be that if one of the cells went into thermal runaway, the other cells would as well. (Exh. B at 80-81). White agreed that any EV battery will have a large number of cells that are close together. (*Id.* at 30, 80-81).

Claiming he did not have access to a photograph of an undamaged module or a battery pack so that he could take it apart, he relied on a photograph of a damaged cell, and made an "assumption" that would represent the spacing in an undamaged module. (*Id.* at 143, 145-47, 150). He does not have tools to take measurements and admitted he had difficulty deciphering the design specifications. (*Id.* at 82).

White did not know what the cell spacing should have been, ***deferring to Tesla to make that determination based on tests and experiments.*** (*Id.* at 82, 140). He acknowledged Tesla's battery expert found no evidence of cell-to-cell propagation, but again flipping the burden of proof, demands Tesla "counter that conclusion" that the cells were too close together. (*Id.* at 80, 82; *see also id.* at 84 ("I don't have any evidence that the design of the battery pack, the cell-to-cell thermal runaway did not occur"); *id.* at 84-85 ("I don't have any evidence that has been given to me by

---

[8] *See* Cases Cited in Issue IA.

Tesla to counter that statement [that the cells are too close together.]")). He complained about never seeing Tesla's testing (*Id.* at 85-88) but acknowledged Tesla's corporate representative testified about the testing and, as discussed, it was produced in discovery. (Exh. I).

On this record, White's opinion lacks any relevant factual foundation because he failed to examine an undamaged battery and take measurements, relying only upon a photograph of a damaged battery. *Fed. Trade Comm'n*, 2021 WL 810262, at *8-9. Additionally, his opinion is unreliable because it is untested and fails to account for propagation testing conducted by Tesla. *Allison*, 184 F.3d 1315; *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Finally, White once again impermissibly attempts to shift the burden onto Tesla to disprove him.

### E. Tesla Should Have Used Fire Retardant Material

Next, White contends the safety of the battery pack could have been improved by the use of an intumescent fire-retardant material. (Exh. B at 121). He claims Tesla had been testing intumescent materials, and it was available, but they chose not to use it in this battery. (*Id.* at 116-18). He did not see it in the design drawings and did not recall Tesla's corporate representative discussing fire-retardant material. (*Id.* at 121-22). He did not believe there was any fire-retardant material around the battery itself. (*Id.* at 123). He acknowledged there was a ceramic blanket on top of the battery pack, and that it acts as a barrier between the battery and cabin, but did not consider it to be a fire-retardant chemical. (*Id.* at 122-23). The ceramic blanket has a classification temperature rating of 1200°C and has a zero flame rating per ASTM E 84. (Exh. C at ¶ 56). He also acknowledged his own peer reviewed articles indicating that mica paper and air gaps between cells provide insulation to protect adjacent cells and decreases damage caused by thermal runaway. (Exh. B at 137-38). Both features were in the Tesla battery. (Exh. C at ¶¶ 15, 36), but White did not know how they were used. (Exh. B at 139).

White's opinion that Tesla should have used fire retardant materials is unfounded because the vehicle actually had fire retardant materials and designs. White fails to account for these safety measures and does not understand how they are used in the vehicle. Thus, his opinion is inherently unreliable and speculative. *Fed. Trade Comm'n*, 2021 WL 810262, at *8-9.[9]

## III.   WHITE'S OPINION THAT THERMAL RUNAWAY PROPAGATION OCCURRED IN THIS CASE IS INADMISSIBLE

Even if White were able to offer an admissible opinion as to alleged defects in the battery, which he cannot, his testimony must be excluded because he cannot establish that any claimed defect was the cause of the fire in this case.

### A.   White Is Not Qualified On Battery Performance In A Crash

After admitting the vehicle is "not really [his] area," he has no experience designing batteries for performance in a crash (Exh. B at 28, 71), and that he had researched the wrong battery, White offers opinions about the battery performance in this crash. While he may be an expert in other areas, plainly, he lacks expertise to provide an opinion on the battery's impact resistance in a crash. *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1368 (11th Cir. 2014) ("Expertise in one field does not qualify a witness to testify about others.").

### B.   Even If Qualified, White Offers No Opinion, Nor Could He That Any Claimed Defect Was A Cause Of Riley's Death.

White acknowledges he does not know the forces in this crash, or the impacts experienced by the battery. (Exh. B. at 46). And *he did not use the impacts in any of the analysis in this case.* (*Id.* at 93). Simply stated, without knowing the forces experienced by the battery, and instead relying on his intuition, possibilities and guesses, White has no basis to opine that the battery experienced thermal runaway propagation as opposed to damage from a series of severe impacts.

---

[9] *See also* Cases Cited in Issue IA.

*See, e.g., Wilson v. Taser Intern., Inc.*, No. 08-13810, 303 Fed. App'x. 708, 714 (11th Cir. Dec. 16, 2008) (excluding causation opinion of treating physician because he failed to demonstrate that his opinion that TASER exposure may cause compression fractures is testable, he did not offer any error rate for his opinion, he did not show any evidence that his opinion has been peer reviewed and did not show the general acceptance of his opinion).[10]

Likewise, without knowing the forces experienced by the battery, and instead relying on his intuition, possibilities and guesses, he conceded he would be speculating to say a stronger battery would not have been breached in this accident or how much stronger it needed to be. (Exh. B at 90).  As he explained it: "it's hard to know whether or not [another battery] would have performed the same way." (*Id.* at 96).

For all of these reasons, White should be precluded from testifying.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(b)(2), Tesla requests oral argument on this motion. Tesla submits that oral argument will aid the Court due to the complexity of the issues presented in the motion. Tesla estimates that 60 minutes will be sufficient to hear argument from the parties.

## CERTIFICATE OF GOOD FAITH COMPLIANCE

Pursuant to local rule 7.1(a)(3), counsel for Tesla has conferred with counsel for Plaintiff in a good faith effort to resolve the issues raised in this motion and has been unable to do so.

Respectfully submitted,

*/s/ Robert J. Rudock*
**VINCENT GALVIN**
*Pro Hac Vice*
**ROBERT J. RUDOCK**
Florida Bar No. 365157
**WENDY LUMISH**
Florida Bar No. 334332

---

[10] *See also* Cases Cited in Issue IA.

**WHITNEY V. CRUZ**
Florida Bar No. 800821
Bowman and Brooke LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Tel: 305-995-5600/Fax: 305-995-6090
*Attorneys for Defendant,*
*Tesla, Inc. a/k/a Tesla Florida, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 14, 2021, the foregoing was filed using the

Court's CM/ECF system, which will send electronic notice of the same to all interested parties.

Respectfully submitted,

*/s/ Robert J. Rudock*
**VINCENT GALVIN**
*Pro Hac Vice*
**ROBERT J. RUDOCK**
Florida Bar No. 365157
**WENDY LUMISH**
Florida Bar No. 334332
**WHITNEY V. CRUZ**
Florida Bar No. 800821
Bowman and Brooke LLP
Two Alhambra Plaza, Suite 800
Coral Gables, Florida 33134
Tel: 305-995-5600/Fax: 305-995-6090
*Attorneys for Defendant,*
*Tesla, Inc. a/k/a Tesla Florida, Inc.*