# EXHIBIT F

Page 3

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA
CASE No.: CACE-19-000422

_____

EDGAR MONSERRATT, as Personal
Representative of THE ESTATE OF
EDGAR MONSERRATT MARTINEZ, Deceased,
        Plaintiff,

-vs-

TESLA, INC., a/k/a TESLA FLORIDA,
INC., HALSTON LOYD, JAMES B. RILEY,
individually, JAMES B. RILEY, as the
Personal Representative of THE ESTATE
OF BARRETT RILEY, Deceased, and JR
CORPORATE SERVICES GROUP, LLC, a
Florida limited liability company,
        Defendants.

_____

        VIDEOTAPE DEPOSITION OF
        LARRY ROBERT GROSHART
        Taken on Behalf of the Plaintiff
DATE TAKEN:      November 19, 2019
TIME:            (9:00) 9:05 - 10:23 a.m.
PLACE:           1218 Southeast 3rd Avenue
                 Ft. Lauderdale, Florida  33316

        Examination of the witness taken by:
        CYNTHIA R. HEWLETT
        Registered Professional Reporter

        United Reporting, Inc.
        1218 Southeast 3rd Avenue
        Fort Lauderdale, Florida
        954-525-2221

INDEX

WITNESS:        EXAMINATION        PAGE
LARRY R. GROSHART    Direct
        By Mr. Berg        5

        Cross
        By Ms. Cruz        34
        Cross
        By Ms. Primus      55

        Redirect
        By Mr. Berg        61
        Recross
        By Ms. Cruz        71

        Recross
        By Ms. Primus      74
        Redirect (Cont'd.)
        By Mr. Berg        76

        - - -

        E X H I B I T S   M A R K E D

Plaintiff's Exhibit 1 for Identification      8
  (Google earth photo)
Plaintiff's Exhibit 2 for Identification      9
  (Street photo)

Plaintiff's Exhibit 3 for Identification      24
  (Scene photo)
Plaintiff's Exhibit 4 for Identification      31
  (Scene photo)

Plaintiff's Exhibit 5 for Identification      69
  (Newspaper article)

Page 2

APPEARANCES:
SCHLESINGER LAW OFFICES, P.A.
By:  ZANE BERG, ESQ.,
      zane@schlesingerlaw.com
1212 Southeast 3rd Avenue
Fort Lauderdale, FL  33316
and
CORBOY & DEMETRIO, P.A.
BY:  PHILIP HARNETT CORBOY, JR., ESQ.,
33 North Dearborn Street
Chicago, IL  60602
Appearing on behalf of the Plaintiff

BOWMAN AND BROOKE, LLP
By:  WHITNEY V. CRUZ, ESQ.,
      whitney.cruz@bowmanandbrooke.com
2 Alhambra Plaza
Suite 800
Coral Gables, FL  33134
Appearing on behalf of Defendant/Tesla, Inc. d/b/a
Tesla Florida, Inc. and Halston Loyd

SELLARS, MARION & BACHI, P.A.
By:  LAURIE A. PRIMUS, ESQ.,
      lprimus@smb-law.com
811 North Olive Avenue
West Palm Beach, FL  33401
Appearing on behalf of Defendant/James B. Riley and JR
Corporate Services Group, LLC

ALSO PRESENT:

STEVE MANNO, Videographer

JAMES B. RILEY, Defendant

JENNY RILEY

Page 4

        Videotape deposition of LARRY ROBERT
GROSHART, a witness of lawful age, taken by the
Plaintiff, for the purposes of discovery and for use
as evidence in the above-entitled cause, pursuant to
notice heretofore filed, before CYNTHIA R. HEWLETT, a
Registered Professional Reporter and Notary Public, in
and for the State of Florida at Large, at 1218
Southeast 3rd Avenue, Ft. Lauderdale, Florida.
        THE VIDEOGRAPHER:  We are now on the record.
The time is 9:05 a.m.
        Today is Tuesday, the 19th day of November,
2019.
        We are here at 1218 Southeast 3rd Avenue,
Fort Lauderdale, Florida, for the purpose of
taking the videotaped deposition of Larry
Groshart, in the matter of Edgar Monserratt
versus Tesla, Incorporated, also known as Tesla
Florida, et al.
        The court reporter is Cindy Hewlett, with
United Reporting.
        The videographer is Steve Manno, with
Dynamic Legal Video.
        Will counsel please announce their
appearances for the record.
        MR. BERG:  This is Zane Berg, on behalf of

Page 5

1  the plaintiff, the Estate of Edgar Monserratt
2  Martinez.
3      And here with me today, as well, is Philip
4  Corboy of the Corboy & Demetrio Law Firm, also on
5  behalf of the plaintiff.
6      MS. CRUZ:  Whitney Cruz, on behalf of Tesla,
7  Inc.
8      MS. PRIMUS:  Laurie Primus, on behalf of
9  James Riley, as the personal representative of
10  the Estate of Barrett Riley and JR Corporate
11  Services Group, LLC.
12      THE REPORTER:  Raise your right hand,
13  please.
14  THEREUPON:
15      LARRY ROBERT GROSHART
16  a witness of lawful age, having been first duly sworn
17  in the above cause, testified under oath as follows:
18      THE WITNESS:  I do.
19          DIRECT EXAMINATION
20      Q   (By Mr. Berg)  Good morning, sir.
21      Would you give us the benefit of your full
22  name, please.
23      A   My name is Larry Robert Groshart.
24      Q   And Mr. Groshart, what's your residential
25  address?

Page 6

1      A   1336 Seabreeze Boulevard, Fort Lauderdale,
2  33316.
3      Q   And Mr. Groshart, how long have you lived at
4  that address?
5      A   Forty-eight years.
6      Q   Who lives there with you?
7      A   My wife, Caroline Groshart.
8      Q   Was anybody else living there with you in
9  May of 2018?
10      A   No.
11      Q   All right.  Mr. Groshart, so I want to turn
12  your attention, right, I want to get right down to it,
13  May 8th, 2018.  I want to walk through that day with
14  you.  Okay.
15      A   Okay.
16      Q   All right, sir.  It's my understanding that
17  you witnessed an automobile crash on that day.  Is
18  that true?
19      A   Yes.
20      Q   All right.  Where were you, such that you
21  witnessed this crash?
22      A   I was standing at the north end of my
23  circular driveway just short of the sidewalk.  And I
24  was facing Seabreeze Boulevard and the property on the
25  other side.

Page 7

1      Q   And just to -- so that we're oriented, is
2  your property on the east side of Seabreeze Boulevard?
3      A   Yes.
4      Q   All right.  And so you said you were
5  standing out in your driveway.
6      What were you doing there?
7      A   I was waiting for an acquaintance to come to
8  visit and tour my garden.
9      Q   Is that something that you typically do,
10  that you wait on folks who are coming to visit you at
11  your home?
12      A   If they're coming for the first time, even
13  sometimes multiple times.  The traffic there is
14  intimidating sometimes, and it's -- sometimes people
15  have difficulty finding the place.
16      Q   It's my understanding, just so that we can
17  make sure that we're oriented, that there's an
18  intersection to the south of your property between
19  Seabreeze Boulevard and Harbor Beach Parkway.  Is that
20  right?
21      A   There's no intersection between my house and
22  Harbor Beach Parkway.
23      Q   Not between it.  But the next intersection
24  south would be Harbor Beach Parkway?
25      A   Yes.

Page 8

1      Q   All right.  And how many homes north of that
2  intersection is yours?
3      A   I think it's five.
4      MR. BERG:  All right.  Just so -- what I'd
5  like to do, I'm just going to mark as the first
6  exhibit -- and if I could grab a sticker from our
7  court reporter.  And I'll show it to everybody.
8      MS. PRIMUS:  Okay.
9      MR. BERG:  Steve, can you get that?
10      (A Google Earth photograph was marked
11  Plaintiff's Exhibit 1 for Identification.)
12      Q   (By Mr. Berg)  Okay.  All right, sir, and so
13  what I've marked as Exhibit Number 1 is just an aerial
14  photograph that I pulled down this morning.  And I'd
15  like to ask you just a question or two about it.
16      A   Uh-huh.
17      Q   Do you see Seabreeze Boulevard here?
18      A   Yes.
19      Q   And is it labeled correctly on the map?
20      A   It is.
21      Q   All right.  And is this Harbor Beach
22  Parkway, the intersection?
23      A   It is.
24      Q   All right.  And could you point out which
25  house is yours, please.



**Page 9**

That one.  So I'm going to put a marker or a dot -- I'll use a marker.  I'll use a marker.  All right.

Am I drawing a circle -- is this your home right here --

A   Yes.

Q   -- that I'm drawing a circle around?

A   Yes.

Q   Okay.  And you were standing out in the northern driveway of our home at that point?

A   Northern end of the circular driveway, yes.

Q   All right.  And what time of day was this?

A   It was about 6:30.

Q   In the afternoon?

A   Yes.

Q   Yes, sir.

MR. BERG:  Okay.  All right.  So -- and what I'd like to do is mark one more exhibit as Exhibit Number 2 to your deposition.

Thank you.

Do you want to see this first.

Show it to counsel first.

(A street photo was marked Plaintiff's Exhibit 2 for Identification.)

Q   (By Mr. Berg)  And while they're looking at

**Page 10**

that, Mr. Groshart, is the photograph that I marked as Exhibit Number 1 a fair and accurate depiction of the area of your home and Seabreeze Boulevard?

A   Yes, it is.

Q   Okay.  All right.  And what I'd like to do now is show you Exhibit Number 2.

Now, is this -- in general, is this the view that you might have if you were standing at the northern end of your driveway looking at Seabreeze Boulevard?

A   Not really.  This is more the view I'd have if I were standing at the south end of my --

Q   South.

A   -- driveway.  I was --

Q   Okay.

A   -- here.

Q   So you can actually -- are you pointing to a -- a location, you can actually see where you were generally standing --

A   Yes.

Q   -- in this photograph?

A   Yes.

Q   Okay.  And I'm just going to grab my marker here.  And we're going to put an X right here where you were generally standing.

**Page 11**

A   Except I was off the sidewalk in my driveway.

Q   Okay.  I'm just going to draw an arrow, then.

A   That's good.

Q   Is that good?

A   Yes.

Q   All right.  And that's generally pointing to where you were standing?

A   Yes.

Q   All right.  Is this view, though, the same scene that you might see from standing in front of your home?

A   Yes.

Q   Okay.  Thank you very much, sir.

And is this the view that you would have if you were -- generally, if you were looking to the north at southbound traffic coming down Seabreeze Boulevard?

A   Yes.

Q   All right.  And is this a fair and accurate depiction of what you would see if you were standing in front of your home looking at Seabreeze Boulevard?

A   Yes, it is.

Q   All right, sir.

**Page 12**

So if you could, and utilizing this photograph, can you explain to us what it is that you witnessed that day with the vehicle that -- that crashed?

A   I saw a passenger car coming south on Seabreeze Boulevard.  It jumped the curb about where this white car is.  It struck this wall with the right side of the vehicle.  Then the vehicle proceeded and struck this curbed wall head-on.

When that vehicle struck that wall, a huge fireball erupted from the front of the automobile.

Then the automobile bounced off that and pirouetted south and across Seabreeze Boulevard to my side of the road.

Q   All right.  So I want to ask you just a couple of questions about that, sir.

When you were standing in your driveway waiting on the individual who was coming to see you, was there anything that drew your attention to the automobile that -- that eventually crashed?

A   Two things.

There was very little traffic, actually no traffic at that point except that car.

And I was expecting my acquaintance to come from the north.  And I heard the tires scrub from the

Page 13

1  automobile, which directed my attention directly to
2  it.
3         I think that answers your question.
4     Q   Yes, it does, sir.
5         And -- and when you say you "heard the tires
6  scrub," could you describe what type of sound that
7  was?
8     A   An ordinary passenger car these days, you
9  don't hear the engine, you just hear the sound of the
10  tires on the asphalt.  And this was unusually noisy
11  for that.
12        And, also, it seems that the brakes were
13  locked, so the tires were skidding.
14        That's what I heard.
15    Q   Okay.  At the point -- well, let me back up
16  for a second.
17        I take it you have a Florida driver's
18  license?
19    A   Yes.
20    Q   All right.  And have you been driving -- how
21  many years have you been driving here in Florida?
22    A   Fifty-two.
23    Q   All right.  Based on your observations of
24  the vehicle that crashed on May 8th of 2018, as you've
25  described into the wall across the street from your

Page 14

1  home, what's your -- what's your observation as to the
2  speed that that vehicle was traveling the first time
3  that you saw it?
4     MS. PRIMUS:  Object to form.
5     MS. CRUZ:  Objection to form.
6     MR. BERG:  What's wrong with the form?
7     MS. PRIMUS:  Go ahead.
8     Calls for speculation.  He hasn't been
9  qualified as an expert.
10    MR. BERG:  You're saying -- okay.
11    Q   (By Mr. Berg)  Go ahead, sir.
12        Do you want me to reask the question for
13  you?
14    A   No, I didn't know I could answer.  No.
15        I was asked at the time by the many people
16  who interviewed me at the time what I thought the
17  speed was.  And I didn't want to answer the question
18  then, because I really had nothing to -- no way to
19  gauge it.
20        The speed limit there is 30 miles an hour,
21  but almost nobody goes 30 miles an hour.
22        All I could really tell was it was much too
23  fast for that curve and the conditions.
24        What I told people at the time, my best
25  guess was somewhere around 60 miles an hour.

Page 15

1     Q   Okay.  And that estimate that you provided
2  of approximately 60 miles per hour, that's based on
3  your observations as you saw them that day at the
4  scene?
5     MS. PRIMUS:  Object to form.
6     MS. CRUZ:  Objection to form.
7     A   It was really just a guess.  I couldn't
8  imagine anybody going faster than that.  So it was
9  just a guess, as I say.
10    Q   (By Mr. Berg)  All right.  So let me -- let
11  me ask you one or two questions here, all right,
12  because I want to unpack a little bit of what we -- or
13  how you described the accident occurring.  All right.
14        With respect to the car traveling south and
15  going over the sidewalk, just so that anybody who's
16  looking at this photograph will understand, there's a
17  driveway across the street in this photograph, is
18  there not?
19    A   Yes, there is.
20    Q   All right.  And there's a wall, both on the
21  north side of the driveway and on the south side of
22  it?
23    A   Yes.
24    Q   All right.  Did the vehicle, when it first
25  made impact with a wall, did it make impact with the

Page 16

1  northern portion of the wall?
2     A   Yes.
3     Q   All right.  Was it really the northern
4  corner of the wall?
5     A   No.  It was the straight side of the wall
6  paralleling the sidewalk and the street.
7     Q   All right.  Do you see the house numbers?
8  You can't read them.  But do you see where the house
9  numbers are --
10    A   Yes.
11    Q   -- for the home across the street?
12    A   Yes.
13    Q   All right.  Where in relation to those
14  numbers do you recall the vehicle first making impact?
15    A   It was north of there, approximately in
16  front of where the white car is in this photograph.
17    Q   All right.  If we put an X right here, is
18  this accurate?
19    A   Yes.
20    Q   Okay.  So we've put an X where you believe
21  that the first point of impact between the vehicle
22  that crashed and the wall was?
23    A   Yes.
24    MS. PRIMUS:  Object to form.
25    MS. CRUZ:  Object -- form.

Page 17

1    MS. PRIMUS:  Sorry.
2    Q   (By Mr. Berg)  Is where we placed the X,
3  sir, is that --
4    A   Close enough, yes.
5    MS. PRIMUS:  Same objection.
6    MS. CRUZ:  Objection.
7    Q   (By Mr. Berg)  All right.  And this is just
8  your obser -- based on your observations?
9    A   Yes.
10   The scar remained on the wall for weeks,
11  even months --
12   Q   All right.
13   A   -- after the accident.  I looked at it every
14  day.
15   Q   All right.  And then after the vehicle
16  impacted approximately at that point where we've
17  marked on this photograph, to -- according to your
18  observations, where did the vehicle next make impact?
19   A   Right here at the apex of this curved wall
20  on the south side of the driveway.
21   Q   All right.  Sir, we're going to put -- we'll
22  put a circle there.
23   Is this accurate?
24   A   Yes.
25   Q   All right.  So we're going to put a circle

Page 18

1  there.
2    And that's where you believe the vehicle
3  made the second point of impact?
4    MS. PRIMUS:  Object to form.
5    MS. CRUZ:  Object to form.
6    Q   (By Mr. Berg)  You can go ahead.
7    A   I don't know why you say "believe".
8    Yes, that's what I saw.
9    Q   All right.  Now, can you describe the
10  vehicle that you saw crash that day?
11   A   Just a gray, appeared to be a 4-door
12  passenger car.
13   Q   All right.  Was it a dark gray?
14   A   I suppose.  I was not all that interested in
15  such details at the time.  Especially once the
16  fireball erupted, I couldn't pay attention to too much
17  beyond that.
18   Q   All right.  Now, at what point did you first
19  see flames coming from the vehicle?
20   A   Right here, where you put the circle.
21   Q   All right.  And can you describe for us what
22  the flames looked like and where they were coming
23  from?
24   A   Flames were coming from the front of the
25  car.  And they were projecting forward and in a bit of

Page 19

1  a fantail left and right of the car.  Very furious.
2  They were bright red/orange.
3    Q   After the car made impact with this apex of
4  the wall where we've put the circle on Exhibit Number
5  2, what happened to the vehicle next?
6    A   The vehicle spun, headed south and east --
7    Q   Yes, sir.
8    A   -- across Seabreeze Boulevard to a point
9  that doesn't show in this photograph.  It was beyond
10  my house, at the southern end of the next property,
11  where it hit a light pole.
12   Q   All right.  And did you -- were you able to
13  observe the vehicle travel from where it made impact
14  at this driveway on the west side of Seabreeze
15  Boulevard, all the way to where it came to final rest
16  on the east side of Seabreeze Boulevard?
17   A   Yes.  I watched the entire thing.
18   Q   All right.  What type of damage was
19  inflicted to the vehicle?  I know we described the
20  flames.
21   But was there any damage that you observed
22  that was inflicted to the vehicle after it impacted
23  the wall on this -- on the east -- on the west side --
24  excuse me, on the west side of Seabreeze Boulevard?
25   MS. CRUZ:  Object to form.

Page 20

1    MS. PRIMUS:  Join.
2    Q   (By Mr. Berg)  You can go ahead, sir.
3    A   I did not at that time notice any other
4  damage.
5    But later on I found two of its wheels in
6  the roadway.
7    Q   All right.  All right.  So when the car
8  was -- after it made impact with the wall on the west
9  side and was traveling eastbound across Seabreeze
10  Boulevard, was it -- was the vehicle skidding across
11  the road?
12   A   Oh, yes.
13   Q   Were flames coming from the vehicle from
14  the --
15   A   Yes.
16   Q   -- from the entire way that it -- after it
17  made impact from the wall, all the way to the east
18  side of Seabreeze Boulevard?
19   A   Yes.
20   Q   All right.  And then the vehicle -- so then
21  the vehicle, you said, hit something on the east side
22  of Seabreeze Boulevard?
23   A   Hit a light pole.
24   Q   All right.  Did it do any damage that you
25  observed to that light pole?

Page 21

1    A   It took the light pole out.  Destroyed the
2  light pole.
3    Q   And then did the car move any further after
4  striking the light pole?
5    A   Yes.  It moved about another 50 feet south
6  of that light pole on the east side of Seabreeze
7  Boulevard.
8    Q   Did you observe the vehicle impact any other
9  structures as it -- between the time it hit the light
10  pole until it came to final rest?
11    A   Structures, no.
12      But it did go through some shrubbery right
13  along the sidewalk.
14    Q   All right.  And so you -- you're standing at
15  your driveway.  You've observed this crash of the --
16  of the vehicle that you've described.
17      At the point that the vehicle comes to final
18  rest, what did you observe next?
19    A   I observed that the fire burned furiously.
20      And what I didn't see was anyone get out of
21  the vehicle.
22      By that time northbound vehicles had stopped
23  and people had gotten out of their cars and went
24  toward the vehicle trying to render assistance but
25  were not able to get close enough to the vehicle to do

Page 22

1  anything because of the fire.
2    Q   Did you -- did you walk down from where your
3  house is located south to the point of final rest of
4  the vehicle?
5    A   No, I did not.
6    Q   Okay.  And you said there were northbound
7  vehicles on Seabreeze Boulevard that were stopping?
8    A   Yes.
9    Q   All right.  Were -- did you ever notice any
10  southbound vehicles that were coming to a stop because
11  of the crash?
12    A   Yes.  After that.
13    Q   All right.  Did you speak with any of these
14  folks that had stopped to attempt to render aid?
15    A   No.  I just heard them shouting.
16    Q   What did you hear them shouting?
17    A   Mostly I remember one tall man shouting
18  obscenities because he was so frustrated that he
19  couldn't render any assistance.
20    Q   Now, as you're standing there and you're
21  observing the folks that have stopped and are trying
22  to render aid, were any of those folks able to get and
23  actually put a hand on the vehicle?
24    A   No.
25    Q   All right.  From your observations, what was

Page 23

1  the reason that they were unable to do that?
2    A   The fire was --
3      MS. PRIMUS:  Object to form.
4      Go ahead.
5    Q   (By Mr. Berg)  You can go ahead.
6    A   The fire was much too furious.
7    Q   Did you actually observe individuals walk up
8  to the vehicle as if they were attempting to render
9  aid and have to shuffle back because of the apparent
10  heat?
11      MS. CRUZ:  Objection to form.
12      MS. PRIMUS:  Join.
13    A   Yes, I did observe that.
14    Q   (By Mr. Berg)  All right.
15    A   Something else that happened that you may
16  not ask me about, about this time loud popping sounds
17  came from the vehicle.
18    Q   So I want -- I want to ask you about that.
19      These popping sounds that you heard, when
20  was the first time -- strike that.
21      These popping sounds that you heard, at what
22  location was the vehicle when you first began to hear
23  those noises?
24    A   After it had stopped.
25    Q   All right.  And can you describe the popping

Page 24

1  sounds for us?
2    A   Yes.  They sounded like gunfire.  And
3  several of the people who were trying to assist
4  shouted "gun, gun", and backed away.  They thought
5  ammunition was cooking off in the vehicle.
6    Q   For how long did those popping sounds -- for
7  how long were they being made?
8    A   As I recall, about ten seconds.
9    Q   And could you hear them clearly from where
10  you were located?
11    A   Yes.
12    Q   Not only -- I mean, I know you heard people
13  yelling gunfire or gun, something to that effect.
14      From where you were located, did it sound
15  like gunfire to you?
16    A   It was close enough to be considered to be
17  gunfire.
18    Q   All right.
19    A   Didn't sound like anything else.
20      MR. BERG:  I'd like to mark another exhibit.
21  I'm going to mark this one.
22      Forget which news agency it's from, but it's
23  from one of them.
24      (A scene photo was marked Plaintiff's
25  Exhibit 3 for Identification.)

Page 25

1    Q   (By Mr. Berg)  Mr. Groshart, could you take
2  a look at what I've marked as Exhibit Number 3.
3    A   Yes.
4    Q   All right.  I know that this is a photograph
5  that's taken from somebody in the roadway itself.
6    A   Uh-huh.
7    Q   But is this generally the view -- the -- the
8  scene that you observed that day, on May 8th, 2018?
9    A   It is.
10    Q   All right.  Is this a fair and accurate --
11  this photograph, is it a fair and accurate depiction
12  of the scene?
13        MS. PRIMUS:  Object to form.
14    A   Yes, it is.
15    Q   (By Mr. Berg)  And you can see here that
16  there are folks standing on the sidewalk north of the
17  actual final rest of the vehicle.
18        Do you see those folks?
19    A   Yes.
20    Q   All right.  Do you know who any of those
21  folks are?
22    A   Yes.
23        This is my wife taking a photograph that was
24  used repeatedly in the Sun-Sentinel.
25    Q   All right.  Do you recognize anybody else in

Page 26

1  the photograph?
2        And just for the record --
3    A   No, I do not.
4    Q   All right.  And just for the record, I guess
5  your wife would be -- if there's -- there's a
6  gentleman, appears to be a gentleman that would be
7  the --
8    A   Yes.
9    Q   -- person -- the northernmost person
10  standing in the photograph.
11    A   Yes.
12    Q   And your wife would be the next person south
13  of --
14    A   Yes.
15    Q   -- him.  Yes?
16    A   Yes.
17    Q   Okay.  Do you know whether your wife took
18  any video on the --
19    A   No, no video.
20    Q   All right.  And what about yourself, did you
21  take any photos or videos of -- of what was happening?
22    A   No.  I was busy on the phone to 911 and to
23  the person who was trying to come to my house.
24    Q   All right.  At what point did you call 911?
25    A   I called 911 before the car had even

Page 27

1  stopped.  I had my cordless phone from the home in my
2  hand so I could talk to the person who was coming to
3  see me.  And as soon as the car struck, I dialed --
4  dialed 911.
5    Q   All right.  And what did you tell the 911
6  operator?
7    A   I told her there was a serious automobile
8  accident in the 1300 block of Seabreeze Boulevard, and
9  that the car was on fire.
10    Q   Now, looking at Exhibit Number 3, this
11  photograph, it appears -- is this -- is this the tire
12  or wheel that you saw --
13    A   That is one of the wheels.  Yes.
14    Q   All right.  And you can see it just behind
15  the police vehicle?
16    A   Yes.
17    Q   All right.  How long did it take for the
18  first responders to show up on scene, the police or
19  the paramedics, the EMT's?
20    A   A very short time.  Maybe two minutes.
21    Q   All right.  Did you see -- well, let me back
22  up for a second.
23        Do you recall who it was that showed up
24  first, whether it was police or fire?
25    A   Police.

Page 28

1    Q   Did the officers or deputies or whoever it
2  may have been that was in law enforcement that showed
3  up on the scene that day initially, did you witness
4  them attempt to render aid or extinguish the fire?
5    A   Yes.
6    Q   All right.  And can you please tell me what
7  you observed?
8    A   The officer in this police car opened his
9  trunk, got out a small fire extinguisher like you'd
10  have in your kitchen, and proceeded toward the fire.
11    Q   All right.  And what did you see him do with
12  that?
13    A   I don't recall.
14    Q   All right.  Was the fire extinguished after
15  you saw that officer?
16    A   Oh, no.
17    Q   For how long did the fire on the vehicle --
18  in the vehicle continue to -- to burn?
19    A   Maybe five minutes.
20    Q   At -- any point in time from the time
21  when you first saw this vehicle that crashed, up until
22  it came to final rest and -- and until it was removed
23  from the scene, did you ever actually -- were you ever
24  able to actually visualize any of the occupants of the
25  vehicle?

---

Page 29

1    A   No, I was not.

2    Q   All right.  Do you know whether your wife
3  was able to visualize the occupants of the vehicle?

4    A   I do not know that.  She never said that she
5  did.

6    Q   All right.  This location where your wife is
7  in Exhibit Number 3, do you know whether she -- did
8  you observe her?  Did she ever walk any closer to the
9  vehicle than that?

10   A   I don't think so.

11   Q   All right.  Do you know of any of your
12  neighbors in the area who may have come out and
13  witnessed what was going on this day with the car
14  burning on fire on Seabreeze Boulevard?

15   A   Yes.  The renters at the house just north of
16  me came out, a man and his wife.

17   Q   Do you know who those folks are?

18   A   Yes.

19   Q   All right.  Do they rent -- do they -- I
20  take it do they rent that -- that home regularly?

21   A   They did.  But they have not been there for
22  almost a year now.

23   Q   What were their names?

24   A   Yeah, I do remember the name.

25       The last name is Gehart, G-e-h-a-r-t.  His

---

Page 30

1  first name is Michael.  Her name is Marianne.

2    Q   Do you know where they're from?

3    A   Alabama.  They live here now.

4    Q   Do -- do they live in Fort Lauderdale?

5    A   Yes.

6    Q   Do you know where they live?

7    A   Approximately.  I haven't been to their new
8  place.  But I am in contact with them from time to
9  time.

10   Q   Sure.

11       I'll take a -- just a general -- a general
12  area would be -- would help me out greatly.

13   A   I think they live in Coral Ridge.

14   Q   Okay.  Mr. Groshart, at any point in time
15  did you -- while the vehicle -- you know, after it
16  made impact with the wall and was skidding across
17  Seabreeze Boulevard, at any point in time from the
18  time of the first impact until it came to final rest,
19  did you see anybody thrown from the vehicle or ejected
20  from the vehicle?

21   A   I didn't see that activity.

22       There was a young man sitting on the
23  sidewalk talking to a lady police officer, the lady
24  officer I gave my contact information to.  And I heard
25  later on that he had been in the vehicle.  But I have

---

Page 31

1  no personal knowledge of that.  That's hearsay.

2    Q   Understood.

3        So -- but did you actually see an individual
4  that you now understand to have been ejected from the
5  vehicle, did you actually see that individual sitting
6  on the sidewalk?

7    A   Yes.

8        MS. PRIMUS:  Object to form.

9        MR. BERG:  All right.  Can I have one more
10  sticker, please.

11       Thank you.

12       (A scene photo was marked Plaintiff's
13  Exhibit 4 for Identification.)

14   Q   (By Mr. Berg)  All right.  So what I've
15  marked as number -- Exhibit Number 4, Mr. Groshart, is
16  just another photograph from the north -- from the
17  northern end of where the collision -- where the
18  vehicle came to final rest looking south at the -- at
19  the vehicle.

20       Can you confirm for me that this is a
21  picture that fairly and accurately depicts the scene
22  that you observed that day --

23       MS. PRIMUS:  Object.

24   Q   (By Mr. Berg)  -- on May 8, 2018?

25       MS. CRUZ:  Object to form.

---

Page 32

1        MS. PRIMUS:  Object to form.

2    A   Yes, that looks like what I saw.

3    Q   (By Mr. Berg)  All right.  And you see
4  this -- you see this gentleman sitting on the
5  sidewalk, kind --

6    A   Yes, sir.

7    Q   -- kind of in the bushes?

8    A   Yes, I do.

9    Q   All right.  You saw -- did you see this --
10  this gentleman who's sitting on the sidewalk?  Did you
11  actually see him yourself that day?

12   A   Yes, I did.

13   Q   And do you know who these two people are
14  that are standing next to him and looking northbound?

15   A   I think I know who they are, but I don't
16  know that as a certainty.

17   Q   All right.  What about these other two folks
18  that have our -- have their backs -- not the officer,
19  but the -- the two other folks that have their backs
20  to the camera here.  Do you know who they are?

21   A   No, I have no idea.

22   Q   Now, do you see debris in the roadway in
23  Exhibit Number 4?

24   A   Yes, I do.

25   Q   All right.  Did you actually observe all

---

Page 33

1  this -- all this debris on that day?
2      A   Yes, I did.
3      Q   All right.  Now, on May 8, 2018, for -- for
4  how long after the collision took place did the
5  vehicle continue to burn?
6      A   It burned furiously for at least five
7  minutes.  And it seemed to smolder for another half
8  hour, at least.
9      Q   All right.  Were you there -- well, let me
10  strike that for a second.
11          For how long did you stay outside of your
12  home out front and observe the scene?  For how long
13  did you do that?
14      A   About 30 minutes.
15      Q   All right.  Did you ever -- were you there
16  when the vehicle was taken away, towed away?
17      A   No.
18      MR. BERG:  All right.  I'm just looking over
19  my notes, sir.  I might almost be done.
20      You good?  You good?
21      MR. CORBOY:  We're good.
22      MS. PRIMUS:  Whitney do you have questions?
23      MS. CRUZ:  Yes.
24      MR. BERG:  Mr. Groshart, I appreciate your
25  time.  And I appreciate you coming down here

Page 34

1  today.
2      These other attorneys may have a few
3  additional questions for you.  Okay.
4      A   Okay.
5      MR. BERG:  Thank you, sir.
6          CROSS EXAMINATION
7      Q   (By Ms. Cruz)  Good morning, sir.
8      A   Hello.
9      Q   Is it your understanding that the vehicle
10  that you viewed that was in the accident on May 8th
11  was a Tesla vehicle?
12      A   Yes.
13      Q   Okay.  So if I refer to the Tesla vehicle,
14  you'll know that we're referring to the vehicle that
15  was involved in the accident on May 8th?
16      A   Yes.
17      Q   What is the closest that you got to the
18  Tesla?
19      A   About 50 feet.
20      Q   Okay.  And when was it that you were 50 feet
21  away from the Tesla?
22      A   As it crossed Seabreeze Boulevard after the
23  impact before it came to rest.
24      Q   Okay.  And so that was when the vehicle was
25  moving, then.

Page 35

1      A   Yes.
2      Q   Correct?
3      A   Yes.
4      Q   After the vehicle came to rest, how close
5  did you get to the Tesla?
6      A   About a hundred feet.
7      Q   And you were standing in your driveway at
8  this time?
9      A   No.  I had to be on the sidewalk and walk
10  south to my neighbor's property to get that close.
11      Q   Okay.  At that time you were off of your
12  property and standing on to your neighbor's property?
13      A   On the sidewalk, yes.
14      Q   Okay.  Is there a photo that we've marked as
15  an exhibit today that would show us -- or that depicts
16  the area where you were standing when you were closest
17  to the Tesla vehicle after it had come to rest?
18      A   Not in these photographs.
19      Only here.
20      Q   Okay.  So we're looking at Exhibit 1.  And
21  just to -- to give us --
22      A   I moved to the sidewalk in front of my
23  neighbor's house, to approximately here.
24      Q   Okay.  So in Exhibit 1, the property that
25  has been circled is your home.  Correct?

Page 36

1      A   Yes.
2      Q   And the property that you're now referring
3  to would be your nextdoor neighbor and who lives to
4  the north of your property.  Correct?
5      A   South.
6      Q   The south.
7          Okay.  So it's the neighbor directly next to
8  you to the south?
9      A   Yes.
10      Q   Okay.  How far is it from the corner of the
11  sidewalk in front of your house to where you were
12  standing when you -- when you were closest to the
13  Tesla after -- after it had come to rest?
14      A   About 50 feet.
15      Q   So you walked on 50 feet of your
16  neighbor's -- or the sidewalk in front of your
17  neighbor's property?
18      A   Yes.
19      MR. BERG:  Objection to form.
20      Q   (By Ms. Cruz)  Okay.  Would that be about
21  the midpoint of their home, or is it to the south end?
22      A   It's about the midpoint.
23      Q   The midpoint of the south neighb -- nextdoor
24  neighbor's home?
25      A   Yes.

Page 37

1    Q   Okay.
2    A   In -- I was just north of here, in this
3    photograph.  I didn't want to intrude on all of this.
4    Q   In -- we're refer -- you're referring to
5    Exhibit 4?
6    A   Yes.
7    Q   And so you were -- your view was almost as
8    if you -- your viewpoint was as if you could have been
9    the person taking this photo that we see in Exhibit 4.
10   You were on this driveway?
11   A   Yes.
12   Q   And you were facing in this direction?
13   A   Yes.
14   Q   Okay.  And you were about 50 feet from the
15   Tesla --
16   A   Yes.
17   Q   -- at that point?
18   A   Yes.
19   Q   Okay.  What part of the Tesla could you
20   view?  What side of the Tesla?
21   A   I could see only the stern, the back-end of
22   the veh -- vehicle.
23   Q   So your view was directly looking at the
24   rear-end of the vehicle.
25   A   Yes.

Page 38

1    Q   Is that correct?
2    A   Yes.
3    Q   Okay.  After the vehicle came to rest there
4    was never a point where you had a view of either the
5    passenger's side or the driver's side of the Tesla.
6    Is that accurate?
7    A   No.
8        At one point I did walk out into the street
9    after I knew all the traffic had been stopped and I
10   could see the passenger's side of the vehicle.
11   Q   Where did you walk to in the street?
12   A   I walked into the inside northbound lane.
13   Q   Which lane, the -- a northbound lane.
14       Okay.  If we look at Exhibit 1, can you show
15   us on Exhibit 1 where you walked to in the street?
16   A   Yes.
17       About right where that shadow is right
18   there.
19   Q   Okay.  So when you walked out into the
20   street, you were pretty much right in between the edge
21   of your property line and the edge of your southbound
22   neighbor's property line.  Is that correct?
23   A   No.  I was about halfway in front of my
24   neighbor's property.
25   Q   Okay.  So this would have been the same

Page 39

1    point, which would have been the southernmost point
2    that you were standing at any time that day?
3    A   Yes.
4    Q   Okay.  And where did you walk?  Did you
5    walk -- you said to the middle of the street?
6    A   Not to the turn lane, but into the inside
7    northbound lane.
8    Q   Okay.  And what was your reason for walking
9    out into the street?
10   A   I -- at that point I was watching the people
11   who were trying to help.  And like anybody, I was
12   hoping they could help.
13   Q   So --
14   A   I wanted to see -- when these accidents
15   happen, the more information that's available, I
16   figure the better.  So I was really trying to gather
17   information as an old military man.
18   Q   Were there people standing between you and
19   the Tesla at that point when you were in the street?
20   A   There might have been one or two, but they
21   were not blocking my view.
22   Q   What part of the Tesla could you see at that
23   point?
24   A   I could see the rear-end and the passenger's
25   side.

Page 40

1    Q   Could you see the entire passenger's side of
2    the vehicle from --
3    A   Yes.  Yes.
4    Q   If you can, let me finish my questions
5    before you answer.  I know you can sometimes
6    anticipate what I'm going to say, but it makes it hard
7    for the court reporter to take it down.
8        So you said you could see the entire
9    passenger's side of the vehicle, from the rear of the
10   vehicle to the front of the vehicle?
11   A   Yes.
12   Q   Okay.  Where -- could you see flames on the
13   passenger's side of the vehicle at that time?
14   A   No.  They were coming only from the front of
15   the vehicle at that time.
16   Q   How far back towards the rear of the vehicle
17   were the flames?
18   A   I don't recall any flames going past the
19   right front wheel well.
20   Q   Okay.  Did you see any damage at that time
21   to the passenger's side of the Tesla, other than up to
22   the front -- from the front of the vehicle to the
23   passenger's side front tire, that area, there were
24   flames.  Did you see any other damage to the
25   passenger's side of the Tesla?

Page 41

1  A  I might have seen it, but I didn't note it
2  and I don't recall it.
3      Q  Okay.  Fair to say you don't know what the
4  condition of the passenger's side of the Tesla was at
5  that time?
6      A  By direct observation, no, I do not.
7      Q  Okay.  Well, do you have any other way of
8  knowing as you sit here today what the damage was to
9  the passenger's side of the Tesla at that time?
10     A  Well, it had sideswiped the wall in front of
11 my place.  So there would have been some damage there.
12         But other than that, it's speculation.
13     Q  Did you ever give any interviews to anyone
14 of any kind following the crash?
15     A  Many.
16     Q  Who did you give interviews to?
17     A  Virtually all of the local TV news
18 organizations.  The Sun-Sentinel newspaper.  The Wall
19 Street Journal.  The police.  I had an audio taped
20 interview with Fort Lauderdale Police.  And Mr. Berg
21 and other attorneys.  And Mr. Martinez.
22     Q  So let's talk a little bit about the
23 interviews.
24         The first one that you mentioned was an
25 interview with a police officer.  Correct?

Page 42

1      A  No, it was not an interview.  I just gave
2  her my name, address and telephone number.  Told her I
3  was a witness.  That's all that happened on that day
4  with the police.
5      Q  Okay.  Did you ever provide an interview or
6  a statement to the police?
7      A  Yes.  As I said, police came to my house
8  with an audio recorder and an affidavit and swearing
9  and all of that.  And I gave a full account.
10     Q  Okay.  Was that interview recorded?
11     A  Yes.
12     Q  Okay.  So it was an oral interview?
13     A  Yes.
14     Q  Okay.  Was it a question and answer, or did
15 you kind of just go on record and just give a
16 statement?
17     A  Mostly a statement.
18     Q  Okay.  So that was one interview.
19         Did you give any other interviews to any
20 type of law enforcement or government agency?
21     A  Yes, I was -- the NTSA.
22     Q  Okay.  What -- do you think that was the
23 NTSB?
24     A  One --
25     Q  Could be?

Page 43

1      A  One of the Federal people who does this sort
2  of thing.
3      Q  Fair enough.
4         A government agency?
5      A  Yes.
6      Q  Okay.  And do you know when that interview
7  was done?
8      A  That was weeks later.  Two or three weeks
9  later.
10     Q  Okay.  Where did that take place at?
11     A  In my driveway.
12     Q  So they came to your home?
13     A  Yes.
14     Q  Okay.  Was that interview recorded?
15     A  Electronically, not that I know of.
16     Q  Okay.  Was that more of you giving a
17 statement like you did with the local police, or was
18 it -- was that more of a question and answer?
19     A  I'd say about half and half.
20     Q  Okay.  You mentioned you gave some
21 interviews to news outlets?
22     A  Yes.
23     Q  And that was the Sun-Sentinel.  Right?
24     A  Yes.
25     Q  The Wall Street Journal?

Page 44

1      A  Yes.
2      Q  And were there other news outlets?
3      A  Local Channel 10, local Channel 7, local
4  Channel 4.
5      Q  Any other news outlets that you can recall?
6      A  No.
7      Q  And you said that you also gave statements
8  to Mr. Berg.  Is that correct?
9      A  Yes.
10     Q  And that's the gentleman sitting next to you
11 that represents the estate that's brought this lawsuit
12 that we're here on today.  Correct?
13     A  Yes.
14     Q  Is that your understanding?
15         Okay.  When were you first contacted by
16 Mr. Berg?
17     A  Oh, I don't know.  I didn't keep a diary.
18     Q  Okay.  Would that have been a year ago?  Was
19 that a month ago?  Can you say with any specificity in
20 regards to the time in which Mr. Berg contacted you?
21     A  Well, I was -- maybe two or three weeks
22 after the accident.  That would be my best guess.
23     Q  And did he call you, or did he come to your
24 home?
25     A  As I recall, he called to ask if he could

Page 45

1  come to my home.  And then he came to my home.
2      Q  When did Mr. Berg come to your home?
3      A  My best guess, as I said, was two or three
4  weeks after the accident.
5      Q  So --
6      A  I didn't -- I didn't keep a -- a diary of
7  this.  I had no idea it was going to become such a big
8  deal.
9      Q  Sure.
10         So -- but he came to your home soon after he
11  reached out to you?
12     A  Yes.
13     Q  Okay.  And what did he say when he called
14  you?
15     A  Just that he would like to talk to me about
16  the accident.
17     Q  Okay.  Did he represent to you who he was?
18     A  Sure.
19     Q  And who did he say that he was?
20     A  He said his name was Zane Berg.  And he
21  probably told me who he was representing at the time.
22        It didn't matter to me, I had only one story
23  to tell.  I told the same story to everybody.
24     Q  Okay.  And so Mr. Berg came to your home.
25        And what happened when he came to your home?

Page 46

1      A  We stood in my driveway where I had observed
2  the accident.  And I told him what I had seen, just as
3  I've told everybody here today.
4      Q  Okay.  How long was he at your home for?
5      A  I'd say about an hour.
6      Q  Okay.  Was -- was it a question and answer
7  kind of a situation, or was it like with the -- the
8  news outlet, where -- or the police, excuse me, where
9  you kind of just gave a statement?
10        MR. BERG:  Objection to form.
11     A  I gave a statement.  And Mr. Berg asked
12  questions to clarify or expand on what I had said.
13     Q  (By Ms. Cruz)  To your knowledge, was this
14  interview or statement recorded?
15     A  I don't believe it was.  It could have been,
16  and I might not recall.
17     Q  Do you recall, is there anything that you
18  discussed or any information that you provided to
19  Mr. Berg when he came to your house two or three weeks
20  after the accident that you haven't told us here
21  today?
22     A  No.
23     Q  When was the next time you spoke to
24  Mr. Berg?
25     A  I don't recall speaking to him again until

Page 47

1  this morning in the lobby.
2      Q  You mentioned that you also spoke or -- or
3  gave a statement to Mr. Monserratt?
4      A  I had seen him --
5         MR. BERG:  Objection to form.
6         Go ahead.
7      A  -- looking over the area.  And, of course,
8  looking very unhappy.  I saw him there two or three
9  times.
10        And then one day when I was out in front of
11  my house he approached me and talked to me about it.
12     Q  (By Ms. Cruz)  Okay.  What was -- what was
13  said during that conversation?
14     A  Not a lot.  He didn't ask me to describe the
15  whole thing.  He was still very dejected.  And I think
16  he was just looking for some comfort that somebody saw
17  it.  Because if I hadn't been standing where I was,
18  looking where I was, nobody in the world would have
19  really seen what happened.  So I think that was
20  comforting to him.
21        He kept talking about what a shame it was
22  about his son.  And I did my best to commiserate.
23     Q  Is it your belief that you are the only
24  person that saw the crash occur?
25     A  From a viewpoint where one could see

Page 48

1  everything, yes.
2         I understand there was a car full of his
3  friends, the driver's friends behind him somewhat.
4  And they would have seen something.
5         But I have no reason to believe that anybody
6  else could see the whole thing as I did.  Because I
7  had been standing there for ten minutes.  There was
8  nobody else, none of my neighbors.  There were no
9  pedestrians at the time, which is very rare at that
10  time of year and that time of day in perfect weather.
11        So there's no reason to believe anybody else
12  saw it besides me.
13     Q  When you say that you saw the entire crash,
14  you testified earlier that before the car had stopped,
15  so during the crash sequence, you called 911.
16  Correct?
17     A  I was on the phone while I watched what was
18  going on.  Yes.
19     Q  Okay.  But at some point when the crash
20  sequence started, you had to look at your phone and
21  dial 911.  Correct?
22     A  Of course.
23     Q  Okay.  So would you agree, then, that there
24  would have been a period of time where you were not
25  observing the vehicle and the accident sequence?

Page 49

1    A   I'll agree to that.
2    **Q   Do you know how long that would have been?**
3  **I know everything is happening very fast and --**
4    A   Well, how long does it take to punch 911,
5  only a few seconds.
6       And -- and I can -- I can watch something
7  and dial the phone at the same time, it's bing, bing,
8  bing.
9       MS. PRIMUS:  You got that, bing, bing, bing?
10   **Q   (By Ms. Cruz)  You talked about giving an**
11 **interview to the Sun-Sentinel.**
12   A   Yes.
13   **Q   And I have a copy of that article here.**
14      **And there's a place in the article, and it's**
15 **a direct quote, and it's -- it's talking about you**
16 **observing the fire in the vehicle and where the fire**
17 **was located.  And the quote says, "The fire was big**
18 **enough that I couldn't really tell".  And then in**
19 **parentheses it says (where it began).**
20      **Is that an accurate quote from you?**
21   A   No.
22      MR. BERG:  Objection.  Objection to form.
23   A   I -- I can't imagine saying that.
24   **Q   (By Ms. Cruz)  Well, I'll show you a copy of**
25 **the article.**

Page 50

1    A   Well, but a reporter read that, maybe a copy
2  editor, who knows.
3  I can't imagine saying what that --
4    **Q   Okay.**
5    A   -- what you just read to me.  Because --
6       MS. CRUZ:  I'm not going to mark it.  Do you
7  want to see it?
8    A   -- it's -- it's absolutely certain where the
9  fire began.
10      MR. BERG:  If you're going to show it to
11 him, you should mark it.  If you're going to.
12      MS. CRUZ:  I don't have to mark anything
13 that I don't want to mark.
14      MR. BERG:  The rules say if you're going to
15 show something to the witness, you need to mark
16 it.  Any witness --
17      MS. CRUZ:  I don't believe that's what the
18 rule says.
19      MR. BERG:  I'll -- I'll pull the rule down.
20 We're -- you know --
21      MS. CRUZ:  Okay.  Go pull the rule.
22      MR. BERG:  Well, if you don't mark it, then
23 I'm going to mark it.  Okay.
24      MS. CRUZ:  That's fine.
25      MR. BERG:  But you're going to mark it.

Page 51

1       Anything you examine a witness with, you
2  need to mark.
3       MS. CRUZ:  Okay.  Well, you just said you're
4  going to mark it, so you can mark it.
5       MR. BERG:  I don't need -- I shouldn't have
6  to.
7       (Mr. Corboy exited the deposition room,
8  after which the following proceedings were had.)
9       MS. CRUZ:  Okay.  All right.  Show it to
10 him.
11      MR. BERG:  Oh, I thought this was for me.
12      MS. CRUZ:  No.
13      MR. BERG:  Do you have an extra copy?
14      MS. CRUZ:  No.
15      Do you have any extra copies of any of
16 these?  I mean --
17      MR. BERG:  Okay.  Show him.
18      Here you go.
19   **Q   (By Ms. Cruz)  I'll just direct your**
20 **attention.  It's the last full paragraph.  The first**
21 **line in the last full paragraph.**
22      MR. BERG:  I'm -- I'm going to object, because
23 I think it's improper use of an article.  At this
24 stage I think it's improper what you're doing.
25   **Q   (By Ms. Cruz)  Do you see the line where it**

Page 52

1  says the quote, "The fire was big enough that I
2  couldn't really tell"?
3    A   Yes, I see it.  And I also see brackets that
4  say where it began.
5    **Q   Right.**
6    A   Linda Trischitta was the reporter.
7    **Q   Correct.**
8    A   And as much as I respect her, she was taking
9  notes.  And who knows what happened with her notes.
10      But I disavow that sentence.  I would not
11 say that.
12      I could tell exactly where the fire began.
13 It came right from the front of the automobile.
14   **Q   Okay.  Can you say any more specifically,**
15 **other than the "front of the automobile" where you**
16 **think the fire began?**
17   A   All I could see was a huge fireball that
18 covered the automobile from the left front corner to
19 the right front corner.  It was that big.  And it
20 fanned out from there.
21      It was not a point fire or a ball.  It was a
22 huge trapezoidal flame.  It was astounding.  I had no
23 idea what was going on.
24      It was only hours later that I heard what
25 kind of car it was.  Because an ordinary gasoline

Page 53

1  automobile doesn't catch fire when it hits like that,
2  fire doesn't look like that.
3       So only when I heard on the news what kind
4  of car it was did I real -- oh, okay, now I have some
5  idea why it looked like that.
6       **Q   Is it your understanding now as you sit here**
7  **today, that the vehicle was traveling a lot faster,**
8  **the Tesla was traveling a lot faster than you had**
9  **originally thought it was?**
10      MR. BERG:  Objection to form.
11      MS. PRIMUS:  Join.
12      A   Well, I have heard many and read many
13  reports that apparently it was going 86 miles an hour
14  when it hit the wall.  And had been going about a
15  hundred twelve before the brakes were applied.
16      **Q   (By Ms. Cruz)  So when you're describing**
17  **where in the vehicle this fire occurred, you're**
18  **observing a fire in a vehicle that's traveling in**
19  **front of you, but at approximately 80 to a hundred**
20  **miles an hour.  Correct?**
21      MR. BERG:  Objection to form.
22      MS. PRIMUS:  Join.
23      A   I object to your question.
24      When I first saw the fire, the vehicle was
25  stopped instantaneously against the wall.

Page 54

1       **Q   (By Ms. Cruz)  So the --**
2       A   And then --
3       **Q   Go ahead.  I'm sorry, sir.**
4       A   And then as it skidded across the -- the
5  road, it would certainly have slowed down a lot from
6  its initial speed.
7       So it wasn't going 80 miles an hour when I
8  saw it go across the road.
9       **Q   Okay.  Do you know how fast the vehicle was**
10  **traveling when it struck the -- at the time -- at the**
11  **second that it struck the wall?**
12      MS. PRIMUS:  Object to form.  Asked and
13  answered.
14      MR. BERG:  Same.  Join.
15      A   Only -- only what I've heard and read in the
16  news.
17      **Q   (By Ms. Cruz)  And did the vehicle come**
18  **to -- you mentioned the vehicle came to a stop when**
19  **it -- when it hit the wall, when it sideswiped the**
20  **wall in the first impact.**
21      **Did it come to a stop, or was it**
22  **continuously moving?**
23      MR. BERG:  Form.
24      A   It sideswiped the wall first, and then it
25  hit the rounded wall head-on, so it would have to stop

Page 55

1  instantaneously and then skid across the road.
2       MS. CRUZ:  I don't have any other questions
3  for now.
4       Thank you, sir.
5       (Mr. Corboy returned to the deposition room,
6  after which the following proceedings were had.)
7            CROSS EXAMINATION
8       **Q   (By Ms. Primus)  Good morning, Mr. Groshart.**
9       My name is Laurie Primus, like I said.  And
10  I represent Jim and Jenny Riley, who are here today,
11  as well.
12      I just have some follow-up questions.  And I
13  apologize if I seem to be jumping around.
14      You had mentioned before about being in the
15  military.
16      Were you in the Navy?
17      A   Yes.
18      **Q   All right.  Thank you for your Service.**
19      While in the Navy, did you have any
20  mechanical -- training in mechanics?
21      A   In the Navy, no.
22      **Q   Okay.**
23      A   I was in electronics in the Navy.
24      **Q   All right.  And now you mentioned when you**
25  had heard the tires scrub, I believe you said it

Page 56

1  seemed like the brakes had locked so the tires were
2  skidding.
3       Are you certain that the -- in fact, that
4  the brakes had locked in this particular vehicle, or
5  is that what you're assuming?
6       MS. CRUZ:  Objection to form.
7       A   That's an assumption.
8       **Q   (By Ms. Primus)  All right.  And I'm**
9  assuming you didn't do any testing on this particular
10  vehicle afterwards.  Correct?
11      A   That's correct.
12      **Q   Okay.  Now, you had also mentioned about**
13  seeing others going over to the vehicle.
14      A   Uh-huh.
15      **Q   Is -- is that correct?**
16      A   Yes.
17      **Q   Do you remember that?**
18      Okay.  Did you see anyone trying to open up
19  the doors of the vehicle?
20      A   They could not get close enough.
21      **Q   Did you see all sides of the vehicle at that**
22  **point, or just the side from your vantage point?**
23      A   One side of the vehicle was up against the
24  shrubbery, so nobody could see the pass -- the
25  driver's side of the vehicle at that point.

Page 57

1    Q   Okay.
2    A   Only the front, the rear and the passenger's
3   side of the vehicle were visible to anybody.
4    Q   At any time did you see anyone exit that
5   vehicle?
6    A   As I said before, I didn't see anybody exit.
7       I heard later that the young man in the
8   photograph had been in the vehicle.
9    Q   But you as the observer --
10    A   I did not --
11    Q   -- don't know otherwise?
12    A   I did not see that, no.
13    Q   Okay.  When you walked out into the roadway
14   and you could see the passenger's side of the vehicle,
15   was the passenger door open?
16    A   No.
17    Q   Was the passenger door missing?
18    A   No.
19    Q   Did you view that passenger door as being
20   closed?
21    A   Yes.
22    Q   You mentioned that your wife took a
23   photograph.
24       Do you still have that photograph?
25    A   She has it somewhere.

Page 58

1    Q   Okay.
2    A   It's in the Sun-Sentinel.  Every time they
3   run an article about this, they use that same
4   photograph with her name under it.
5    Q   Does that photograph look similar to the
6   photograph that is in Exhibit 3 that actually shows
7   your wife in the photograph?
8    A   No, it doesn't look similar at all, because
9   it wasn't taken from the roadway.
10       If -- if you can imagine a photograph where
11   the flames take up most of the photograph, that's more
12   what it looks like.
13    Q   Okay.  So you're putting your hands on
14   either side of the photograph --
15    A   Yes.
16    Q   -- on 3?
17    A   Yes.
18    Q   Okay.  And you believe she still has that
19   photograph?
20    A   I suspect so.  She never throws any away.
21    Q   Okay.  Now, you mentioned, you said the two
22   people that are in Photograph 4 that are standing
23   close to the person sitting on the sidewalk --
24    A   Uh-huh.
25    Q   -- those two gentlemen, and I'm pointing to

Page 59

1   now, that are actually facing the person taking the
2   photograph, do you know -- you said you're not sure
3   who they are, but you think you might know.
4       What did you mean by that?
5    A   I highly suspect they were the friends of
6   the driver who had been in the following car.
7    Q   Okay.  Did you ever speak to any of them to
8   confirm whether or not they were friends of the people
9   involved in the accident?
10    A   No, I did not.
11    Q   Did you ever see those two individuals
12   getting out of a vehicle after the accident occurred?
13    A   No, I did not.
14    Q   So when you had mentioned about you believe
15   that there were friends of the people involved in the
16   accident, a car full of friends behind them, did you
17   hear that from somebody else, or did you actually
18   observe it?
19    A   That's hearsay.  I heard that later.
20    Q   Okay.  Do you know who you heard that from?
21   Do you remember?
22    A   No.
23    Q   No.
24    A   Probably I heard it from several people.
25    Q   Okay.

Page 60

1    A   But, no, I can't tell you who they were.
2    Q   Did you ever take any notes or anything or
3   journal about this accident?
4    A   No, I did not.
5    Q   Okay.  Did you ever give a written statement
6   to anyone where you actually wrote down --
7    A   Where I wrote it down, no.
8    Q   Okay.  Now, you mentioned that you were
9   awaiting for an acquaintance to arrive that day.
10    A   Yes.
11    Q   Who -- who is that person?
12    A   Her name is Cheryl Taylor.
13    Q   Did she ever show up that day?
14    A   No.  She called me because she was stuck in
15   traffic.  Her computer was telling her she was two
16   minutes away from my house and couldn't get closer
17   because she was stuck behind all the traffic that was
18   stopped.  So she was able to make a U-turn and get out
19   of there.
20    Q   Did you tell her what you had observed when
21   you spoke with her?
22    A   No.
23    Q   Okay.  Had you seen this particular Tesla in
24   the neighborhood before this accident?
25    A   I have no idea if I had or not.

Page 61

1    Q   Okay.  So you don't recall as you sit here
2  today?
3    A   No.  I --
4    Q   No?
5    A   -- would have no reason to note an
6  individual car like that that didn't look distinctive.
7    Q   Okay.  Did you know the Riley family?  Were
8  you aware of who they were before this accident
9  occurred?
10   A   No, I had never heard of them, although they
11  live in my neighborhood.
12       MS. PRIMUS:  Okay.  I don't have anything
13  further.
14       Thank you.
15   A   You're welcome.
16       MS. PRIMUS:  Appreciate it.
17       REDIRECT EXAMINATION
18   Q   (By Mr. Berg)  Mr. Groshart, I get --
19   A   Yes.
20   Q   -- I get the benefit of going last.  I just
21  have one or two follow-ups to some of the cross
22  examination from counsel.  Okay.
23   A   Sure.
24   Q   All right.  Counsel for Tesla had asked you
25  a number of questions about specifically where the

Page 62

1  flames were coming out of the vehicle from.
2    A   Uh-huh.
3    Q   Do you recall that?
4    A   Yes.
5    Q   All right.  And you said when the vehicle
6  came to final rest, that the -- and you had walked
7  sort of out into the middle of the road, that the
8  flames were only coming out of the hood, back to --
9  you know, not past the front wheel well at that point.
10       Do you recall that?
11   A   That's -- that's the best recollection I
12  have right now.
13   Q   Sure.
14       And at this point in time were -- were
15  people attempting to get close to the Tesla to
16  extricate the occupants?
17   A   Yes.
18   Q   All right.  And despite the fact that the
19  fire was only out of the hood, they still were unable
20  to get close enough?
21   A   Yes.
22       MS. PRIMUS:  Object to form.
23       MS. CRUZ:  Object to form.
24   Q   (By Mr. Berg)  Let me reask the question
25  because there was an objection.

Page 63

1        Were the folks that were attempting to
2  extricate the occupants of the vehicle, were they able
3  to get to the Tesla to actually put a hand on it to
4  extricate those individuals when the flames were only
5  coming out of the hood area?
6    A   I don't know what they were --
7        MS. CRUZ:  Objection to form.
8    A   -- able to do.  I could see that they were
9  not willing to get any closer.
10   Q   (By Mr. Berg)  All right.
11   A   They got maybe ten feet from the car and
12  then stopped.
13   Q   All right.  And were these the -- were these
14  folks that were yelling expletives that you
15  described earlier that were unable to get close enough
16  to the vehicle?
17   A   Yes.
18       MS. PRIMUS:  Object to form.
19   A   Yes.
20   Q   (By Mr. Berg)  All right.  And what was your
21  understanding as the reason why they were, you know,
22  yelling expletives or -- or -- or -- or showing some
23  sort -- some form of anger at their inability to get
24  close enough to the vehicle?  What was your
25  understanding from your observations at the scene

Page 64

1  there?
2    A   There appeared --
3        MS. CRUZ:  Objection to form.
4        MS. PRIMUS:  Join.
5    A   It appeared to be they were frustrated.
6  They wanted to help, as anybody would, and they were
7  unable to do anything.
8    Q   (By Mr. Berg)  All right.  You were asked a
9  number of questions by counsel for Tesla with
10  respect --
11   A   Huh.
12   Q   You were asked a number of questions by --
13  by counsel for Tesla, the lawyer for Tesla who's here
14  today, with respect to all the various interviews that
15  you had given to individuals over the past year and a
16  half or so.
17       Do you recall that?
18   A   Yes.
19   Q   All right.  Would you have spoken with the
20  Tesla folks if they had come to talk to you?
21   A   I would speak to anybody at any time about
22  this.  I tell the same story to everybody.  I believe
23  in fair play.
24   Q   Absolutely.
25       Did -- did anybody from Tesla or any of

Page 65

1  their investigators, did they ever send anybody to
2  come to you, the eyewitness that saw the accident?
3  Did they ever do that?
4      A   I certainly don't recall any particular
5  person coming to talk to me and saying that they were
6  from Tesla.
7      Q   All right.
8      A   Oh, nope, I -- I have to amend that.
9          Only recently, just about three days ago, an
10  investigator came to me who was working for Tesla, but
11  on another case.
12      Q   Okay.  Do you know which case that was?
13      A   Yes.
14          I don't know the names, but a driver hit a
15  tree, I think in Palm Beach County or Northern
16  Broward, and couldn't get out of the car.  And his
17  wife is suing Tesla.  That's my best recollection.
18      Q   All right.
19      A   It was not this case, as far as I know.
20      Q   Did you catch the name of that investigator?
21      A   I think I have a copy of -- I may have a
22  copy of the affidavit I signed.
23          He wanted me to sign an affidavit saying
24  that there was no way in hell I was going to
25  California to testify.

Page 66

1      Q   Okay.
2      A   Of course there was legalese.  But that's
3  essentially what it meant.
4      Q   Uh-huh.
5      A   And they had the story wrong in the
6  affidavit, and I amended the story to make it correct
7  and initialed it.
8          So I wanted to be clear that, yes, there was
9  some contact with somebody involved with Tesla, but as
10  far as I know not on this case.
11      Q   All right.  Was -- this investigator that
12  you spoke with about three days ago, did he record or
13  videotape the statement?
14      A   No.
15      Q   All right.  Did he tell you what the purpose
16  of that affidavit was?
17      A   Yes.  They were trying to move the trial
18  from California to here, because the suit had been
19  brought against Tesla headquarters in California.
20      Q   All right.  And this investigator told you
21  that this case involved an accident that occurred in
22  Palm Beach?
23      A   That's my best recollection.  Palm Beach
24  County or Northern Broward County.
25      Q   All right.

Page 67

1      A   Again, I didn't -- didn't keep a -- a diary
2  of all this stuff.  I -- I didn't know I was going to
3  get the third and the fourth and the fifth degrees on
4  it.
5      Q   Under -- understood.
6          But you've done -- have you done your best
7  to give us accurate testimony here today?
8      A   Absolutely.
9      Q   All right.  You were asked a number of
10  questions about -- about seeing my client, Edgar
11  Monserratt, Senior, at the scene where this crash took
12  place.
13          Do you recall that?
14      A   Yes.
15      Q   All right.  On how many occasions did you
16  see him at the scene?
17      A   I would -- my best recollection is I saw him
18  about three times wandering around the scene, and then
19  the fourth time when he came to speak to me.
20      Q   All right.  Was -- was -- was
21  Mr. Monserratt, was he distraught when you saw him?
22      A   Yes.  Appeared to be.
23      Q   All right.  And -- and for how long would he
24  stay on each of these visits?
25      A   About an hour.

Page 68

1      Q   And what -- how many -- was it just on one
2  occasion that you had a conversation with him?
3      A   Yes.
4      Q   All right.  And can you -- well, was he
5  distraught during the conversation?
6      A   Yes.
7      Q   All right.  Through your observations,
8  was -- Mr. Monserratt, was he -- well, strike that.
9          All right.  You were asked a question about
10  a -- a news article, if I could have a sticker,
11  please, written by Linda Trischitta.
12      A   Yes.
13      Q   Okay.
14      MR. BERG:  And I think we're at number -- I
15  think I'm at 5.
16      MS. PRIMUS:  May I see it if it's going to
17  be marked?
18      MR. BERG:  Yeah.  It should have been marked
19  in the first place.
20      MS. PRIMUS:  Wherever you want to put it.
21      MR. BERG:  Who Googled mine printed funky,
22  but that's what I get.
23      MS. PRIMUS:  I'm sorry.
24      MS. CRUZ:  Laurie, may I?
25      MS. PRIMUS:  Uh-huh.

Page 69

1    MS. CRUZ:  Thank you.
2    MR. BERG:  Same article?
3    MS. CRUZ:  I -- I don't know.  I haven't
4  checked it word for word.
5    MR. BERG:  Hum.
6    MS. CRUZ:  I didn't check it word for word.
7    MR. BERG:  What was the title of yours?
8    MS. CRUZ:  It looks like it.
9    The title is the same.
10    MR. BERG:  Okay.  I just want to make sure
11  we have the title right.
12    (An article was marked Plaintiff's Exhibit 5
13  for Identification.)
14    **Q  (By Mr. Berg)  All right.  So I've marked as**
15  **Exhibit Number 5 an article that's entitled Witness**
16  **Recalls Horror of Tesla Crash that killed Two Teens.**
17    **Do you see that?**
18    A   I do.
19    **Q   All right.  Is that the article that counsel**
20  **for Tesla showed you a few minutes ago?**
21    MS. CRUZ:  Objection to form.
22    **Q   (By Mr. Berg)  Yeah, mine printed a little**
23  **funky, so I apologize for that.**
24    **But --**
25    A   Appears to be the same article.

Page 70

1    **Q   All right.  And you see the author is Linda**
2  **Trischitta?**
3    A   Trischitta.  Yes.
4    **Q   All right.  Was this a horrific crash that**
5  **you witnessed?**
6    A   I never used that word.
7    **Q   Okay.  Was it a catastrophic incident?**
8    MS. PRIMUS:  Object to form.
9    MS. CRUZ:  Object to form.
10    A   I never used that word.
11    **Q   (By Mr. Berg)  All right.  How would you**
12  **describe it?**
13    A   The word that I think of when I think of
14  this is -- in fact while it was going on I asked
15  myself, how many bad decisions led up to this?  It's
16  terribly sad and unfortunate.  Things like this don't
17  happen because of one bad decision.
18    And being an engineer, I like to know why
19  things happen.  That's all I think of, is how sad and
20  unfortunate.
21    MR. BERG:  Thank you for your time,
22  Mr. Groshart.
23    A   You're welcome.
24    THE VIDEOGRAPHER:  Off the rec --
25    MS. CRUZ:  I have a few.

Page 71

1    MS. PRIMUS:  Oh, no, we still -- we still
2  have an opportunity to ask questions.
3    MS. CRUZ:  I have some questions.
4    MR. BERG:  I'm sorry.  I thought we were
5  done.  My apologies.
6    A   Fine.
7    RECROSS EXAMINATION
8    **Q   (By Ms. Cruz)  Is there -- you -- you lived**
9  **for 48 years on this curve on Seabreeze Avenue on Fort**
10  **Lauderdale Beach.  Right?**
11    A   No.
12    **Q   How long have you lived there?**
13    A   Seabreeze Boulevard.
14    **Q   Seabreeze Boulevard.  I'm sorry.**
15    A   I've been there 48 years.
16    **Q   Okay.  I saw a reference in an article to a**
17  **nickname, if you will, that you gave to that curve.**
18    **Do you remember that?**
19    A   I didn't give the nickname to it.  That has
20  been its nickname as long as I've been there.
21    **Q   And what's the nickname for that curve where**
22  **this accident occurred?**
23    A   Dead man's curve.
24    **Q   Why do you think it's called dead man's**
25  **curve?**

Page 72

1    A   Because people die in automobile accidents
2  by driving too fast around that curve.  I've seen it
3  happen more than once.
4    **Q   How many accidents have you seen or heard**
5  **about that occurred where people have been killed on**
6  **this, what -- what is referred to as dead man's curve?**
7    A   I've seen three fatal accidents and many,
8  many injuries.
9    **Q   When you're going around that curve, how**
10  **fast do you travel?**
11    A   I go 30 miles an hour.  I'm an old fogey.  I
12  do the speed limit.  Everybody honks at me and passes
13  me.
14    **Q   Have you always gone 30 miles around -- an**
15  **hour around that curve for the past --**
16    A   No.  I used to young and foolish.
17    **Q   You got to let me finish my question.**
18    A   I didn't know you weren't finished.  I'm
19  sorry.
20    **Q   That's okay.**
21    **So you drive 30 miles an hour around that**
22  **curve, but you see people driving faster around that**
23  **curve?**
24    A   Frequently.  It's a common place for the
25  police to set up a radar trap to catch speeders.

Page 73

1    But normally they catch them going north,
2    because even the police will not set up a radar
3    station on the outside of that curve, they're too
4    smart to put themselves in that much danger.
5        Q   When you say "they're too smart to put
6    themselves in that much danger", what do you mean by
7    that?
8        A   Only an idiot would spend any time near that
9    wall where this car hit, because that's where most of
10   the vehicles hit.
11       There's a reason that wall is there and a
12   reason that wall is so strong.
13       Q   All right.
14       A   Everybody in the area knows that's dead
15   man's curve.
16       Q   That's kind of common knowledge in Broward
17   County, would you agree?
18       A   That's --
19       MS. PRIMUS:  Object to form.
20       MR. BERG:  Form.
21       A   As long as I've lived there everybody I've
22   ever talked to knows that's dead man's curve.
23       Q   (By Ms. Cruz)  You would agree that it's
24   extremely dangerous to be traveling at 50, 60, 70, 80,
25   90, a hundred miles an hour around this dead man's

Page 74

1    curve.  Right?
2        MR. BERG:  Form.
3        MS. PRIMUS:  Object to form.
4        A   I would agree going around that curve at any
5    speed higher than the posted speed limit is a foolish
6    thing to do.
7        They have re-striped that road several times
8    trying to reduce the hazard.  They've put up more
9    signs.  There's an advisory speed limit sign of
10   20 miles an hour on the entrance to that curve going
11   south, and nobody pays any attention to it.
12       Q   Do you know what the speed limit is there?
13       A   It's 30 in the neighborhood.
14       Q   When you had the opportunity to observe the
15   passenger's side of the Tesla following the accident
16   when you had walked out into the street, did you make
17   note of the door handles for any reason of the
18   vehicle?
19       A   I did not look at a detail like that.  No.
20       MS. CRUZ:  I don't have any other questions.
21       RECROSS EXAMINATION
22       Q   (By Ms. Primus)  I just have a few
23   follow-ups.
24       The affidavit that you signed from the
25   investigator you believe was from Tesla, I believe you

Page 75

1    said you amended it and then signed it.
2        Do you recall what you amended?
3        A   Yes.
4        There was a short precis of the activities
5    in the accident.  And the way it was typed said that
6    the vehicle caught fire when it hit the lamppost.
7        And I amended that, no, it caught fire when
8    it hit the wall across the street.
9        Q   So when this investigator met with you, do
10   you believe that he already had the typed affidavit?
11       A   He did.
12       Q   Did you talk with him before you met with
13   him?
14       A   Only to talk to him on the phone.  He was
15   trying to find the house.
16       Q   Okay.
17       A   So I stood out in the driveway so he would
18   see where the house was.
19       Q   Did he ever talk to you on the phone,
20   though, before he showed you a typed affidavit about
21   the accident and what you observed?
22       A   No.
23       Q   Do you know where he got that information
24   from to put in that affidavit if he didn't speak with
25   you?

Page 76

1        A   No, I do not.
2        Q   Okay.  What is the best phone number to
3    reach you at, if you don't mind having it on the
4    record?
5        A   954-522-5327.
6        MS. PRIMUS:  Thank you.  I appreciate it.
7    I don't have any further questions.
8        A   You're welcome.
9        MR. BERG:  Just -- just one or two
10   follow-ups.
11       REDIRECT EXAMINATION (Cont'd.)
12       Q   (By Mr. Berg)  The other crashes that you've
13   seen at this -- at this curve, any of them involve a
14   vehicle erupting in flames?
15       A   No.
16       MR. BERG:  All right.  Thank you, sir.
17       THE VIDEOGRAPHER:  All right.  We're off the
18   record --
19       MS. PRIMUS:  That was one.  That was good.
20       THE VIDEOGRAPHER:  Off the record at 10:23
21   a.m.
22       (A discussion was held off the record, after
23   which the following proceedings were held on the
24   written record.)
25       MR. BERG:  Mr. Groshart, so you have the --

Page 77

1   this is still on this record.  You have the
2   opportunity to obtain a copy of the transcript
3   that the court reporter is going to type up, and
4   you can read it for accuracy or make any changes
5   that you would like.  That's a right that you
6   have.  Or you can waive that right.
7           You waive it?
8           He'll waive.
9           MS. PRIMUS:  You have to say waive.
10  A    Waive.
11          AND FURTHER DEPONENT SAITH NAUGHT
12          STIPULATION ON READING AND SIGNING
13       It is hereby stipulated and agreed by and
14  between counsel present at this deposition and by the
15  deponent that the reading and signing of this
16  deposition is waived.
17          (The deposition was concluded at 10:23 a.m.)
18
19
20
21
22
23
24
25

Page 78

CERTIFICATE OF OATH

1           CERTIFICATE OF OATH
2   STATE OF FLORIDA   )
                       )
3   COUNTY OF BROWARD  )
4
5       I, Cynthia R. Hewlett, Registered
6   Professional Reporter, Notary Public, State of
7   Florida, certify that LARRY R. GROSHART, personally
8   appeared before me and produced a driver license for
9   identification, on the 19th day of November, 2019, and
10  was duly sworn.
11          Signed this 5th day of December, 2019.
12
13
14          CYNTHIA R. HEWLETT, R.P.R.
            Notary Public, State of Florida
15          Commission No.:  GG 292478
            My commission expires:
16          March 12, 2023
17
18
19
20
21
22
23
24
25

Page 79

1           CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA  )
                      )
4   COUNTY OF BROWARD )
5
6       I, CYNTHIA R. HEWLETT, Registered Professional
7   Reporter and Notary Public in and for the State of
8   Florida at Large, do hereby certify that I was
9   authorized to and did stenographically report the
10  deposition of LARRY R. GROSHART; that a review of the
11  transcript was not requested; and that the foregoing
12  transcript, Pages 1 through 78, is a true record of my
13  stenographic notes.
14      I further certify that I am not a relative,
15  employee, or attorney, or counsel of any of the
16  parties, nor am I a relative or employee of any of the
17  parties' attorney or counsel connected with the
18  action, nor am I financially interested in the action.
19      Dated this 5th day of December, 2019, at Fort
20  Lauderdale, Broward County, Florida.
21
22
23  CYNTHIA R. HEWLETT, R.P.R.
    Notary Public, State of Florida at Large
    Commission No.:  GG 292478
24  My commission expires:  March 12, 2023
25