UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-60517-VALLE

JAMES B. RILEY,
as personal representative of
the Estate of Barrett Riley,

      Plaintiff,

v.

TESLA, INC., d/b/a
Tesla Motors, Inc.,

      Defendant.
_____/

## OMNIBUS ORDER ON MOTION TO STRIKE EXPERT AFFIDAVITS, MOTIONS TO EXCLUDE EXPERTS UNDER *DAUBERT*, AND MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court upon Tesla, Inc.'s ("Tesla"): (i) Motion to Exclude Testimony of Plaintiff's Biomechanic Expert Kelly Kennett (ECF No. 28); (ii) Motion to Exclude Certain Testimony of Plaintiff's Expert Robert Caldwell (ECF No. 29); (iii) Motion to Exclude the Testimony of Plaintiff's Expert Ralph White (ECF No. 31); (iv) Motion for Summary Judgment (ECF No. 34); and (v) Motion to Strike Plaintiff's Experts' Affidavits (ECF No. 44) (together, the "Motions"). The parties have consented to the undersigned for all further proceedings in the case, including trial and entry of final judgment pursuant to 28 U.S.C. § 636(c). *See* (ECF Nos. 84, 85).

The Court has reviewed the Motions, the record, the supporting and opposing filings, the exhibits attached thereto, and is otherwise fully advised. The undersigned also held a lengthy hearing on the Motions on January 21, 2022. *See* (ECF No. 106); *see also* (ECF No. 109) ("Hr'g Tr."). The Motions are addressed below.

## I.     **BACKGROUND**

### A.     **The Accident and Claims**

This case arises from a fatal accident that occurred on May 8, 2018 in the 1300 block of Seabreeze Boulevard, in Fort Lauderdale, Florida involving a 2014 Tesla Model S (the "Model S" or "vehicle") that was driven by 18 year-old Barrett Riley ("Barrett").  While trying to pass another car, Barrett lost control of the Model S and crashed as he was driving southbound at approximately 116 mph on a curve with a posted 25 mph speed limit.  The Model S made five points of impact, initially mounting a concrete curb (Curb 1) and hitting two walls (Walls 1 and 2) on the west side of the road, deflecting off Wall 2, and crossing five lanes of traffic while rotating, then hitting two other points on the east side of the street (Curb 2 and a light pole) before coming to rest.  (ECF No. 29 at 5).  Barrett and the front seat passenger died in the crash.  A second passenger in the back seat (who was not wearing a seatbelt) was ejected and survived the accident.

Approximately two months prior to the accident in March 2018, Barrett's parents, Mr. and Mrs. Riley (the "Rileys"), had requested that Tesla install a speed limiter on the vehicle to limit its maximum speed to 85 mph.  (ECF No. 1 ¶ 2).  Although Tesla installed the speed limiter as requested, it later removed the speed limiter without the knowledge or consent of the Rileys after the vehicle was taken to Tesla for servicing.  *Id*. ¶ 3.  Tesla admits that it did not inform the Rileys that the speed limiter had been disabled until after the accident.  *See* (ECF No. 3 ¶ 3)

In the Complaint, Plaintiff James Riley (Barrett's father and personal representative of Barrett's estate) asserts three causes of action against Tesla.  In Count I (negligence), Plaintiff asserts that Tesla was negligent for deactivating the speed limiter without alerting the Rileys.  *See* (ECF No. 1 ¶¶ 48-52).  In Count II (strict liability) and Count III (negligence), Plaintiff asserts that the Model S contained design defects in its lithium-ion battery cells and battery pack that made

the product unsafe for its intended and foreseeable use.[1]  *Id*. ¶¶ 54-59, 61-66.  According to Plaintiff, the vehicle's battery cells and battery pack failed to include materials to mitigate or contain thermal runaway or fire.[2]  *Id.* ¶¶ 56, 62.  Plaintiff further asserts that Tesla knew, or should have known, that the Model S was negligently designed and knew or should have known that the car was unreasonably dangerous.  *Id*. ¶ 63.

Tesla denies that it was negligent in deactivating the speed limiter.  (ECF No. 76 at 5).  Tesla also denies that the Model S was defective in its design of the battery pack or that  it was uniquely susceptible to thermal runaway.  *Id.* at 4-5.  According to Tesla, the battery design was overwhelmed by the crash forces, which caused mechanical damage to the battery.  *Id.*  Tesla also claims that: (i) the crash was due to Barrett's reckless driving; and (ii) the Rileys were negligent in allowing Barrett to drive the vehicle given their knowledge of Barrett's driving history.  *Id.* at 5.

### B.  Tesla's *Daubert* Challenges to Plaintiff's Experts and Motion to Strike

Plaintiff has identified three experts to support his claims: (i) biomechanical engineer Kelly B. Kennett; (ii) accident reconstruction expert Robert Caldwell; and (iii) chemical engineer and lithium-ion battery expert Dr. Ralph White.  Tesla, in turn, has moved to exclude each expert under

---

[1] According to Tesla's expert, the 2014 Tesla Model S was equipped with an 85 kWh Li-ion battery located beneath the floor of the car.  (ECF No. 31-3 ¶ 23).  The battery consists of 16 modules that sit on mica paper.  *Id*. ¶ 36. Each module contains 444 individual Li-ion cells separated by air, a ceramic heat blanket, mica sheets, and a thermal barrier made of woven fiberglass. *Id.* ¶¶ 15, 23. The 16 modules and their individual cells comprise the "battery pack" enclosed in a ¼ inch thick aluminum alloy encasement.  *Id*. ¶ 36.  The top of the battery pack is covered with a ceramic blanket to protect occupants in the cabin of the vehicle in the event of a fire.  *Id*. ¶ 56.

[2] Thermal runaway occurs when the heat generated by an individual battery cell becomes great enough to cause combustion of the battery and materials near the battery.  (ECF No. 39-8 at 28).  One Tesla patent explains that: "[w]hen a battery undergoes thermal runaway, it typically emits a large quantity of smoke, jets of flaming liquid electrolyte, and sufficient heat to lead to the combustion and destruction of materials in close proximity to the cell. If the cell undergoing thermal runaway is surrounded by one or more additional cells as is typical in a battery pack, then a single thermal runaway event can quickly lead to the thermal runaway of multiple cells which, in turn, can lead to much more extensive collateral damage."  *Id.*; *see also* (ECF No. 31-2, hereinafter "White Dep." 119:15-24).

Federal Rule of Evidence 702 (governing testimony of expert witnesses) and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), as well as Federal Rule of Evidence 403 (excluding relevant evidence based on undue prejudice, confusion, waste of time, or other reasons). *See generally* (ECF Nos. 28, 29, 31) (collectively, "Tesla's *Daubert* Motions").

In response to Tesla's *Daubert* Motions, Plaintiff filed affidavits by each expert to purportedly "provide a better understanding of the sufficiency of the facts and data used" and "understand the reliability of the methodology used" for the opinions.[3] (ECF Nos. 40-1 ¶¶ 5-6, 41-3 ¶¶ 5-6, 42-2 ¶¶ 4-5). Tesla, in turn, moved to strike Plaintiff's expert affidavits. *See* (ECF No. 44) ("Tesla's Motion to Strike"). Tesla generally argues that the affidavits constitute impermissible new opinions that violate Rule 26. *See generally id*. Although the parties disagree about the effect of striking the expert affidavits, both parties agree that, even if the Court strikes the affidavits, the Court could still consider the merits of Tesla's *Daubert* Motions on the current record. (Hr'g Tr. 128:19-129:6, 140:1-13).[4]

### C.    Tesla's Motion for Summary Judgment

Tesla also moves for summary judgment on all counts, arguing that Plaintiff has failed to establish causation. *See generally* (ECF No. 34). Notably, the parties agree that partial summary judgment is appropriate on the claims based on alleged defective door handles and alleged failure to contain adequate warnings within Counts II and III. *See* IV.B. *infra*. The parties, however, disagree whether there is sufficient evidence for the claims under Count I (alleging that Tesla was negligent for deactivating the speed limiter without consent from or notice to the Rileys) and

---

[3] Dr. White's submission was captioned a "Declaration." *Compare* (ECF Nos. 40-1, 41-3), *with* (ECF No. 42-2). For ease of reference, the three expert submissions will be called "affidavits," unless referring only to Dr. White's Declaration.

[4] Page references are to the page numbers in the transcript, not the ECF generated numbers in the header.

Count III (alleging a defective battery design).  *Compare* (ECF Nos. 34 at 3-6, 49 at 1-4), *with* (ECF No. 38 at 12-15).  Moreover, although Plaintiff no longer seeks punitive damages under Count II (negligence based on design defect) and Count III (strict products liability), the parties disagree whether punitive damages remain appropriate as to Count I (alleging negligence for deactivating the speed limiter without the Rileys' knowledge or consent).  *See* IV.E. *infra.*

## II.   TESLA'S MOTION TO STRIKE EXPERT AFFIDAVITS (ECF NO. 44)

Tesla has moved to strike the three affidavits of Plaintiff's experts.  *See generally* (ECF No. 44).  Relevant to the Court's ruling, Plaintiff's expert affidavits were filed in response to Tesla's *Daubert* Motions, well after the deadline for expert disclosures and expert discovery had expired.  *See* (ECF Nos. 18, 22) (Amended Scheduling Orders).  In all three affidavits, Plaintiff's experts deny offering new opinions and purport to merely "provide a better understanding of the sufficiency of the facts and data used" and "understand the reliability of the methodology used" for the opinions.  (ECF Nos. 40-1 ¶¶ 5-6, 41-3 ¶¶ 5-6, 42-2 ¶¶ 4-5).

### A.   Legal Standards

Federal Rule of Civil Procedure 26(a)(2)(B)(i) provides that a written expert report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Under the rules, an expert witness has a duty to supplement his or her report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).

If a party fails to provide information as required by Rule 26(a) or (e), exclusion of the expert evidence is automatic and the party is not allowed to use that information to supply evidence at a trial, unless the failure was substantially justified or is harmless.  Fed. R. Civ. P. 37(c)(1).

"Exclusion is also appropriate pursuant to Rule 16(b), which 'authorizes the district court to control and expedite pretrial discovery through a scheduling order' and which gives the court 'broad discretion to preserve the integrity and purpose of the pretrial order,' including the exclusion of evidence as a means of enforcing the pretrial order." *Companhia Energetica Potiguar v. Caterpillar Inc.*, No. 14-CV-24277, 2016 WL 3102225, at *5 (S.D. Fla. June 2, 2016) (citations omitted); *see also Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004) (explaining that compliance with Rule 26's expert disclosure requirements is "not merely aspirational"), *overruled on other grounds, Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 457 (2006); *Mitchell v. Ford Motor Co*., 318 F. App'x 821, 825 (11th Cir. 2009) (affirming order striking expert for failing to timely disclose the scientific bases for expert opinion); *United States v. Batchelor-Robjohns*, No. 03-CV-20164, 2005 WL 1761429, at *2 (S.D. Fla. June 3, 2005) ("Rule 37(c)(1) requires absolute compliance with Rule 26(a), in that it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or substantially justified.") (citation and quotations omitted).  Additionally, the burden rests upon the non-producing party to demonstrate that its actions were substantially justified or harmless.  *In re Trasylol Prods. Liab. Litig.*, No. 08-MD-1928, 2012 WL 12897158, at *3 (S.D. Fla. July 9, 2012).

Courts have broad discretion to exclude expert testimony that is untimely disclosed— even when the late disclosure is designated as "supplemental" reports.  *See Corwin v. Walt Disney Co*., 475 F.3d 1239, 1252 (11th Cir. 2007) ("a supplemental expert report may be excluded pursuant to Federal Rule of Civil Procedure 37(c) if a party fails to file it prior to the deadline"); *Cook v. Royal Caribbean Cruises Ltd.*, No. 11-CV-20723, 2012 WL 2319089, at *3 (S.D. Fla. June 15, 2012) (striking supplemental report issued after discovery cut-off).  Consequently, a party cannot use Rule 26(e) as a means to bolster a previously disclosed defective or problematic expert witness report.  *Cochran v. Brinkmann Corp.*, No. 08-CV-1790, 2009 WL 4823858, at *5 (N.D. Ga. Dec.

9, 2009) (Rule 26(e) "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy."), *aff'd*, 381 F. App'x 968 (11th Cir. 2010); *Jones Creek Invs., LLC v. Columbia Cnty.*, 98 F. Supp. 3d 1279, 1289 (S.D. Ga. 2015) ("[Rule] 26(e) does not permit supplementation to add points that could have been made in the original expert report or to otherwise shore up weaknesses or inadequacies, and there is no reason why the new assumptions and methodologies used in the second report could not have been adopted and disclosed in the first during the discovery period."). In sum, an expert's duty to supplement under Rule 26(e) is not a right to supplement at will. *Maunlad Trans Inc. v. Carnival Corp.*, No. 18-CV-24456, 2020 WL 7481484, at *1 (S.D. Fla. Mar. 18, 2020) (striking expert report as untimely and deficient under Rule 26) (citations omitted).

Against this legal backdrop, the Court must decide whether the expert affidavits Plaintiff submitted in opposition to Tesla's *Daubert* Motions are supplemental opinions and, if so, whether Plaintiff's delayed disclosure was substantially justified or otherwise harmless.

### B.      Plaintiff's Biomechanical Engineer: Kelly Kennett

Tesla challenges Mr. Kennett's affidavit (ECF No. 41-3, hereinafter the "Kennett Affidavit"). According to Tesla, Mr. Kennett provided new opinions and "more in-depth analysis" on: (i) single-impact versus multiple-impact crash testing; and (ii) the effect of the deflation of the frontal airbags during the multiple-impact crash. (ECF No. 44 at 5-6). Tesla also argues that Mr. Kennett improperly declared that "the information he relied on is sufficient." *Id.* at 6. Without addressing Tesla's arguments on these three topics, Plaintiff generally opposes the Motion to Strike the Kennett Affidavit, summarily arguing that "there is no duty in law to anticipatorily demonstrate the reliability or every component of an expert's opinion." (ECF No. 50 at 8). Plaintiff's interpretation of his duty to disclose, however, is inconsistent with his legal burden. Plaintiff bears the burden of laying the proper foundation for the admission of the expert

testimony, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999) (citing to *Daubert*, 509 U.S. at 592 n.10). Thus, Plaintiff's unsupported argument that he did not have an initial duty to demonstrate the reliability of Mr. Kennett's opinion until Tesla challenged the opinion is unpersuasive.

Nevertheless, as discussed below, the Court has reviewed and compared Mr. Kennett's initial expert report (ECF No. 28-2, hereinafter the "Kennett Report"), the Kennett Affidavit, and Mr. Kennett's deposition testimony (ECF No. 28-1, hereinafter, "Kennett Dep."), focusing on the three topics that Tesla challenges as "new" opinions.

*1.  Vehicle Crash Testing Results*

Tesla argues that the single-impact crash tests upon which Mr. Kennett relied are inapposite to the more severe multi-impact crash in this case. (ECF Nos. 28 at 9-13, 44 at 5-6). Relevant here, Mr. Kennett's Report states that:

- None of the impacts are of a likely fatal severity for an occupant seated in the driver's seat;

- The second frontal impact of 38 mph delta-V with a PDOF of 33-37 degrees is of the approximate severity of New Car Assessment Program (NCAP) 35 mph frontal barrier impacts, upon which vehicles are rated by NHTSA for their Star ratings.

- Also, in keeping with customary FMVSS 208 compliance requirements, Karco[5] conducted an unbelted, 25 mph, 30 degree right angle barrier test for Tesla of the subject model vehicle. While the FMVSS 208 unbelted impact speed of 25 mph is below the subject vehicle delta-V, the unrestrained driver's dummy achieved good occupant injury criteria well below the injury threshold values with wide compliance margins.[6]

---

[5] Capitalized terms not defined herein have the meaning set forth in the relevant record. Here, the record is Mr. Kennett's Report.

[6] During his deposition, Mr. Kennett also agreed in principle with the statement that "there is a greater risk of injury in multiple-impact crashes as opposed to single-impact crashes." Kennett Dep. 97:12-19. Nevertheless, Mr. Kennett also opined that, in this case, he did not see injuries beyond thermal injuries and did not see "a single bit of evidence in the vehicle of a pathological contact . . . ." Kennett Dep. 97:20-98:2.

Kennett Report at 4-5.

In comparison, the Kennett Affidavit states that:

• This testing represents foundational information regarding the performance of the vehicle's occupant restraints and structure in crash impacts.

• For instance, the testing formed under the [FMVSS] 208 is the regulatory standard test for restraint performance frontal impacts.

• That test is conducted by crashing vehicles into a flat immovable barrier. Automobiles in the field rarely impact flat immovable barriers. Still, that is the test model relied upon by the government for regulation and by the automakers for the safety ratings and extensive marketing efforts.

• The severity of an impact is commonly measured by Delta-V (change in velocity) during the impact. The tests relied upon present Delta-Vs which are in fact very similar to the reconstructed impact Delta-Vs from both sides' experts.

• In other words, each of the impacts of the subject vehicle with the curb, walls, pole, vegetation, and so on where less forceful than the impacts in the crash test results, and thereby even less likely to cause serious injury or death than the impacts involved in the crash tests upon which I relied.

Kennett Affidavit ¶¶ 17-19, 21-22.

Upon comparison, the Court concludes that the statements in the Kennett Affidavit regarding crash testing are consistent with Mr. Kennett's Report. More specifically, Mr. Kennett's Affidavit explains why he concludes that "dissimilarity [of single-impact crash testing] is an insubstantial distinction . . . , because all of the impact forces applied to [Barrett's] person in each of these multiple impacts were less than those forces measured in those [single-impact] test results, which themselves reflected no risk of fatal or serious personal injuries from those crash tests." Kennett Affidavit ¶ 20. Accordingly, the portion of the Kennett Affidavit regarding crash testing is admissible and Tesla's Motion to Strike is denied on this topic. *See, e.g., Mann v. Taser Int'l*, No. 05-CV-0273, 2007 WL 9712075, at *2 (N.D. Ga. Dec. 27, 2007) (denying motion to strike expert addendum affidavit where it did not disclose new opinion, was the result of additional research conducted after the expert's deposition, and would not prejudice defendant); *Impac*

*Warehouse Lending Grp., Inc. v. Reali*, No. 04-CV-426-FtM-33SPC, 2007 WL 9718612, at *4 (M.D. Fla. Jan. 17, 2007) (denying motion to strike supplemental expert report where it did not contain new opinion or prejudice the opposing party, and because it was relevant to a defense in the case).

2. *Deflation of Frontal Airbags*

Tesla next challenges Mr. Kennett's explanation in the Affidavit of why the deflation of the front airbags during the multiple-impact crash does not render his opinion unreliable. (ECF Nos. 28 at 12-13). In relevant part, Mr. Kennett's Report stated that:

> Based upon [his] inspection of the subject vehicle, the driver's occupant compartment exhibited no relevant impact-related survival space intrusion. Furthermore, interior structures surrounding the driver such as the steering wheel rim and column, instrument panel structural members, knee bolster area, and adjacent pillars showed no signs of serious occupant induced deformation or excessive contact loading. There were no signs of occupant overload of the restraint system either, such as strikethrough of the airbag onto the steering wheel or significant deformation of belt hardware structures. The inboard side of the right front passenger's seat showed no signs of significant driver's occupant contact as well. In sum, there was no apparent deformation or damage to the interior vehicle structures surrounding the driver's occupant compartment to indicate likely injurious or fatal driver contact.

Kennett Report at 4.

In comparison, the Kennett Affidavit states that:

> The deflation of the frontal airbags following the initial impacts in this case does not render unreliable my methodology and opinion for other reasons as well, including [Barrett's] use of his seatbelt, the absence of occupant-induced deformation of interior structures of the vehicle, the absence of external intrusion in [Barrett's] seating location, and all other circumstances negate the notion that Mr. Riley could have been killed or seriously injured from the forces of those subsequent impacts after airbag deflation.

Kennett Affidavit ¶ 26.

Based on a comparison of the statements above, the undersigned finds that Mr. Kennett's opinion in the Affidavit regarding the effect of deflation of the frontal airbags is consistent with his Report, which concluded that "the driver's occupant compartment exhibited no relevant

impact-related survival space intrusion." Kennett Report at 5. Moreover, the opinion that "the deflation of the frontal airbags following the initial impacts . . . does not render unreliable [Mr. Kennett's] methodology" is not a new opinion since Mr. Kennett testified during his deposition that although Barrett would not have the full benefit of the front and knee airbags, "there was enough frontal restraint to keep [Barrett] from pathologically interacting with the steering wheel and steering column." Kennett Dep. 88:25-89:5, 89:23-90:5. Accordingly, the portion of the Kennett Affidavit regarding the deflation of frontal airbags is admissible and Tesla's Motion to Strike is denied on this topic.

### 3. Sufficiency of Information

Tesla also challenges Mr. Kennett's statement that "the information [he] relied upon is sufficient upon which to base [his] opinion." (ECF Nos. 41-3 ¶ 14, 44 at 6). Clearly, a party cannot use a supplemental expert report to merely bolster an expert opinion. *In re Denture Cream Prods. Liab. Litig.*, No. 09-MD-2051, 2012 WL 3639045, at *4 (S.D. Fla. Aug. 23, 2012) ("supplementation is not appropriate whenever a party wants to bolster or submit additional expert opinions . . . .") (citation omitted). Here, the undersigned finds that Mr. Kennett's characterization of the sufficiency of the information upon which he relied is nothing but self-serving bolstering. Thus, this portion of the Kennett Affidavit is stricken and Tesla's Motion to Strike is granted on this topic.

Accordingly, Tesla's Motion to Strike the Kennett Affidavit is granted in part and denied in part as set forth above.

### C. Plaintiff's Accident Reconstruction Expert: Robert Caldwell

In his Report, Mr. Caldwell opined that "assuming the speed limiter was active, it could have made the curve." (ECF No. 29-1, hereinafter "Caldwell Report" at 9). In the Report, Mr. Caldwell used Lane 2 for his calculations. *Id.* According to Tesla, the subsequent Caldwell

Affidavit provides a new opinion (with a corresponding new diagram) that the lane in which the vehicle/Barrett was traveling is irrelevant.[7]  (ECF No. 44 at 5); *see also* (ECF No. 40-1, hereinafter "Caldwell Affidavit" ¶ 18).

In his Affidavit, Mr. Caldwell opined that "whether the Tesla at 85 mph begins in [L]ane 2, [L]ane 1 or the center-left turn lane, the Tesla would make the curve, as demonstrated by the diagram[.]"  Caldwell Affidavit ¶ 18.  Mr. Caldwell further explains that "[i]n either scenario, a beginning point in the center-left turn lane or in Lane 2, the Tesla could make the curve at 85 mph.  In short, the radii at 645.5 fee and at 85 mph can be moved at various points in the subject roadway to determine if the Tesla could make the curve at 85 mph."  *Id*. ¶ 19.  Plaintiff argues that this opinion is indistinguishable from that in Mr. Caldwell's Report that "[i]f the Tesla speed was limited to 85 mph the vehicle could have made the curve."  (ECF No. 50 at 8).  The undersigned disagrees.

In the Report, Mr. Caldwell's opinion was calculated using Lane 2.  Caldwell Report at 9.  During his deposition, however, Mr. Caldwell testified that he "could calculate [his analysis] for any other radius," *see* (ECF No. 29-2, hereinafter "Caldwell Dep." 117:12-17), but he did not do that calculation until Tesla challenged his opinion.  He also had not provided the diagram that he included in his Affidavit.  Caldwell Affidavit ¶ 18.  Accordingly, the Caldwell Affidavit provides a new opinion (and diagram) not found in Mr. Caldwell's Report, including additional calculations regarding different lanes and relevant radii.  *See, e.g., Companhia*, 2016 WL 3102225, at *7 (excluding supplemental report where expert could have offered his opinions earlier but waited until after motions for summary judgment and a *Daubert* challenge to provide a sworn explanation of why he inspected the wrong product); *Cochran*, 2009 WL 4823858, at *6 (concluding that

---

[7] Also material to this argument is whether the reference to "it" within the opinion referred to the Model S or to Barrett as the driver.  (Hr'g Tr. 45:7-47:2).  At the hearing, Plaintiff acknowledged "it" referred to both the vehicle and Barrett.  *Id*. 63:11-14, 71:20-72:18.

untimely expert disclosure of new testing was unprecedented and unfair); *Ocasio v. C.R. Bard, Inc.*, No. 13-CV-1962-T-36AEP, 2020 WL 7586930, at *5 (M.D. Fla. Dec. 22, 2020) (striking expert report, noting that supplementation was not an opportunity to repeat, tweak, streamline, or otherwise elaborate on prior opinion). Here, the difference in lanes is relevant to both the movement of the vehicle and the actions of the driver because a tighter turn radius may affect how a driver maneuvers a turn. (Hr'g Tr. 121:17-23). Moreover, Plaintiff has not satisfied his burden to show that the delayed disclosure of Mr. Caldwell's new opinion regarding the lanes was substantially justified or harmless.[8] Accordingly, Tesla's Motion to Strike that specific opinion in the Caldwell Affidavit is granted.

### D.  Plaintiff's Battery Expert: Ralph White, Ph.D.

Tesla moves to strike Dr. White's Declaration (ECF No. 42-2, hereinafter "White Declaration") for three main reasons.[9] First, Tesla challenges the statement in the Declaration that Tesla's expert "randomly harvested" a cell that met Dr. White's suggested wall thickness as opined in his initial Report. (ECF No. 44 at 3). Tesla also opposes Dr. White's statement that his methodology, known as "differential diagnosis" and discussed for the first time in his Declaration, is a scientifically accepted method of ruling out other potential causes. *Id*. Lastly, Tesla moves to strike Dr. White's assertion that although he may have used inconclusive language in his initial opinion, he now holds his opinions "within a reasonable degree of engineering certainty." *Id.* at

---

[8] The undersigned is also unpersuaded by Plaintiff's argument during the hearing on the Motions that the new diagram contained in the Caldwell Affidavit is akin to demonstrative evidence. (Hr'g Tr. 128:10-18). Demonstrative aids are not usually admitted as evidence. *Murphy v. Precise*, No. 16-CV-0143-SLB-DAB, 2017 WL 6033063, at *10 (M.D. Ala. Dec. 1, 2017). Therefore, if the new diagram is intended as a demonstrative exhibit, it has no place in a supplemental expert opinion on a significant issue.

[9] During the hearing, Tesla confirmed that it was withdrawing a fourth argument challenging Dr. White's reference to a patent for fire-retardant material. (ECF No. 44 at 4); *see* (Hr'g Tr. 109:21-24, 218:18-19).

4.  In response, Plaintiff asserts that Dr. White's Declaration is not a new opinion, but rather: (i)  a fair response to the Motion to Exclude under *Daubert* as Dr. White did not have to specify his methodology until it was challenged*;* and (ii)  a clarification that Dr. White holds his opinions "within a reasonable degree of engineering certainty."  (ECF No. 50 at 6-7).

   *1.  "Randomly harvested" cell thickness*

   In his initial Report, Dr. White opined that the thickness of the battery cells was too thin and then testified that the battery cells should have been greater than 0.2mm.  *See* (ECF No. 31-1, hereinafter "White Report" at 6, 20) (opining that battery cells were constructed with thinner can walls); White Dep. 108:16-109:1.  In the Motion, Tesla challenged the testimony on the basis of a CT scan (conducted by Tesla's expert) of an undamaged cell from the vehicle battery pack, confirming the thickness of the can wall to be 0.21mm, which met Dr. White's thickness standard. (ECF No. 31 at 16).  In response to Tesla's challenge, Dr. White's Declaration characterized the cell Tesla scanned as having been "randomly harvested" and noted that "there is no evidence that the thickness of the [harvested] cell is typical" of other cells.  (ECF No. 42-2 ¶ 12).

   The undersigned finds that Dr. White's statements in the Declaration regarding the thickness of the cell and his characterization that Tesla "randomly harvested" a cell is a new opinion.  First, at his deposition Dr. White had reviewed Tesla's expert report and was—or should have been—aware of the measurement of the cell wall, but failed to address or challenge that measurement in any way.  White Dep. 14:17-21 (confirming that he had reviewed the reports from Tesla's experts).  Moreover, contrary to Plaintiff's argument, Dr. White's characterization of the cell as "randomly harvested" is not a fact, but an untimely opinion to rebut the findings of Tesla's expert.  Accordingly, Tesla's Motion to Strike the White Declaration regarding cell thickness and characterization of a "randomly harvested" is granted.

   *2.  "Differential Diagnosis" Methodology*

It is undisputed that neither Dr. White's Report nor his deposition testimony discuss "differential diagnosis" as the methodology used for his opinion.  According to Plaintiff, "[i]t was only when [Dr. White's] opinion was challenged that the need arose for him to specify his methodology."  (ECF No. 50 at 6).  The undersigned disagrees.

Although "differential diagnosis" may be a generally recognized methodology, *see, e.g.*, *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d at 1365 (recognizing differential diagnosis as a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated), Dr. White failed to identify this methodology in his Report.  This lapse denied Tesla the opportunity to question Dr. White regarding differential diagnosis.  Moreover, Plaintiff has the burden to show that Dr. White's methodology is sufficiently reliable.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  Dr. White's Declaration, which for the first time mentions "differential diagnosis" as a methodology, fails to meet this burden.  Thus, Dr. White's Declaration regarding "differential diagnosis" is an inadmissible new opinion.  Moreover, Plaintiff has not shown that the delayed disclosure of Dr. White's methodology was substantially justified or harmless.  Accordingly, Tesla's Motion to Strike the White Declaration's discussion of "differential diagnosis" as a methodology is granted.

### 3. *Opinions held to "a reasonable degree of engineering certainty"*

In his Declaration, Dr. White concedes that at the time of his Report and deposition, he may have used language that seemed "inconclusive," including words like 'maybe' and 'possible.'"  White Declaration" ¶ 20.  In contrast, the Declaration asserts that his opinions "that the cell walls and lack of fire-retardant material resulted in runaway thermal propagation are opinions that [he] hold[s] within a reasonable degree of engineering certainty."  *Id.*  "[A] party,

however, cannot abuse Rule 26(e) to merely bolster a defective or problematic expert witness report." *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 719 (11th Cir. 2019).  In the Declaration, Dr. White is attempting to change and strengthen his prior equivocal statements to now assert his opinions with a reasonable degree of engineering certainty.  That is an improper and untimely disclosure.  Moreover, Plaintiff has not satisfied his burden to show that the delayed disclosure of Dr. White's opinions was substantially justified or harmless.  Accordingly, Tesla's Motion to Strike the White Declaration is granted on all issues and the Declaration is excluded in toto from the Court's analysis.

### III.   TESLA'S MOTIONS TO EXCLUDE EXPERT TESTIMONY UNDER *DAUBERT* (ECF NOS. 28, 29, 31)

### A.   Legal Standards

Federal Rule of Evidence 702 governs the admission of expert testimony.  More specifically, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if: (i) the testimony is based upon sufficient facts or data; (ii) the testimony is the product of reliable principles and methods; and (iii) the witness has applied the principles and methods reliably to the facts of the case.  Fed. R. Civ. P. 702; *Daubert,* 509 U.S. 579; *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003).  The subject of an expert's testimony must be "scientific knowledge," which implies a grounding in the methods and procedures of science.  *Daubert*, 509 U.S. at 589-90 (citations and quotations omitted).  Similarly, "knowledge" connotes more than subjective belief or unsupported speculation.  *Id.* (citations and quotations omitted).  The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."  *Id* at 590.

Rule 702 compels district courts to perform the critical "gatekeeping" function concerning the admissibility of expert evidence. *Frazier*, 387 F.3d at 1260. This function "inherently require[s] the trial court to conduct an exacting analysis" of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702. *Id.*; *see also McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) ("Rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology."). This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. *Daubert*, 509 U.S. at 592-93. Although there is no definitive checklist or test, courts have discussed several factors that bear on this inquiry. *Id.* at 593.

In determining the admissibility of expert testimony under Rule 702, courts must conduct a rigorous three-part inquiry on whether: (i) the expert is qualified to testify competently regarding the matters he intends to address; (ii) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (iii) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Frazier*, 387 F.3d at 1260 (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)); *see also Quiet Tech.*, 326 F.3d at 1340-41 (same). Furthermore, in ascertaining the reliability of a particular scientific expert opinion, courts consider, to the extent possible: (i) whether the expert's theory can be and has been tested; (ii) whether the theory has been subjected to peer review and publication; (iii) the known or potential rate of error of the particular scientific technique; and (iv) whether the technique is generally accepted in the scientific community. *Quiet Tech.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256); *see also FTC v. Simple Health Plans, LLC*,

No. 18-CV-62593, 2021 WL 810262, at *6 (S.D. Fla. Mar. 3, 2021) (discussing the factors that court's consider when assessing reliability).

Nevertheless, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. *Quiet Tech.*, 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256). Indeed, "[a] district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.' *Id.* (citing *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Quite the contrary, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Daubert*, 509 U.S. at 596).

Under *Daubert* and its progeny, the undersigned must apply these legal principles to evaluate the admissibility of the various opinions of Plaintiff's experts.

### B.    Plaintiff's Biomechanical Engineer: Kelly Kennett

Counts II (strict liability) and III (negligent design) of Plaintiff's Complaint allege that design defects in the Model S caused the vehicle to burst into flames during the accident. (ECF Nos. 1 ¶¶ 29, 30, 53-66, 41 at 2). Plaintiff concedes that "a central issue for the trier of facts . . . is whether [Barrett] would likely have survived the crash without serious injury in the absence of these [alleged] defects." (ECF No. 41 at 2). Mr. Kennett, Plaintiff's biomechanical engineer, has opined, among other things, that "[a]bsent the vehicle fire, there was no expectation or evidence that [Barrett] would have been fatally or even seriously injured in this crash."[10] (ECF No. 28 at 1); *see also* Kennett Report at 9. Tesla moves to exclude this two-line opinion in Mr. Kennett's Report.[11]

---

[10] The undersigned has concluded that Mr. Kennett's Affidavit is partially admissible on the issue of crash testing and deflation of the airbags. *See* II.B. *supra*.

[11] Tesla, however, had no objection to Mr. Kennett's other statement, including the preceding sentence that "[g]iven that Mr. Riley [was] a young[,] restrained occupant of an ordinary height

According to Tesla: (i) Mr. Kennett's opinion relies on "dissimilar vehicle testing" that is an unreliable methodology to opine on the injuries specific to this crash (ECF No. 28 at 9-17); (ii) the alleged lack of contact marks in the vehicle upon a visual inspection is an improper means of determining whether Barrett experienced an impact during the accident (*Id.* at 17-18); and (iii) Mr. Kennett's statement is an impermissible parroting of the medical examiner's opinion on cause of death.  (*Id.* at 18-19).  During the hearing on the Motions, Plaintiff agreed to strike the clause "absent the vehicle fire" from Mr. Kennett's two-line opinion.  (Hr'g Tr. 38:13-18).  Thus, the undersigned must determine whether the remaining clause—i.e. that "there was no expectation or evidence that Barrett would have been fatally or even seriously injured in this crash"—is admissible under the standards set forth in *Daubert*.

  *1.  Single-Impact Vehicle Crash Testing*

Mr. Kennett relied on ten different crash tests to form his opinion, including: (i) three tests from the National Highway Traffic Safety Administration ("NHTSA") New Car Assessment Program (involving front, pole, and side impacts); (ii) four tests by the Insurance Institute for Highway Safety ("IIHS") (involving front and side impacts); and (iii) three tests conducted by Tesla.  (ECF Nos. 28 at 10, 41 at 7); (Hr'g Tr. 13:17-21).  It is undisputed that all of the tests Mr. Kennett relied upon are single-impact crash tests and that no independent or government entity conducts multi-impact tests resembling the accident sequence in this case.  (ECF Nos. 28 at 12, 41 at 13).

According to Tesla, two of the main differences between the single-impact crash tests and the multi-impact crash sequence at issue here is that: (i) Barrett lacked the full benefit of the frontal

---

and weight with his occupant survival space maintained, he should likely enjoy the good impact injury outcomes predicted by the tests and confirmed by the lack of impact injuries noted at autopsy."  (Hr'g Tr. 20:18-21:4).

airbag restraint system, which would have deployed only once—after the first impact that meets the deployment criteria—and then deflate; and (ii) unlike the crash test dummies, various forces acting on Barrett "naturally moved him out of the 'normal seated'" position such that he lacked optimal seating position. (ECF No. 28 at 12-13). In Mr. Kennett's Affidavit, which the Court has found is admissible, Mr. Kennett explains that "the only airbags that would have deflated for the subsequent impacts in the sequence are the frontal airbags" and both Plaintiff's and Defendant's accident reconstruction experts "derive directions for the major impacts" that are primarily side impacts and not frontals. Kennett Affidavit ¶¶ 24, 26). Mr. Kennett, therefore, opines that the deflation of the frontal airbags following the initial impact does not render his methodology unreliable. *Id.* ¶ 26.

In terms of Barrett's seating position, Mr. Kennett opines that at the conclusion of the crash sequence, Barrett was restrained by his seat belt and never left his seated position, which is significant because it correlates with the likelihood of low injury. Kennett Dep. 41:18-42:5, 95:11-13; *see also* (ECF No. 41 at 16). Mr. Kennett also testified there is no evidence that Barrett suffered any facial fractures, which proves that he had enough frontal restraint to keep him from pathologically interacting with the steering wheel and steering column. Kennett Dep. 76:9-16, 88:17-89:8; *see also* (ECF No. 41 at 12-13). Ultimately, although Mr. Kennett does not dispute that a crash involving multiple-impacts is worse and has a much greater risk of injury, Kennett Dep. 96:4-7, he notes that the crash tests upon which he relies involved a higher Delta V force than those experienced in the instant crash sequence. (ECF No. 41 at 14). Thus, according to Plaintiff, the single-impact crash tests are not dissimilar and therefore reliable.

The admissibility of the "crash test" evidence depends upon a foundational showing of a substantial similarity between the test results being offered into evidence and the circumstances of the accident at issue in the litigation. *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 366

(W.D.N.Y. 1999) (citation omitted).  However, perfect identity between experimental and actual conditions is neither attainable nor required.  *Id*.  In fact, here, it is undisputed that multi-impact crash testing resembling the accident sequence at issue does not exist.  Moreover, although Tesla conceded that the crash tests may be presented to the jury to show Tesla's excellent performance, (Hr'g Tr. 13:25-14:3),[12] it nonetheless opposes Dr. Kennett's reliance on those same crash tests as a basis for his opinion on what would have happened to Barrett in this multi-impact scenario.  To be sure, there are differences between the crash tests and the actual crash sequence that Barrett experienced.  Those differences, however, do not make the crash tests so dissimilar as to render Mr. Kennett's methodology unreliable.  *See, e.g.*, *Guild*, 53 F. Supp. 2d at 366-68 (denying motion to exclude results of crash tests despite differences between the test and the actual collision).  Furthermore, Tesla will have ample opportunity to cross-examine Mr. Kennett regarding the dissimilarities between single-impact crash tests and the multi-impact crash sequence at issue here.  *Id.* (finding that differences in tests goes to weight and not admissibility); *cf. Finchum v. Ford Motor Co.*, 57 F.3d 526, 530 (7th Cir. 1995) (affirming the district court's exclusion of tests where they could confuse and prejudice the jury).  Accordingly, Mr. Kennett's reliance on single-impact crash tests is not a basis to exclude his opinion.

### 2.  *Visual Inspection of Vehicle Showing No Contact Marks*

Tesla next challenges as unreliable and irrelevant Mr. Kennett's opinion that the vehicle had no interior occupant contact marks, arguing that the fire consumed the plastic interior areas that would most likely reveal evidence of occupant contact.  (ECF No. 28 at 17 -18).  Tesla, therefore, disputes whether Mr. Kennett's visual inspection is a generally accepted means of

---

[12] Mr. Kennett also concedes that the Model S received superior ratings from IIHS, five stars from NHTSA (their highest rating), and performs "quite well" on the tests.  (ECF No. 28 at 10).

testing whether a passenger experienced an impact during the accident. *Id.* at 17.  In response, Plaintiff explains that Mr. Kennett inspected, measured, and photographed the vehicle to determine if there was evidence of substantial or deleterious occupant impact strikes.  (ECF No. 41 at 10). Although Mr. Kennett concedes that burning degrades some evidence, he asserts that burning assists in revealing evidence of deformation to metal structures, such as the steering wheel rim, the steering column, and the seat backs. *Id.*; Kennett Dep. 99:14-102:9.

The undersigned agrees with Tesla that, without more to support Mr. Kennett's methodology regarding lack of contact marks, Plaintiff has not shown that Mr. Kennett's visual inspection of the vehicle is a reliable method that: (i) can be and has been tested; (ii) has been subject to peer review and publication; (iii) has a known or potential rate of error; and (iv) the technique is generally accepted in the scientific community.  *Quiet Tech.,* 326 F.3d at 1341 (citing *McCorvey*, 298 F.3d at 1256); *see also Knepfle v. J&P Cycles, LLC*, No. 18-CV-543-T, 2021 WL 1845214, at *8 (M.D. Fla. May 7, 2021) (excluding expert opinion where plaintiff failed to show that visual inspection was reliable methodology).  Mr. Kennett's self-serving Affidavit to the contrary does not make it so.  At bottom, relying on a visual inspection of a vehicle consumed by flames to opine that there is no expectation or evidence that the driver would have been fatally or even seriously injured in a multi-impact crash is speculative.  Accordingly, Mr. Kennett's opinion regarding lack of contact marks upon a visual inspection does not support Mr. Kennett's conclusion regarding the likely that Barrett would have been injured.

### 3. *Parroting Medical Examiner*

Lastly, Tesla argues that Mr. Kennett is not a medical expert and should not permitted to opine on the cause of death.  (ECF No. 28 at 18).  Rather, as a biomechanic, Mr. Kennett can address forces present during the accident and whether such forces could cause injury.  *Id.*; *see Berner v. Carnival Corp.*, 632 F. Supp. 2d 1208, 1212 (S.D. Fla. 2009).  In response, Plaintiff

concedes that Mr. Kennett is not a pathologist or medical doctor, but has pathology training. (ECF No. 41 at 8-9). According to Plaintiff, Mr. Kennett can reasonably rely on the autopsy report for the factual determination of whether Barrett suffered any impact-related injuries. *Id.* at 9.

The undersigned agrees that Mr. Kennett may rely on the autopsy report to form his opinion. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010) (permitting an expert to adopt the finding of another expert). Indeed, Tesla does not object to Mr. Kennett's other statement that "the autopsy does not find any significant orthopedic or organic impact injuries," Kennett Report at 9, and concedes that Mr. Kennett is "free to opine about the absence of facial fractures or absence of evidence of impacts on the structures inside the vehicle." (ECF No. 46 at 5). That said, however, the autopsy report and the lack of impact injuries do not allow for Mr. Kennett to leap to the conclusion that "there is no expectation or evidence that [Barrett] would have been fatally, or even seriously, injured in this crash." Kennett Report at 9. Further, during the hearing on the Motion, Plaintiff conceded that he would be calling the medical examiner as a witness. (Hr'g Tr. 109:2-6). Therefore, the undersigned finds that Mr. Kennett's expert opinion (which merely parrots the examiner's) is inadmissible.

In sum, for the reasons noted above, the undersigned concludes that Mr. Kennett's opinion must be excluded as unreliable and speculative. Therefore, Mr. Kennett's statement that "there is no expectation or evidence that [Barrett] would have been fatally, or even seriously, injured in this crash" is inadmissible under *Daubert* and Tesla's Motion to exclude this statement is granted.

### C.   Plaintiff's Accident Reconstruction Expert: Robert Caldwell

Count I of Plaintiff's Complaint alleges that Tesla was negligent in removing the speed limiter from the Model S, which would have limited the top speed of the vehicle to 85 mph. *See* (Complaint); *see also* (ECF No. 29 at 2). In support of Count I, Plaintiff offers the opinion of Mr. Caldwell (Plaintiff's accident reconstructionist), who opined that "assuming the speed limiter

was active [limiting the driver to a top speed of 85 mph], it could have made the curve."

Caldwell Report at 9, Caldwell Dep. 109:7-10.  Although Tesla disagrees with other aspects of

Mr. Caldwell's reconstruction, it seeks only to exclude the one-sentence opinion above as

inadmissible based on the physics and capabilities of the vehicle, and Mr. Caldwell's lack of

qualifications to testify on driver input/human factors.  (ECF No. 29 at 1-3).  Lastly, Tesla argues

that the probative value of this opinion is outweighed by the danger of unfair prejudice, confusion

of the issues, and misleading the jury.  (ECF No. 29 at 3, 14).

Preliminarily and as noted above, the Court has already stricken the opinion in the Caldwell

Affidavit that "whether the Tesla at 85 mph begins in [L]ane 2, [L]ane 1 or the center-left turn

lane, the Tesla would make the curve, as demonstrated by the diagram[.]"  Caldwell Affidavit ¶ 18;

*see* II.C. *supra*.  That statement is a new opinion, which Mr. Caldwell cannot express in response

to Tesla's *Daubert* challenge.  Therefore, the undersigned now considers the admissibility of

Mr. Caldwell's one-sentence opinion in his Report (i.e., "assuming the speed limiter was active, it

could have made the curve"), focusing on the reliability of this statement in light of the physics

and capabilities of the vehicle and Mr. Caldwell's qualifications to opine on human factors and

driver input.

### 1.  The Physics and Capabilities of the Vehicle

Expert testimony must be based on "sufficient facts or data" and be "the product of reliable

principles and methods" that have been "reliably applied . . . to the facts of the case."  Fed. R.

Evid. 702.  "Every step of an expert's analysis must be 'supported by good grounds,' which 'means

that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's

testimony inadmissible.'"  *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1298 (N.D. Fla.

2017) (citation omitted).  To meet this standard, "[a]n expert's method need not be perfect, nor

must he apply it perfectly."  *Banta Props., Inc. v. Arch Specialty Ins. Co.*, No. 10-CV-61485, 2011

WL 13096149, at *4 (S.D. Fla. Dec. 20, 2011).  Rather, a minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible.  *See Quiet Tech.*, 326 F.3d at 1345-46 (concluding that failure to include variables will affect the probativeness of the analysis, not its admissibility).  However, where "the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions," exclusion of the expert's testimony is warranted.  *Navelski*, 244 F. Supp. 3d at 1298 (citation omitted).

Here, although Plaintiff argues that Mr. Caldwell's opinions are based on sufficient facts and data, *see* (ECF No. 40 at 7-9),  it is undisputed that Mr. Caldwell did not calculate the turning radius of the Model S from the center turning lane, where the vehicle was located as it entered the curve.  Caldwell Dep. 112:7-113:5.  Rather, Mr. Caldwell calculated the turning radius from Lane 2.  Although Plaintiff concedes that remaining in the center lane would result in a tighter turn radius, he argues that Barrett nonetheless had more space (i.e., two other available lanes) to make the turn at 85 mph.  (Hr'g Tr. 68:19-69:16).  As discussed previously, the turning radius from the center lane would be tighter than from Lane 2, and would make the curve harder to maneuver and require the driver to slow down.  Caldwell Dep. 115:9-23.  Thus, Mr. Caldwell's Lane 2 reconstruction reduces the severity of the turn and ignores the loss of traction that would result from a tighter turn radius.  For these reasons, the undersigned concludes that Mr. Caldwell's opinion is based on inaccurate calculations (i.e., using Lane 2) and is unreliable.  *See, e.g., Simple Health Plans*, 2021 WL 810262, at *8-9 (finding expert testimony unreliable where expert did not consider relevant areas of inquiry); *In re Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d at 1363 (excluding expert testimony based on a significant inaccurate factual premise); *see also Jordan v. Celebrity Cruises, Inc.*, No. 17-CV-20773, 2018 WL 3584702, at *8 (S.D. Fla. July 25, 2018), *report and recommendation adopted*, 2018 WL 4776336 (S.D. Fla. Sept. 21, 2018) (concluding that "expert evidence based on a fictitious set of facts is just as unreliable as evidence

based on no research at all.") (citation omitted); *Navelski*, 244 F. Supp. 3d at 1301 (excluding expert testimony when correcting error in expert's analysis essentially negated the expert's conclusion).

Additionally, Mr. Caldwell opines that the vehicle tires "theoretically" could have gripped the turn and safely maneuvered at 85 mph, *see* Caldwell Dep. 120:23-122:22, but he does not identify any scientific evidence or testing to support this opinion. *Knepfle*, 2021 WL 1845214, at *7 (plaintiff did not demonstrate reliability of expert opinion where expert cited no peer reviewed studies or publications and had an untested theory); *Ramkelawan v. Globus Med. Inc.*, No. 18-CV-100-OC-30PRL, 2019 WL 8267231, at *9 (M.D. Fla. Dec. 10, 2019) (excluding opinion on causation where expert failed to employ independent testing); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 (11th Cir. 2005) (rejecting expert's conclusion that is connected to existing data "only by the ipse dixit of the expert"). Based on these differences, Mr. Caldwell's opinion that "it could have made the curve" if the speed limiter had been active is speculative and inadmissible under *Daubert*.

### 2. *Human Factors/Driver Input*

The field of "human factors" concerns evaluating how an individual would have reacted in a given environment. *Padula v. Carnival Corp.*, No. 16-CV-23862, 2017 WL 7792714, at *5 (S.D. Fla. Oct. 13, 2017) ("Human Factors is concerned with the application of what we know about people, their abilities, characteristics, and limitations to the design of equipment they use, environments in which they function, and jobs they perform.") (citation omitted). One such consideration is whether a person can react quickly enough to avoid an accident. *See Mitchell v. Royal Caribbean Cruises, Ltd.*, No. 12-CV-22734, 2013 WL 8283958, at *5 (S.D. Fla. June 7, 2013) (finding expert unqualified to offer opinion on whether plaintiff would have been able to avoid a fall).

In the Motion, Tesla challenges Mr. Caldwell's qualifications to opine on the human factors of whether Barrett "could" or "would" have been able to safely maneuver the turn at 85 mph if the vehicle had a speed limiter.  (ECF No. 29 at 12-13).  Tesla further argues that, even if Mr. Caldwell was qualified to generally opine on the subject of human factors, he could not do so in this case because he knows nothing about Barrett's driving history, training, or reaction times.  *Id.* at 13. The undersigned agrees.

Although Mr. Caldwell is qualified as an accident reconstructionist, with more than 47 years of experience and more than 5,000 studied events, *see* (ECF No. 40 at 6), he is not sufficiently qualified on human factors to provide an expert opinion on what Barrett could or would have done in the circumstances of this crash.  *See, e.g., Mitchell*, 2013 WL 8283958, at *5 (excluding testimony because expert unqualified in human factors); *see Kessler v. NCL (Bahamas) Ltd.*, No. 19-CV-20583, 2019 WL 8128483, at *4 (S.D. Fla. Dec. 20, 2019) (excluding expert's opinion on "gait, signage, and visibility" where he was not qualified as human factors expert); *Padula*, 2017 WL 7792714, at *5 (without human factors expertise, witness was not qualified to offer expert opinions "regarding what [p]laintiff, or some other reasonable person, would have seen and how they would have reacted to it").  Additionally, Mr. Caldwell was generally unaware of Barrett's driving history or training, and did not review any studies regarding the distractibility of teenage boys while driving with passengers in the car.  Caldwell Dep. 116:18-118:2, 124:16-126:3. Although Plaintiff correctly notes that court's use a liberal policy for admissibility when evaluating an expert's qualifications, *see* (ECF No. 40 at 6), under the circumstances this case, the undersigned concludes that Mr. Caldwell is not qualified to opine on human factors relevant to

whether Barrett could have hypothetically made the curve if the Tesla's speed limiter had been activated.[13]

In sum, the undersigned finds that Mr. Caldwell's methodology is unreliable because he calculated the turn radius from a different lane (Lane 2) and he is not qualified to opine on human factors. Accordingly, Tesla's motion to exclude Mr. Caldwell's opinion is granted.

### D.      Plaintiff's Battery Expert: Ralph White

Lastly, Tesla seeks to exclude the opinion of Dr. White (Plaintiff's battery expert) that the fatal fire resulted from thermal runaway propagation caused by two alleged defects in the Model S lithium-ion battery.[14] *See generally* (ECF Nos. 31, 47). More specifically, Dr. White opined that: (i) the battery cell walls in the Model S battery pack were too thin, which increased the likelihood that the cell would go into thermal runaway and propagate other cells; and (ii) Tesla was testing fire retardant material that for some reason it chose not to use in the instant Model S battery. (ECF No. 47 at 4, 7); *see also* White Dep. 98:23-25, 117:9-20. Tesla argues that both opinions are unreliable and fail to satisfy Rule 702 or 403. In response, Plaintiff emphasizes Dr. White's extensive expertise as a battery design expert and argues that Dr. White's opinions are based on reliable principles and methods. *See generally* (ECF No. 42).

As noted above, the Court has stricken the White Declaration as inadmissible expert opinion. *See* II.D. *supra.* Accordingly, that Declaration is excluded from the Court's analysis of

---

[13] The Court is also unpersuaded by Plaintiff's argument that information from the Event Data Recorder ("EDR") effectively removes human factors from the evaluation. (ECF No. 40 at 6-7). "The EDR records the vehicle's speed and driver control inputs at half-second intervals for the five seconds preceding the system 'waking up' . . . at the time of the beginning of the crash. The driver control inputs include braking and steering." *Id.* at 6. This, however, says nothing about whether Barrett had the skills and abilities to safely maneuver the curve at 85 mph.

[14] Initially, Dr. White had opined about four alleged battery defects, but Plaintiff has since abandoned two theories and now pursues only two theories of a design defect: (i) thinness of the battery cell walls; and (ii) lack of fire retardant material between cells. *Compare* (ECF No. 31), *with* (ECF Nos. 42, 47).

Tesla's Motion to Exclude Dr. White's opinions under *Daubert.*  The Court has nevertheless reviewed Dr. White's Report and his deposition testimony and finds that, even under a liberal interpretation of admissibility under *Daubert*, Plaintiff has only partially met his burden to show that: (i) Dr. White's testimony is based upon sufficient facts or data; (ii) Dr. White's opinion is the product of reliable principles and methods; and (iii) Dr. White applied the principles and methods reliably to the facts of the case.  Fed. R. Civ. P. 702; *Daubert*, 509 U.S. at 579; *Quiet Tech.,* 326 F.3d at 1340.

> ### 1.  *Thickness of Battery Cell Walls*

Dr. White initially opined on the thickness of the battery cell walls based on his assessment of a totally different battery (the "BA" version) than the battery actually used in the Model S (the "BB" version).  White Dep. 97:5-98:25.  Nevertheless, when questioned about the different cells, Dr. White opined that "it is possible that the BB cells are also cells that would be considered to have a thin wall if you look at the variation in the thickness of the can walls."  *Id.* 100:19-24.  Moreover, Dr. White did not specify what would have been "strong enough" or "thick enough" to prevent the fire and was unaware of any standards, guidelines, or peer reviewed documentation concerning the thickness of the cylinder wall.  *Id.* 102:2-12, 104:18-22, 105:17-25, 106:21-107:4.

Additionally, although Dr. White recognized that "determin[ing] the thickness of the can walls in the [Model S] battery" would require "measuring the wall thickness of perhaps a major sample of the 7,000 cells or whatever might remain in order to determine what the actual average cell wall thickness is and what the center deviation is," Dr. White did not examine the battery cell walls of the Model S or investigate further.  *Id*. 100:25-101:25.  Rather, Dr. White based his opinion on "common knowledge" that the Panasonic battery was too thin.  *Id.* 100:13-24.  Dr. White's testimony was also framed as "probabilities" as he did not have a specific measure of how thick the battery cells should be or know of tests to determine how thick the cell wall would

have to be to prevent side rupturing.  *Id.* 108:19-109:2.  During continued questioning, Dr. White

ultimately testified that the battery cell thickness should have been greater than 0.2mm.  *Id.* 108:16-

109:2; *see also* (ECF No. 31-1 at 6, 20) (opining that battery cells were constructed with thinner

can walls).  Tesla rebutted Dr. White's testimony with a CT scan (conducted by Tesla's expert) of

an undamaged cell from the vehicle battery pack that confirmed the thickness of the wall to be

0.21mm, which met the standard suggested by Dr. White.  (ECF No. 31 at 16).  Against this factual

backdrop, Dr. White's opinions regarding the thickness of the cell walls are unreliable and

irrelevant based on inaccuracies in his methodology and insufficient information.  *See, e.g., In re

Denture Cream Prods. Liab. Litig.*, 795 F. Supp. 2d at 1363 (excluding as unreliable expert opinion

based on inaccurate factual premise); *Cook*, 402 F.3d at 1111 (affirming exclusion of expert

opinion that lacked factual foundation).  Accordingly, these statements are inadmissible as a basis

for Dr. White's opinion that the fire resulted from thermal runaway propagation.

### 2. *Use of Fire Retardant Intumescent Material Between Cells*

Tesla challenges Dr. White's opinion that "the safety of the Model S . . . could have been

improved by using an intumescent fire retardant material that expands when heated to seal around

items consumed by fire."  White Report at 5; *see also* (ECF Nos. 31 at 18-19, 47 at 7-8)

(challenging Dr. White's opinion on intumescent material as a potential fire retardant that allegedly

Tesla had but chose not to use in the Model S battery).  Although Tesla also argues that Dr. White

fails to account for other safety features that would have served as fire retardant material,

(ECF No. 47 at 7-8), Plaintiff clarifies that Dr. White's opinion dealt with the absence of fire

retardant material between the cells of the battery (e.g., blue visible material that was used in a

2011 Model 3) and not about other fire-retardant material around the battery pack itself (e.g., a

ceramic blanket on top of the battery pack).  (ECF No. 42 at 18).

The undersigned finds that Dr. White's opinion regarding the fire retardant intumescent material meets the liberal admissibility standard under *Daubert*.  Dr. White testified that upon a visual inspection of the battery, he did not see any material similar to the blue material that he had seen in testing of the 2011 Model 3.  White Dep. 120:20-121:6.  On this limited point, the undersigned finds that Dr. White's visual inspection is a reliable method and Dr. White applied the principles and methods reliably.  Tesla, of course, is free to cross-examine Dr. White on this point.

To summarize, Tesla's Motion to exclude Dr. White's opinion is granted in part and denied in part.  More specifically, Dr. White's opinion regarding cell wall thickness is excluded as unreliable, but his opinion regarding the lack of intumescent fire retardant material is admissible under *Daubert*.  Accordingly, the undersigned concludes that Plaintiff has met the minimum admissibility standard for Dr. White's opinion that the fatal fire resulted from thermal runaway propagation based on the lack of intumescent material in the Model S battery.

## IV.   TESLA'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 34)

### A.   Legal Standards

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(a).  An issue is genuine if "a reasonable trier of fact could return judgment for the nonmoving party."  *Miccosukee Tribe of Indians v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id*. (quoting *Anderson*, 477 U.S. at 247-48).

The movant shoulders the initial burden of demonstrating the absence of a genuine issue of material fact.  *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once the movant satisfies this burden, "the burden shift[s] to the nonmoving party to demonstrate that there is indeed

a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Rule 56 requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Mid-Continent Cas. Co. v Arpin & Sons, LLC*, 261 F. Supp. 3d 1245, 1249-50 (S.D. Fla. 2017) (quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "Thus, the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleadings, but must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 1250 (citing *Anderson*, 477 U.S. at 248).

In considering a motion for summary judgment, it is not the Court's duty or function to try or decide factual issues. *Gross v. S. Ry. Co.*, 414 F.2d 292, 297 (5th Cir. 1969).[15] Rather, "[i]ts only duty is to determine whether or not there is an issue of fact to be tried." *Id.* Further, the Court must consider all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Stanley Indus., Inc. v. W.M. Barr & Co., Inc.*, 784 F. Supp. 1570, 1572 (S.D. Fla. 1992) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir. 1994). If a genuine issue of fact exists for trial, summary judgment should not be granted. *See* Fed. R. Civ. P. 56(a). An issue of fact is genuine if the record taken as a whole could lead a reasonable jury to find for the nonmoving party. *Burgos v. Chertoff*, 274 F. App'x 839, 841 (11th Cir. 2008) (citation omitted).

---

[15] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981), this Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to the close of business on September 30, 1981.

**B.    Claims based on Door Handle and Failure to Warn**

In response to Tesla's Motion for Summary Judgment, Plaintiff confirms that he is not pursuing the claims for defective door handles under Counts II and III.  (ECF No. 38 at 17); *see also* Joint Pretrial Stipulation (ECF No. 76 at 10).  Thus, partial summary judgment on the claims alleged in Paragraphs 56(e)-(f) of Count II and 62(e)-(f) of Count III of the Complaint is appropriate.[16]  Plaintiff has also confirmed that he is not pursuing the claims based on failure to warn regarding a product defect.  (ECF No. 38 at 17).  Therefore, summary judgment on the claims alleged in Paragraphs 56(h) of Count II and 62(h) of Count III of the Complaint is also appropriate.[17]  Accordingly, Tesla's Motion for Summary Judgment is granted in part on the two claims discussed above.  Tesla must file a proposed judgment on those claims by the date set forth below.

**C.    Speed Limiter Claim**

In Count I of the Complaint, Plaintiff alleges that Tesla was negligent for deactivating the speed limiter without consent from or notice to the Rileys.  (ECF No. 1 ¶ 48).  Relevant to Count I and as noted above, the Court granted Tesla's Motion to Exclude the opinion of Mr. Caldwell that "assuming the speed limiter was active [limiting the driver to a top speed of 85 mph], it could have made the curve."  Caldwell Report at 6, Caldwell Dep. 109:7-23.  Mr. Caldwell's opinion  has been excluded and, therefore, cannot assist to establish causation.

---

[16] Those counts initially alleged that: (i) the Model S was not reasonably escapable in the event of a foreseeable accident resulting in battery fire and loss of power; and (ii) the Model S door handles were improperly designed and prevented rescuers from extracting occupants after an accident. (ECF No. 1 ¶ 56(e)-(f)).

[17] Those counts alleged that the Model S failed to contain adequate warnings to users and their passengers of the defective and unreasonably dangerous condition of the vehicle.  (ECF No. 1 ¶¶ 56(h) and 62(h)).

Nevertheless, Plaintiff's remaining theory of liability regarding the speed limiter relies on Plaintiff's testimony. More specifically, Plaintiff alleges that "[i]f the speed limiter had remained in place—instead of being removed without [Plaintiff's] knowledge or consent—the accident would not have happened" because Plaintiff would not have permitted Barrett to drive the Model S. (ECF Nos. 1 ¶ 51, 39 ¶ 38, 39-2 ¶ 9). Thus, the Court considers whether the negligence claim based on Tesla's removal of the speed limiter survives summary judgment. *Shiver,* 549 F.3d at 1343 (noting that the movant shoulders the initial burden of demonstrating the absence of a genuine issue of material fact); *Clark*, 929 F.2d at 608 (concluding that once the movant satisfies its burden, "the burden shift[s] to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.").

Under Florida Supreme Court precedent,[18] in a cause of action for negligence:

> the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.

*Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So.2d 1015, 1018 (Fla. 1984); *see also Prieto v. Total Renal Care, Inc.*, 843 F. App'x 218, 225 (11th Cir. 2021). Here, Plaintiff has submitted a Declaration that if he had been informed that Tesla had removed the speed limiter from the Model S, he would not have allowed Barrett to drive the car. (ECF Nos. 1 ¶ 51, 39-2 ¶¶ 9, 100). In reply, Tesla argues that what Plaintiff would have done under different circumstances is impermissible speculation. (ECF No. 49 at 2-3).

---

[18] The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). (ECF No. 1 ¶ 10). A federal court sitting in diversity applies the substantive law of the state in which the case arose. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1132-33 (11th Cir. 2010).

The case law that Tesla relies upon, however, is distinguishable. *See, e.g., Kurtz v. Young*, No. 08-CV-80355, 2009 WL 1490578, at *3-4 (S.D. Fla. May 26, 2009) (citing cases receding from *Drackett Products Co. v Blue*, 152 So.2d 463 (Fla. 1963)); *see also* (Hr'g Tr. 179:12-15).   In *Drackett*, a mother testified that she had not read a portion of the label on a Drano can instructing to keep water out of the can.  *Drackett*, 152 So.2d at 464.  Under those circumstances, the court held that what the mother might have done had she read the entire label or otherwise known about the explosive potential of Drano when combined with water, would be improper and conjectural. *Drackett*, 152 So. 2d at 465.  Additionally, more recent cases have permitted relevant and competent testimony and distinguished *Drackett*.  *See, e.g.*, *Kurtz*, 2009 WL 1490578, at *3-4 (allowing evidence of what plaintiff would have done had he known about restrictions on a parcel of land and noting that courts have receded from *Drackett*—which relied on Florida state law— whereas admissibility of evidence in federal court is governed by the Federal Rules of Evidence). Here, unlike *Drackett*, there is evidence through Plaintiff's Declaration that he would not have allowed Barrett to drive the Model S had he known that the speed limiter had been removed.  (ECF No. 39-2 ¶¶ 9, 100).  Moreover, there is evidence the Rileys insisted that the speed limiter be installed, stating that the speed limiter would "save lives," and confirmed that a loaner vehicle they used had an active speed limiter.  (ECF No. 39 ¶¶ 92-94).

Ultimately, the question of proximate cause is for the jury unless reasonable persons could not differ in their determination of the question.  *LeMaster v. Glock, Inc.*, 610 So.2d 1336, 1338 (Fla. 1st DCA 1992) (noting that where questions of negligence are close, any doubt should always be resolved in favor of a jury trial) (citations omitted).  The circumstances under which a court may resolve the question of proximate cause as a matter of law are extremely limited.  *LeMaster*, 610 So.2d at 1338.  Therefore, in viewing the evidence in the light most favorable to Plaintiff—as the Court must do—the undersigned finds that Plaintiff has met his burden to show that Tesla's

removal of the speed limiter without consent or notice from the Rileys may have affected the events in this case. *Prieto*, 843 F. App'x at 225 (noting that the nonmoving party must introduce on a reasonable basis for the conclusion that it is more likely than not that the conduct of defendant was a substantial factor in bringing about the result) (citation omitted). Accordingly, Tesla's Motion for Summary Judgment regarding the negligence claim related to the speed limiter is denied based on Plaintiff's testimony that had he would not have allowed Barrett to drive the vehicle had he been informed that Tesla had removed the speed limiter from the Model S.

### D.    Battery Defect Claim

Count III of Plaintiff's Complaint alleges that Tesla was negligent in that the Model S battery cells and battery pack failed to include materials to mitigate or contain thermal runaway or fire, including, among other things, an intumescent material to provide protection against the propagation of thermal runaway from one cell to adjacent cells. (ECF No. 1 ¶ 62(c)); *see also* (ECF No. 76 at ¶ 6(e) (Joint Pretrial Stipulation) (an issue of fact to be ligated is whether the Model S contains a defect in the design due to its failure to use intumescent material as a fire retardant in the lithium-ion battery pack).

In relevant part, Tesla's Motion for Summary Judgment regarding the claim of a defective battery focuses on purported deficiencies in the testimony of Dr. White (Plaintiff's battery design expert). (ECF No. 34 at 6-11). As discussed above, Tesla moved to exclude Dr. White's opinion as unreliable and challenged specific topics within the opinion. *See* II.D. *supra; see also* (ECF No. 31). The Court has: (i) excluded Dr. White's Declaration as an untimely expert opinion (II.D *supra*); and (ii) excluded part of Dr. White's Report under *Daubert* as inaccurate and unreliable (III.D.1 *supra*). Nevertheless, the Court allowed Dr. White's limited opinion regarding the lack of intumescent fire retardant material between battery cells, *see* III.D.2 *supra*, and this limited opinion is considered in determining whether a genuine issue of material facts exist for trial.

Under Florida law, a strict products liability action based upon design defect requires the plaintiff to prove that: (i) a product; (ii) produced by a manufacturer; (iii) was defective or created an unreasonably dangerous condition; (iv) that proximately caused; (iv) an injury. *Pierre v. Intuitive Surgical, Inc.*, 476 F. Supp. 3d 1260, 1269 (S.D. Fla. 2020), *aff'd*, 854 F. App'x 316 (11th Cir. 2021). To satisfy this burden, plaintiff must provide "more than a mere scintilla of evidence of a defect" and cannot "simply rely on legal conclusions or evidence which would be inadmissible at trial." *Id.* (citation omitted). Plaintiff must also provide expert testimony to prove a design defect, and failure to provide such testimony is fatal to Plaintiff's claim. *Id.* at 1269 (citation omitted). Additionally, "[p]roducts liability does not make the manufacturer an insurer of all foreseeable accidents which involve its product . . . An action is not maintainable in products liability merely because the design used was not the safest possible." *Hernandez v. Altec Environmental Prods., LLC*, 903 F. Supp. 2d 1350, 1360 (S.D. Fla. 2012); *see also Pinchinat v. Graco Children's Prods., Inc.*, 390 F. Supp. 2d 1141, 1148 (M.D. Fla. 2005) ("[A] manufacturer does not have to make a product accident proof.").

Here, in relevant part, Dr. White has opined that: (i) "[t]he safety of the battery pack in the Tesla Model S . . . could have been improved by using an intumescent fire retardant material that expands when heated to seal around items consumed by fire," White Report at 5; (ii) "Tesla did not use a fire-retardant material that may have prevented thermal runaway propagation," *id.* at 20; and (iii) "Tesla chose not to use an intumescent material on the lithium-ion battery cells in their Tesla Model S . . . . This decision led to a less safe battery pack." *Id.* The undersigned must consider all inferences drawn from Dr. White's opinion and testimony in the light most favorable to Plaintiff and resolve all doubts against Tesla. *Davis v. Williams*, 451 F. 3d 759, 763 (11th Cir. 2006). Thus, although tenuous, Dr. White's opinion sufficiently supports Plaintiff's battery defect

claim so as to survive summary judgment.[19]   Rather, based on the admissible evidence, the undersigned concludes that there is a triable issue of fact on whether the vehicle's battery was defective based on the lack of intumescent material.   At trial, Plaintiff must meet his burden of proving that the lack of intumescent fire retardant material in the Model S battery pack created an unreasonably dangerous condition.

Accordingly, the Court denies Tesla's Motion for Summary judgment on the battery claim based on the admissible testimony of Dr. White regarding the lack of intumescent material.

### E.      Punitive Damages

Plaintiff initially alleged punitive damages in the "Wherefore" clause of all three Counts in the Complaint.  (ECF No. 1 at 12, 14, 15).  Presently, Plaintiff confirms that he will not be seeking punitive damages on Count II (negligence based on design defect) or Count III (strict products liability).  (ECF No. 38 at 18).  Plaintiff, therefore, concedes that partial summary judgment on the claim for punitive damages is appropriate on those two Counts.  *Id.; see also* (Hr'g Tr. 142:23-143:14).

The parties, however, disagree on whether Plaintiff sufficiently alleged facts to support punitive damages under Count I, which asserts a claim of negligence based on Tesla's removal of the speed limiter without the Rileys' consent or knowledge.  *Compare* (ECF Nos. 34 at 15-17, 49 at 7-10), *with* (ECF No. 38 at 18).  Plaintiff is correct that Tesla's Motion for Summary Judgment

---

[19] Indeed, an expert opinion that something is "unreasonably dangerous" is an inadmissible legal conclusion.  *See, e.g., Holley v. Carnival Corp.*, No. 20-CV-20495, 2021 WL 5371507, at *9-10 (S.D. Fla. Nov. 18, 2021) (excluding as inadmissible legal conclusion that conditions posed an "unreasonable" risk); *Feldman v. Target Corp.*, No. 19-CV-419, 2021 WL 112794, at *2-3 (M.D. Fla. Mar. 29, 2021) (compiling cases where courts have excluded expert testimony amounting to legal conclusions); *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 19-MD-2885, 2021 WL 765019, at *46-47 (N.D. Fla. Feb. 28, 2021) (excluding as legal conclusions expert opinions that defendant's conduct was "unreasonable," or "unreasonably dangerous").   Therefore, Dr. White's opinion that the battery pack was "less safe"—as opposed to "unreasonable dangerous"— is not fatal to this claim.

on punitive damages focuses on claims that are no longer at issue relating to the design of the battery and the door handle (within Count I), with no mention of the negligence claim (also within Count I) regarding the removal of the speed limiter.  (ECF No. 34 at 15-18).  During the hearing, Tesla confirmed that it did not address whether punitive damages were proper under Count I for negligence because Tesla did not believe that the claim was properly pled and the pretrial stipulation does not reference punitive damages as to that Count.[20]  (Hr'g Tr. 159:11-18, 182:20-183:11).

Without deciding the merits of the claim for punitive damages under Count I (alleging negligence based on the removal of the speed limiter), the undersigned denies the Motion for Summary Judgment for procedural reasons.  First, arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.  *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).  Here, Tesla raised the issue of wavier for the first time in its Reply on the Motion for Summary Judgment.  (ECF No. 49 at 7-10).  Therefore, Tesla waived that argument by not raising it in its initial Motion for Summary Judgment.  Conversely, the Court rejects Tesla's argument that Plaintiff waived his punitive damages claim under Count I by failing to address it in the Joint Pretrial Stipulation.  (Hr'g Tr. 183:6-7).

Under Florida law, a plaintiff seeking punitive damages must plead a reasonable basis for recovery of punitive damages.[21]  § 768.72, Fla. Stat.  Here, Plaintiff has alleged "outrageous"

---

[20] The Joint Pretrial Stipulation does include the waiver of punitive damages under Count II (negligence based on design defect) and Count III (strict products liability).  (ECF No. 76 ¶ 7(e)).

[21] More specifically, a defendant may be held liable only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence, which is in turn defined as: (i) having actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage; or (ii) conduct so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct. Fla. Sat. § 768.72(2)(a)-(b); *see also Smith v. Ceres Marine Terminals, Inc.,* No. 20-CV-1666-WWB-GJK, 2021 WL 3111614, at

conduct.  (Hr'g Tr. 171:9-15); (Complaint ¶¶ 3, 26).  Therefore, for procedural reasons and in light of the allegations of "outrageous" conduct in the Complaint, the issue of whether there is sufficient evidence to prove punitive damages under Count I is better addressed at the conclusion of the evidence and not at this summary judgment stage.  (Hr'g Tr. 175:21-176:1).

Accordingly, Tesla's Motion for Summary Judgment on the claims of punitive damages is granted in part and denied in part.  At this stage of the litigation, it is denied without prejudice on Count I alleging negligence based on the removal of the speed limiter.  The Motion, however, is granted as to Counts II and III based on the parties' agreement.

**V.**     **CONCLUSION**

For the reasons set forth above, it is hereby **ORDERED AND ADJDUGED** that:

1.     Tesla, Inc.'s Motion to Exclude Testimony of Plaintiff's Biomechanic Expert Kelly Kennett (ECF No. 28) is **GRANTED**;

2.     Tesla, Inc.'s Motion to Exclude Certain Testimony of Plaintiff's Expert Robert Caldwell (ECF No. 29) is **GRANTED**;

3.     Tesla, Inc.'s Motion to Exclude the Testimony of Plaintiff's Expert Ralph White Under Federal Rules of Evidence 702 and 403 (ECF No. 31) is **GRANTED IN PART AND DENIED IN PART**;

4.     Tesla, Inc.'s Motion for Summary Judgment (ECF No. 34) is **GRANTED IN PART AND DENIED IN PART**.  Within **14 days** from the date of this Order, Tesla must file a proposed Judgment on the specific claims upon which the Court grants summary judgment; and

---

*3 (M.D. Fla. Mar. 31, 2021) ("the plaintiff must allege facts demonstrating that the defendant's conduct amounted to intentional misconduct or gross negligence"); *Douse v. Bos. Sci. Corp.*, 314 F. Supp. 3d 1251, 1264 (M.D. Fla. 2018) (noting that "punitive damages can only be awarded where a pleading provides a 'reasonable basis' for an allegation that a party acted with 'intentional misconduct or gross negligence.'").

5.      Tesla, Inc.'s Motion to Strike Plaintiff's Expert Affidavits (ECF No. 44) is **GRANTED IN PART AND DENIED IN PART**.  More specifically, the motion is **GRANTED IN PART AND DENIED IN PART** regarding Mr. Kennett and **GRANTED** as to Mr. Caldwell and Dr. White.

**DONE AND ORDERED** in Chambers, at Fort Lauderdale, Florida, on this May 11, 2022.

ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc:  Counsel of Record

41